# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DAVEL CHINN,

                          :

        Petitioner,                      Case No. 3:02-cv-512

                          :          District Judge Edmund A. Sargus, Jr.
     -vs-                                Magistrate Judge Michael R. Merz

WARDEN, Mansfield Correctional
  Institution,

                          :

        Respondent.

---

## REPORT AND RECOMMENDATIONS

---

This is a capital habeas corpus case brought pursuant to 28 U.S.C. § 2254, now before the

Court for decision on the merits.

### Background Facts

The Ohio Supreme Court summarized the facts of the crime as follows:

> On the evening of January 30, 1989, Davel "Tony" Chinn, appellant,
> completed a midterm examination at Cambridge Technical Institute
> in Dayton. Later that night, fifteen-year-old Marvin Washington saw
> appellant near Courthouse Square in downtown Dayton.
> Washington, who had known appellant for approximately one year,
> knew him only by the name of "Tony." Washington and appellant
> spent part of the night drinking beer and loitering around the
> downtown area. At some point, appellant showed Washington a .22
> caliber nickel-plated revolver and suggested that they look for
> someone to rob. At approximately 11:00p.m., Washington went into
> an adult bookstore on South Ludlow Street and was ejected from the
> store because of his age. Thereafter, Washington and appellant

loitered in the area of South Ludlow Street looking for someone to rob.

Meanwhile, Gary Welborn and Brian Jones had pulled their cars into a parking lot at the corner of South Ludlow Street and Court Street and had parked side-by-side in opposite directions to converse with each other through their driver's side windows. Appellant and Washington spotted the two men and decided to rob them.

Washington approached Jones's vehicle from the rear, and appellant approached Welborn's car from the rear. Appellant pulled out a small silver revolver, pressed it against the side of Welborn's head, and demanded money. Welborn saw Washington's face, but he was unable to see the face of the gunman. Welborn handed his wallet to Washington, and Jones handed his wallet to the gunman. According to Welborn, "the guy with the gun said we'd better have at least a hundred dollars between us or he'd kill us both." After emptying the victims' wallets of money, the two assailants began discussing which car they wanted to steal. Following a brief discussion, they decided to steal both cars. Washington got into the driver's side of Jones's car and forced Jones into the passenger's seat. Appellant instructed Welborn to remain still. As appellant began walking toward the back of Welborn's vehicle, Welborn seized the opportunity to escape. At trial, Welborn testified, "The guy, he comes around. He starts walking around my car, telling me not to touch my keys. He still has the gun pointed at me. I watch him in my rearview mirror and sideview mirror. As soon as he gets behind my car, I duck down. I thought he was going to kill me now or later anyway so I ducked down in my car seat, threw it in drive, and took up off [sic] Ludlow the wrong way, straight to the police station." Welborn arrived at the station at approximately 11:30 p.m., and reported the incident to police.

After Welborn had escaped, appellant got into the back seat of Jones's car and held the revolver to Jones's neck while Washington drove the car away from Dayton and toward an area in Jefferson Township. At some point, appellant instructed Washington to turn the vehicle around and to pull over to the side of the road. Washington complied with appellant's instructions. After Washington had stopped the car, he leaned forward in the driver's seat so that appellant could exit the two-door vehicle from the driver's side. According to Washington, appellant got out of the car

and walked around to the passenger's side. Appellant then got Jones out of the car and shot him. Appellant and Washington drove away from the scene in Jones's automobile. While fleeing from the scene, appellant told Washington that he shot Jones because Jones could have identified them and because Jones "didn't have enough money." Appellant told Washington that he had shot Jones in the arm.

Stacy Ann Dyer lived at 5500 Germantown Pike in Jefferson Township. Dyer witnessed the shooting but did not see the gunman's face. Dyer testified that on January 30, 1989, at approximately 11:30 p.m., she had just arrived home and parked in her driveway facing the street. At that time, Dyer saw a black two-door Chevrolet Cavalier pull off to the side of the road on Germantown Pike. Dyer observed a man get out of the driver's side of the vehicle and walk over to the passenger's side. She also saw the silhouette of a person exiting the vehicle from the passenger's side. The two people then walked to the back of the car. At that moment, Dyer heard a gunshot and a scream. The victim ran through Dyer's yard and fell to the ground in her neighbor's yard. Dyer then saw the black car speed away from the scene. Dyer ran inside her house and informed her father and her sister what had happened. Dyer's sister called police, and Dyer and her father went outside to check on the victim. They found the victim, Brian Jones, on his knees with his face to the ground. Dyer asked the victim whether he was injured, but Jones did not respond. When police and paramedics arrived at the scene, Jones was still breathing but was unconscious. He never regained consciousness and was pronounced dead on arrival at the hospital.

Dr. David M. Smith performed the autopsy. Smith found that Jones had died as a result of a massive acute hemorrhage due to a gunshot wound to his arm and chest. Smith found that the projectile had entered through Jones's left arm, had proceeded directly into Jones's chest, and had perforated the main pulmonary artery. Smith recovered the .22 caliber lead projectile from an area near the base of Jones's heart. Carl H. Haemmerle, an expert in firearms, examined the .22 caliber projectile and determined that it had been fired from a revolver. He also examined the sweatshirt that Jones had been wearing at the time of the shooting. Evidence revealed that the muzzle of the weapon had been in direct contact with the garment at the time the shot was fired.

Following the shooting, Washington and appellant drove in Jones's car to 5214 Lome Avenue in Dayton. There, Washington introduced appellant to Christopher "Bay" Ward. Ward testified that, on January 31, 1989, at approximately 12:30 or 1:00 a.m., Washington had pulled up to 5213 Lome Avenue in the black Chevrolet Cavalier and had introduced Ward to a man named "Tony," who was seated in the front passenger's seat. Ward spoke to Washington for approximately thirty to forty-five minutes until Washington and the man he was with drove away. Later that night, Washington returned to Lome Avenue and told Ward that "Tony" had shot someone in Jefferson Township.

On February 5, 1989, police arrested Washington based on information they had received from Ward. Washington confessed to police and named Tony as the killer. However, Washington was unable to give police the suspect's last name and address. On February 7, Washington helped police prepare a composite sketch of Tony. Later, after police had nearly exhausted all leads in their search for Tony, the composite sketch was released to the news media. On Wednesday, February 22, 1989, a Dayton area newspaper printed the composite sketch along with an article indicating that the suspect's name was Tony.

Shirley Ann Cox worked as a receptionist in her husband's law office. On Thursday, February 23, two men walked into the office. One of the men identified himself as Tony Chinn and requested to see Cox's husband. Cox informed the man that her husband was not available. That night, while Cox was reading the previous day's newspaper, she saw the composite sketch of the suspected killer. She said to her husband, "My God, I don't believe this." "This Tony Chinn that was in [the office] this morning is in the paper." On Friday, February 24, Cox called police to inform them that she had seen the suspect and that his name was Tony Chinn.

After speaking to Cox, police obtained a photograph of appellant and placed it in a photo array with the pictures of five other men. On February 24, police showed the photo array to Washington and to Ward. Washington positively identified appellant as the killer. Additionally, Ward identified appellant as the man he had seen in the passenger's seat of the victim's car-the man Washington had referred to as "Tony." That same day, on February 24, police arrested appellant in connection with murder.

On February 27, police conducted a lineup. Washington, Ward, Cox,

Dyer, and Welborn all viewed the lineup. Dyer and Welborn could not identify appellant. Welborn attempted to make a selection based on the voices of the subjects but chose someone other than appellant. Ward and Cox were able to positively identify appellant. Washington initially indicated that the killer was not in the lineup. However, after leaving the room where the lineup was conducted, Washington summoned Detective David Lantz into an interview room and told him that number seven in the lineup (appellant) was the killer. Washington explained to the detective that he had previously indicated that appellant was not in the lineup out of fear that appellant was able to see him through the screen in the room where the lineup was conducted.

*State v. Chinn*, 85 Ohio. St. 3d 548, 553, 709 N.E.2d 1166, 1173 (1999).

## Procedural History in the State Courts

Petitioner was indicted on March 3, 1989, by the Montgomery County Grand Jury on one count of aggravated murder in violation of Ohio Rev. Code § 2903.01 (B) and on three counts of aggravated robbery in violation of Ohio Rev. Code § 2913.02. In addition, he was also charged with one count of kidnapping in violation of Ohio Rev. Code § 2905.01 and one count of abduction under Ohio Rev. Code § 2905.02 (A)(2). Chinn was also charged with three death penalty specifications: 1) that the aggravated murder was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense (Ohio Revised Code § 2929.04(A)(3)), 2) that the aggravated murder occurred during the course of an aggravated robbery ( Ohio Revised Code § 2929.04(A)(7)), and 3) that the offense was committed during the course of a kidnapping (Ohio Revised Code § 2929.04(A)(7)). In addition each count had a firearm specification and counts two through five carried a prior felony specification. A Montgomery County jury found Chinn guilty on all counts. On September 1, 1989, the trial judge accepted the recommendation and sentenced Chinn to death

with an additional sentence of fifteen to twenty-five years on counts two, four, and five; fourteen to twenty-five years on count three; seven to ten years on count six; and three years on each firearm specification.

On direct appeal to the Montgomery County Court of Appeals, Chinn raised the following assignments of error:

Assignment of Error No. I

The trial court's failure to grant the defense motion for individual sequestered voir dire and the limitations placed by the trial court on defense counsel's questioning of prospective jurors constitutes an abuse of discretion which violated appellant's rights to an impartial jury, fair trial, and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Assignment of Error No. II

The prosecutor's misconduct throughout Appellant Chinn's capital trial denied appellant his due process right to a fair trial.

Assignment of Error No. III

The trial court erred during Appellant Chinn's capital trial by either failing to instruct the jury on important issues or by erroneously instructing the jury.

Assignment of Error No. IV

The trial court erred to the prejudice of Appellant Chinn by failing to grant the motion for bill of particulars.

Assignment of Error No. V

The sentencer's consideration of duplicative aggravating

circumstances tipped the weighing process against Appellant Chinn, destroyed the reliability of the sentencing process and resulted in the arbitrary and capricious imposition of the death sentence in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

Assignment of Error No. VI

The trial court erred in allowing the irrelevant and prejudicial testimony of state's witness Shirley Cox.

Assignment of Error No. VII

The trial court erred in allowing Detective Lantz to offer hearsay evidence of state's witness Shirley Cox concerning lineup identification.

Assignment of Error No. VIII

The trial court committed error when it allowed the admission of victim impact statement by way of the testimony of the victim's mother at the sentencing hearing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

Assignment of Error No. IX

The trial court erred in its weighing of aggravating circumstances against mitigating factors pursuant to R.C. 2929.03.

Assignment of Error No. X

The trial court erred in failing to excuse for cause prospective jurors that were biased against the appellant, which violated appellant's rights to an impartial jury, fair trial, and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 5, 10, and 16, Article I of the Ohio Constitution.

Assignment of Error No. XI

The trial court erred in failing to grant discovery as authorized by the local rules in violation of appellant's rights to equal protection and due process.

Assignment of Error No. XII

The withholding of evidence favorable to the appellant, by a prosecutor and those persons acting under his direction and control, violated the appellant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and denied the appellant a fair trial.

Assignment of Error No. XIII

The trial court erred in determining that death was the only appropriate punishment in this case. The death sentence is excessive and disproportionate to sentences imposed in similar cases thereby resulting in cruel and unusual punishment and a denial of due process in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

Assignment of Error No. XIV

The trial court erred in communicating with the jury during its deliberations outside the presence of the defendant or his counsel.

Assignment of Error No. XV

The trial court erred in failing to grant appellant's motion for acquittal when insufficient evidence was presented to sustain a conviction.

Assignment of Error No. XVI

A conviction cannot stand when it is against the weight of the evidence presented at trial.

Assignment of Error No. XVII

The trial court erred in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9, 10, and 16, Article I of the Ohio Constitution when it oversentenced appellant to nine years of actual incarceration for offenses involving a single firearm.

Assignment of Error No. XVIII

The trial court erred to the prejudice of Appellant Chinn by allowing jurors to take notes during appellant's trial.

Assignment of Error No. XIX

The trial court erred in failing to supply defense counsel with the statement of witness Gary Welborn pursuant to an in camera inspection under Crim. R. 16(B)(1)(G) in violation of Appellant's Chinn's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

Assignment of Error No. XX

The trial court erred by prohibiting defense counsel from using a public record, in defense counsel's possession, to impeach state's witness Christopher Ward. This error denied Appellant Chinn his rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Assignment of Error No. XXI

The trial court erred when it did not allow the composite prepared by Marvin Washington to be viewed by the jury during the testimony of Marvin Washington and Shirley Cox. This error denied Appellant Chinn his rights as guaranteed by the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

## Assignment of Error No. XXII

The trial court improperly admitted hearsay evidence during the guilt phase of Appellant Chinn's trial, in violation of Ohio Rule of Evidence 802, thereby depriving Appellant Chinn of the reliability and fairness required in a capital trial by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 5, 9, 10, and 16, Article I of the Ohio Constitution.

## Assignment of Error No. XXIII

The trial court violated Appellant Chinn's Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution when inflammatory and gruesome photo-slides of the victim were admitted during the guilt phase of the trial.

## Assignment of Error No. XXIV

Appellant Chinn was denied a fair trial and his rights as guaranteed by the Sixth Amendment through the failure of his defense counsel to make appropriate and timely objections.

## Assignment of Error No. XXV

The trial court erroneously denied defense counsel's motion that a complete copy of the prosecutor's file be made and sealed for appellate review.

## Assignment of Error No. XXVI

The state and the trial court applied an incorrect standard in "death-qualifying" Appellant Chinn's jury.

## Assignment of Error No. XXVII

> The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed requirements, and, thus, are unconstitutional both on their face and as applied to Appellant Chinn.

(Return of Writ, Doc. No. 24, Apx. Vol. II at 56.)

The court of appeals affirmed Chinn's conviction but reversed the death sentence, holding that the trial court had erred, post-jury recommendation, in its sentencing. *State v. Chinn*, 1991 Ohio App. LEXIS 6497 (2nd Dist. 1991)("Chinn 1st DirApp"). Specifically the court found that the trial court erred in making the findings required by Ohio Revised Code § 2929.03(D)(3) and (F)[1] prior to imposing a sentence of death and in failing to merge the multiple gun specifications for offenses involving a single firearm. The court of appeals vacated the actual incarceration sentence on two of the three gun specifications and affirmed a single term. The sentence of death was vacated and the case remanded to the trial court for proper sentencing proceedings. *Id*. at 48-67, 80-81,102.

On remand, the trial court reexamined the propriety of Chinn's sentence and on December 4, 1994, resentenced him to death. Chinn again appealed to the Second District Court of Appeals and raised the following assignments of error:

> Assignment of Error No. I
>
> The trial court erred in failing to grant Appellant Chinn a re-sentencing hearing upon remand from this court when the sentence of death was a possibility.
>
> Assignment of Error No. II

---

[1] Weighing of aggravating circumstances against mitigating factors.

The trial court erred when, without the appellant being present, the court re-sentenced him to death.

Assignment of Error No. III

The death sentence imposed against Davel Chinn was an unlawful sentence and must be vacated.

Assignment of Error No. IV

The trial court's erroneous weighing process mandates reversal of Mr. Chinn's death sentence.

Assignment of Error No. V

The sentence of death is not appropriate.

Assignment of Error No. VI

The trial court erred in determining that death was the only appropriate punishment in this case. The death sentence is excessive and disproportionate to sentences imposed in similar cases thereby resulting in cruel and unusual punishment and a denial of due process in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

(Return of Writ, Doc. No. 24, Apx. Vol. VII at 48.)

The court of appeals concluded that the trial court had again erred in sentencing because Chinn was not permitted the right to be present during his resentencing in violation of Ohio R. Crim. P. 43(A) and again vacated the sentence of death and remanded the case. *State v. Chinn*, 1996 Ohio App. LEXIS 2530, *22-23 (2nd Dist. 1996)("Chinn 2nd DirApp").

On remand, the trial court held a sentencing hearing, with Chinn present and sentenced him

to death for the third time. Chinn appealed this decision to the court of appeals and raised the following errors:

> Assignment of Error No. I
>
> The sentence of death is not appropriate
>
> First Issue Presented for Review
>
>> The procedure for imposing the sentence of death violated the Eighth and Fourteenth Amendments.
>
> Second Issue Presented for Review
>
>> The imposition of the sentence of death for the third time in a six year period violates the Constitution's prohibition against cruel and unusual punishment.
>
> Third Issue Presented for Review
>
>> The aggravating circumstance does not outweigh the mitigating factors.
>
> Fourth Issue Presented for Review
>
>> The sentence of death is disproportionate to similar cases from Montgomery County.

(Return of Writ, Doc. No. 24, Apx. Vol. X at 14.)

The court of appeals affirmed the sentence. *State v. Chinn*, 1997 Ohio App. LEXIS 3614 (2nd Dist. 1997)("Chinn 3rd DirApp"). Chinn then appealed his conviction and sentence to the Ohio Supreme Court raising the following propositions of law:

> Proposition of Law No. I
>
> When a jury is allowed to consider nonstatutory aggravating circumstances because it receives inadequate guidance through a lack

of instruction, or erroneous instruction during the penalty phase, and duplicative aggravating circumstances are not merged, the resulting death sentence is unreliable and cannot stand.

Proposition of Law No. II

Where the aggravating circumstances are not proved beyond a reasonable doubt, the death penalty is not appropriate.

Proposition of Law No. III

The death sentence in Appellant Chinn's case is excessive and disproportionate to sentences imposed in similar cases.

Proposition of Law No. IV

The cumulative effect of prosecutorial misconduct throughout Chinn's trial violated his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Proposition of Law No. V

The accused's rights to a jury trial, to due process, and to a reliable capital sentencing hearing are denied when the trial court fails to define an essential element of an aggravating circumstance, that makes the accused death eligible.

Proposition of Law No. VI

A trial court abuses its discretion when it allows the introduction of irrelevant and prejudicial evidence and further allows inadmissible hearsay to be introduced in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Proposition of Law No. VII

A resentencing procedure in a capital case violates due process and

infringes the defendant's right against cruel and unusual punishment, when the defendant is resentenced to death without a recommendation by the trial jury that convicted him, and the resentencing court excludes relevant mitigation, and the resentencing court fails either to independently weigh the mitigation and aggravation or state the reasons why the aggravation outweighs the mitigation.

Proposition of Law No. VIII

Insufficient evidence to sustain a conviction of aggravated murder is presented where the state relies entirely on the testimony of a co-defendant whose testimony is suspect and reliable, independent evidence rebuts this testimony.

Proposition of Law No. IX

Ohio Revised Code Ann. § 2929.03(D)(1)(Anderson 1996) renders R.C. §§ 2929.04(A) and (B) unconstitutionally vague.

Proposition of Law No. X

Where a jury, during its deliberations, communicates with the trial court, and the court, out of the presence of the parties, provides erroneous, substantive instructions to the jury, a new trial is warranted.

Proposition of Law No. XI

A capital defendant's conviction and death sentence must be overturned where he was denied his right to a fair and impartial jury because the trial court unfairly limited his questioning, refused to conduct individual sequestered voir dire, and failed to excuse jurors who could not be fair and impartial.

Proposition of Law No. XII

In order for a capital defendant to be assured equal protection and due

process of law, the trial court must see that the state complies with all discovery rules and turns over exculpatory material before trial. Where there are indications that the state is not complying with these rules, the prosecutor's file must be sealed for appellate review.


## Proposition of Law No. XIII

The accused's rights to due process, to a fair trial, and to confrontation are denied when the trial court denies the accused an opportunity to challenge the identification testimony of the state's witnesses.


## Proposition of Law No. XIV

A jury should not be instructed that the defendant may be found guilty as an accomplice to aggravated murder when the evidence adduced at trial does not reasonably support that instruction. Whenever the jury is charged that a capital defendant may be found guilty as the principal offender, or an accomplice acting with prior calculation and design, the defendant is entitled to unanimous verdict on one of those alternative theories.


## Proposition of Law No. XV

A jury instruction that shifts the burden of proof on the *mens rea* element of any offense to the accused, or reduces the state's burden of proof, violates the due process clause.


## Proposition of Law No. XVI

The accused is denied due process and a fair trial when the trial court fails to give a jury instruction that informs the jury of the problems with identification testimony.


## Proposition of Law No. XVII

The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the state is permitted to convict upon a standard of proof below proof beyond a

reasonable doubt.

Proposition of Law No. XVIII

Constitutional error results when the trial court's penalty phase instructions keep the jury from considering nonstatutory mitigation factors.

Proposition of Law No. XIX

A capital defendant's right to a reliable and nonarbitrary death sentence under the Eighth and Fourteenth Amendments is violated when the sentencing jury's responsibility for its verdict is attenuated by the trial court's instructions.

Proposition of Law No. XX

A capital defendant's right to reliable sentencing under the Eighth and Fourteenth Amendments to the United States Constitution is violated when the trial court refuses to instruct the jury that it may consider mercy in its penalty phase deliberations.

Proposition of Law No. XXI

It is constitutional error for the trial court to consider victim impact evidence in capital sentencing in the form of an opinion by a victim's family member about the defendant's inability to be rehabilitated and about the proper punishment for the defendant.

Proposition of Law No. XXII

The accused's right to the effective assistance of appointed counsel is denied when counsel's errors and omissions undermine confidence in the result of the trial.

Proposition of Law No. XXIII

The defendant is entitled to a new trial when the cumulative effect of

trial error renders the conviction unreliable, and when the evidence against the defendant is not overwhelming.

Proposition of Law No. XXIV

The appellant's right to due process under the Fourteenth Amendment to the United States Constitution is violated by the ineffective assistance of counsel in the court of appeals.

Proposition of Law No. XXV

Ohio's death penalty laws are unconstitutional. The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution establish the requirements for a valid death penalty scheme. Ohio Rev. Code Ann. Sections 2903.01, 2929.02, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 (Anderson 1996). Ohio's death penalty statute does not meet the prescribed constitutional requirements and is unconstitutional on its face and as applied to Appellant Chinn.

(Return of Writ, Doc. No. 24, Apx. Vol. XI at 16.)

The Ohio Supreme Court upheld both Chinn's conviction and sentence. *State v. Chinn*, 85 Ohio St. 3d 548, 709 N.E.2d 1166 (1999)("Chinn OhioSCt"). The United States Supreme Court denied *certiorari* on January 18, 2000. *Chinn v. Ohio*, 528 U.S. 1120 (2000).

On September 20, 1996, Chinn filed his petition for Post-Conviction Relief in the Montgomery County Court of Common Pleas under Ohio Revised Code § 2953.21. The State moved for summary judgment and the trial court dismissed the post-conviction petition as being "premature." Chinn then filed a second post-conviction proceeding on March 14, 1997, raising the following claims:

First Claim for Relief

Petitioner's convictions and/or sentences are void or voidable because defense counsel failed to present the testimony of an expert

on eyewitness identification at petitioner's capital trial. Petitioner was prejudiced by the ineffective assistance of counsel.


Second Claim for Relief

Petitioner's convictions and/or sentences are void or voidable because trial counsel were ineffective for failing to obtain an expert to present evidence to the jury that Marvin Washington's mental retardation impacted on his ability to testify as to the facts in this case.


Third Claim for Relief

Petitioner's convictions and/or sentences are void or voidable because counsel failed to investigate and present relevant, available mitigating evidence.

      A.     Evidence of good prison conduct while awaiting trial at the Montgomery County Jail.

      B.     Additional evidence of residual doubt.

          1.     Testimony that petitioner was at home when this crime occurred.

          2.     Testimony of an expert witness regarding the unreliability of eyewitness testimony.

          3.     Testimony and evidence impeaching the state's chief witness and co-defendant Marvin Washington.

              a.     Testimony of an expert witness regarding Washington's mental retardation and its effect on his ability to identify petitioner and relate what happened the night of this crime.

              b.     Testimony of petitioner regarding an incident that occurred before Washington's testimony when Washington was brought into the courtroom so petitioner could be pointed out to him.

              c.     Juvenile records of Washington in which the following impeachment material was obtained:

                  1)     psychological report dated March 2, 1989, in which

Washington's IQ was 48, placing him in the moderately retarded range.

2)  Neuropsychological assessment, performed on 10/10/87 and 10/26/87. These records indicated Washington had congenital cranial abnormalities associated with impaired brain functioning. These records also indicated that Washington "is sensitive to the opinions of persons in authority."

3)  Chemical abuse assessment from March 8, 1989 concerning his chemical abuse at the time of this crime. Washington admitted to the examiner that he was under the influence of chemicals the night of this offense and that he "forgot some of the night."

4)  Social history and social history update, prepared August 24, 1987, March 29, 1989. This report indicates that Washington has poor vision which requires corrective lenses but that he refuses to wear them.

d.  Supplemental police report of February 7, 1989, which indicates that Washington described "Tony" as "a black male, 22 years old, approximately 5-7 to 5-8, 160-170 lbs. and clean shaven. He stated that in fact he is built much like himself." At trial Washington described "Tony" as 5-7, bigger and heavier than himself, more muscular and with a mustache.

4.  Police witness statement from Christopher Ward taken on 2/5/89, as well as the sixteen page report of Major McKeever in which

> Christopher Ward stated he did not pay attention to the person in the car with petitioner because he was looking at the dashboard of the car which was digital. The statement of Ward, which was written by him also indicates that there may be some sort of mental impairment.

Fourth Claim for Relief

Petitioner's conviction and/or sentence are void or voidable because the aggravating circumstance does not outweigh the mitigating factors in his case, rendering the death sentence inappropriate and unconstitutional.

Fifth Claim for Relief

Petitioner's conviction and/or sentence are void or voidable because petitioner's resentencing was conducted by a biased judge.

Sixth Claim for Relief

Petitioner's convictions and/or sentences are void or voidable because he has been denied a meaningful proportionality review by the Ohio courts.

Seventh Claim for Relief

Petitioner's conviction and/or sentences are void or voidable because death by electrocution constitutes a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pain, and diminishes the dignity of man.

(Return of Writ, Doc. No. 24, Apx. Vol. XV at 18.)

The trial court granted the State's motion for summary judgment. (Return of Writ, Doc. No. 24, Apx. Vol. XV at 327.) Chinn appealed to the court of appeals, which affirmed the trial court's decision in part, but remanded for an evidentiary hearing on the claim of ineffective assistance of

counsel for failing to obtain experts to challenge the testimony of witness Marvin Washington. *State v. Chinn*, 1998 Ohio App. LEXIS 3857 (2nd Dist. 1998)("Chinn 1st PCApp"). The evidentiary hearing was held on February 10, 2000. (Trial T.p. Vol VI at 1-208.) The trial court denied relief, Chinn appealed, but the court of appeals this time affirmed the decision of the trial court. *State v. Chinn*, 2001 Ohio App. LEXIS 3127 (2nd Dist. Ohio 2001)("Chinn 2nd PCApp"). Chinn then appealed to the Ohio Supreme Court which declined to take jurisdiction. *State v. Chinn*, 93 Ohio St. 3d 1473, 757 N.E. 2d 772 (2001).

## Proceedings in this Court

Chinn filed his Petition for Writ of Habeas Corpus in this Court on November 4, 2002, pleading the following grounds for relief:

> First Claim for Relief
>
> Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the State of Ohio failed to provide the defense with exculpatory and favorable evidence prior to trial. U.S. Const. amends. V, VI, XIV.
>
> Second Claim for Relief
>
> Petitioner's due process right to a fair trial and fair penalty phase was violated by the cumulative effect of prosecutorial misconduct. U.S. Const. amend. XIV.
>
> Third Claim for Relief
>
> Petitioner's due process right to a fair trial was violated by the introduction of the irrelevant and prejudicial testimony of State's witness Shirley Cox. U.S. Const. amend. XIV.
>
> Fourth Claim for Relief

Petitioner's right to confront a material witness against him was violated when the trial court restricted his cross-examination of Christopher Ward. U.S. Const. amends. VI, XIV.

Fifth Claim for Relief

Petitioner's right to confrontation was violated by the admission of prejudicial hearsay evidence at his trial. U.S. Const. amends. VI, XIV.

Sixth Claim for Relief

Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance in failing to present expert testimony and in failing to cross-examine the State's key witness based on information contained in the witness's juvenile records at Petitioner's capital trial. U.S. Const. Amends. VI, XIV.

Seventh Claim for Relief

Petitioner's right to trial by jury and due process were violated because the trial court failed to define "principal offender," an essential element of aggravating circumstances that made petitioner eligible for the death penalty. U.S. Const. amends. VI, XIV.

Eighth Claim for Relief

Petitioner's due process right to a fair trial and his right to equal protection were violated because the State of Ohio failed to provide timely discovery and the State failed to disclose material evidence. U.S. Const. amend. XIV.

Ninth Claim for Relief

Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance at both phases of petitioner's capital trial. U.S. Const. Amends. VI, XIV.

## Tenth Claim for Relief

Petitioner's convictions violate the Due Process Clause as the State's evidence was insufficient to prove the element of identity. U.S. Const. amend. XIV.

## Eleventh Claim for Relief

Petitioner's right against cruel and unusual punishment and his right to due process were violated by multiple errors in the jury instructions at the penalty phase. U.S. Const. amends. VIII, XIV.

## Twelfth Claim for Relief

The penalty phase instructions kept petitioner's jury from considering all relevant mitigating factors. U.S. Const. amends. VIII, XIV.

## Thirteenth Claim for Relief

Petitioner's right to due process and his right against cruel and unusual punishment were violated because he was denied his right to present all relevant mitigating evidence to the sentencer, on remand to the trial court and he was also sentenced to death without a valid recommendation from his trial jury on remand to the trial court. U.S. Const. amends. VIII, XIV.

## Fourteenth Claim for Relief

Petitioner's right to due process and his right against cruel and unusual punishment were violated when his jury was misinstructed to be unanimous in order to find that aggravating circumstances did not outweigh mitigating factors. U.S. Const. amends. VIII, XIV.

## Fifteenth Claim for Relief

Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance in failing to investigate, prepare, and present compelling mitigation evidence during the penalty phase of Petitioner's trial. U.S. Const. Amends. VI, VIII, XIV.

Sixteenth Claim for Relief

Petitioner's due process right to a fair trial was violated because he was denied his right to be present when the trial court gave supplemental jury instructions. U.S. Const. amend. XIV.

Seventeenth Claim for Relief

Petitioner's right to be tried and sentenced by a fair and impartial tribunal was violated because the State trial judge presiding over Petitioner's trial and sentencing was biased. U.S. Const. amends. V, VI, VIII, IX, XIV.

Eighteenth Claim for Relief

Petitioner's right against cruel and unusual punishment and the right to due process were violated when a victim impact statement with opinions about punishment and petitioner's potential for rehabilitation was made at the capital sentencing hearing. U.S. Const. amends. VIII, XIV.

Nineteenth Claim for Relief

Petitioner's right against cruel and unusual punishment and his right to due process were violated because O.R.C. § 2929.03(D)(1) renders O.R.C. § 2929.04 (A) and (B) unconstitutionally vague. U.S. Const. amends. VIII, XIV.

Twentieth Claim for Relief

Petitioner's right to due process was violated by the ineffective assistance of counsel in his first appeal as of right to the Ohio Court of Appeals of Montgomery County. U.S. Const. amend. XIV

(Petition, Doc. No. 3.)   After the Petition was filed, Respondent filed a Motion to Dismiss

Procedurally Defaulted Claims. (Doc. No. 18.)  Judge Sargus granted that Motion in part, ordering

Claims 5(C), 7, 11, 14, 17, and 19 dismissed as procedurally defaulted and Claims 9(D) and 9(I) dismissed on the merits (Opinion and Order, Doc. No. 30, PageID 569.)

## Standard of Review and Generally Applicable Law

The Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") took effect on April 24, 1996. Because Chinn filed his petition thereafter, this case is subject to the provisions of the AEDPA. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003); *Mason v. Mitchell*, 320 F.3d 604, 613 (6th Cir. 2003); *Herbert v. Billy*, 160 F.3d 1131 (6th Cir. 1998), *citing Lindh v. Murphy,* 521 U.S. 320 (1997), and *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1998).

28 U.S.C. § 2254(d), as amended by the AEDPA, provides:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim-
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Any factual finding made by the state courts is presumed to be correct and a petitioner must

rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).  A state

court's decision is contrary to the Supreme Court's clearly-established precedent if (1) the state court

applies a rule that contradicts the governing law as set forth in the Supreme Court case law, or (2)

the state court confronts a set of facts that is materially indistinguishable from those in a decision

of the Supreme Court and nonetheless arrives at a result different from Supreme Court precedent.

*Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).   A state court's decision involves an

unreasonable application of clearly established federal law "if the state court identifies the correct

governing legal rule [from the Supreme Court] but unreasonably applies it to the facts of the

particular state prisoner's case," "if the state court either unreasonably extends a legal principle from

[Supreme Court] precedent to a new context where it should not apply[,] or [if the state court]

unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529

U.S. at 407-08.

### Procedural Default

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his
> federal claims in state court pursuant to an adequate
> and independent state procedural rule, federal habeas
> review of the claims is barred unless the prisoner can
> demonstrate cause of the default and actual prejudice
> as a result of the alleged violation of federal law; or
> demonstrate that failure to consider the claims will
> result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th

Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he

could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977);

*Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977). *Wainright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainright v. Sykes*, 433 U.S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 433 U.S. 72, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, *citing County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F.2d at 138.


## Ineffective Assistance of Counsel


The general governing standard for effective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694; *see also Darden v. Wainright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987); *see generally* Annotation, 26 ALR Fed 218.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial, counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988). Counsel must be appointed on appeal of right for indigent criminal defendants. *Douglas v. California*, 372 U.S. 353 (1963); *Anders v. California*, 386 U.S. 738 (1967); *United States v. Cronic,* 466 U.S. 648 (1984). The right to counsel is limited to the first appeal as of right. *Ross v. Moffitt*, 417 U.S. 600 (1974); *Lopez v. Wilson*, 426 F.3d 339 (6th Cir. 2005). The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.") Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *See Smith v. Murray*, 477 U.S. 527 (1986). However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-

29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland,* 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002). "Counsel's performance is strongly presumed to be effective." *McFarland,* 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).

**ANALYSIS**

**First Claim for Relief**

> Petitioner's rights under the Fifth, Sixth, and Fourteenth
> Amendments were violated when the State of Ohio failed to provide
> the defense with exculpatory and favorable evidence prior to trial.
> U.S. Const. amends. V, VI, XIV.

In his first claim for relief Chinn argues that his conviction must be reversed because the

State failed to disclose impeaching evidence about its witness Marvin Washington, specifically that

Washington was moderately retarded with neuropsychological deficits which might have impacted

his credibility. (Petition, Doc. No. 3 at 8);(Traverse, Doc. No. 27, PAGEID 285.)  Petitioner alleges

that the guilt against him was not overwhelming and that this impeachment evidence, had it been

revealed to him, may have been a pivotal point in his defense. (Traverse, Doc. No. 27, PAGEID 285-

292.)

Respondent defends this claim on the merits, arguing that the Second District Court of

Appeals was correct in its reasoning and in applying the relevant legal standards. (Return of Writ,

Doc. No. 24, PAGEID167); *citing State v. Chinn*, 2001 Ohio App. LEXIS 3127, *26 (2nd Dist.

2001)("Chinn 2nd PC App").  Respondent asserts that the state courts thoroughly reviewed the claim,

reviewed trial records, ordered an evidentiary hearing, and concluded that the evidence of mental

retardation was not as strong as Chinn suggests. (Return of Writ, Doc. No. 24, PAGEID 167.)

Before turning to the claim at hand, the Court first turns to the state court's holdings on the

issue of Washington's possible mental retardation, as the two issues are intertwined:

> Further, we have carefully reviewed Washington's testimony at
> Chinn's trial.  His testimony is remarkably coherent and consistent.
> We do not agree with Everington's testimony that, during Chinn's
> trial, Washington had been unable to recall important facts from the
> night of the crime, had not understood questions, and had given

inconsistent and inappropriate answers. Although Washington was unable to give times for many of the events during the evening, he testified that he had not been wearing a watch. While Washington was unable to remember some facts about the evening of the crime, such as with which hand Chinn had held the gun, Washington did remember other very specific facts, such as what he had worn on the night of the crime, the general type of clothing that Chinn had worn, that Jones' car had had a digital clock, and that Chinn had been drinking a sixteen ounce "big mouth Micky" when he had first seen him. Further, although Washington admitted during his testimony that he could not read or write in cursive, we do not believe that such abilities were required for Washington to accurately identify Chinn.

Washington picked Chinn from a photo spread, after not picking suspects from earlier photo spreads that had not contained Chinn's photograph. Thus, although mentally retarded people might be eager to please authorities, assuming Washington was mentally retarded, he must not have been eager enough to please authorities to immediately pick a suspect from the first photo spread or to immediately identify Chinn during the police lineup. Finally, although mentally retarded people might generally have a decreased accuracy rate in making later identifications, such decreased accuracy rate does not mean Washington's identification of Chinn was wrong. In fact, Washington's familiarity with Chinn prior to the night of the crime likely increased his accuracy rate in identifying him. As Martin testified, a person's level of adaptive functioning is not apparent from his IQ scores. The witnesses who came in contact with Washington prior to Chinn's trial thought that, while Washington might not have been especially bright, he would have passed "muster" and that his story was consistent and plausible.

Considering all of the evidence on the record, we cannot conclude that there is a reasonable probability that had Chinn's counsel called experts on eyewitness identification and mental retardation, the result of the trial would have been different. Thus, we will not conclude that the trial court erred in concluding that Chinn's counsel was not ineffective for failing to call experts on eyewitness identification and mental retardation.

*Chinn 2nd PCApp.*, 2001 Ohio App. LEXIS 3127, *26-28.

Analyzing this claim under *Brady v. Maryland*, 373 U.S. 83 (1963), the Court of Appeals

-33-

held:

Chinn argues that the prosecutor's failure to disclose psychological reports, social history reports, neuropsychological reports, and juvenile court personnel evaluations from Washington's juvenile court records constituted a *Brady* violation. Assuming *arguendo*, that Chinn did not waive his argument regarding a *Brady* violation by failing to raise it in his original petition for post-conviction relief, we will address this argument.

The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S. Ct. At 1196-1197; see *State v. Treesh* (2001), 90 Ohio St. 3d 460, 475, 739 N.E.2d 749, 767. "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Johnston* (1988), 39 Ohio St. 3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L. Ed. 2d 481.

We cannot conclude that the non-disclosed records were evidence that was material to Chinn's guilt or punishment because we do not believe that there is a reasonable probability that, had the records been disclosed to the defense, the result of the trial would have been different. Chinn's own attorney, Monta, testified at the post-conviction relief hearing that had he had Washington's juvenile records prior to trial, he "may very well" have had an expert examine Washington to see if his testimony could be impeached. Monta did not say definitively that he would have consulted an expert had he had the records. Further, Monta stated that the case was not centered solely on Washington's identification of Chinn, as other witnesses that testified had identified Chinn as well. Further, as we indicated above, Everington's testimony was contradicted by the testimonies of Martin and Lantz. Thus, because we cannot conclude that the non-disclosed records were material to Chinn's guilt, there was no *Brady* violation.

The fourth assignment of error is overruled.

*Chinn* 2nd PC App., 2001 Ohio App. LEXIS 3127, *33-35. Thus the state courts decided this claim on the merits and this Court reviews that decision under the deferential standard of 28 U.S.C. § 2254(d).

The State has a duty to produce exculpatory evidence in a criminal case. If the State withholds evidence and it is material, the conviction must be reversed. *Brady v. Maryland*, 373 U.S. 83 (1963). The materiality of the favorable evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112-113 (1976). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 683 (1985).

There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene,* 527 U.S. 263 (1999):

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*., at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id*., at

438, 115 S.Ct. 1555. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437, 115 S.Ct. 1555.

*Id*. at 280.

The Sixth Circuit has explained habeas corpus review of a state court decision on a *Brady* claim as follows:

> Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution must disclose all material, exculpatory evidence to a defendant, irrespective of whether the failure to disclose was done in good or bad faith. To assert a successful *Brady* claim, a habeas petitioner must show that (1) the withheld evidence was favorable to the petitioner, (2) the evidence was suppressed by the government, and (3) the petitioner suffered prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The *Brady* rule encompasses both exculpatory and impeachment evidence when such evidence is material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). This Court explained in *United States v. Bencs* that "[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial." 28 F.3d 555, 560 (6th Cir. 1994) (citing *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976)). Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682. A reasonable probability is one that sufficiently undermines confidence in the outcome of the trial. *Id*. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). When determining whether the withheld information was material and therefore prejudicial, we consider it in light of the evidence available for trial that supports the petitioner's conviction. *See Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004).

*Jells v. Mitchell*, 538 F.3d 478, 501-02 (6th Cir. 2008).

Petitioner fails to establish both the prejudice prong and the materiality component in this *Brady* allegation. He argues that his conviction was based on Washington's testimony, as

Washington was the sole witness to the crime, and the State could not have convicted him without this identification testimony. (Traverse, Doc. No. 27, PAGEID 296, 299.) He cites to the Ohio Supreme Court's statement that the "State's case against [Chinn] hinged on the testimony of Marvin Washington. If the jury accepted Washington's testimony, the jury was certain to convict [Chinn], but if the jury did not believe Washington, it was certain to acquit [Chinn] of all charges." *Id.* at 296. He also alleges that the State failed to turn over exculpatory records, namely Washington's juvenile records. He argues that the court of appeals should have recognized the force of the information contained within these records, specifically, the social history report and updates, a chemical abuse assessment, psychological reports, and neuropsychological assessments prepared from evaluations. (Traverse, Doc. No. 27, PAGEID 289, 300.) If he had had access to these records, Petitioner would have been able inform the jury of Washington's low IQ and that he was in the moderate range of mental retardation, thus allowing the jurors to have all the information about this witness when they were assessing his credibility. (Traverse, Doc. No. 27, PAGEID 296.) He further argues that the information contained in these records was crucial to his defense in that it would have shown that Washington was "a gullible youth of very low intelligence; with poor vision; with a substance abuse problem; and more importantly, with a documented history of poor memory and poor information processing skills due to an abnormal brain." *Id.* at 297. Additionally, if counsel had known of the evidence of possible mental retardation, they could have challenged the identification during the line-up as characteristics of mentally retarded individuals include that; they are easily led, more prone to give false confessions, and are eager to please authority figures. *Id.*; *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). If Washington was prone to being easily swayed by authorities then there would have been reasonable doubt whether or not he had identified Chinn on his own volition. Thus,

creating a reasonable probably that had the jurors had this additional information, one or more jurors would have decided differently. *Id.*

At the evidentiary hearing in post-conviction Dr. Caroline Everington, an expert in mental retardation and developmental disabilities, testified on Chinn's behalf. (Traverse, Doc. No. 27, PAGEID 289);(Trial Tr. Vol. VI at 73-111.)[2] Chinn argues that her testimony demonstrated that Washington's credibility as a witness was questionable because of his mental deficiencies. (Traverse, Doc. No. 27, PAGEID 289.) Her testimony addressed Washington's history of poor vision, chemical abuse, neuropsychological impairments with moderate mental retardation and brain dysfunction, diminished intellectual capacity, and limited ability to process information. (Traverse, Doc. No. 27, PAGEID 289); (Trial Tr. Vol. VI at 78-82.) In preparation for her testimony she reviewed the juvenile court transcript, the social history, police interview, psychological evaluations, school records, and the transcript of his testimony.[3] (Trial Tr. Vol. VI at 78.) Based on this review, she noted a decline in Washington's mental capacity between his 1987 and 1989 IQ tests where he scored a 54 and later a 48, putting him in the range of mental retardation. (Traverse, Doc. No. 27 at 290); (Trial Tr.Vol. VI at 79, 82.) Dr. Everington also noted from the previous records that Washington had a hard time understanding the instructions for the tests, was eager to please, wanted feedback and encouragement during testing, was easily distracted, and could be easily swayed by others. (Trial Tr. Vol. VI at 83.) She assessed that Washington had a diagnosis of

_____

[2] Though the evidentiary hearing did not specifically address the *Brady* claim, it did address the underlying issue of mental retardation in terms of whether or not counsel had been ineffective in their failure to hire an expert. For purposes of determining what is alleged to have been withheld in Washington's files, it is necessary to consider the evidentiary hearing transcript to the extent it addresses the underlying issue of the records and the possibility that Washington may have been mentally retarded.

[3] Dr. Everington was not able to interview Marvin Washington as he was deceased by the time of the hearing.

neuropsychological impairment associated with cranial abnormality, which resulted in confusion or distortion of new information, the inability to read at a level of comprehension, placement in developmentally handicapped classrooms at school, a short attention span, significant deficits in memory, and mental impairment compounded with memory lapses due to alcohol consumption. *Id*. at 84-87. It was her professional opinion that Washington had significant deficits in memory. *Id*. at 92.

The State relies heavily on the court of appeals' finding that Washington's testimony was "remarkably coherent and consistent." (Return of Writ, Doc. No. 24, PAGEID 167); *Chinn 2nd PCApp,* 2001 Ohio App. LEXIS 3127, *26 (2nd Dist. 2001). The State also notes that there were multiple identification witnesses, not solely Washington, and that while mentally retarded people may have an increased risk of false identifications, none of those factors were present here. (Return of Writ, Doc. No. 24, PAGEID 167.)

At the state court evidentiary hearing, the State countered the Petitioner's claim by presenting Barbara DeVoss as a witness. DeVoss was a social worker that had worked first hand with Washington during his time at the Training Center for Youth. (Trial Tr. Vol. VI at 138-141.) DeVoss testified that before she met Washington she had reviewed his records and thought that he would be a "blooming idiot." (Traverse, Doc. 27, PAGEID 292); (Trial Tr. Vol. VI at 142.) Despite Petitioner's argument that this statement clearly supports his contention that Washington had serious mental deficiencies in 1989, Ms. DeVoss continued her assessment and testified that despite her original impression based on Washington's records, upon meeting and working with him, she found him to have a high level of adaptation and functioning in numerous aspects of his life, from personal grooming, finances, ability to read and tell time, his work ethic, to obtaining a high school diploma,

-39-

graduating at the top of his class and delivering the graduation speech. (Trial Tr. Vol. VI at 138-161.)

The State also presented testimony from Dr. Thomas, a clinical psychologist. (Trial Tr. Vol. VI at 181.) Petitioner again counters this State's witness by stating that Dr. Thomas admitted that based on the juvenile records, Washington had congenital cranial abnormalities that may have affected his memory. (Traverse, Doc. No. 27 at PAGEID 292); (Trial Tr. Vol. VI at 195.) However, it should be noted that Dr. Thomas also testified it was necessary to consider more than just an IQ score, that one must look at several different factors in evaluating for mental retardation. (Trial Tr. Vol. VI at 185.)

In order to establish a *Brady* violation, the omitted evidence must be material either to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner has established the first prong of a *Brady* violation; the omitted records could have been used for impeachment purposes. However the Petitioner has not established that the evidence was material to the outcome of his trial, nor is he able to demonstrate prejudice resulting from the omission of this evidence. When determining whether the withheld information was material and therefore prejudicial, habeas courts consider it in light of the evidence available for trial that supports the petitioner's conviction. *See Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004). From the time of his interview to the time of his trial testimony, Washington's version of events remained consistent, coherent, and plausible. When making his subsequent identifications of Chinn, Washington identified him from a second photo spread after stating that the defendant was not present in the first spread. He later identified Chinn after a line-up. There was a corroboration of events and identification by other witnesses. Additionally, there was testimony as to Washington's

high level of adaptive functioning.  Finally, defense counsel himself testified that he *might* have used the information contained within the records for impeachment purposes, but he did not feel Washington would have met the criteria for mental retardation. (Trial Tr. Vol. VI at 129-134.)  The juvenile records were not material to guilt, nor is there a reasonable probability that had they been disclosed, the result of the proceeding would have been different.  The decision of the state court was therefore neither contrary to, nor an unreasonable application of U.S. Supreme Court law.  The First Claim for Relief under *Brady* should be dismissed with prejudice.

When the reference of this case was transferred to the undersigned Magistrate Judge, the parties confirmed that it was then ripe for decision on the merits.  After a status conference on October 26, 2009, the Magistrate Judge confirmed his intention to handle the case "in the manner now used for capital habeas corpus cases in the Western Division."[4]  The Minutes (Doc. No. 56) contain the statement  that motion for certificate of appealability will be filed and decided post-judgment.  *Id.*  at PageID 652.  However, Rule 11 of the Rules Governing § 2254 Cases was amended December 1, 2009, to require that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  To comply with that new requirement, recommendations to grant or deny a certificate of appealability as to each Claim for Relief is made in the analysis of the relevant claim.

To obtain a certificate of appealability, a petitioner must show at least that "jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  That is, it must find that reasonable jurists would find

---

[4] Death penalty habeas corpus cases are assigned randomly to District Judges throughout the District.  This Magistrate Judge has been referred all capital habeas corpus cases assigned to Western Division District Judges since April, 2000.  This was the first capital habeas corpus case referred by a District Judge from the Eastern Division.

the district court's assessment of the petitioner's constitutional claims debatable or wrong or because they warrant encouragement to proceed further. *Banks v. Dretke*, 540 U.S. 668, 705 (2004); *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). If the district court dismisses the petition on procedural grounds without reaching the constitutional questions, the petitioner must also show that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484. The procedural issue should be decided first so as to avoid unnecessary constitutional rulings. *Slack*, 529 U.S. at 485, *citing Ashwander v. TVA*, 297 U.S. 288, 347 (1936)(Brandeis, J., concurring). The first part of this test is equivalent to making a substantial showing of the denial of a constitutional right, including showing that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further, *Slack v. McDaniel*, 529 U.S. 473 at 484 (2000), *quoting Barefoot v. Estelle,* 463 U.S. 880, 893 (1983). The relevant holding in *Slack* is as follows:

> [W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue (and an appeal of the district court's order may be taken) if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

529 U.S. at 478.

The standard is higher than the absence of frivolity required to permit an appeal to proceed *in forma pauperis. Id.* at 893.

> Obviously the petitioner need not show that he should prevail on the merits... Rather, he must demonstrate that the issues are debatable

> among jurists of reason; that a court could resolve the issues [in a
> different manner]; or that the questions are 'adequate to deserve
> encouragement to proceed further.'

*Id.* n.4. *Accord, Miller-El v. Cockrell*, 537 U.S. 322 (2003). A certificate of appealability is not to

be issued *pro forma* or as a matter of course. *Id.* at 1040. Rather, the district and appellate courts

must differentiate between those appeals deserving attention and those which plainly do not. *Id.* A

blanket certificate of appealability for all claims is improper, even in a capital case. *Frazier v.

Huffman*, 348 F.3d 174 (6th Cir. 2003), *citing Porterfield v. Bell,* 258 F.3d 484 (6th Cir. 2001).

In this case, the Magistrate Judge concludes reasonable jurists could disagree with his

conclusion that the First Claim for Relief should be dismissed with prejudice. If the District Court

does dismiss the Claim as recommended, the Magistrate Judge also recommends that a certificate

of appealability be issued on this claim.

### Second Claim for Relief

> Petitioner's due process right to a fair trial and fair penalty phase was
> violated by the cumulative effect of prosecutorial misconduct. U.S.
> Const. amend. XIV.

In his second ground for relief, Petitioner argues that his rights were violated as a result of

pervasive prosecutorial misconduct. (Petition, Doc. No. 3 at 10); (Traverse, Doc. No. 27, PAGEID

302.) Specifically, he argues that because the case against him was not strong, the prosecutor

resulted to improper tactics to get a conviction. (Traverse, Doc. No. 27, PAGEID 302.) Examples

of the alleged misconduct include; improperly vouching for witnesses, comments as to the alibi

witness, relying on hearsay evidence, informing the jurors that the defendant had requested an

instruction on a lesser included offense, misleading the jury by claiming to have additional knowledge, and making statements to appeal to the jurors' emotions. (Traverse, Doc. No. 27, PAGEID 302-319.)

Respondent moved to dismiss two of the sub-claims to this ground for relief as procedurally defaulted. (Return of Writ, Doc. No. 24 at PAGEID 169, 179, 182, 184-185, 187); (Respondent's Motion to Dismiss Procedurally Defaulted Claims, Doc. No. 18, PAGEID 89.) However, the District Court previously held that this Claim is preserved for merits review in its entirety. (Opinion and Order, Doc. No. 30, PAGEID 523-528.) That is now the law of the case and no argument is made to overcome it at this juncture.

The Ohio Supreme Court concluded:

> Appellant raises claims of prosecutorial misconduct, but many of appellant's arguments have been waived by his failure to object at trial. We have carefully reviewed the record in its entirety and have considered all of appellant's claims of prosecutorial misconduct. We have found no instance of prosecutorial misconduct that would rise to the level of reversible error. The instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial and a fair and reliable sentencing determination.

*State v. Chinn*, 85 Ohio St. 3d 548, 559, 709 N.E.2d 1166, 1177 (1999). On the first direct appeal, the Court of Appeals concluded:

> Chinn argues that the following acts of the prosecutor during the guilt phase of the trial constitute reversible error: (1) that he vouched for police (T. 573); (2) stated that Washington and Ward are telling the truth (T. 578); (3) attributed Washington's rationale for misidentifying Chinn at the lineup to Det. Lantz rather than Washington himself; and (4) said that "victims have rights, too" (T. 583). Chinn's failure to object to any of these statements waived objection, and we see no plain error. *Broom* and *Awan, supra*.

> Chinn did object to the following statements by the prosecutor during closing argument.

Mr. Heck: ". . . Then you're also going to hear about involuntary manslaughter. I'm not going to get into it because in order for you to find involuntary manslaughter, you must find it was not a purposeful killing. I think that's absolutely ridiculous but that's the next thing. Well, if you find that he was there, and if you find the ID was fine, which it was, well then just say, "I didn't really mean to kill him. I really didn't mean to. I meant to hurt him a little bit."

Mr. Monta: I object, your Honor. This wasn't argued.

The Court: Overruled, because the Court is going to give that instruction.

Mr. Monta: I'm objecting to this comment, not the instructions.

Mr. Heck: Well, they asked for it, your Honor.

Mr. Monta: I object to that, your Honor.

The Court: Overruled.
(T. 580-581) (Emphasis added.)

Chinn's first objection was without merit. In presenting its argument the State may go beyond the scope of a defendant's closing argument. *State v. Apanovitch* (1987), 33 Ohio St. 3d 19, 24-25. Therefore, because the involuntary manslaughter instruction was to be given by the court the State was not required to wait until Chinn mentioned it before discussing it.

The prosecutor's comment that "they asked for it", however, is far more objectionable. No instruction should be identified with a particular party. *Columbus v. Bee* (1979), 67 Ohio App. 2d 65, 80. Therefore, it was clearly improper to inform the jury that Chinn had requested the lesser included offense instruction. However, the error was harmless since we find that Chinn would yet have been found guilty absent the prosecutor's comment. *Smith, supra*.

The prosecutor also commented to the jury on the fact that Chinn's brother, who was named on a witness list, did not testify to substantiate the alibi defense offered through Chinn's mother.

-45-

Do I think she's a liar? I'm not going to say that. I think she did what any mother we would expect to do, but it's incredible. You don't sit there when your son's charged, and she knew about it. She read it in the paper. So, she told you two days later and sit there and do nothing and come into the trial and say, "he's at home with his brother all night. I heard them." You must test that. You must test if you believe that. And the other things I want you to ask. Where is Darryl, if he's at home with his brother.

Mr. Monta: I object, Rule 16 before any comment on the Witness list.

The Court: Overruled.

Mr. Heck: He was at home, they said, with his brother, but his brother didn't say that. Only mother says that. You can believe every Defendant's witness with the exception of his mother, and still find the Defendant very clearly guilty, beyond any doubt whatsoever. (T. 576-577)

Crim. R. 16 (C)(3) provides that "the fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at the trial." The Supreme Court has interpreted this to mean that once a person's name is placed upon a witness list there is an absolute bar upon mentioning his absence at trial. *State v. Hannah* (1978), 54 Ohio St. 2d 84, 90.

We continue to hold to the view that the better interpretation is that the State is prohibited from mentioning the absence of a witness in conjunction with the fact that he was named on a witness list. However, this element, though apparently contained in the rule itself, is not required by *Hannah*. Courts have found no *Hannah* violation in previous cases because there was no evidence that the witness in question was actually named on a witness list. *See, e.g., Walton, Ingle*, and case cited therewith *supra*.

In this case Chinn's brother was named on a witness list. Therefore, the court should have ordered the comment of the prosecutor stricken. It was error to fail to do so. However, because we find that Chinn would yet have been found guilty even absent this comment, the error was harmless.

*Chinn 1st DirApp*, 1991 Ohio App. LEXIS 6497, *17-20 (2nd Dist. 1991).

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process, or whether it was "so egregious as to render the entire trial fundamentally unfair." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999); *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979); *accord Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983).

The court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and whether the evidence against the defendant was strong." *Id.* The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993), *quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982). In *Serra*, the Sixth Circuit identified factors to be weighed in considering prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice

the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.,* at 1355-56, *quoting Angel*, 682 F.2d at 608. The misconduct must be so gross as probably to prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 572 (1997); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988). Claims of prosecutorial misconduct are reviewed deferentially on habeas review. *Thompkins v. Berghuis,* 547 F.3d 572 (6th Cir. 2008), *citing Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

The Sixth Circuit has recently articulated the relevant standard for habeas claims of prosecutorial misconduct as follows:

On habeas review, "the relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 106 S. Ct. 2464 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974)). "Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). Yet reversal is required if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997); see also *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000), overruled on other grounds by, *Bowling v. Parker,* 344 F.3d 487, 501 n.3 (6th Cir. 2003).

In order to obtain relief, [a petitioner] must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). If this Court finds improper conduct, four factors are considered in determining whether the challenged conduct is flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *See Millender v. Adams*, 376 F.3d 520, 528 (6th Cir.

2004); *Bowling v. Parker,* 344 F.3d 487, 512-13 (6th Cir. 2003); *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir. 1982) (en banc) (citing *United States v. Leon,* 534 F.2d 667, 677 (6th Cir. 1976)). Under AEDPA, we are required to give deference to the Tennessee Supreme Court's determination of Bates's prosecutorial misconduct claims. *See Macias v. Makowski,* 291 F.3d 447, 453-54 (6th Cir. 2002)(noting that habeas relief is only appropriate if there "was an unreasonable application of clearly established federal law"); see also *Millender v. Adams,* 376 F.3d 520, 528 (6th Cir. 2004) ("Claims of prosecutorial misconduct are reviewed deferentially on habeas review.") In determining whether prosecutorial misconduct mandates habeas relief, we apply the harmless error standard. *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). An error is found to be harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993).

In the context of a death penalty sentencing hearing, however, the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a "not guilty" verdict to a "guilty" verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death.

*Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005); *see also Bowling v. Parker*, 344 F.3d 487, 512-513 (6th Cir. 2003); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008).

In *Slagle v. Bagley*, 457 F.3d 501 (6th Cir. 2006), the court applied the foregoing law and categorized various types of prosecutorial misconduct: character assault, referring to facts outside the record, referring to nonstatutory aggravating factors, denigration of defense counsel and witnesses, and vouching for prosecution witnesses.

**Asserted Prosecutorial Misconduct in the Guilt Phase**

Petitioner cites to several instances of alleged prosecutorial misconduct in the guilt phase of the trial. First he alleges that the State improperly vouched for its witness Marvin Washington. (Traverse, Doc. No. 27, PAGEID 308.) Specifically, he cites to the following comments:

> Marvin Washington. Now, ladies and gentlemen, it's always easy to use ridicule and criticism as a cleaver [sic] attempt to avoid any honest attempt to refute the facts. That's what the Defendant is doing. It's awfully easy to say you have a 18-year old , who's living with his grandmother, whose mother died, who had seen his father once in the last year and doesn't know where he lives. He hasn't been to school because of fighting since 1984-1985. I'm not here to ask you to like him. I don't like him, but I don't have anybody else. He's the one that this Defendant picked. I didn't pick him. The defendant picked him and said, "Look I want you to help me do a robbery." I can't help that, but he told you the truth and it's interesting because his account is confirmed by other independent evidence and witnesses starting with Jack Couch, who says, "Yeah, I saw him down there at that bookstore. I put the guy out and I saw him talking to one other person down there." He told you that. See, that's the type of thing that has the ring of truth to it. It was confirmed by Welborn, by Christopher Ward, and seen by Stacy Dyer, who - -it's interesting, Stacy says, "Yeah. The guy got out of the driver's door." Which at first when I heard about this case, I said why would he get out, but it makes sense. Even Marvin Washington says, "I got out, and the guy crawls out behind me and goes around and gets Brian Jones out of the passenger side." Very interesting.

(Trial Tr. Vol IV at 578-579); (Traverse, Doc. No. 27, PAGEID 308.)


Additionally, he alleges that the State vouched for the truthfulness of the police officers. (Traverse, Doc. No. 27, PAGEID 309.) Respondent counters that the State was not vouching, but rather arguing that its case relied on the truthfulness of the police officers and if the jurors believed the testimony of the police officers than they should convict defendant. (Return of Writ, Doc. No. 24, PAGEID 173.) The comments in question are as follows:

> If you people think that this police department just arrested this

Defendant for no reason, that there's no evidence, that Detective Lantz is lying to you when he told you about Marvin Washington identifying and picking out the Defendant from his photo spread after he had been shown others, if he's lying, go back to that Jury room. Don't take your coats off; let's not waste any time. Come back in here and find him not guilty. Put him back on our case [sic] square; put him back on the street.

(Trial Tr. Vol. IV at 573. )

The Sixth Circuit has addressed the issue of vouching by stating that:

It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying. *United States v. Young*, 470 U.S. 1, 17-19, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985); *Berger*, 295 U.S. at 86-88 (citing prosecutor's statements suggesting that he had personal knowledge that a witness was not being truthful as one example of egregious prosecutorial misconduct); *see also Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) ("To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. But, they can not put forth their opinions as to credibility of a witness, guilt of a defendant, or appropriateness of capital punishment."); *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994) ("We cannot overstate the extent to which we disapprove of this sort of improper vouching by prosecutors."); *State v. Smith*, 14 Ohio St. 3d 13, 14 Ohio B. 317, 470 N.E.2d 883, 885 (Ohio 1984)("It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused."). As the Supreme Court explained in *Young*, there are two separate harms that arise from such misconduct. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Young*, 470 U.S. at 18. Second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id*. at 18-19.

*Hodge v. Hurley*, 426 F.3d 368, 378-79 (6th Cir. 2005).

In this case the prosecutor was not vouching for the credibility of the witnesses, but rather

referring to what he believed to be the strength of the State's evidence, illustrating the corroboration between witnesses and a lack of motive to lie. The statements asked the jury to assess the credibility of these witnesses in conjunction with the evidence and to determine whether or not the State had proved its case. The sub-claim of prosecutorial misconduct for improper vouching is without merit, as the prosecutor was not vouching, but rather arguing his case.

Next Petitioner argues that the State improperly referred during closing arguments to evidence that was not in the record. During his testimony, surviving victim Gary Welborn was asked if he had been able to make an identification of a suspect during the line-up, to which he responded affirmatively. (Traverse, Doc. No. 27, PAGEID 310); (Trial Tr. Vol. III at 132.) The State asked if the man picked by Welborn had been investigated as a possible suspect, defense counsel objected and the court sustained the objection. (Traverse, Doc. No. 27, PAGEID 310); (Trial Tr. Vol. IV at 396.) Despite this objection, during closing arguments the State referenced the other suspect:

> This is real life. It would be nice to go out and pick people like yourselves and bring them in. What do you do for a living? But we don't have that luxury. We have to take our witnesses as we find them. You heard from Mr. Welborn. . . . .He told you what he remembers. He told you that he could not identify the shooter, the other person. He told you, that he also told you, he tried his darndest to make an identification by voice alone. It's as simple as that. And Detective Lantz also told you it couldn't have been that guy because he was in jail. He told you all of that. To say that Mr. Welborn now doesn't recall things because it's convenient for him, as Mr. Monta alleges, is absolutely incredible. Why would anybody, especially victims, come in and lie after what they've been put through?

(Trial Tr. Vol. IV at 577-578.)

Respondent counters that there was no due process violation as the comment was so brief and focused on a secondary point. (Return of Writ, Doc. No. 24, PAGEID 174.) Specifically,

Respondent asserts that the comment was made when the prosecutor was discussing credibility and pointing out the weaknesses in his own case. *Id.* The State acknowledged that the victim of the crime failed to identify Chinn by voice, instead identifying someone else's voice as that of the shooter. *Id.* In order to explain this inconsistency and preserve the credibility of their witness, the State made a comment that it could not have possibly been this other person as he was in jail on the day of the murder. *Id.*; (Trial Tr. Vol. IV at 577.) Respondent argues that this appears to be a slip by the prosecution on a relatively unimportant fact. (Return of Writ, Doc. No. 24, PAGEID 175.) Furthermore, there was no objection made to this comment during trial. *Id.*

This comment was brief and isolated. The Court further notes that this comment was made during the State's rebuttal in closing argument in the guilt phase. (Trial Tr. Vol. IV at 570-584.) The trial judge instructed the jurors that, "[t]he evidence will not include the indictment, the opening statements of counsel, or the closing arguments of counsel." *Id.* at 588-589. Furthermore, the judge instructed the jurors that if, during testimony, an objection had been raised and was sustained, they were not to consider it, speculate as to what the answer may have been, or as to the reasons why it was sustained. *Id.* at 589. There is nothing to suggest that the jury did not follow the instructions as given by the court. As the jurors were properly instructed and due to the briefness of the comment, it is unlikely that the remark misled the jury or prejudiced the accused, and the comment was not flagrant. This sub-claim is without merit.

Next, Petitioner asserts prosecutorial misconduct because the State improperly reminded the jury that Chinn's brother had failed to testify as an alibi witness in the case. He argues that such comment was a violation of Ohio R. Crim. P. 16 C (1)(c).

Respondent argues that this was not a constitutional violation. (Return of Writ, Doc. No. 24,

PAGEID 30.)  The comment, as argued by the prosecutor queried, "[w]here is Darryl, if he's at home with his brother?" (Trial Tr. Vol. IV at 576-577.)  Respondent argues that under federal law this was not an out-of-bounds question, but rather was used to encourage the jury to test the evidence.  There had been testimony from Chinn's mother that he was at home that evening and she heard him talking with his brother Darryl.

> Q:    Was anyone else over at home, then?
> A:    Darryl was there.
> Q:    Your other son?
> A:    Right.
>
> * * * *
> Q:    Was your son still at home, then?
> A:    Yes.
> Q:    Do you know what he was doing?
> A:    He was talking to his brother the last, you know, the last I
>        heard.
> Q:    You were in your bedroom; is that correct?
> A:    Right.
> Q:    You didn't see him there?
> A:    No, I didn't see him.  I heard the voices.
> Q:    You heard the voices and you recognized that to be your son?
> A:    Yes.

(Trial Tr. Vol. IV 500-502.)

Due to this exchange, Respondent asserts that this was not an out-of-bounds question but rather was a fair consideration for the jury to question as to why Chinn did not call his key alibi witness. (Return of Writ, Doc. No. 24, PAGEID 176.)  The State was not commenting that the defendant should have presented evidence to prove his innocence, but rather was commenting that there was a lack of evidence corroborating the alibi defense that defense counsel did offer.

This sub-claim pertains to Ohio R. Crim. P. 16 and is not directly cognizable on habeas

because it is not a constitutional violation. *See Macias v. Makowski,* 291 F.3d 447, 453-54 (6th Cir. 2002)(noting that habeas relief is only appropriate if there "was an unreasonable application of clearly established federal law"). Even assuming the comment violated the Ohio Rules of Criminal Procedure, it did not render the trial unfair because it made a fair comment on the weakness of the alibi defense.

Next, Chinn argues misconduct because the prosecutor argued that the involuntary manslaughter charge was not realistic because "you must find that it was not a purposeful killing." (Trial Tr. Vol. IV at 590.) Respondent counters by arguing that the State was merely arguing that the facts were not consistent with accidental shooting. (Return of Writ, Doc. No. 24, PAGEID 176.)

> Mr. Heck: This defense is something like Let's Make a Deal. It's like, beyond door number one is an alibi, "I wasn't there. I really didn't do it. I was someplace else", but you know that's not true. That's ridiculous. So behind door number two is, "Well, the ID wasn't there." You know, you can always get a better ID. There's no question I would love to bring in someone like yourselves to point him out, but that's not real life, but that's what they're trying to say. That's what they want to use to get him out, to find him not guilty, to set him free, as Mr. Monta says. Then you're also going to hear about involuntary manslaughter. I'm not going to get into it because in order for you to find involuntary manslaughter, you must find it was not a purposeful killing. I think that's absolutely ridiculous but that's the next thing. Well, if you find that he was there, and if you find the ID was fine, which it was, well then just say, "I didn't really mean to kill him. I didn't mean to. I meant to hurt him a little bit.

> Mr. Monta: I object, your Honor. This wasn't argued.

> The Court: Overruled, because the Court is going to give that instruction.

> Mr. Monta: I'm objecting to this comment, not the instructions.

> Mr. Heck: Well, they asked for it, you Honor.

> Mr. Monta: I object to that, your Honor.

The Court:    Overruled.

(Trial Tr. Vol. IV at 580-581.)

This argument over the objection was made to the trial judge, apparently within the hearing of the jury. The comment "well, they asked for it," was improper, but it does not rise to the level of being flagrant or prejudicial. The comment itself was very brief and isolated and appears to have been non-deliberate, as it was made in the midst of an exchange where counsel for both sides were arguing their position on the objection before the trial judge. *Id.* Additionally the Court notes the general nature of the comment as opposed to making a specific reminder that, "well, they requested the instruction on the lesser included offense." It is unlikely given the brevity of the statement and the nature of the exchange that the jurors would have been misled or prejudiced. Finally, the Court notes that this occurred during closing arguments and the trial judge properly instructed the jury that closing arguments were not in evidence. (Trial Tr. Vol IV at 588-589.)

Next Petitioner alleges misconduct arising from the prosecutor's statement that "victims have rights too." The comment in whole is as follows:

> First of all, if I have done anything to offend you in this case, please hold it against me personally, but not against the case, not against the victim Brian Jones, because Mrs. Armanini and I believe that the victim has just as much right to effective representation as the Defendants do, because victims have rights too. Because, even though Defendants are entitled to justice, so are victims and the victims' families.

(Trial Tr. Vol. IV at 583.) This Court agrees with Respondent's interpretation that the prosecutor is asking the jury to follow the law and not to hold against the evidence presented any prejudices they may have against the prosecutors. (Return of Writ, Doc. No. 24, PAGEID 178.) Additionally,

the Court notes that this is a relatively short statement in a lengthy closing. As the prosecutor did not dwell on this topic it was an isolated statement and unlikely to have misled the jurors.

In his final sub-claim of prosecutorial misconduct in the guilt phase, Petitioner argues that the State improperly relied on testimony from Shirley Cox. (Traverse, Doc. No. 27, PAGEID 312.) Specifically, he objects to the impropriety of the State presenting testimony from Mrs. Cox that Chinn came to her husband's law firm because he needed to speak with an attorney. *Id*.; *see also* Trial Tr. Vol. IV 375-378. He argues that the State's presenting this testimony effectively penalized him for exercising his right to counsel and that Mrs. Cox's testimony on this matter created an inference of guilt. (Traverse, Doc. No. 27, PAGEID 312.)

From the several comments at sidebar during the presentation of Mrs. Cox's testimony, it is clear that the question of the admissibility of her testimony had been vetted prior to trial and the trial judge had ruled that, within the limits set, it was admissible (See Trial Tr., Vol. IV at 375-383). The prosecutor does not appear to have exceeded or attempted to exceed the limits set by the trial court. Therefore his use of Mrs. Cox's testimony was not misconduct.

### Asserted Prosecutorial Misconduct in the Penalty Phase

Next Petitioner asserts prosecutorial misconduct during the penalty phase because the State argued to the jury that they should consider non-aggravating circumstances, such as the nature and circumstances of the crime. (Petition, Doc. No. 3 at 12.) This violated the Ohio Supreme Court's directive "that prosecutors need to exercise an abundance of caution to avoid suggesting or implying that the nature and circumstances of the offenses are 'aggravating circumstances.'" *State v.*

*Wogenstahl,* 75 Ohio St. 3d 344, 358, 662 N.E.2d 311, 323 (Ohio 1996). The Respondent counters

by stating that this is a matter of state law, that defense counsel failed to object at the time of the

comment, and that the jury is required to consider the nature and circumstances of the aggravating

circumstances in the guilt phase in order to properly weigh the mitigating factors. (Return of Writ,

Doc. No. 24, PAGEID 179-181.) The contested statement is as follows:

> Very briefly, I want to relate to you why is this a death penalty case.
> In addition to the three aggravating circumstances, and it only
> requires one, that we have found to have existed, you've already
> heard this afternoon this Defendant is not an underprivileged,
> disadvantaged youth. This Defendant is 32 years of age, going to
> school. He knew what he was doing. The nature and circumstances,
> ladies and gentlemen, we have total compliance of the victims here.
> Never any refusal on their part to go along with what they wanted to
> do. They were told what to do and those victims did it without
> hesitation, without any fight, without any defense. This Defendant
> had an abundance of time. This is not a hot blooded, a passionate
> type thing. He had plenty of time, an abundance of time to stop this
> murder. This is murder in cold blood. He drove and drove for
> minutes, think, if you will. The time that this Brian Jones sat in that
> car wondering when he was going to die because he had a gun that
> this Defendant had pushed against his neck for over 20 or 30 minutes,
> riding around until this Defendant said: Pull over here.

(Trial Tr. Vol. IV at 726-727.)


It has been held that the circumstances of a capital crime are admissible during the

sentencing phase to dispel the existence of any mitigating circumstances. *Slagle v. Bagley*, 457 F.3d

501, 519-520 (6th Cir. 2006). "A prosecutor can legitimately refer to the facts and the nature and

circumstances of the offense, to refute any suggestion they are mitigating or to demonstrate why

aggravating circumstances outweigh mitigating factors." *Slagle v. Ohio*, 65 Ohio St. 3d 597, 605

N.E.2d 916 at 930 (1992). In *Slagle*, the Sixth Circuit held that the Ohio Supreme Court had

consistently taken this position, *citing State v. Stumpf*, 32 Ohio St. 3d 95, 512 N.E.2d 598 (1987), and *State v. Gumm,* 73 Ohio St. 3d 413, 653 N.E.2d 253, 262 (1995). *Slagle v. Bagley*, 457 F.3d 501, 519-520 (6th Cir. 2006). Furthermore, the court instructed the jurors as to what aggravating circumstances they may consider in weighing the mitigation phase evidence:

> You will consider all the evidence, the arguments, the statement of the Defendant, and all other information and reports which are relevant to the nature and circumstances of the aggravating circumstances. Among the circumstances that are listed in the statute and there are eight references have been made and you have found these aggravating circumstances. One is that if the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender. Another of those aggravating circumstances is if the offense was committed while the offender was committing or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping. Then they list a number of others; Kidnapping and rape; aggravated arson; aggravated robbery; or aggravated burglary; and either the offender was the principal offender in the commission of the aggravated murder, or, if not the principal offender, committed the aggravated murder with prior calculation and design. You will consider all the evidence, the arguments, the statement of the Defendant, and all of the information and reports that are relevant to the nature and circumstances of the mitigating facts, and the mitigating facts include but are not limited to the nature and circumstances of the offense, ------[5] history, character, and background of the Defendant; and you may consider, I guess, should consider any facts that are relevant to the issue of whether the Defendant should be sentenced to death. The prosecutor has the burden to prove beyond a reasonable doubt that the aggravating circumstances of which the Defendant was found guilty outweighs the facts in mitigation of imposing the death sentence.

(Trial Tr. Vol. IV at 730-732.)

This Court finds Petitioner's contention to be without merit. The trial judge properly instructed the jury on the aggravating circumstances. There is nothing to suggest that the jury did

---

[5] This word is illegible in the copy of the transcript filed with this Court. However, given the context, it is probably "the." See Ohio Revised Code § 2929.04(B).

not follow the instructions as given by the court. Additionally, errors by the sentencing court in

weighing aggravating and mitigating factors can be cured by reweighing in the state appellate courts.

*Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the

requirements of *Clemons. Cooey v. Coyle,* 289 F.3d 882, 888-90 (6th Cir. 2002); s*ee also Baston v.*

*Bagley*, 420 F.3d 632 (6th Cir. 2005); *Eley v. Bagley*, 604 F.3d 958 (6th Cir. 2010). Furthermore,

consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not

violate the Constitution. *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007), *quoting Smith v.*

*Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003). This sub-claim is without merit.

Next, Petitioner alleges prosecutorial misconduct as the State encouraged the jurors to

consider both aspects of Ohio Revised Code § 2929.04(A)(7) specification of "principal offender"

and "prior calculation and design." (Petition, Doc. No. 3 at 13); (Trial tr. Vol. IV at 724.) The

comment made during closing argument in mitigation is as follows:

> You know what the aggravating circumstances are, that the
> Defendant committed this aggravated murder for the purpose of
> escaping detection, apprehension, trial, or punishment; that he did it
> as the principal offender, or with prior calculation, and prior
> calculation and design during the commission of an aggravated
> robbery and during the commission of a kidnapping; and he's been
> found guilty beyond a reasonable doubt of those.

(Trial Tr. Vol. IV at 724.)

Petitioner argues that the instruction was improper because, as the Ohio Supreme Court held

in *State v. Penix*, the elements of "principal offender" and "committed the aggravated murder with

prior calculation and design" are mutually exclusive alternatives and are not to be charged and

proven together in the same case. (Petition, Doc. No. 3 at 13); *State v. Penix*, 32 Ohio St. 3d 369,

371, 513 N.E. 2d 744, 746 (1987). He argues that the prosecutor's statement confused the jury and

resulted in them sending a note to the judge asking for a definition of aggravating circumstances. (Petition, Doc. No. 3 at 13.) Additionally, because the jurors were never properly instructed by the court, the improper statement by the State was even more prejudicial. *Id.*

The trial court did, however, touch on this instruction, informing the jurors that, "either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design" though the jury had found earlier in the culpability phase that Chinn was the principal offender. (Trial Tr. Vol. IV at 731.)

In *Penix* the jury was not given the option of finding either that the defendant was the principal offender or if not the principal offender, committed the murder with prior calculation or design. Rather, they were required to find both. In subsequent cases, the Ohio Supreme Court found no error where "the prior calculation and design and principal offender elements of R.C. 2929.04(A)(7) were charged disjunctively to the jury in a single specification; the jury could not have found both elements to have been proven, as it could have in *Penix*." *Ohio v. Cook*, 65 Ohio St. 3d 516, 527, 605 N.E. 2d 70 (1992); *see also Ohio v. Nields*, 93 Ohio St. 3d 6, 30, 752 N.E. 2d 859 (2001); *State v. Burke*, 73 Ohio St. 3d 399, 405, 653 N.E. 2d 242, 248 (1995). The rationale is, if the instruction is given disjunctively, then the jurors will not consider both. Nonetheless, a court errs if it does not instruct the jury that they must be unanimous in agreeing on which of the alternatives the defendant is guilty. *See Ohio v. Burke*, 73 Ohio St. 3d 399, 405, 653 N.E. 2d 242 (1995). That error is harmless if the jury elsewhere indicates its unanimous verdict on either the prior calculation and design aspect or on the principal offender aspect. *Id.*; *see also Ohio v. Moore*, 81 Ohio St. 3d

22, 40, 689 N.E. 2d 1 (1998).

In the penalty phase of trial, the court instructed the jury with the language that "[A]nd either the offender was the principal offender in the commission of the aggravated murder, *or*, *if not the principal offender*, committed the aggravated murder with prior calculation and design." (Trial Tr. Vol. IV at 731.) (Emphasis added.)  Thus, the instruction was given in the disjunctive form and the jury was asked to consider the various portions in separate counts.  The State's comment was convoluted due to a mistatement of the words "and" and "or."  However, the jurors were properly instructed by the court. There is nothing to suggest that the jury did not follow the instructions as given by the court and therefore Chinn did not suffer prejudice as a result of the State's comment.

Next Petitioner alleges prosecutorial misconduct arising out of the State's comment focusing the jury's attention on the absence of a mitigating factor, specifically, that Chinn was not underprivileged. (Petition, Doc. No. 3 at 13.)  Respondent argues that this sub-claim is without merit as there are no clearly established United States Supreme Court cases prohibiting a prosecutor from commenting on the weight of mitigation evidence as offered by the defendant. (Return of Writ, Doc. No. 24, PAGEID 184.)  The comment was as follows, "[i]n addition to the three aggravating circumstances, and it only requires one, that we have found to have existed, you've already heard this afternoon this Defendant is not an underprivileged, disadvantaged youth.  This Defendant is 32-years of age, going to school." (Trial Tr. Vol. IV at 726.)  "[T]he sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).  A sentencer may not, as a matter of law, refuse to consider any mitigating evidence presented. *Eddings v. Oklahoma,* 455 U.S. 104 (1982).  As long as the factors presented are considered, the sentencer and the courts on reweighing, may determine

the amount of weight to be given to the mitigating factors. *Eddings*, 455 U.S. at 115. Furthermore, errors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in the state appellate court. *Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle,* 289 F.3d 882, 888-90 (6th Cir. 2002). *See also Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005).

Next Petitioner argues that the State improperly argued that Chinn deserved the death penalty because of the impact criminals have on society. (Traverse, Doc. No. 27, PAGEID 317.)

> Brian Jones had a right to live. He is not a celebrity to us; he was no one special. To his parents, to his family, he is; but, he had a right to live, to breathe, to laugh, to cry. He had a right to experience life, and he was denied that without anyone coming to his defense. There was no mitigation at all about robbing and killing and kidnapping, completely compliant victims like in this case, and I wonder sometimes if we hear so much about how people commit crimes that we just sort of put ourselves away from them. I wonder if we become so morally ambivalent and so guilt ridden that we simply cannot punish anyone anymore to the extent of putting them to death. I suggest to you that justice requires that criminals get what they deserve, and that criminals deserve death on [sic] what they've done to us.

(Trial Tr. Vol. IV at 728-729.) In following the guidance from a line of Sixth Circuit cases, this comment was not improper. When considered in context of the entire closing, this was a comment on the case, on crime in general, and on the fact that guilty people should be punished. This was not an overt attempt to elicit passion from the jurors. "Unless calculated to incite the passions and prejudices of the jurors appeals to the jury to act as the community conscience are not *per se* impermissible." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991); *see also Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004)(holding a prosecutor may make general references as to society's need to punish guilty people); *Byrd v. Collins*, 209 F.3d 486, 538-539 (6th Cir. 2000).

Next Petitioner argues that the prosecutor improperly told the jury they could not consider sympathy and mercy in weighing mitigation. (Petition, Doc. No. 3 at 14.) The prosecutor's closing argued, "[n]ow, all we've heard in the mitigation hearing is about his [sic] Defendant's childhood. We have heard no mitigating facts, none. Sympathy is not a mitigating fact. One's plea or his family's plea for mercy are not mitigating facts." (Trial Tr. Vol. IV at 724.) Defense counsel made an objection at the appropriate time. *Id*. at 725. The prosecutor continued the closing with:

> Mercy is not a mitigating fact. He talked about what we commonly refer to residual doubt. . . .Sympathy for this Defendant, and certainly empathy for his family, is not a mitigating fact, or we would never have a death penalty. And, the Judge is going to tell you that the existence - - even if they were mitigating facts - - the existence of any do not preclude or prevent a death sentence if the aggravating circumstances outweigh any mitigating facts which I suggest to you are none in this case.

*Id*. at 725-726. Again defense counsel made an objection. The court overruled the objection. *Id*. at 726.

> The Defendant asks for mercy for his life as does his family, and we're all very sympathetic to those types of appeals, and there's nothing wrong with that. There's nothing wrong with that. They make some of us cry; they make some of us pray. If you feel like praying, or feel like crying, shed a tear, or say a prayer for Brian Jones, because if we don't speak for him today, nobody else will. And, the Defendant asks for mercy but, yet, after it's all said and done, after he drove away, and after he gave Marvin Washington $5.00, his departing words to Marvin Washington were: Let's do it again, Wednesday.

(Trial Tr. Vol. IV at 728.) A capital defendant is not entitled to a "merciful discretion" instruction. In fact, an instruction to a death sentence jury that it may disregard statutory criteria may be constitutionally impermissible under *California v. Brown*, 479 U.S. 538, 541 (1987). The claim that the standard instruction to disregard sympathy is unconstitutional was rejected on the basis of *California v. Brown* in *Depew v. Anderson*, C-1-94-459 Report and Recommendations of June 8,

1999, adopted 104 F. Supp. 2d 879 (S.D. Ohio 2000), *aff'd*, 311 F.3d 742 (6th Cir. 2002); a*ccord, Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000); *Mapes v. Coyle,* 171 F.3d 408, 414-15 (6th Cir. 1999); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000). The Supreme Court has held that "the sentencer must **rationally** distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Zuern v. Tate*, 101 F. Supp. 2d 948 (S.D. Ohio 2000). The jury must of course listen sympathetically to the mitigating evidence. That is, they are required to accept as mitigating those factors which the Supreme Court has held are proper to be considered in mitigation. But they may not exercise general sympathy. This is to ensure that the death penalty is not administered in an arbitrary and unpredictable manner. *Gregg v. Georgia,* 428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).

Finally, Petitioner alleges prosecutorial misconduct based on the prosecutor's making improper comments on Petitioner's unsworn statement. (Petition, Doc. No. 3 at 14.) Chinn argues that the State may remind the jurors that the comment is unsworn but must stop there, and in this case it did not. *Id.* The portion in question stated, "I also want to say, and you've heard now from during the penalty phase, from this Defendant in an unsworn statement, unlike every other single witness who testified in this trial, the Defendant has now taken the stand. We're not permitted to ask him any question or to cross- examine him." (Trial Tr. Vol. IV at 726.) This statement was objected to at trial, and the court overruled the objection. *Id.* at 726.  It is not improper for a prosecutor to argue that an unsworn statement by an accused was not made under oath and therefore was not subject to cross-examination. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000); *Mason v. Mitchell*, 95 F. Supp. 2d 744, 785 (N.D. Ohio 2000); *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 827 (N.D. Ohio 2001); *see also Franklin v. Anderson*, 2002 U.S. Dist. LEXIS 26814. This sub-claim

is without merit.

Because the state courts' decision of this Claim for Relief was neither contrary to nor an unreasonable application of controlling United States Supreme Court precedent, the Claim should be dismissed with prejudice. Moreover, reasonable jurists would not disagree with this conclusion and the Court should therefore not grant a certificate of appealability on it.

### Third Claim for Relief

> Petitioner's due process right to a fair trial was violated by the introduction of the irrelevant and prejudicial testimony of State's witness Shirley Cox. U.S. Const. amend. XIV.

In his third ground for relief, Petitioner argues that the testimony of Shirley Cox was irrelevant and prejudicial to his case and should not have been admitted. (Petition, Doc. No. 3 at 15);(Traverse, Doc. No. 27, PAGEID 320.) He argues that this testimony misled the jury into believing that the evidence presented by the State as to identity was stronger than it really was. *Id*. Petitioner argues further that Shirley Cox's repeated reference to the fact she spoke with him at her husband's law office was prejudicial as it allowed the jury to infer that he was seeking legal advice. *Id*.

Respondent's position is that this claim is without merit and basically argues that the Ohio Supreme Court's opinion "is well-reasoned and is more than merely reasonable." (Return of Writ, Doc. No. 24, PAGEID 191.)

Petitioner raised this claim on direct appeal. The Ohio Supreme Court rejected it, holding:

> In his sixth proposition of law, appellant contends that the trial court erred by allowing Shirley Ann Cox to testify at trial concerning appellant's visit to her husband's law office. Appellant claims that Cox's testimony was irrelevant and was unfairly prejudicial. We agree with appellant's assertions that the trial court should not have

permitted Cox to testify that her encounter with appellant occurred in a law office. However, we also agree with the court of appeals' finding in 1991 that although the evidence was "unfairly prejudicial, that unfairness does not clearly jeopardize the fundamental fairness of the proceeding or the reliability of the verdict." *Chinn*, Montgomery App. No. 11835, unreported, at 38. Appellant protests that the court of appeals' holding on this issue "fails to take into account the fundamental weakness of the State's case against Chinn." However, appellant's arguments plainly mischaracterize the strength of the evidence against him which, in our view, cannot seriously be labeled as "weak." Rather, the state's case against appellant was substantial and compelling.

Appellant also suggests that Cox's testimony concerning her identification of appellant as the person depicted in the composite drawing should have been excluded because Cox did not witness the crimes and her testimony may have misled or confused the jury. However, the jury was not mislead or confused by Cox's testimony. The jury was well aware that Cox did not witness the killing. Her testimony was relevant to the fact that she had seen a man who identified himself as Tony Chinn and that she subsequently saw a composite sketch of the suspected killer and recognized the resemblance between the composite and Chinn. While this testimony was largely irrelevant to the question of appellant's guilt, the testimony was relevant to inform the jury of the events that led to appellant's apprehension and arrest. Cox's testimony also corroborated Washington's testimony that appellant (whose real name is Davel Von Tress Chinn) went by the name of Tony Chinn. The evidence was not confusing or misleading in any way.

We conclude that while it might have been better for the trial court to have excluded Cox's testimony altogether, or at least any reference to the fact that she had seen appellant in a law office, the trial court's decision to allow Cox's testimony was harmless beyond a reasonable doubt. Cox's testimony was not a major factor in this case. Indeed, her testimony comprises less than eight full pages of the printed transcript. The state's case against appellant hinged on the testimony of Marvin Washington. If the jury accepted Washington's testimony, the jury was certain to convict appellant, but if the jury did not believe Washington, it was certain to acquit appellant of all charges. Had the jury disregarded Washington's account of the crimes, Cox's testimony would have made no difference. However, the jury believed Washington and, therefore, the verdicts of guilt were inevitable. Cox's testimony had little or no impact on the outcome.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 560-561, 709 N.E. 2d 1166, 1178 (1999).

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida,* 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62 (1991).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983); *Bell v. Arn*, 536 F.2d 123 (6th Cir. 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir. 1975), *cert. denied,* 423 U.S. 937 (1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003), *cert. denied sub nom, Bugh v. Bradshaw*, 540 U.S. 930 (2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001), *cert. denied,* 534 U.S. 977 (2001). Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly. *Bugh,* 329 F.3d at 512*, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993), *quoting Dowling v. United States*, 493 U.S. 342, 352 (1990). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Bugh,* 329 F.3d 496 at 512, *citing, Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000), *cert. denied,* 532 U.S. 989 (2001) *quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). The Supreme Court has defined "very narrowly" the category of

infractions that violate fundamental fairness. *Bey v. Bagley,* 500 F.3d 514 (6th Cir. 2007), *citing,*

*Dowling v. United States,* 493 U.S. 342 (1990).

> Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly. As we observed in [*United States v.*] *Lovasco,* [431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed2d 752 (1977)]: Judges are not free, in defining 'due process', to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

*Bey,* 500 F.3d at 522, *citing, Dowling,* 493 U.S. at 352-53.


Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness

turns upon "whether the evidence is 'material in the sense of a crucial, critical, highly significant

factor.'" *Brown v. O'Dea,* 227 F.3d 642, 645 (6th Cir. 2000)(citations omitted).

Shirley Cox testified at Mr. Chin's trial as follows:

> **Q. [by assistant prosecutor]:** Would you state your full name for the Court, please?
>
> **A.** Shirley Ann Cox.
>
> **Q**. Your last name is spelled?
>
> **A**. C-O-X.
>
> **Q.** You are married; is that right?
>
> **A.** Yes. I am married to Bobby Cox.
>
> **Q.** Are you employed?

**A.** Yes. I am for my husband, Bobby Cox.

**Q.** What do you do for him?

**A**. I'm sort of a receptionist, and I do all the billing and I work in his law office.

**Q.** Where is that law office located?

**A.** It's located in the Hulman Building on the third floor.

**Q.** Now, I'm going to ask you, Mrs. Cox, if you would, to refer your attention to Thursday, February the 23rd of 1989, at about 9:30 in the morning. I'd like you to tell the Jury where you were?

**A.** I was in the law office, at the front of the desk. I work at the front of glass doors in my husband's law office in the Hulman Building.

      **[Defense counsel]:** Your honor, our continuing objection on the subject we noted before.

      **The Court:** The Court has considered and overruled the objection.

      **[Defense counsel]:** Thank you, Judge.

**Q.** I'm going to ask you if someone came into the office at about 9:30?

**A.** Uhm, it was not 9:30. It was closer to about a quarter to nine. I had only been there 15 minutes.

**Q.** About 8:45?

**A.** Right. I had opened the one door so we could have furniture moved in that day. A person came in through the opened door.

**Q.** What do you mean, person? A male or female.

**A.** It was two males.

**Q.** Two males. And were they White or Black?

**A.** They were Black.

**Q.** I'm going to ask you not to relate any conversations but, if you would, during the conversations did one of the men indicate his name to you?

**A.** Yes. The person kept saying his name was Tony and he wanted to see my husband.

**Q.** Did he ever indicate his last name?

**A.** Yes. After I told him that I could not let him see him, he said his name was Chinn and he needed to see him. Tony Chinn.

**[Defense counsel]:** Excuse me. Can we approach the Bench? Just a second?

**The Court:** All right.

(A sidebar conference is held on the record.)

**[Defense counsel]:** Mrs. Cox is continually indicating and this is what we're objecting to. He's there to see a lawyer. He's in a law office. We feel, based on our objection before, that this should not be allowed and stricken.

**The Court:** Since the purpose is not disclosed, the Court has already considered this matter and finds that objection should be overruled.

(Side Bar conference concludes.)

**Q.** Mrs. Cox, I ask you to look around the Courtroom and tell the Jury if you see this individual in the Courtroom today?

**A.** Yes, I do.

**Q.** Would you point him out for us, please?

**A.** He's the person on the left, the Black man in the black V-neck sweater.

**[Assistant prosecutor]:** Indicating the Defendant for purposes of the record, your Honor.

**Q.** How, Mrs. Cox, without going into any detail, I'm going to ask,

for whatever reasons, just whether your attention was directed and did you observe continuously this Defendant on February the 23rd of 1989?

**A.** Yes, I did.

**Q.** Approximately how long?

**A.** Approximately ten to fifteen minutes.

**Q.** Now, as a result of that, did you have occasion to discuss this with your husband later that day?

**A.** Yes, I did the minute he came in the door.

**Q.** Following that discussion, did you call anyone?

**A.** Yes, I did. I called Tony Spells, the Dayton Police Department.

**Q.** Did you have occasion then to be at home later that evening?

**A.** Yes, I did.

**Q.** I'm going to ask what, if anything, occurred that evening?

**A.** Approximately that same evening, I always read the day before's papers. I mean, I never read the same day. I always read the day before because we're always one day behind. I was reading — I was reading Wednesday night's paper. I just looked up at my husband. He was watching T.V. I said, "My God, I don't believe this." He said, "What?" " This Tony Chinn that was in here this morning is in the paper."

**Q.** Now, I'll hand you —

[**Defense counsel**]: I object to that conclusion, your Honor. Not necessarily that she didn't say that, but that the Jury would reach that conclusion.

**The Court:** Overruled.

**Q.** I'll hand you what has been marked as State's exhibit 21 for identification purposes, and ask you to tell the Jury what that is?

**A.** That is the torn-out article of the page that I was reading on Thursday night, and when I looked at the picture, I just knew it had to be the same person that was in the office that morning.

**Q.** I'm going to ask you, the picture composite that's in that exhibit 21, is that the same — that is also on the Defendant's exhibit L; same two?

**A.** Right, That's just blown-up from this paper.

**Q.** Without going into any details, does that composite and article that's below it, concerning homicide that occurred on January the 30th of 1989, in the 5000 block of Germantown Pike, Jefferson Township?

**A.** Yes, it is.

**Q.** Now, as a result of this article that you saw and read in the paper, and your conversations with your husband, what, if anything, did you do?

**A.** Friday morning I had made a trip to Cincinnati with another lawyer, and his wife, and my husband, for a seminar, and, at the Frisch's in Kentucky, I called Detective Lantz of the Dayton Police Department, because the newspaper says that's who to call.

**Q.** Were you able to talk to Detective Lantz right away?

**A.** No, I wasn't. He ended up giving me some Sergeant that was in charge. I just told him what all I wanted to tell Detective Lantz. He said Detective Lantz would get a hold of me later in the day.

**Q.** Because of your being in Cincinnati, did you have occasion to call Detective Lantz later?

**A.** Right. Apparently, Detective Lantz called my office — my husband's office and my office, at about 1:30, and the secretary told me when I called her.

[Defense counsel]: We'll just stipulate she made phone calls. [The assistant prosecutor] need not introduce phone records here.

[Assistant prosecutor]: That's fine. We can stipulate that. That you did.

**Q.** You have the long distance records that you did, in fact, make from Cincinnati, calling Detective Lantz; is that right?

**A.** Right.

**Q.** I believe you called him on several occasions; is that correct?

**A.** Right. I called him that morning, which I didn't get him. Then, I talked to him from the hotel approximately around 2:00 — 2:30 — 3:00.

**Q.** Again, without getting into all the conversation you had with him, I'll just ask if the reason you called Detective Lantz — did you tell him the person who was in your office is the person you saw in the paper?

**A.** Right. I told him the reason I was calling in —

**Q.** Did you give Detective Lantz the full name of the person, though?

**A.** Yes, I did.

**Q.** In any newspaper article, there is not the full name?

**A.** There is no name other than it said he may go by the name of Tony.

**Q.** That was it?

**A.** Right.

**Q.** And you gave Detective Lantz his full name?

**A.** Right

**[Assistant prosecutor]:** I have no further questions. Thank you very much. You [sic] witness.

**Q. [by defense counsel]:** Good morning, Mrs. Cox.

**A.** Good morning.

**Q.** Your office is downtown?

**A.** Yes, it's in the Hulman Building.

**Q.** Just so I'm straight with this. Defendant's exhibit L is what you said was a blow-up of the composite?

**A.** That is the picture that was in the paper from Wednesday night.

**Q.** That is what you relied on when to may your phone call?

**A.** Yes, I did.

> **[Defense counsel]:** I don't have any other questions.

> **[Assistant prosecutor]:** No further questions.

(Trial Tr. Vol. IV at 375-83.)

As noted above, Petitioner's claim with respect to Mrs. Cox's testimony is two-pronged—first that it misled the jury into believing that the evidence presented by the State as to identity was stronger than it really was and second that Mrs. Cox's repeated reference to the fact she spoke with him at her husband's law office allowed the jury to infer that he was seeking legal advice.

As the Ohio Supreme Court acknowledged, the State's case against Petitioner hinged on Marvin Washington's testimony. Mrs. Cox's testimony was largely irrelevant to the question of Petitioner's guilt. The question, of course, is whether the admission of the irrelevant testimony resulted in a violation of Petitioner's due process rights.

Mrs. Cox's testimony concerning her identification of Petitioner as the person depicted in the composite drawing was relevant to explain to the jury the events that led to the identification and arrest of Petitioner. Therefore, the admission of that testimony, even if erroneous under state law, did not rise to the level of a due process violation.

On direct appeal, the Montgomery County Court of Appeals Court of Appeals analyzed the admission of Mrs. Cox's testimony under Ohio Rules of Evidence 401 and 403. It found Mrs. Cox's testimony had probative value "to show that Chinn possessed a guilty mind" *Chinn* 1st Dir App., 1991 Ohio App. LEXIS 6497, *42 (2nd Dist. 1991). However, the trial court prohibited the prosecutor from arguing this inference and also prevented Mrs. Cox from testifying about "the heavy stuff" - Chinn's comments to Mrs. Cox about why he wanted to consult with her husband. The court of appeals found this exclusion "ameliorated, somewhat, the prejudicial character of the evidence, but the fundamental unfairness remained." It found the unfairness arose from the implicit intrusion on Chinn's Sixth Amendment right to consult counsel. Nonetheless, it declined to find reversible error:

> After a careful review of the record we cannot find an abuse of discretion. The trial court gave a complete hearing, out of the jury's presence, to the various objections of Appellant. The court [*44] excluded evidence of Appellant's "heavy stuff" statement to Mrs. Cox and prohibited the state from arguing that Chinn's attempt to consult with an attorney is indicative of guilt. The court gave no limiting instruction pursuant to Evid. R. 105, but the Appellant did not request one. Though the evidence was unfairly prejudicial, that unfairness does not clearly jeopardize the fundamental fairness of the proceeding or the reliability of the verdict. While the trial court should have excluded evidence that Chinn attempted to consult a lawyer, we cannot find that its decision is unreasonable, arbitrary, or unconscionable.

*Chinn 1st DirApp*, 1991 Ohio App. LEXIS 6497 at *43-44.

The Ohio Supreme Court considered this claim as Petitioner's Proposition of Law No. VI. It held:

> In his sixth proposition of law, appellant contends that the trial court erred by allowing Shirley Ann Cox to testify at trial concerning appellant's visit to her husband's law office. Appellant claims that Cox's testimony was irrelevant and was unfairly prejudicial. We

agree with appellant's assertions that the trial court should not have permitted Cox to testify that her encounter with appellant occurred in a law office. However, we also agree with the court of appeals' finding in 1991 that although the evidence was "unfairly prejudicial, that unfairness does not clearly jeopardize the fundamental fairness of the proceeding or the reliability of the verdict." Chinn, Montgomery App. No. 11835, unreported, at 38. Appellant protests that the court of appeals' holding on this issue "fails to take into account the fundamental weakness of the State's case against Chinn." However, appellant's arguments plainly mischaracterize the strength of the evidence against him which, in our view, cannot seriously be labeled as "weak." Rather, the state's case against appellant was substantial and compelling.

Appellant also suggests that Cox's testimony concerning her identification of appellant as the person depicted in the composite drawing should have been excluded because Cox did not witness the crimes and her testimony may have misled or confused the jury. However, the jury was not misled or confused by Cox's testimony. The jury was well aware that Cox did not witness the killing. Her testimony was relevant to the fact that she had seen a man who identified himself as Tony Chinn and that she subsequently saw a composite sketch of the suspected killer and recognized the resemblance between the composite and Chinn. While this testimony was largely irrelevant to the question of appellant's guilt, the testimony was relevant to inform the jury of the events that led to appellant's apprehension and arrest. Cox's testimony also corroborated Washington's testimony that appellant (whose real name is Davel Von Tress Chinn) went by the name of Tony Chinn. The evidence was not confusing or misleading in any way.

[*561] We conclude that while it might have been better for the trial court to have excluded Cox's testimony altogether, or at least any reference to the fact that she had seen appellant in a law office, the trial court's decision to allow Cox's testimony was harmless beyond a reasonable doubt. Cox's testimony was not a major factor in this case. Indeed, her testimony comprises less than eight full pages of the printed transcript. The state's case against appellant hinged on the testimony of Marvin Washington. If the jury accepted Washington's testimony, the jury was certain to convict appellant, but if the jury did not believe Washington, it was certain to acquit appellant of all charges. Had the jury disregarded Washington's account of the crimes, Cox's testimony would have made no difference. However, the jury believed Washington and, therefore, the verdicts of guilt

> were inevitable. Cox's testimony had little or no impact on the
> outcome.

*Chinn OhioSCt,* 85 Ohio St. 3d 548, 560-561, 709 N.E. 2d 1166 (1999).

This Court cannot say that the Ohio Supreme Court's decision is contrary to or an unreasonable application of clearly established Supreme Court precedent. The jury did not learn what Chinn wanted to consult Mr. Cox about or anything about Mr. Cox's chosen areas of practice, so the inference that Chinn wanted to consult Mr. Cox about this crime would have been indirect. Some explanation of how Mrs. Cox came to meet Chinn was necessary to give context to her testimony. Had she testified that she was a receptionist for her husband's business and met Chinn in that way, without mentioning that her husband was an attorney, the testimony would have been completely unobjectionable.

While the court of appeals and the Ohio Supreme Court both found the identification of the place of meeting as a law office to be error, neither found that it rendered the trial fundamentally unfair. In particular, the Ohio Supreme Court analyzed the other evidence of identity and found it to be compelling. This Court agrees. While some of the witnesses could not identify Chinn, his co-perpetrator did so quite positively as someone he had known for over a year (although not closely, close enough to join in an aggravated robbery scheme) and he had no motive to lie.

Weighing the other evidence of Chinn's guilt, the Ohio Supreme Court found admission of Mrs. Cox's testimony to be "harmless beyond a reasonable doubt." *Chinn OhioSCt*, 85 Ohio St. 3d 548, 561, 709 N.E. 2d 1166 (1999). Constitutional error in a habeas case is not required to be harmless beyond a reasonable doubt. Rather, error is harmless if the habeas court is satisfied it did not have a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993), adopting standard from *Kotteakos v. United States*, 328 U.S. 750

(1946). This standard calls for reversal when the reviewing court lacks a "fair assurance" that the outcome of a trial was not affected by evidentiary error. *Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004). *Brecht* applies post-AEDPA "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705." *Fry v. Pliler*, 551 U.S. 112 (2007).

Because the Ohio Supreme Court's finding of harmless beyond a reasonable doubt would have satisfied the *Chapman* standard, *a fortiori* it satisfies *Brecht*. And this Court cannot say it is contrary to or an unreasonable application of *Brecht*. Therefore Petitioner's Third Claim for Relief should be denied on the merits. This conclusion is, however, one on which reasonable jurists could disagree. Therefore, if the Court dismisses this Claim for Relief, it should grant a certificate of appealability on it.

### Fourth Claim for Relief

> Petitioner's right to confront a material witness against him was violated when the trial court restricted his cross-examination of Christopher Ward. U.S. Const. amends. VI, XIV.

In his fourth ground for relief, Petitioner argues that his rights were violated when the court denied him the ability to cross-examine a witness for the State. (Petition, Doc. No. 3 at 17);(Traverse, Doc. No. 27, PAGEID 326.) Respondent contends that this ground for relief is without merit. (Return of Writ, Doc. No. 24 at 47, PAGEID 192.) In addressing this claim, the Ohio Supreme Court held:

> At trial, Christopher Ward testified that on January 31, 1989, at

approximately 12:30 or 1:00a.m., Washington had pulled up to 5213 Lome Avenue in the black Chevrolet Cavalier and introduced Ward to "Tony," who was seated in the front passenger seat. Ward testified that he shook Tony's hand and then spoke to Washington for approximately thirty to forty-five minutes until Washington and Tony drove away. Ward identified appellant as the man that Washington had introduced as Tony. During cross-examination, defense counsel sought to cast doubt on Ward's identification of appellant. During questioning, the following exchange took place:

"Q. Do you remember telling McKeever-

Mr. Heck: I'm going to object now even though he didn't get to finish what he's going to quote.

The Court: Let me see counsel at side Bench.

* * *

The Court: Let's make a record. First of all, let's have your complete question.

Mr. Monta: Okay. The question which we would like to ask this witness was if he gave an oral statement to Major McKeever, with the Jefferson Township Police on the 5th of February, 1989, and did he say to Major McKeever he did not pay any attention to the other man in the car whose name was Tony.

Mr. Heck: I object. If he wants to cross-examine him on an alleged inconsistency in the statements, written statements, that's fine. But, my reading of the written statements there is not that inconsistency. He is trying to cross-examine this witness on either a made-up statement or on something that's in the police report, which they have, and I object.

The Court: First of all, under Rule 16, the police report is not available. Secondly, the copy of the statement given to the Court made by this witness on the 5th of February, and McKeever as the officer signing it, has nothing to do with this question. It does not contain any reference to the question before the Court; therefore, the question has to be solely caused by this police report, and so the Court will

sustain the objection.

> Mr. Monta: May I just add, your Honor, the question which would be asked is one in which the defense is attempting to test the credibility of what the witness has said and answer will either be consistent with or impeach that testimony.

> The Court: Police reports are inherently inaccurate and that is the very reason why under criminal rule 16 they are not to be made available and not to be used on cross-examination of any witnesses. On that basis, the Court sustains the objection. (Emphasis added.)

The court of appeals in its 1991 decision in this matter found that the trial court had erred by denying defense counsel the opportunity to cross-examine Ward on the alleged prior inconsistent statement, finding that "whether evidence is discoverable under Crim. R. 16 has no bearing on its [admissibility]," since such evidence could be relevant, and all relevant evidence is generally admissible. *Chinn*, Montgomery App. No. 11835, unreported, at 73. The court of appeals found that the question defense counsel propounded "did not concern a police report, but a prior statement of the witness to a police officer," and that "Ward's statements to Officer McKeever concerning 'Tony' were certainly relevant to his identification of Appellant." *Id*. Therefore, the court of appeals determined, "To the extent that [Ward's statements to McKeever] might contradict Ward's trial testimony they were proper grounds for impeachment." *Id*. Additionally, the court of appeals stated, "Appellant was prohibited by Evid. R. 613(B) from introducing evidence of the inconsistent statement in extrinsic form, that is, by way of McKeever's testimony or his written report, unless Ward was first afforded an opportunity to explain and deny the same. The trial court's ruling foreclosed that opportunity. The error was prejudicial if the prior statement could reasonably cause the jury to reject Ward's testimony." 1991 Ohio App. LEXIS 6497 at *86. However, on the issue of prejudice, the court of appeals determined that "the error was not so prejudicial as to require reversal." 1991 Ohio App. LEXIS 6497 at *87.

Upon a review of the record, we find that the error, if any, in the trial court's decision not to permit defense counsel to cross-examine Ward on the alleged prior inconsistent statement did not unfairly prejudice appellant. After the trial court had sustained the objection to the

question propounded by defense counsel, the defense questioned Ward whether he had ever "Talked to McKeever about the description of the man on the passenger's side" of Jones's automobile.  Ward responded, "I don't remember at all."  Later, during the cross-examination of Major McKeever, defense counsel was permitted to question McKeever concerning the statements that Ward had allegedly made on February 5, 1989:

> Q: Now, you also did some investigation in this case; did you not?
> A: Yes, sir.
> Q: And before you interviewed Marvin Washington, did you not interview a person by the name of Christopher Ward?
> A: Yes, sir. I did.
> Q: In fact, you interviewed him first; is that correct?
> A: That's correct.
> Q: On the same day, the 5th of February?
> A: I can't recall the day.  I probably would have to see my report.
>
> * * *
>
> Q: This starts at page 12, which was provided to us. Is that your statement?
> A: Yes, that's mine.
> Q: All right.
> A: That was on the same day.
> Q: And was Mr. Ward able to give you a description of the person that he said he saw, the other person, not Marvin Washington?
> A. Very- - he indicated to me that he - -well, he did see the driver.
> Q: Right.
> A: And shook hands with him, but he was more interested in the car they were driving, the dashboard.
> Q: Didn't he indicate to you that he didn't pay any attention to the other person?
> A: Yes, sir, meaning that he spoke to the gentleman but he was more interested in the dashboard of that particular automobile.
> Q: More interested in the dashboard and didn't pay any attention to the other person?
> A: Correct

During redirect examination, the prosecutor questioned McKeever concerning the police report. The prosecution asked McKeever, "I'm going to ask you, they [the defense] asked you about the statement and what Christopher Ward told you. They asked you this on cross-examination, about the second person, the passenger, this Tony in the car, and I believe Mr. Monta asked about paying attention to him. Was that your conclusion or is it his words?" McKeever responded, "That was my conclusion." The prosecution also asked, "Did Mr. Ward tell you at all times that he could identify the passenger in that car?" McKeever responded, "Several times." The prosecution then asked, "Did he also tell you that he saw the passenger and shook hands, in fact, with the passenger in the victim's car along with Marvin Washington?" McKeever replied, "That's correct."

The record is clear that defense counsel had an opportunity to impeach Ward's trial testimony during cross-examination of McKeever by questioning McKeever concerning Ward's alleged prior inconsistent statement that he "didn't pay any attention" to the man who was with Washington in the victim's car. The record is equally clear that Ward never made any such statement to McKeever. Rather, the statement at issue was McKeever's own statement and was the product of McKeever's own conclusions. In actuality, Ward specifically told McKeever that he had seen "Tony" and that he could positively identify him. Ward did positively identify appellant, and he did so on three separate occasions, *i.e.*, once from a photo array, once at the lineup, and again at trial. Therefore, the alleged inconsistent statement, even if Ward had made it, was not inconsistent with any of Ward's trial testimony. We think it obvious that the trial court's decision not to allow defense counsel to cross-examine Ward concerning the statement had no prejudicial impact whatsoever. The error, if any, was harmless beyond a reasonable doubt.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 570-573, 709 N.E. 2d 1166, 1184-1186 (1999).

Petitioner argues that he was never able to cross-examine Ward as to the notation in the police file that stated that "Ward said when Marvin came by his home there was another subject in the car, a black male but he did not pay any attention to him." (Traverse, Doc. No. 27, PAGEID 327.) This restriction on defense counsel's cross-examination resulted in a denial of his Confrontation Clause rights. *Id*. This statement made to police was relevant to identification, went

to the credibility of the witness, and could have been used as an impeaching statement to contradict his trial testimony. *Id.*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This right is incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406 (1965). This right means more than "being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." *Id.* at 315-316 (emphasis in original). The Supreme Court noted that the trial judge maintains the ability to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant and that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)

Counsel directs the Court to *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). In *Van Arsdall*, defense was denied the opportunity to fully cross-examine a witness for the State on any possible bias, plea deal, or motives he may have had in giving his testimony. *Id.* The Supreme Court held this to be a violation of the Confrontation Clause. *Id.* The Court also determined that it was not necessarily appropriate to show "outcome determinative prejudice" but rather that the focus of the Confrontation Clause, and of the prejudice inquiry, is on individual witnesses. *Id.* at 680.

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and

thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

*Id.*, *citing Davis v. Alaska*, 415 U.S. 308, 318 (1986).

The Court continued by stating that after concluding there was a constitutional error, it is subject to *Chapman* harmless error analysis. *Id.*

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of facts, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. Cf. *Harrington*, 395 U.S., at 254; *Schneble v. Florida*, 405 U.S., at 432.

*Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Of course *Van Arsdall* precedes the change in the harmless error standard in *Brecht*.

There is no dispute that Ward testified at Petitioner's trial and was, in essence, "available" to testify and that Petitioner had the opportunity to cross-examine him. Petitioner has met his burden here that had counsel been able to cross-examine Ward on this inconsistency, a reasonable juror may have had a different impression of Ward's credibility. However, in turning to the other factors, even though the precise question was objected to and sustained, defense counsel was permitted to ask on cross-examination whether or not Ward recalled having a conversation with Officer McKeever in which he described the other man in the car with Washington. (Trial Tr. Vol. III at 177.) Ward responded that he could not remember. *Id.* Whether he would have remembered if confronted with McKeever's record of what he said is not known. However Officer McKeever testified that it was

his own impression, rather than Ward's statement, that Ward had paid more attention to the dashboard of the car than the occupants. (Trial Tr. Vol. III at 339, 343.) The Court also notes that Ward maintained at all times that he could in fact identify the person he saw with Washington that night, that he had shook this man's hand, and spoke with Washington and "Tony" for at least half an hour. Additionally, the Court notes that Ward did in fact identify Petitioner on three separate occasions, from a photo spread, from a line-up, and an in court identification. (Trial Tr. Vol. III at 154, 159, 178-179, 182.) Petitioner has not shown prejudice arising from the inability to cross-examine this witness on this statement. The Fourth Ground for Relief should be denied on the merits and Petitioner should be denied any requested certificate of appealability.


### Fifth Claim for Relief

Petitioner's right to confrontation was violated by the admission of prejudicial hearsay evidence at his trial. U.S. Const. amends. VI, XIV.

A.      The trial court erred when it allowed Detective Lantz to present hearsay evidence of state's witness Shirley Cox.

B.      The trial court erred when it allowed Detective Lantz to present hearsay evidence of state's witness Marvin Washington.

C.      The trial court erred when it allowed Christopher Ward to present hearsay evidence of state's witness Marvin Washington.

In his Fifth Claim for Relief, Petitioner alleges that his Confrontation Clause right was violated because the trial court improperly admitted prejudicial hearsay. (Petition, Doc. No. 3 at 19); (Traverse, Doc. No. 27, PAGEID 330). Respondent raises no procedural defense to this Claim, but

asserts that it may be "summarily rejected" on the merits. (Return of Writ, Doc. No. 24, PageID 200.)

Sub-claim C has been dismissed by the District Court as procedurally defaulted and that remains the law of the case. (Opinion and Order, Doc. No. 30, PAGEID 528.) As for the remaining portions of the claim, the Ohio Supreme Court held:

> In this proposition [Proposition of Law No. VI], appellant also contends that the trial court erred by permitting Detective David Lantz to testify at trial concerning Cox's identification of appellant at the February 27, 1989 lineup. At trial, the following exchange took place during the state's direct examination of Detective Lantz:
>
> Q: Was Mrs. Cox able to make an -
>
> Mr. Monta [defense counsel]: Objection, your Honor. We need to approach on this.
>
> Mr. Monta: Your Honor, the prosecution had Mrs. Cox on the stand. They also had these documents which would indicate whether a person is seen in a line-up or not. They did not choose to go into that with Mrs. Cox, and as a result of no questioning on this subject with her, this * * * testimony is going to be hearsay.
>
> The Court: Well, defense has also known that she had made the identification, which she could have been asked about. The fact that she was not asked by either party does not in any way prevent this witness to testify as to what he saw. I'll overrule the objection.
>
> Q. Was Mrs. Cox able to [make an] identification at the line-up?
> A: Yes, she was.
> Q: Whom did she indicate?
> A. Again, number seven, the Defendant Davel Chinn
>
> Appellant contends that Lantz's testimony constituted impermissible hearsay and resulted in substantial prejudice. We disagree. Lantz's statements concerning Cox's identification of appellant were not hearsay. Evid. R. 801 provides:
>
>> (D) A statement is not hearsay if:
>> (1) The declarant testifies at the trial or hearing and is

-87-

subject to cross-examination concerning the statement, and the statement is * * * (c) one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification.

As the court of appeals ably recognized, "because Cox was 'subject to cross-examination' on the lineup, regardless of whether she was actually ever subjected to such examination, Det. Lantz's testimony was not hearsay." (Emphasis sic.) *Chinn*, Montgomery App. No. 11835, unreported, at 39. We agree that Lantz's testimony did not constitute hearsay under Evid. R. 801(D)(1)(c). Moreover, and in any event, we fail to see how that testimony was prejudicial to appellant.

Appellant also argues that the trial court erred by permitting Detective Lantz to testify at trial, over defense objection, concerning Washington's explanation for not immediately identifying appellant at the lineup. Appellant contends that Lantz's testimony was hearsay. However, even if the testimony at issue was hearsay, and we do not believe that it was (see Evid. R. 801 (D)(1)(b) and *Chinn*, Montgomery App. No. 11835, unreported, at 75-760, prejudice is lacking in that Washington had earlier testified as to the statement he made to Lantz.

Additionally, appellant challenges Christopher Ward's testimony concerning certain statements that Washington had made in the early morning hours of January 31, 1989. Specifically, appellant claims that Ward's testimony constituted inadmissible hearsay. However, we conclude that appellant failed to demonstrate plain error, i.e., that but for the alleged errors, the outcome of his trial clearly would have been otherwise. Therefore, we reject appellant's arguments concerning Ward's testimony.

Accordingly, for the foregoing reasons, appellant's sixth proposition of law is not persuasive.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 561-562, 709 N.E. 2d 1166, 1178-1179 (1999).

The Supreme Court adverts at several points to the Court of Appeals decision on these claims, which was as follows:

For his seventh assignment of error, Chinn contends that

THE TRIAL COURT ERRED IN ALLOWING DETECTIVE LANTZ TO OFFER HEARSAY EVIDENCE OF STATE'S WITNESS SHIRLEY COX CONCERNING LINEUP IDENTIFICATION.

Det. Lantz testified over Chinn's objection that Cox picked Chinn out of lineup. (T. 397). Because Cox did not testify concerning the matter, Chinn contends that it was improper to allow Det. Lantz to so testify.

Chinn also contends that the statement was hearsay. We do not agree. Evid. R. 801 (D)(1)(c) states, in pertinent part, "A statement is not hearsay if. . . the declarant testifies and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification." Because Cox was "subject to cross-examination" on the lineup, regardless of whether she was actually ever subjected to such examination, Det. Lantz's testimony was not hearsay.

The seventh assignment of error will be overruled.

*Chinn 1st DirApp*, 1991 Ohio App. LEXIS 6497, *44-45 (2nd Dist. 1991).

Chinn's twenty-second assignment of error contends that

THE TRIAL COURT IMPROPERLY ADMITTED HEARSAY EVIDENCE DURING THE GUILT PHASE OF APPELLANT CHINN'S TRIAL, IN VIOLATION OF OHIO RULE OF EVIDENCE 802, THEREBY DEPRIVING APPELLANT CHINN OF THE RELIABILITY AND FAIRNESS REQUIRED IN A CAPITAL TRIAL BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 5, 9, 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

Det. Lantz testified that Washington told him that he had deliberately misidentified Chinn at a lineup for fear that he could be seen by Chinn through the one-way glass. (T. 398-399). Chinn contends that this was hearsay and should have been excluded.

A statement is not hearsay if it is "consistent with [the declarant's] testimony and is offered to rebut an express or implied charge against

him of recent fabrication or improper influence or motive." Evid. R. 801(D)(1)(b). Appellant elicited from Washington on cross-examination that he had identified another person in the lineup. (T. 302-307). Thus, Chinn was implicitly, and later during closing argument explicitly, asserting that Washington fabricated the identification out due to police coercion. Therefore, Det. Lantz's testimony was admissible under Evid. R. 801(D)(1)(b). Furthermore, due to the fact that Washington had previously testified to the same thing (T. 249), we see no unfair prejudice.

The twenty-second assignment of error is overruled.

*Id.* at *88-90.

As discussed above with respect to the Fourth Claim, the Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right is applicable to the States by incorporation through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406 (1965).

The Sixth Circuit addressed the recent history of the Confrontation Clause in *Miller v. Stovall,* 608 F.3d 913 (6th Cir. 2010):

> For over twenty years, courts analyzed confrontation challenges using *Ohio v. Roberts,* 448 U.S. 56 (1980), under which hearsay statements were admissible so long as they bore sufficient "indicia of reliability," that is, if they fell into a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.* at 66. In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court revised its understanding of the confrontation right. ... The Court held that if a hearsay statement is testimonial, it can be admitted against a criminal defendant only if the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. *Id* at 59. Although the Court left unanswered whether *Roberts* still governs nontestimonial hearsay, *id.* at 68, it later held that the Confrontation Clause did not apply at all to such statements, abrogating *Roberts* in full, *see Davis v. Washington,* 547 U.S. 813, 821 (2006).

In *Crawford*, the Supreme Court declined to "spell out a comprehensive definition of 'testimonial.' " 541 U.S. at 68. It began at the extremes, noting that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51. It then listed three "formulations" of th[e] core class of testimonial statements," drawn from court filings and pervious cases:

> [(1)] "*ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; [(2)] "extrajudicial statements ... contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [(3)] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. at *Amici Curiae* 3.

*Id.* at 51-52. The Court noted that "all share a common nucleus." *Id.* at 52. It also declared that testimony at a preliminary hearing, grand jury proceeding, or former trial and statements in police interrogations are testimonial under any definition, *id.* at 52, 68, and that business records and statements in furtherance of a conspiracy are not testimonial "by their nature," *id.* at 56.

In *Davis v. Washington,* 547 U.S. 813 (2006), the Court delivered a refined definition of "testimonial," but only for a subset of cases involving police interrogation. ... The Court explicitly cautioned that it did not mean "to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial," because the Framers did not intend "to exempt from cross-examination volunteered testimony or answers to open-ended questions." *Id.* at 822 n.1. In its most recent case on the Confrontation Clause, the Court appeared to discuss the three formulations as more than merely possible definitions. *See Melendez-Diaz v. Massachusetts,* 129 S.Ct. 2527, 2531 (2009))(stating that in listing the three formulations,

-91-

> *Crawford* "described the class of testimonial statements covered by the Confrontation Clause"); *id.* at 2532 (in holding that drug-analysis certificates are testimonial, noting that "[o]ur description of [the core class of testimonial statements] mentions affidavits twice").
>
> The Sixth Circuit had adopted a standard for applying the Supreme Court's ruling in *Crawford.* In *United States v. Cromer,* 389 F.3d 662 (6th Cir. 2004), this court offered the following guidance for determining whether a statement in testimonial:
>
>> The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.
>
> *Id.* at 675; *see also United States v. Hinton,* 423F.3d 355, 359-60 (3rd Cir. 2005) (adopting the *Cromer* standard). Applying this standard, we held that a confidential informant's statements to a police officer, relating the name identification and physical description of the defendant, were testimonial. *Id.* at 677-79. This court has consistently applied the *Cromer* standard. *See, e.g., United States v. Mooneyham,* 473 F.3d 280, 286-87 (6th Cir. 2007) (co-conspirator's statements to undercover police officer were not testimonial because he would not have believed they would be used a trial); *United States v. Johnson,* 440 F.3d 832, 843 (6th Cir. 2006) (statement to twenty-five year acquaintance was not testimonial when declarant had no reason to suspect acquaintance's cooperation with law enforcement); *United States v. Barry-Scott,* 251 F. App'x. 983, 989-90 (6th Cir. 2007) (unpublished opinion) (confidential informant's statements to police officer were testimonial).

*Miller,* 608 F.3d at 923-24.

In addressing Petitioner's Third Claim, *supra*, this Court reviewed, in its entirety, Mrs. Cox's testimony. That review reveals that at no time did the prosecutor question Mrs. Cox about the line-up. *See* Trial Tr. Vol. IV at 375-83. At the end of defense counsel's cross-examination of Mrs. Cox, after counsel advised the court that, "I don't have any other questions," the assistant prosecutor advised the court that he had, "[n]o further questions," and the court dismissed Mrs. Cox. *Id.* at 383.

Immediately after the court dismissed Mrs. Cox, the State called Detective David Lantz as a witness. *Id.* at 384. The assistant prosecutor initially examined Detective Lantz about background matters particularly with respect to the February 27, 1989, line-up. *Id.* at 384-97. The Ohio Supreme Court accurately described the assistant prosecutor's direct examination of Detective Lantz on the issue of Mrs. Cox's identification of Petitioner in the line-up and this Court will not repeat that examination herein. (Trial Tr. Vol. at 397.) Although the State had the opportunity to examine Mrs. Cox about her participation in the line-up and her identification of Petitioner, the State chose not to do so.

In the absence of the State's eliciting the identification from Mrs. Cox, there would be no reason for Petitioner's counsel to do so. Indeed, in the absence of any evidence introduced by the State, one would be suspect of a defendant's counsel who introduced into evidence a witness' line-up identification of the defendant merely for the purpose of cross-examining the witness about it.


This Court concludes that for purposes of a Confrontation Clause claim analysis, Mrs. Cox intended to "bear testimony against" Chinn. *See, Miller,* 608 F.3d at 923-24. This Court therefore concludes that the statements Mrs. Cox made to Detective Lantz as to her identification of Petitioner at the line-up and about which he testified were testimonial in nature.

In deciding whether the State violated Petitioner's Confrontation Clause rights, however, the Court does not apply *Crawford*. *Crawford* was decided in 2004, but the Ohio Supreme Court rendered the last state judgment on the merits of this claim in 1999. *Crawford* is not applicable on collateral review or retroactively. *Whorton v. Bockting*, 549 U. S. 406 (2007); *Dorchy v. Jones,* 398 F.3d 783 (6th Cir. 2005). Since the test under 28 U.S.C. § 2254(d) looks to the law at the time the

state courts reached their decision, Chinn can show a Confrontation Clause violation only if he can show the Ohio Supreme Court decision was contrary to or an unreasonable application of Supreme Court law as it existed in 1999. This he has failed to do. So far as the record shows, Chinn's counsel made no effort to re-call Mrs. Cox in order to cross-examine her after Lantz testified. Even though Mrs. Cox had been excused as a witness after cross-examination, there is no showing she had become unavailable by the time Detective Lantz finished testifying. There is no showing Mrs. Cox could not have been found in the place where Mr. Chinn found her, in the Hulman Building on West Second Street in Dayton, less than two blocks from the Montgomery County Courthouse.

In Sub-claim B, Petitioner argues that Detective Lantz improperly testified as to a conversation between himself and Marvin Washington after the line-up. (Traverse, Doc. No. 27, PAGEID 332.) He indicated that after the line-up Washington approached him to tell him he could make an identification and that he had failed to do so during the line-up because he had been scared. *Id*. Both the court of appeals and the Ohio Supreme Court correctly held that this was not hearsay because it was excluded from the definition of hearsay by Ohio R. Evid. 801(D)(1)(b). Moreover, Washington himself testified to the exact same facts and circumstances during trial and was subject to cross-examination. *See* Trial Tr. Vol. III at 247-249, 301-307. There was thus no violation of the Confrontation Clause in permitting Detective Lantz to testify to the same conversation.

The Fifth Claim for Relief should be dismissed with prejudice. As to Sub-claim A, reasonable jurists could differ with that conclusion and Petitioner should be allowed a certificate of appealability on that claim, but denied as to the other two sub-claims.

**Sixth Claim for Relief**

Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance in failing to present expert testimony and in failing to cross-examine the State's key witness based on information contained in the witness's juvenile records at Petitioner's capital trial.

A.    Trial counsel failed to present the testimony of an expert on eyewitness identification at Petitioner Chinn's trial.

B.    Trial counsel failed to obtain an expert to present evidence to the jury that Marvin Washington's mental retardation impacted his ability to testify as to the facts in this case. In addition, trial counsel failed to cross-examine Washington with information contained in his juvenile records.

In his sixth ground for relief, Petitioner argues that he was denied effective assistance of counsel because his trial attorneys failed to hire the expert witnesses necessary to "destroy the testimony" of Marvin Washington. (Petition, Doc. No. 3 at 20); (Traverse, Doc. No. 27, PAGEID 336.) Chinn argues that this ineffectiveness was partially "State-induced" as it was a direct result of the State's failing to turn over exculpatory evidence. *Id*. Regardless, without this information, and because of defense counsel's failure to hire the proper experts, Chinn alleges he was prejudiced. Specifically, he argues that if counsel had hired these witnesses, they could have challenged Washington's identification testimony, as well as the testimony of two other witnesses. *Id*. Respondent does not argue procedural default. (Return of Writ, Doc. No. 24, PAGEID 202.)

In addressing this claim on post-conviction relief, the court of appeals held:

Chinn argues that his trial counsel's failure to present testimony from experts on eyewitness identification and mental retardation constituted ineffective assistance of counsel.

At Chinn's trial, the state's key witness was Marvin Washington, a juvenile who testified that he had helped Chinn rob and murder Jones. Chinn denied participation in the crime and claimed that he did not know Washington. Washington is now deceased.

In his petition for post-conviction relief, Chinn alleged, *inter alia*, that his trial counsel should have presented an expert to testify about eyewitness identification and an expert to testify that Washington had suffered from mental retardation and that such retardation had affected his ability to remember and testify about the evening of the crime. With his petition, he presented affidavits from Solomon M. Fulero, Ph.D., J.D. and Caroline Everington, Ph.D. In reversing the trial court's first denial of his petition, we concluded as follows:

> Given the information contained within [the Fulero and Everington] affidavits, we find that trial counsel's failure to call any expert witnesses could rise to the level of ineffective assistance of counsel prejudicial to the rights of the defendant. Thus, we conclude that the trial court should have conducted an evidentiary hearing to determine more fully the nature of the testimony of these two witnesses, as well as the strategical reasoning of trial counsel for not presenting this expert testimony.

On remand, an evidentiary hearing was held. Fulero, Everington, and Michael Monta testified on behalf of Chinn. Barbara DeVoss, David Lantz, and Dr. Thomas O. Martin testified on behalf of the state.

Fulero testified that he held a J.D. and a Ph. D. in psychology and had published on the subject of the reliability of eyewitness identification. He said that had he testified at Chinn's trial, he would have informed the jury as follows. The accuracy of eyewitness evidence is not as "great" as lay witnesses believe it to be because a person's memory can be faulty for many reasons. The following factors can affect a person's ability to acquire, store, and recall memories. The longer a witness is able to look at a perpetrator's face, the more accurate his later identification of the perpetrator will be, with the total length of exposure to an event not being as relevant as the length of time the witness can actually look at the perpetrator's face. The presence of a salient detail, such as a weapon is significant because it draws a witness's attention away from the perpetrator's face. Fulero testified that people who report fear for their lives during an event are often less accurate in subsequent attempted identification procedures. Fulero stated that cross-race identifications are less accurate than same-race identifications, with the lowest accuracy resulting when a white person attempts to identify a black person. He said that mentally retarded people show a decreased accuracy rate in making

later identifications and are also more suggestible and often have desires to please authority and to hide their mental retardation. He also stated that if a witness is alcohol-impaired at the time of the event, his later recall will be less accurate unless he is alcohol-impaired at the time he recalls it as well.

Fulero stated that the longer the period of time between the event and the person's attempt to retrieve his memory, the less accurate that memory will be. He also said that during the period of time between the event and the witness's attempt to retrieve his memory, post-event information given to the witness can become part of his initial memory of what occurred at the event and thus his own actual memory of what occurred at the event will be less accurate. Fulero also testified that there is really no relationship between a witness's confidence level in the accuracy of his memory and the actual accuracy of his memory because post-event information usually changes a witness's confidence level in the accuracy of his memory.

On cross examination, Fulero testified that it was not his role to tell the jury whether a witness's memory was correct or wrong because such judgment would be beyond the scope of his knowledge. He stated that his role in Chinn's trial would have been to give the jurors knowledge about eyewitness identifications that would have helped them make their decision.

Everington testified that she was an associate professor in the department of educational psychology at Miami University. She testified that she had that researched and published in the field of mentally retarded offenders in the criminal justice system. She indicated that the Public Defender's Office had contacted her and asked her to review the following documents pertaining to Washington; his juvenile court records, a social history report, a police interview, a transcript of his testimony against Chinn, several psychological evaluations, a neuropsychological assessment, and his school records. She testified that each of those records clearly showed the presence of moderate range mental retardation in Washington, indicating that his IQ had been below the lowest two percent of the population. She reported that Washington had had "profound academic deficits" as he had scored below a third grade level, the lowest level possible, on achievement tests when he had been thirteen years old. She stated that people who suffer moderate mental retardation need support in many areas of their lives and are less likely to live completely independently. She stated that they might not be literate and are frequently unable to do "first grade kinds

of academic tasks" such as telling time.

Everington stated that the psychological reports revealed that Washington had had a limited ability to comprehend, had been easily swayed by others, had been eager to please authority figures, had been easily distracted, and had had significant weaknesses in long-term recall. She stated that the neuropsychological assessment indicated that Washington had suffered cranial abnormality that had caused a neuropsychological impairment that would have led Washington to distort and confuse new information. According to Everington's interpretation of the chemical assessment, Washington had "functioned well below his level," had consumed alcohol on the evening of the crime, and had reported at least three blackout episodes. She also noted that Washington's school records indicated that he had been in a developmentally handicapped class.

Based upon her review of Washington's testimony at Chinn's trial, Everington stated that Washington had been unable to tell time, had been unable to recall or had given inconsistent answers to questions about temporal events, had had deficits in receptive learning in that he had not understood questions, had given inappropriate responses to questions, had asked for questions to be rephrased, and had had memory problems in that he had been unable to recall important facts from the night of the crime. On direct examination, Everington concluded that in her professional opinion, Washington had had "significant deficits in the memory" and that "his memory [had been] * * * questionable."

During cross examination, Everington admitted that she had no first-hand knowledge about Washington because she had never met him. She stated that she does not administer IQ tests because she is not a psychiatrist or psychologist. She agreed that Washington had been consistent with his story about the night of the crime. She also stated that while the police might have influenced the truthfulness of Washington's testimony, it was equally possible that Washington had not been influenced and had testified truthfully about what had happened on the night of the crime.

Michael Monta was Chinn's trial counsel. Monta had had fifteen years of experience in criminal cases and "had participated" in one other capital murder case prior to his appointment to represent Chinn. He testified that to prepare Chinn's case, he had filed a discovery motion and had received Washington's juvenile record, pre-interview forms, statements, and police reports. Monta did not receive

Washington's psychological reports, social history, neuropsychological reports, or juvenile court personnel evaluation. He said that such information would have been helpful in his defense of Chinn because he could have used it during his cross examination of Washington to ask about his previous blackouts and his ability to remember things. He also stated that had he had such information, he "may very well" have had an expert examine Washington to assess his credibility and to determine whether his testimony could have been impeached.

On cross examination, Monta stated that he had met Washington prior to Chinn's trial. He stated that he had perceived Washington to be "young, uneducated, [and] not especially bright" but stated that Washington had "seemed to understand what the situation was and what he was doing there." Monta stated, "I'm not a psychologist but I'[ve] seen some psychology reports in my time; and I thought [Washington] probably would have passed that muster any way." When asked if the case against Chinn centered solely on Washington's identification of Chinn, Monta stated "probably not completely" because there were other witnesses who had testified at trial and had implicated Chinn in the commission of the crime. Monta noted, however, that Washington had been the only witness against Chinn who had been with him on the night of the crime continually from 6:45 p.m. until shortly after midnight.

Barbara DeVoss testified on behalf of the state. She stated that she was a social worker with almost thirty years of experience. She testified that she had provided counseling for boys on her "living unit" at the Training Center for Youth and had been assigned to counsel Washington in April 1989. She stated that she had interacted with Washington every day for at least some period of the day between April 1989 and August 1992. DeVoss stated that before she met Washington, she had read the reports and materials on him and had thought, "oh, my God, I have got a blooming idiot." She stated that after she had started spending time with Washington, however, she had been pleasantly surprised. She testified that although the reports had stated Washington would have problems grooming himself, he had, in fact groomed himself very well and "was quite particular on how he looked." DeVoss said that Washington had "kept his appearance up" and had ironed his clothes because he had wanted to look nice and clean. She stated that Washington had been able to do things on his own initiative and had worked himself up to the highest level program and had been placed in an outside honor group where only ten other boys had been and he had been given a

"fair amount of freedom and responsibility" in that position. DeVoss testified that after Washington had worked and saved money, she had purchased a watch for him and he had been able to read it and use it correctly to meet appointments. DeVoss also stated that she knew Washington was literate because she had heard him read aloud and she knew he had read Sports Illustrated, stories, and novels. She testified further that Washington had been able to balance a checkbook, count money, and make change with money. She testified that she did not think that Washington had had a low IQ as stated in the psychological reports.

DeVoss stated that Washington had written a letter to the juvenile court judge who had sentenced him for his participation in Jones' murder asking for early release and that the judge had written back stating that he would consider Washington for early release after he had graduated from high school. DeVoss stated that after Washington had received that information, he had been quite motivated and had eventually earned a "regular diploma[,]" had been valedictorian of his class, and had given a "talk" at the graduation. DeVoss also stated that Washington had never attempted to go "AWOL."

On cross examination, DeVoss admitted that she had not known Washington prior to April 1989. She stated that some of the staff at the training center provide a very nurturing environment for young people. She testified that Washington had been placed with learning disabled students when he had first arrived at the training center. DeVoss also agreed that there had been a marked improvement in Washington after he had been sent to the training center.

David Lantz also testified on behalf of the state. He had been the chief investigator in the murder of Jones and had interviewed Washington six days after the crime. Washington had been fifteen years old at the time of the crime.

Lantz testified that Washington had eventually picked Chinn's photograph from a photo spread, after not making picks from earlier photo spreads that had not contained Chinn's photo. Lantz stated that during a police lineup that had included Chinn, Washington had indicated that he had not seen the suspect. After Washington was taken to an interview room, however, he indicated that he wanted to see Lantz and eventually told Lantz that the suspect had been in the lineup and was Chinn. Washington told Lantz that he had been afraid to identify him while the suspect were standing on the stage. Lantz

stated that Washington's trial testimony against Chinn had been consistent with his original story. He also testified that nothing about his interactions with Washington had led him to think that Washington had been mentally retarded or had been unable to give a truthful account of the event.

Dr. Thomas O. Martin testified that he was a clinical psychologist. He stated that a number of things can affect a person taking an IQ test, such as motivation, hallucinations, brain injury, and a lack of education. He stated that little can be known by looking solely at a person's IQ scores because IQ scores tell how a person compares to similar aged people in terms of intelligence. He said that IQ scores do not give information about a person's level of adaptive functioning. Martin stated that a person who is born moderately mentally retarded would not be expected to graduate from high school, to drive a car, to write checks, to read books, to make change with money, or to be able to hold down unsupervised jobs. On cross examination, Martin testified that he had reviewed Washington's neuropsychological report and that such report had indicated a congenital cranial abnormality that could have affected his IQ score and memory functioning.

"To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal* (200)), 87 Ohio St. 3d 378, 388-389, 721 N.E.2d 52, 64, certiorari denied (2000), 531 U.S. 838, 121 S. Ct. 99, 148 L.Ed. 2d 58, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S. Ct. 2052, 2064, 80 L. Ed.2d 674; accord *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373, paragraphs two and three of syllabus, certiorari denied (1990), 497 U.S. 1011, 110 S. Ct. 3258, 111 L.Ed. 2d 768. A defendant's failure to satisfy one prong of this test negates a court's need to consider the other prong of the test. *Madrigal*, 87 Ohio St. 3d at 389, 721 N.E.2d at 64, citing *Strickland*, 466 U.S. at 697, 104 S. Ct. At 2069.

Under the second prong of the *Strickland* test, "prejudice" has been defined as "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, supra, at paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Bays* (1999), 87 Ohio St. 3d 15, 27, 716 N.E.2d 1126, 1140,

certiorari denied (2000), 529 U.S. 1090, 120 S. Ct. 1727, 146 L.Ed. 2d 647.

We also note that the supreme court has concluded that counsel's failure to call an expert and his decision to rely instead upon cross-examination does not constitute ineffective assistance of counsel. *State v. Nicholas* (1993), 66 Ohio St. 3d 431, 436, 613 N.E.2d 225, 230; see *State v. Thompson* (1987), 33 Ohio St. 3d 1, 10-11, 514 N.E.2d 407, 417. Further, one court has specifically held that counsel's failure to call an expert to testify about the variable affecting eyewitness identification was speculative in determining that defense counsel violated as essential duty owed to the defendant. *State v. Spencer*, 1997 Ohio App. LEXIS 1675 (Apr. 22, 1997), Franklin App. No. 96APA09-1226, unreported.


Chinn argues that his trial counsel was ineffective because he failed to present the testimony of experts on eyewitness identification and mental retardation. He asserts that the state presented testimony from three people who identified Chinn and that there was no other physical or circumstantial evidence linking him to the offense. Chinn argues that had an expert such as Fulero been called to testify, he could have informed the jury of the variables that affect the reliability of eyewitness identification and helped the jury understand that eyewitness identification can be unreliable in some circumstances. He asserts that had an expert such as Everington been called to testify, she could have informed the jury of Washington's mental condition and inability to store and recall memories.

The trial court concluded that Chinn's trial counsel could not be faulted for failing to call experts to testify on the reliability of eyewitness identifications and on mental retardation. The court found that Chinn's case was not a typical identification case where an identification had been made by a victim who had been involved in an incident with an unknown perpetrator for only a brief period of time or by a victim who had been under a high amount of stress.

Fulero's testimony at the evidentiary hearing concerned the following factors that can affect the reliability of eyewitness identifications: the amount of time the eyewitness has to view the perpetrator's face, the presence of a salient detail like a weapon, the amount of fear reported by the eyewitness, cross-race identifications, the effects of mental retardation, the effects of being alcohol-impaired at the time the perpetrator is witnessed, and the acquisition of post-event

information.

Three witnesses identified Chinn at his trial. Shirley Cox was not a witness to the crime but identified Chinn as a person who had introduced himself to her almost three weeks after the crime as "Tony" Chinn. She also testified that the "Tony" she had met resembled the police sketch that had been drawn from Washington's descriptions of Chinn. Christopher Ward testified that he had been introduced by his friend, Washington, to another man named "Tony" and had talked to Washington and "Tony" for thirty to forty-five minutes late on the night of the crime. Apparently, Washington and "Tony" drove Jones' car to Ward's house sometime after committing the crime. Ward stated that he had known nothing about the crime at the time he had met "Tony." He learned of the crime later that night, however, when Washington returned to his house and informed him of it. At Chinn's trial, Ward identified Chinn as the "Tony" he had met on the evening of the crime. Ward also gave a description of the vehicle that Chinn and Washington had driven and such description matched other witnesses' descriptions of Jones' vehicle.

The factors about which Fulero testified were not particularly relevant to the testimonies of Cox and Ward. Cox testified that Chinn was in her presence for ten to fifteen minutes. Thus, she apparently had sufficient time to view his face. Ward testified that he had been in Chinn's presence for thirty to forty-five minutes. Thus, he had sufficient time to view his face. Neither Cox nor Ward testified about the presence of any salient detail and neither reported that they had been in fear while in Chinn's presence. Although Cox's race is unknown from the record, both Ward and Washington were black. There was no evidence that Cox or Ward were mentally retarded. There was no evidence that Cox was alcohol-impaired at the time she witnessed "Tony." Ward testified that he had not been drinking or smoking marijuana on the night he had met Chinn. Further, there was no evidence presented that would support the conclusion that either Cox or Ward had received post-event information which would have changed their identifications of Chinn. Thus, pursuant to the record, none of the factors discussed by Fulero were relevant to the testimonies of Cox and Ward.

The main witness against Chinn was Washington. On the night of the crime, Washington was with "Tony" from approximately 7:00 p.m. to midnight, a significant length of time. Further, Washington knew "Tony" before the night of the crime because he had previously met and "partied" with him. In fact, the two were together awhile before

they decided to rob someone and ultimately spent the entire evening together. Washington knew that Chinn was carrying a gun before the crime was committed, but it apparently was not visible to him during most of the evening. Washington did not report being in fear at any time during the night. Although he might have experienced fear or stress during the actual crime, he was not the victim of the crime.

Both Washington and Chinn were black. Washington testified that when he had met Chinn on the evening of the crime, Chinn had been drinking alcohol. Washington, who had not had any alcohol before meeting Chinn, then began drinking with Chinn and the two eventually purchased more beer and consumed it before committing the crime. Washington testified that he had felt intoxicated by the time he had arrived at the scene where the crime had been committed. Although Washington might have been alcohol-impaired at the time of the crime, he had not had alcohol at the time he originally saw and recognized Chinn.

There is no evidence that Washington acquired post-event information about the crime that altered his memory. In fact, Detective Lantz testified that at the time Washington gave his first account of the events of that evening, Lantz had not given him any information about the crime. Lantz also said that until Washington had implicated "Tony," investigators had never suspected anyone linked to that name. Further, Lantz testified that Washington's testimony at Chinn's trial had been consistent with his original story. Thus, none of the factors discussed above would have been particularly relevant to Washington's testimony. The only factor that might have been relevant was the effect of mental retardation on Washington's ability to perceive and remember information.

At the post-conviction relief hearing, Everington testified that Washington had suffered from moderate range mental retardation, had had a limited ability to comprehend, had been easily swayed by others, had been eager to please authority figures, could have been easily distracted, had had significant weakness in long-term recall, and had distorted and confused new information. Fulero testified that mentally retarded people show a decreased accuracy rate in making later identifications and are also more suggestible and often have desires to please authority and to hide their mental retardation.

On the other hand, Monta, an experienced criminal attorney, testified that, after meeting Washington, he had thought Washington probably would have passed psychological "muster." He also stated that the

case was probably not centered solely on Washington's identification of Chinn because other witnesses who testified had implicated Chinn in the commission of the crime. Although DeVoss testified positively about Washington's characteristics and abilities, we note that she met Washington in April 1989 and thought he was a "blooming idiot" at that time. During her contact with him between April 1989 and 1992, she decided otherwise, but Chinn's trial was in August 1989, so DeVoss most likely would not have been available to testify positively about Washington's characteristics at the time of Chinn's trial.

Lantz testified that Washington had understood questions and had appropriately answered them. He said that in his interactions with Washington, nothing had led him to think that Washington had been mentally retarded or had been unable to give a truthful account of the events in question. Dr. Martin testified that little can be known by looking solely at a person's IQ scores and that IQ scores do not give information about a person's level of adaptive functioning.

Considering all of this evidence, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had Chinn's counsel called experts to testify about eyewitness identification and Washington's mental retardation. The only eyewitness identification factor that was relevant in the case was Washington's alleged mental retardation and the effects of that retardation were disputed. Although Everington could have testified as to her beliefs about Washington, such testimony was contradicted by the testimonies of Monta, Lantz, and Martin.

Further, we have carefully reviewed Washington's testimony at Chinn's trial. His testimony is remarkably coherent and consistent. We do not agree with Everington's testimony that, during Chinn's trial, Washington had been unable to recall important facts from the night of the crime, had not understood questions, and had given inconsistent and inappropriate answers. Although Washington was unable to give times for many of the events during the evening, he testified that he had not been wearing a watch. While Washington was unable to remember some facts about the evening of the crime, such as with which hand Chinn had held the gun, Washington did remember other very specific facts, such as what he had worn on the night of the crime, the general type of clothing that Chinn had worn, that Jones car had had a digital clock, and that Chinn had been drinking a sixteen ounce "big mouth Micky" when he had first seen him. Further, although Washington admitted during his testimony that he could not read or write in cursive, we do not believe that such

abilities were required for Washington to accurately identify Chinn.

Washington picked Chinn from a photo spread, after not picking suspects from earlier photo spreads that had not contained Chinn's photograph. Thus, although mentally retarded people might be eager to please authorities, assuming Washington was mentally retarded, he must not have been eager enough to please authorities to immediately pick a suspect from the first photo spread or to immediately identify Chinn during the police lineup. Finally, although mentally retarded people might generally have a decreased accuracy rate in making later identifications, such decreased accuracy rate does not mean Washington's identification of Chinn was wrong. In fact, Washington's familiarity with Chinn prior to the night of the crime likely increased his accuracy rate in identifying him. As Martin testified, a person's level of adaptive functioning is not apparent from his IQ scores. The witnesses who came in contact with Washington prior to Chinn's trial thought that, while Washington might not have been especially bright, he would have passed "muster" and that his story was consistent and plausible.

Considering all of the evidence on the record, we cannot conclude that there is a reasonable probability that had Chinn's counsel called experts on eyewitness identification and mental retardation, the result of the trial would have been different. Thus, we will not conclude that the trial court erred in concluding that Chinn's counsel was not ineffective for failing to call experts on eyewitness identification and mental retardation.

The first and second assignments of error are overruled.

*Chinn 2nd PCApp*, 2001 Ohio App. LEXIS 3127, *26 (2nd Dist. 2001). This is the last state court decision on this question because the Ohio Supreme Court declined jurisdiction over a requested appeal.

Chinn makes the argument that, aside from the identification testimony from Washington, Shirley Cox, and Ward, there was little evidence linking him to the offense. (Traverse, Doc. No. 27, PAGEID 336-337.) Had counsel employed an expert in witness identification, defense could have shown the jury various factors affecting eyewitness identification and challenged the reliability of such identification. (Traverse, Doc. No. 27, PAGEID 336.) Dr. Solomon Fulero testified in post-

conviction relief that various things can effect a person's memory and identification such as salient details, passage of time, duration of time victim had to look at assailant's face, or use of drugs or alcohol. Additionally, he noted mental retardation can also affect a witness' reliability because of suggestibility, a desire to please authorities and a desire to mask that they are different. *Id.* He further testified that evidence shows that mentally retarded people have a decreased accuracy rate in making identifications. *Id.* Petitioner argues that had this testimony been presented during trial, the jury would have had a better understanding of the variables affecting reliability, applied this information to the eyewitnesses in Chinn's case, and it would have undermined the confidence in the identification. *Id.*

Chinn argues that his counsel was ineffective in their failure to obtain an expert to testify to the mental ability and reliability of State's witness, Marvin Washington, as well as counsel's failure to effectively cross-examine Washington as to his records. (Traverse, Doc. No. 27, PAGEID 336.) Chinn apportions the blame for this with the State as they failed to provide exculpatory evidence as to Washington's IQ and alleged mental retardation. *Id.* Chinn argues that this information was necessary because mental retardation may affect a person, possibly making them more prone to suggestibility and pleasing authority figures, and that these factors may impact a witness' reliability. (Traverse, Doc. No. 27, PAGEID 337.) Additionally, mentally retarded individuals may have more difficulty in accurately recalling events and in identifying a suspect through a line-up or photo spread. *Id.* The records in question contained multiple reports that would have put into question Washington's mental ability, including juvenile records, social history and updates, a chemical abuse assessment, psychological reports, and neuropsychological assessments. (Traverse, Doc. No. 27, PAGEID 340-341.) Chinn argues that these records contained information specifically to the fact that Washington should have been wearing glasses but did not, that he had neuropsychological

impairments with moderate mental retardation and brain dysfunction, that he was chemically abusive, and that he had diminished intellectual capacity and a limited ability to process information. (Traverse, Doc. No. 27, PAGEID 341.)

Chinn further attacks Washington's reliability by stating that he had only met "Tony" once, a year prior to the night of the crime. Washington admitted to consuming alcohol and being intoxicated at the time of the crime. Further, Washington was unable to identify Chinn in a line-up. (Traverse, Doc. No. 27, PAGEID 339.) If counsel had the records, in conjunction with the above facts, they could have called an expert and challenged Washington's testimony. (Traverse, Doc. No. 27 PAGEID 341.)

The State counters Petitioner's argument by asking whether "counsel's assistance was reasonable considering all the circumstances."*Strickland v. Washington*, 466 U.S. 668 (1984). "Judicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Bell v. Cone*, 535 U.S. 685, 698 (2002).

The State asserts that counsel was effective in their representation and that certain decisions were made after a reasonable amount of investigation and thought, and could be considered sound trial strategy. For example, the States notes that the majority of the eye witness identification issues were not present in this case. (Return of Writ, Doc. No. 24, PAGEID 217.) The State relies on the extensive discussion from the court of appeals' holding weighing these identification issues and whether or not they were applicable and summarizing that this was not a typical eyewitness

identification case. *Id*. This is not a case of a victim identifying an unknown perpetrator, but rather the case of another defendant to the crime, identifying who he had been with during the incident.

In regard to the issue of Marvin Washington, during the post-conviction evidentiary hearing, trial counsel Michael Monta, testified that as part of his trial preparation he had in fact met with Marvin Washington. (Return of Writ, Doc. No. 24, PAGEID 214); (Tr. Vol. VI at 132.) During this meeting Washington gave a narrative of what happened on the night of the crime. (Return of Writ, Doc. No. 24, PAGEID 214); (Tr. Vol. VI at 133.) Monta's own perception of Washington was, "that he was young, uneducated, not especially bright. But seemed to understand what the situation was and what he was doing there. I'm not a psychologist but I'm [sic] seen some psychology reports in my time; and I thought he probably would have passed that muster any way." (Return of Writ, Doc. No. 24, PAGEID 214); (Tr. Vol. VI at 133-134.) The State asserts that Monta demonstrated that he met with this key witness, spoke with him, and evaluated his ability to perceive, testify, and articulate, thus effectively fulfilling his role of counsel in this particular instance. (Return of Writ, Doc. No. 24, PAGEID 214.)

In addition, the State pointed to additional evidence of Washington's credibility. Detective Lantz, who had interacted with Washington shortly after the crime testified that it was his impression that Washington had understood the questions posed to him and had answered them appropriately. (Trial Tr. Vol. VI at 165-170.) This interaction and the demeanor of Washington gave Lantz no reason to believe that Washington may have been mentally retarded. (Return of Writ, Doc. No. 24 PAGEID 215); (Trial Tr. Vol. VI at 170.) The State also points to Washington's testimony at trial, which it found to be both coherent and consistent with prior recantations of the events. This is contrasted with Dr. Everington's opinion, though the State points out her view was based only

on two pieces of evidence, a reading of portions of the trial transcript and several reports, she never met with Washington personally. (Return of Writ, Doc. No. 24, PAGEID 215-216.) Therefore, the State argues the court of appeals was correct in noting that Dr. Everington's conclusions were not well supported, especially when compared with the testimony of DeVoss, who knew and interacted with Washington on a daily basis. (Return of Writ, Doc. No. 24, PAGEID 216.)

After a review of the evidence, the Magistrate Judge concludes that the thorough decision of the state appellate court was neither contrary to, nor an unreasonable application of, relevant U.S. Supreme Court precedent. The expert that would have testified as to the various factors that impact reliability of an identification may have provided information to the jurors, but much of this evidence could be considered common sense or was not applicable in this case (e.g., cross-race identification, weapon focus, short opportunity to observe). (Trial Tr. Vol. VI at 29-33.) Neither Washington, Ward, nor Shirley Cox testified that they were in fear for their life or under duress/stress. Washington encountered Chinn at a location downtown. (Trial Tr. Vol. III at 228.) After recognizing Chinn, the two began to converse and at some point thereafter, but before the crime, Washington began to drink. *Id.* at 228-229, Washington did not testify that he himself had felt threatened prior to the robbery, kidnapping, and murder of Mr. Jones. At no point did Washington say that he felt threatened or that he was scared for his life. Nor was there a cross-identification at issue here. Likewise, Ward testified that he met Chinn when Washington and another man drove a car over to his house and he spent between 30-40 minutes talking with the two. (Trial Tr. Vol. III 154-156, 170.) While he does admit that he was more interested in the details of the car than the conversation, he introduced himself to "Tony" and shook his hand. *Id.* at 154-155, 169. Ward had not had any alcohol or drugs that night which would have affected his memory, and this identification was not cross-cultural. *Id.* at 168. Again, Ward did not express any threats or

feelings of duress or fear. Given these facts, many if not all of the factors the expert in witness identification would have testified to are simply inapplicable in this case. Petitioner is unable to show prejudice from counsel's failure to call this witness.

In considering the issue of ineffectiveness for failure to obtain an expert in mental retardation and challenge the testimony of Washington, this Court finds the decision by the state court to be thorough and reasonable. During the evidentiary hearing in post-conviction, multiple witnesses were presented as to this matter. The trial court was able to assess each expert's credibility during the hearing. This Court notes that while the experts for the defense presented a strong case for Petitioner regarding Washington, the State presented evidence very much to the contrary from someone that had worked with and interacted with Washington on a daily basis. The Court notes Washington's statement of the events remained consistent and coherent throughout the entire investigation and trial process. Additionally, while he was cooperative with authorities, he was not so "eager to please" as to pick a suspect out of the first photo array but rather stated that Chinn was not in the photos and made the identification during the second photo array, which did contain Petitioner's photo. Additionally, the Court finds plausibility in the testimony that a 15-year-old boy would have been intimidated and scared during a line-up and unsure as to whether or not a defendant would be able to see and identify him through a two way mirror. Immediately after the line-up, Washington asked to speak to Detective Lantz and made an identification. While mentally retarded people may have an increased risk of false positive identification, it does not seem that these factors were present here, assuming that Washington was mentally retarded. Petitioner has failed to show that but for counsel's failure to present these experts during trial there is a reasonable probability that the outcome of his trial would have been different. The decision of the state court was neither contrary to, nor an unreasonable application of law. The Sixth Claim for Relief should

be dismissed with prejudice and Petitioner should be denied any requested certificate of appealability.

## Seventh Claim for Relief

Petitioner's right to trial by jury and due process were violated because the trial court failed to define "principal offender," an essential element of aggravating circumstances that made petitioner eligible for the death penalty. U.S. Const. amends. VI, XIV.

In his Seventh Claim for Relief, Petitioner argues a violation of his constitutional rights because the instructions to the jury failed to define "principal offender." (Petition, Doc. No. 3 at 29); (Traverse, Doc. No. 27, PAGEID 348.) The District Court has held this Claim procedurally defaulted and that remains the law of the case. (Doc. No. 30, PAGEID 535-540.)

## Eighth Claim for Relief

Petitioner's due process right to a fair trial and his right to equal protection were violated because the State of Ohio failed to provide timely discovery and the State failed to disclose material evidence. U.S. Const. amend. XIV.

A.   The state violated petitioner's right to due process and equal protection when it failed to provide discovery.
B.   The state failed to disclose material evidence to petitioner before trial.

In his next ground for relief Petitioner argues *Brady* and an Equal Protection Clause violation because the State failed to turn over a previous statement made by witness Gary Welborn regarding a third person that had been with Washington and Chinn. (Petition, Doc. No. 3 at 31.) Petitioner was made aware of Ward's statement during his cross-examination at trial and this late disclosure allegedly did not allow time for proper trial preparation. (Petition, Doc. No. 3 at 31); (Traverse, Doc.

No. 27, PAGEID 352.)[6]

Respondent counters by arguing that the complaint only goes to the failure of the prosecutors to follow Ohio Crim. R. 16 and Montgomery County local rules on discovery and that Petitioner admits to having received some of the information from other sources prior to trial. (Return of Writ, Doc. No. 24, PAGEID 222.)

The procedural history shows that Petitioner filed his motion for discovery in the trial court on March 15, 1989. He requested this discovery under Ohio R. Crim. P. 16(B)(1)(a-g) and Montgomery County Common Pleas Local Rule 3.01 and 3.03 , known as the Court Management Plan. (Petition, Doc. No. 3 at 32.) The trial court allowed discovery under Ohio R. Crim. P. 16 but denied it under the court management plan.[7] *Id*. Defense counsel renewed their motion asking the court to modify its ruling.[8] The trial court overruled the motion, stating that the purpose of the case management plan was to avoid trials, and it was anticipated that this case would go to trial. (Traverse, Doc. No. 27, PAGEID 354.) Petitioner argues therefore, that he was not enabled to benefit from this rule, and that the arbitrary compliance of the rule separated him from other

---

[6] The only argument made in support of an Equal Protection violation is Chinn's assertion that discovery of the sort he was not given – that covered by the Montgomery County Common Pleas Court's Case Management Plan – was "available to similarly situated persons accused of crimes." No proof was offered that there were similarly-situated persons granted this discover. the trial judge explained that the Case Management Plan was designed to avoid trials and this case was clearly headed to trial. Finally, Petitioner offers no suggestion that the discrimination was on an invidious basis. No Equal Protection claim has been established.

[7] "This Court may modify its ruling concerning the obligation of the Prosecutor to provide discovery materials under Criminal Rule 16 if it appears in the future that it is appropriate to attempt to meet the spirit of the local Court Management Plan." (Petition, Doc. No. 3 at 31.)

[8] 1) The co-defendant in the instant case, Marvin Washington, had been granted full discovery under both Crim. R. 16 and the Court Management Plan.
2) This had been the first and only case since the Court Management Plan had been adopted that either defense attorney had not received discovery under the Court Management Plan thus defendant was the subject of discriminatory and arbitrary application of the discovery rules.
3) The local rules are meant to be an amplification of discovery and not a limitation
4) the selective withholding of discovery in defendant's capital case was a violation of due process. (Petition, Doc. No. 3 at 31.)

-113-

defendants. (Petition, Doc. No. 3 at 31.) As a result of this denial he was prejudiced in that he failed to receive all materials in the "discovery packet," specifically that the prosecutor was aware that Welborn saw a third person talking with Washington and Tony just prior to the robbery. *Id.* Petitioner raised this claim on appeal and the state court held:

> Appellant also asserts that the trial court erred when it failed to grant discovery in accordance with the Local Rules of the Court of Common Pleas of Montgomery County, General Division. Specifically, the trial court in this case ordered that discovery would proceed pursuant to Crim. R.16 as opposed to Loc. R. 3.01 and 3.03. While much could be said concerning Crim. R. 16 and the theory of "open file" discovery of the type authorized by local rules (see, e.g., *State v. Lambert* [1994], 69 Ohio St. 3d 420, 428-429, 639 N.E.2d 83, 89-90), suffice it to say that our review of the record reveals that appellant suffered no prejudice in connection with the trial court's decision to adhere to Crim. R. 16 exclusively. The record is clear that appellant was in possession of much of the material that would have been available to him had the local rules been deemed applicable by the trial court. With respect to the materials that appellant allegedly did not have and to which he claimed entitlement under the local rules, appellant has utterly failed to demonstrate that he was prejudiced in any discernible way.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 569, 709 N.E. 2d 1166, 1184 (1999).

Even assuming that the prosecutor did violate Ohio Crim. R. 16, that claim is not cognizable in habeas corpus because it is not a constitutional violation. *Barclay v. Florida*, 463 U.S. 939 (1983); *see generally* 28 U.S.C. § 2254 (a)(providing that habeas corpus proceedings are available only for claims that a person "is in custody as a violation of the Constitution or laws or treaties of the United States.") "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977);*United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988); *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002)(holding that there was no constitutional violation to an alleged Ohio Crim. R. 16 violation.)

As far as the *Brady* portion of this claim, *Brady* requires the government to turn over

evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. Thus, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 281 (1999), *quoting Kyles v. Whitley*, 514 U.S. 419, 437 (1995)(internal quotation marks omitted).

To make a successful *Brady* claim, three criteria must be met; 1) the evidence in question must be favorable, 2) the State suppressed the relevant evidence, whether purposefully or inadvertently, and 3) that the State's actions resulted in prejudice. *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008). Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have ben different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008); *LaMar v. Ishee*, 2010 U.S. Dist. LEXIS 139621, *24-26 (S.D. Ohio 2010). The Supreme Court noted in *Kyles* that:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) *as quoted in LaMar v. Ishee*, 2010 U.S. Dist. LEXIS 139621, *24-26 (S.D. Ohio 2010). Thus, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict.'" *Cone v. Bell*, 129 S. Ct. 1769, 1783, 2009 U.S. LEXIS 3298, *38 (2009) *quoting Kyles*, 514 U.S. at 435. As stated by the Sixth Circuit in *Montgomery v. Bagley*, "[t]he law under *Brady* follows the common sense proposition that the State must disclose the 'material exculpatory evidence to the defendant *before* trial,' not afterward." 581 F.3d 440, 442 (6th Cir. 2009); *see also Dist. Attorney's Office for the Third Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2009 U.S. LEXIS 4536 (2009) (emphasis added).

The only item Petitioner claims was not turned over prior to trial was the statement by Gary Welborn that a third person was seen with Chinn prior to the crime. (Traverse, Doc. No. 27, PAGEID at 354.) Petitioner has characterized this *Brady* claim as a "delayed disclosure rather than suppression." (Petition, Doc. No. 3 at 34); *United States v. Johnston*, 784 F.2d 416, 425 (1st Cir. 1986). He argues that nonetheless he suffered prejudice from this delayed disclosure because the testimony at trial regarding a third person caught him by surprise. (Traverse, Doc. No. 27, PAGEID 355.) He was denied the opportunity to explore alternative theories of guilt, to fully present inconsistencies in the testimony of the State's witnesses, and to show weaknesses in the State's evidence. *Id.* He argues that had this information been disclosed to counsel at the proper time and had they been permitted to pursue this line of defense there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 355-356.

Gary Welborn was one of the victims in this case. During his trial testimony he referred to an additional man at the scene. The concise exchange on direct-examination was as follows:

> Q: What happened next?
> A: Then, there were three guys standing on the corner and they yelled something out. We ignored them. When we looked over, one of the three guys that was standing on the corner got in a car and left. There was just two of them left then.

(Trial Tr. Vol. III at 110.) Defense counsel was able to cross-examine Welborn on this point,

asking:

> Q:    So, shortly before that, you were in this area of Court and
>        Ludlow; is that correct?
> A:    Yes.
> Q:    And you had indicated that you saw three men?
> A:    Yes.
> Q:    On the corner of what?
> A:    Court and Ludlow.
> Q:    Would that be up near that building?
> A:    Yeah.
> Q:    Was the lighting good in that area?
> A:    There was a lot of street lights around there. The parking lot
>        has light through there.
> Q:    How long were those people there?
> A:    That I don't really know.
> Q:    Did you look at them for any length of time?
> A:    No.
> Q:    Were all three of them Black people?
> A:    As far as I could tell.
> Q:    You say one person left in a car?
> A:    Yes.
> Q:    Do you know that kind of car that was?
> A:    It was a newer Buick.
> Q:    Color?
> A:    Silver.
> Q:    Have you ever told this to anybody before, this part of the
>        story about a third man?
> A:    Yes
> Q:    Who did you tell it to?
> A:    Matt Heck
> Q:    When did you do that?
> A:    When I first came down to the prosecutor's office.
> Q:    You didn't tell the police about that, though; did you?
> A:    Yes

(Trial Tr. Vol. III at 123-125.)


The state courts addressed this *Brady* issue and held:

> It is well settled that the State cannot withhold evidence favorable to
> the defendant if the evidence is material to either guilt or punishment.
> *Brady v. Maryland* (1963), 373 U.S. 83. Furthermore, the State has

a duty to volunteer exculpatory information to the defendant if it could create a reasonable doubt. *U.S. v. Agurs* (1976), 427 U.S. 97. Chinn argues that the State violated these duties in four instances.

Welborn testified that prior to the robbery he saw a third man with "Tony" and Washington, but that the man drove away prior to the robbery. The man was not identified. (T. 124). Welborn testified that he gave this information to the prosecutor (T. 125), but the State did not share this information with Chinn. We are dismayed that the evidence was not produced. However, we see no reasonable probability that Chinn would have been acquitted if he had known this information. Therefore, there was no *Brady* violation. *U.S. v. Bagley* (1985), 473 U.S. 667.

*Chinn 1st DirApp*, 1991 Ohio App. LEXIS 6497, *73-74 (2nd Dist. 1991). The Ohio Supreme Court simply stated that it found no reversible error in connection with the *Brady* claim. *Chinn OhioSCt*, 85 Ohio St. 3d 548, 569, 709 N.E.2d 1166, 1184 (1999), so the Court of Appeals' decision is the last reasoned state court decision in the case.

The Sixth Circuit Court of Appeals has observed, that "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose," continuing on to say the delay violates *Brady* only "when the delay itself causes prejudice." *LaMar v. Ishee*, 2010 U.S. Dist. LEXIS 139621, *30 (S.D. Ohio 2010); *citing O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007), *quoting United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994) and *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992), *judgment vacated and remanded on other grounds by Mohwish v. United States*, 507 U.S. 956 (1993). This case clearly deals with an incident of alleged delayed disclosure as opposed to a true *Brady* violation of failure to disclose completely. Therefore, in order to advance this claim, Petitioner must show that the delay itself caused him prejudice. *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007).

Petitioner argues that this statement was favorable in nature because not only does it place another person at the scene of the crime, but it also corroborates Welborn's earlier statement to

police that the other man involved was taller than Marvin Washington. (Traverse, Doc. No. 27, PAGEID 355); (Trial Tr. Vol. III at 127). The suppression of this statement until the time of trial effectively deprived him and his counsel of the opportunity to pursue an investigation and denied them possible trial strategies and defenses. (Traverse, Doc. No. 27, PAGEID 355.) Had counsel known of this alleged third person prior to trial, they could have investigated and found the mystery person who could have provided a description of "Tony." *Id*. Additionally, this person could have testified as to whether or not Chinn was present, the strength of his alibi, and cast doubt on Washington's credibility. *Id*.

Petitioner has not established any prejudice from the delay. It is purely speculative that defense counsel would have been able to track down this unidentified third person and what he would have said. Furthermore, the State's key witness testified that when he met Chinn downtown Chinn was alone. (Trial Tr. Vol. III at 265.) At no point does Washington mention another person meeting up with them downtown. *Id*. Additionally, despite the information allegedly having been disclosed at trial, defense counsel was afforded the opportunity to fully cross-examine Welborn on this issue. Therefore, the issue of a possible third man meeting up with Washington and Chinn was before the jury.

The Court of Appeals' conclusion that there was no prejudice from the delay in disclosure of this information is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, nor is its conclusion that there was no *Brady* violation contrary to or an unreasonable application of clearly established Supreme Court precedent. The Eighth Claim for Relief should be dismissed with prejudice and Petitioner should be denied a certificate of appealability on this claim.

## Ninth Claim for Relief

Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance at both phases of petitioner's capital trial. U.S. Const. Amends. VI, XIV.

A.  Counsel failed to object to the trial court's penalty phase instruction that permitted the jury to consider both the principal offender and prior calculation and design components of the O.R.C. § 2929.04(A)(7) aggravating circumstance. Those alternatives should not have been given to the jury, and petitioner was prejudiced because he had a codefendant. See State v. Penix, 513 N.E.2d 744 (Ohio 1987). He was further prejudiced because the trial court weighed both components as aggravating circumstances. Because this error affected the judge, it must have tainted the deliberations of the twelve lay persons on the jury who were also exposed to it.

B.  Trial counsel failed to object to duplicative aggravating circumstances that should have been merged for sentencing. The O.R.C. § 2929.04(A)(7) (kidnapping) and O.R.C. § 2929.04 (A)(3) aggravating circumstances should have been merged into the O.R.C. § 2929.04(A)(7) (aggravated robbery) aggravating circumstance. This error was prejudicial because the trial court failed to merge those duplicative aggravators for its weighing process also, as the jury was exposed to the same error. See also State v. Jenkins, 473 N.E.2d 764 (Ohio 1984).

C.  Trial counsel failed to object to the trial court's improper penalty phase instruction on aggravating circumstances. This improper definition allowed the jury to weigh the noncapital firearm specifications as aggravating. The jury was told to weigh the specifications that it had previously found, which included the firearm specifications. Trial counsel had a duty to object to this instructional error in light of State v. Johnson, 494 N.E.2d 1061 (Ohio 1986).

D.  Trial counsel failed to object at the culpability phase when the trial court failed to define "principal offender" which was an element of the O.R.C. § 2929.04(A)(7) aggravating circumstance. See Cabana v. Bullock, 474 U.S. 376 (1986).

E.  Trial counsel failed to object at the penalty phase to the

court's instruction on the "nature and circumstances of the aggravating circumstance." That instruction rendered the jury's sentencing process unconstitutionally vague by incorporating a statutory mitigating factor, the circumstances of the offense, into the aggravating circumstances. See O.R.C. 2929.03(D)(1); 2929.04(A), (B). See also Godfrey v. Georgia, 446 U.S. 420 (1980); Stringer v Black, 403 U.S. 222 (1992).

F. Counsel failed to object to prejudicial victim impact evidence from Brian Jones's mother in the form of opinions about punishment and petitioner's perceived inability for rehabilitation. He was prejudiced because that evidence exceeded the scope of victim impact evidence under Payne v. Tennessee, 501 U.S. 808 (1991).

G. Counsel were ineffective to petitioner's prejudice because they failed to request a limiting instruction for Shirley Cox's trial phase testimony. Cox's testimony prejudiced petitioner because she testified that she met him while he was trying to consult with an attorney after this offense. From Cox's testimony, the jury was likely to have inferred that petitioner sought legal advice because he had just committed this crime. A limiting instruction was therefore necessary.

H. Trial counsel were ineffective because they failed to object to prejudicial hearsay testimony from Marvin Washington, offered during Detective Lantz's testimony. As well, counsel failed to object to hearsay testimony from Washington, offered through Christopher Ward.

I. Trial counsel were further ineffective for failing to object to prosecutorial misconduct throughout this capital trial. At the **culpability phase**, the prosecutor improperly vouched for the credibility of the police. (T.p. 573); The prosecutor also vouched for the credibility of Marvin Washington and Christopher Ward (T.p. 578); the prosecutor misled the jury by attributing Washington's failure to identify petitioner in a police line-up to Detective Lantz, and not to Washington's unreliability; and the prosecutor improperly stressed victim's rights as a witness. (T.p. 583). At the **penalty phase**, the prosecutor argued nonstatutory aggravators based on the crime of abduction, a firearm specification, the murder charge itself, that the victim did not have enough money, the supposed heinousness of the crime, petitioner's future dangerousness, and that petitioner was not sufficiently

underprivileged. (See T.p. 713, 721, 726-27, 727-28, 729). The prosecutor also misled the jury by arguing that there were no mitigating factors in this case (T.p. 716, 717, 724, 725). The prosecutor also diminished the jury's sense of responsibility for its sentencing verdict by arguing that the jury would not be killing petitioner. (T.p. 723). The prosecutor improperly emphasized extraneous considerations and made inflammatory remarks by arguing for "justice for victims." (T.p. 718, 728); that criminals "deserve death for what they've done to us," (T.p. 229); speculated about what petitioner would have done after passing an entire class as he allegedly killed Jones after passing a mid-term examination (T.p. 712); wrongly implored the jury not to reward petitioner for not being "more brutal" (T.p. 725); misled the jury by arguing that one aggravating circumstance was enough for the death penalty but petitioner had three against him. (T.p. 726). These errors, and their cumulative effect, denied petitioner his right to a fair trial. He was therefore prejudiced by counsel's failure to object to this prosecutorial misconduct.

(Petition, Doc. No. 3, pp. 35-36.)

Chinn argues that the above instances of error and omissions, and their cumulative effect, denied him his right to effective assistance of counsel. (Petition, Doc. No. 3 at 34); (Traverse, Doc. No. 27, PAGEID 361.) Claims 9(D) and 9(I) were previously dismissed as being without merit by Judge Sargus and that remains the law of the case (Opinion, Doc. No. 30). The merits of the remaining sub-claims remain to be resolved.

In order to prevail on this claim Petitioner must be able to show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In evaluating whether or not the representation of counsel fell into the category of ineffectiveness it must be evaluated for "reasonableness under prevailing professional norms." *Id*. Next, Petitioner must be able to show that he was prejudiced by the ineffectiveness of counsel. *Strickland*, 466 U.S. at 680. Prejudice

results when a defendant is deprived of a fair trial. *Id*. To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id*. at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

> A. Counsel failed to object to the trial court's penalty phase instruction that permitted the jury to consider both the principal offender and prior calculation and design components of O.R.C. § 2929.04(A)(7) aggravating circumstance. Those alternatives should not have been given to the jury, and petitioner was prejudiced because he had a codefendant. *See State v. Penix*, 513 N.E.2d 744 (Ohio 1987). He was further prejudiced because the trial court weighed both components as aggravating circumstances. Because this error affected the judge, it must have tainted the deliberations of the twelve lay persons on the jury who were also exposed to it.

Petitioner argues that defense counsel should have objected as this instruction was improper because, as the Ohio Supreme Court held in *State v. Penix*, the elements of "principal offender" and "committed the aggravated murder with prior calculation and design" are mutually exclusive alternatives and are not to be charged and proven together in the same case. (Traverse, Doc. No. 24, PAGEID 359); *State v. Penix*, 32 Ohio St. 3d 369, 371, 513 N.E. 2d 744, 746 (1987). He further asserts these alternatives should not have been given, especially in light of the fact that Chinn had a codefendant, Marvin Washington. (Traverse, Doc. No. 24, PAGEID 359.) He was further prejudiced because the trial court improperly weighed both elements as aggravating circumstances, and if this error could affect the judge, than it "must have" tainted deliberations of the jury as well. *Id*.

On his first direct appeal the court of appeals considered this claim and remanded the case back to the trial court, in part, because of improper weighing:

Since the jury found that appellee was the principal offender, the second aggravating circumstance referred to in the instructions was present. The first, however, was a incomplete statement of a portion of R.C. 2929.04(A)(7) not applicable to appellee. Prior calculation and design is an aggravating circumstance *only* in the case of an offender who did not personally kill the victim. Thus, the criteria set forth in R.C. 2929.04(A)(7) are constructed *in the alternative*. If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (i.e., the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design. The language of the statute provides that *these are alternatives which are not to be charged and proven in the same cause*. Thus, if the defendant is found to be the principal offender, then the aggravating circumstance is established, and the question of whether the offense was committed with prior calculation and design is irrelevant with respect to the death sentence. *State v. Penix* (1987), 32 Ohio St. 3d 369, 371. (Emphasis added). The aggravating circumstances that may be considered in imposing the death penalty are those specifically enumerated in R.C. 2929.04(A). *State v. Johnson* (1986), 24 Ohio St. 3d 87. Use of both the "principal offender" and "prior calculation and design" culpability factors in an (A)(7) aggravating circumstance is contrary to the mandate of the statute that they apply only in the alternative, and taints the weighing process against mitigating factors that may apply. Thus, it impermissibly tips the scales in favor of death. *State v. Penix, supra*. This conclusion applies to an independent review by the trial court as well as to a jury deliberation, the case in *Penix*. [sic] because the trial court must also find that the aggravating circumstances were sufficient to outweigh the mitigating factors. R.C. 2929.03(D)(3).

We conclude that the trial court erred by (1) failing to merge the three aggravating factors into one, viz., that Chinn was the principal offender in the aggravated murder committed while he was fleeing immediately after committing an aggravated robbery, per R.C. 2929.04(A)(7), and by (2) considering the additional, alternative culpability element of the aggravating circumstance that Chinn, clearly the principal offender, committed the murder with prior calculation and design, which it was not permitted to do. Each, and both together, tainted the weighing process required by R.C. 2929(D)(3) and impermissibly tipped the scales in favor of death.

*Chinn 1st DirApp,* 1991 Ohio App. LEXIS 6497, *61-63 (2nd Dist. 1991).

The case was remanded to the trial court for resentencing. *Id.* Upon review in direct appeal to the Ohio Supreme Court, the court held:

> Appellant also claims that the trial court erred by instructing the jury in the penalty phase on both the principal offender and the prior calculation and design aspects of R.C. 2929.04(A)(7). Appellant asserts that the jury should have been instructed that it could not consider whether appellant committed the murder with prior calculation and design if appellant was found to be the principal offender in the aggravated murder. However, we have held that "a trial court may instruct the jury on prior calculation and design and principal offender status disjunctively in the same specification." *State v. Burke* (1995), 73 Ohio St. 3d 399, 405, 653 N.E. 2d 242, 248. That is precisely what occurred in the case at bar.
>
> The court of appeals vacated the appellant's death sentence in 1991 because the trial court, in its original sentencing opinion, had determined that appellant was the principal offender *and* that he had committed the offense with prior calculation and design. *Chinn*, Montgomery App. No. 11835, unreported, at 52-57. Appellant claims that "because the trial court committed precisely this error, it is highly likely that the jury did also." However, appellant's argument is purely speculative and is not supported by the record. Moreover, contrary to appellant's arguments, it is clear to us that the jury unanimously determined that appellant was the principal offender in the aggravated murder of Jones. At trial, the state's evidence portrayed appellant as the principal offender. Conversely, appellant offered a defense of alibi. Thus, the main issues for the jury was one of identity, i.e. , either appellant was the man who was with Marvin Washington on the night in question. Therefore, the evidence suggested that appellant was either the principal offender in the aggravated murder, or, if not the principal offender, that he committed no offense at all. The jury obviously accepted the state's theory of the case and, in doing so, found appellant to be the principal offender in the aggravated murder. Under these circumstances and because the jury was instructed on the principal offender and the prior calculation and design aspects of R.C. 2929.04(A)(7) in the disjunctive, there is no danger that the jury actually considered the prior calculation and design alternative of the R.C. 2929.04(A)(7) death penalty specifications during its sentencing deliberations.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 558-559, 709 N.E. 2d 1166, 1176-1177 (1999).

In *Penix* the jury was not given the option of finding either that the defendant was the

principal offender or if not the principal offender, committed the murder with prior calculation or design. Rather, they were required to find both. In subsequent cases, the Ohio Supreme Court found no error where "the prior calculation and design and principal offender elements of R.C. 2929.04(A)(7) were charged disjunctively to the jury in a single specification; the jury could not have found both elements to have been proven, as it could have in *Penix*." *Ohio v. Cook*, 65 Ohio St. 3d 516, 527, 605 N.E. 2d 70 (1992); *see also Ohio v. Nields*, 93 Ohio St. 3d 6, 30, 752 N.E. 2d 859 (2001); *State v. Burke*, 73 Ohio St. 3d 399, 405, 653 N.E. 2d 242, 248 (1995). The rationale is, if the instruction is given disjunctively then the jurors will not consider both. Nonetheless, a court errs if it does not instruct the jury that they must be unanimous in agreeing on which of the alternatives the defendant is guilty. *See Ohio v. Burke*, 73 Ohio St. 3d 399, 405, 653 N.E. 2d 242 (1995). That error is harmless if the jury elsewhere indicates its unanimous verdict on either the prior calculation and design aspect or on the principal offender aspect. *Id.*; *see also Ohio v. Moore*, 81 Ohio St. 3d 22, 40, 689 N.E. 2d 1 (1998).

In this case the instruction was given in the disjunctive form. (Trial Tr. Vol. IV at 730-732.) Additionally, this Court notes that while the initial finding by the trial court was incorrect in that it considered both factors, the case was remanded and corrected. Because this error was in fact corrected and considered by the state courts on direct appeal, Petitioner is not able to demonstrate prejudice from counsel's failure to object.

> B. Trial counsel failed to object to duplicative aggravating circumstances that should have been merged for sentencing. The O.R.C. § 2929.04(A)(7) (kidnapping) and O.R.C. § 2929.04 (A)(3) aggravating circumstances should have been merged into the O.R.C. § 2929.04(A)(7) (aggravated robbery) aggravating circumstance. This error was prejudicial because the trial court failed to merge those duplicative aggravators for its weighing process also, as the jury was exposed to the same error. See also State v. Jenkins,

473 N.E.2d 764 (Ohio 1984).

The court of appeals found error in the trial court's failure to merge aggravating circumstances, however, not enough to prejudice Chinn:

> It may be that the trial court performed an unannounced merger of two of the specifications. Its charge, quoted at pp. 23-25, *supra*, charges only the first specification, murder to escape apprehension, etc., and third specification, murder while committing kidnapping. Therefore, our analysis is limited to the need of merging only those.
>
> The kidnapping and the movement of the victim from downtown Dayton to a location on Germantown Pike had but two possible purposes: to remove Jones from the scene of the robbery and to remove Jones to where he could be killed, or both. In either or both cases the movement in the kidnapping was only incidental to, and not separate from those purposes, which are charged in the first specification. Therefore, the specifications charged should have been merged under the rules of *Logan* and *Jenkins* and the court erred in failing to do so.
>
> Our review of the record reveals that Chinn failed to object to the instruction. Therefore, he waives the error on appeal unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood, supra*. We cannot find that but for the error the outcome of the trial court would clearly have been otherwise.

*Chinn 1st DirApp,* 1991 Ohio App. LEXIS 6497, *36-37 (2nd Dist. 1991).

Errors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in the state appellate court. *Richmond v. Lewis*, 506 U.S. 40, 48 (1992); *Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle*, 289 F.3d 882, 888-90 (6th Cir. 2002). *See also Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005). Here both courts on appeal merged the specifications in their weighing. *Chinn 2nd DirApp*, 1996 Ohio App. LEXIS 2530, *10-12 (2nd Dist. Ohio 1996);*Chinn OhioSCt*, 85 Ohio St. 3d 548, 577-578, 709 N.E.2d 1166, 1189-1190 (1999). The Ohio Supreme

Court specifically stated:

> For purposes of our independent review, however, we will consider only the single (merged) aggravating circumstance that was considered by the trial court on remand from the court of appeals and that was considered by the court of appeals in its own independent review of appellant's death sentence. Thus, we consider the R.C. 2929.04(A)(7) specification of the aggravating circumstance premised on aggravated robbery - -i.e., that appellant shot and killed Brian Jones during the course of an aggravated robbery - - which is clearly shown on the record before us.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 577, 709 N.E.2d 1166, 1189 (1999). It is apparent from these decisions that upon reweighing, the state courts properly weighed the aggravating circumstance against the mitigation. As the circumstance was properly merged and weighed against the mitigating factors, Chinn cannot show prejudice arising from counsel's failure.

> C. Trial counsel failed to object to the trial court's improper penalty phase instruction on aggravating circumstances. This improper definition allowed the jury to weigh the noncapital firearm specifications as aggravating. The jury was told to weigh the specifications that it had previously found, which included the firearm specifications. Trial counsel had a duty to object to this instructional error in light of <u>State v. Johnson</u>, 494 N.E.2d 1061 (Ohio 1986).

Next, Petitioner argues that counsel was ineffective as they failed to object to the instruction allowing the jury to weigh firearm specifications as aggravating circumstances. The Ohio Supreme Court held:

> Additionally, during its deliberations in the penalty phase, the jury sent a note to the trial judge requesting a clarification of the aggravating circumstances and mitigating factors. The note stated, "We would like a summary of the elements that make up the mitigating and aggravating circumstances/factors. For example, character of [defendant], testimony of [defendant], etc." (Emphasis sic.) The trial court responded, "The aggravating circumstances are those that you have found in previous specifications and the

mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant." We find that the trial court's response to the jury's question clarified that there were only three aggravating circumstances the jury was to consider and weigh in the penalty phase, i.e., the three specifications of aggravating circumstances the jury had previously found appellant guilty of committing.

Nevertheless, appellant claims that the trial court's response to the jury's question merely "added to the confusion." Specifically, appellant argues that "by telling the jury that the aggravating circumstances were the same as the specifications, the court instructed the jury to weigh a nonstatutory aggravating circumstance, the firearm specification, which was attached to each substantive count in the indictment." However, the record does not support appellant's arguments in this regard. The record clearly demonstrates that the trial court's statement that "the aggravating circumstances are those that you have found in previous specifications" referred only to the death penalty specifications for which the jury had previously found appellant guilty of committing. The firearm specifications were submitted to the jury only in the guilt phase and were not even identified as "specifications" on the verdict forms that were returned by the jury at the conclusion of the guilt phase. The only specifications that were identified as such on the verdict forms in the guilt phase of appellant's trial were the three death penalty specifications that had been submitted to the jury in connection with Count One of the indictment, i.e., the R.C. 2929.04 (A)(3) specification and the two R.C. 2929.04 (A)(7) specifications. For these reasons, it is clear that the trial court's response to the jury's question in the penalty phase did no invite the jury to consider the firearm specifications as nonstatutory aggravating circumstances.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 557, 709 N.E.2d 1166, 1175 (1999).

After a review of the record, this Court concurs with the state court in its holding on the underlying issue of the jury instructions and specifications. *Id*. The firearm charges were not identified to the jury as specifications. As such, the jury would have understood the specifications to include those that were supplied to them in the first count for their consideration: "committing and/or attempting to commit or fleeing immediately after committing or attempting to commit the

kidnapping of Brian K Jones . . .; committing the offense for the purpose of escaping detection, apprehension, trial or punishment for another offense committed by the defendant, and committing or attempting to commit and/or fleeing immediately after committing and/or attempting to commit an aggravated robbery. . ." (Return of Writ, Doc. No. 24, Apx. Vol. I at 147-152.)  As the Court does not find the instruction to be erroneous, counsel's failure to object to this instruction cannot be held to be ineffective and to have prejudiced Chinn.  This sub-claim is without merit.

> D.    Dismissed by the District Court.

> E.    Trial counsel failed to object at the penalty phase to the court's instruction on the "nature and circumstances of the aggravating circumstance."  That instruction rendered the jury's sentencing process unconstitutionally vague by incorporating a statutory mitigating factor, the circumstances of the offense, into the aggravating circumstances. See O.R.C. 2929.03(D)(1); 2929.04(A), (B). See also Godfrey v. Georgia, 446 U.S. 420 (1980); Stringer v Black, 403 U.S. 222 (1992).

Petitioner argues that the State's closing argument during the penalty phase of trial made improper comments as to the nature and circumstances of the crime as "aggravating circumstances." (Petition, Doc. No. 3 at 35); (Traverse, Doc. No. 27, PAGEID 360.)  This argument encouraged the jury to weigh an invalid aggravating circumstance against the mitigating evidence and violated Petitioner's Eighth Amendment rights. (Traverse, Doc. No.27, PAGEID 360.)  This claim has been previously rejected. *Cooey v. Coyle*, 2000 U.S. App. LEXIS 38700 (6th Cir. 2000).

> F.    Counsel failed to object to prejudicial victim impact evidence from Brian Jones's mother in the form of opinions about punishment and petitioner's perceived inability for rehabilitation.  He was prejudiced because that evidence exceeded the scope of victim impact evidence under Payne v. Tennessee, 501 U.S. 808 (1991).

*Payne v. Tennessee* permitted the use of victim impact statements in the sentencing phase

and the Sixth Circuit extended the *Payne* holding to the guilt phase of trial in *Cooey v. Coyle*. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004), *citing Cooey v. Coyle*, 289 F.3d 882 (6th Cir. 2004) and appendix at 2000 U.S. App. Lexis 38700 (6th Cir. 2000); *Cooey v. Anderson*, 988 F. Supp. 1066, 1089-1090 (N.D. Ohio 1997). Counsel was not ineffective in their failure to object. This sub-claim is without merit.

> G.  Counsel were ineffective to petitioner's prejudice because they failed to request a limiting instruction for Shirley Cox's trial phase testimony. Cox's testimony prejudiced petitioner because she testified that she met him while he was trying to consult with an attorney after this offense. From Cox's testimony, the jury was likely to have inferred that petitioner sought legal advice because he had just committed this crime. A limiting instruction was therefore necessary.

Petitioner next argues counsel's ineffectiveness for their failure to request a limiting instruction on Mrs. Cox's testimony. (Traverse, Doc. No. 27, PAGEID 360.) Defense counsel strongly voiced objections to this testimony in an in-chambers conference prior to Shirley Cox's testimony. (Trial Tr. Vol. III at 347-369); (Trial Tr. Vol. IV at 374-375.) The judge held that he would permit the identification of her place of employment. (Trial Tr. Vol. IV at 374.) Counsel then objected during trial when Mrs. Cox was giving her testimony. *Id*. at 376-378. Again, the trial judge overruled the objection. *Id*. Additionally, at the conclusion of Mrs. Cox's testimony, defense counsel moved for a mistrial. *Id*. at 383. The court overruled this motion. *Id*. The Court finds that counsel were effective in their efforts to prevent this testimony. Even if they had requested a limited instruction, the court had already permitted the testimony, overruled objections, and denied the motion for a mistrial. A limiting instruction would have called the jury's further attention to this damaging fact about Mrs. Cox's place of employment. Counsel's performance was not deficient nor did their failure to request this instruction seem unreasonable under prevailing professional norms.

Chinn was not prejudiced by counsel's actions in this matter nor were they deficient as a matter of performance.

> H.    Trial counsel were ineffective because they failed to object to prejudicial hearsay testimony from Marvin Washington, offered during Detective Lantz's testimony. As well, counsel failed to object to hearsay testimony from Washington, offered through Christopher Ward.

As previously held in the fifth ground for relief, there was no error in admitting this testimony, so counsel cannot be held to have been ineffective in failing to object to it. Furthermore, the Court notes that Washington testified to the same information as that given through Lantz and Ward, so there is no prejudice. (Trial Tr. Vol. III at 244, 246-249, 301-307.) This sub-claim is without merit.

> I.    Dismissed by the District Court.

Considered as a whole, the Ninth Claim for Relief is without merit and should be dismissed with prejudice; Petitioner should also be denied a certificate of appealability.

## Tenth Claim for Relief

> Petitioner's convictions violate the Due Process Clause as the State's evidence was insufficient to prove the element of identity. U.S. Const. amend. XIV.

In his Tenth Claim, Petitioner argues that his conviction was based on insufficient evidence, as the State failed to offer sufficient proof of identity. (Petition, Doc. No. 3 at 37); (Traverse, Doc. No. 27, PAGEID 362.) In addressing this claim on direct appeal, the Ohio Supreme Court held:

> In his eighth proposition of law, appellant contends that the evidence is insufficient to establish his identity as the perpetrator of the aggravated murder. He also claims that the evidence is insufficient to

show that he specifically intended to cause the death of his victim. Appellant's contentions are not well taken.

In this proposition, appellant essentially asks us to evaluate the credibility of witnesses and to resolve all evidentiary conflicts in his favor. However, in reviewing the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573.

Appellant argues that Marvin Washington's testimony is inherently unreliable and wholly unbelievable. We emphatically disagree. Washington's trial testimony was cogent and intelligible, and we are completely satisfied that his testimony identifying appellant as the killer, if accepted, sufficiently and overwhelmingly establishes appellant's guilt beyond a reasonable doubt. Appellant points out that Washington was an eyewitness to the killing and he participated in and witnessed all aspects of the crimes. As a participant, he was in a much better position to identify the killer than anyone else who testified at trial. Washington had nothing to gain from testifying against appellant. Prior to testifying, Washington was charged with and was sentenced in juvenile court for his participation in these crimes. Washington's testimony at appellant's trial was not part of any plea agreement. Additionally, as a juvenile offender, Washington was not eligible for the death penalty as an accomplice to the crimes. Therefore, in addition to having been in the best position to identify the killer, Washington simply had no reason to lie.

At trial, Washington testified that he and appellant robbed two men in Dayton and that they kidnapped Jones in Jones's car. Welborn corroborated Washington's description of the robbery, the abduction, the kidnapping, and the car theft. Welborn testified that Washington was one of the perpetrators of the robbery. Welborn never saw the face of the second robber, but Washington's testimony clearly identified appellant as the other participant in the crimes. Washington testified that he and appellant drove Jones to an area of Jefferson Township. According to Washington, appellant then got out of the car and shot Jones. Stacy Dyer witnessed the shooting. Although Dyer did not get a look at the shooter and therefore could not identify him, Dyer's testimony corroborated, in large part, Washington's description of the events that occurred in Jefferson Township on the night of January 30, 1989. Washington also testified that he and appellant then drove in the victim's car to Lome Avenue in Dayton and that they

spoke to Christopher Ward. Ward testified that he saw Washington and appellant in Jones's car in the early morning hours of January 31, 1989. Therefore, Ward's testimony not only corroborated Washington's testimony but also served to severely undermine appellant's alibi defense.

Appellant points out that Washington failed to immediately identify him at a lineup conducted on February 27, 1989. However, the reason that Washington had failed to do so was adequately explained at trial. Additionally, there is no dispute that immediately after the lineup Washington summoned Detective Lantz into an interview room and positively identified appellant as the perpetrator of the aggravated murder.

Appellant also points out that several witnesses at trial indicated that the man who was with Washington on the night of the murder was taller than appellant. However, this discrepancy in the evidence does not severely undermine either Washington's testimony identifying appellant as the killer or Ward's testimony that he saw appellant and Washington in the victim's car shortly after the murder.

The fact remains that Washington was the state's eyewitness to the crimes and that he positively identified appellant as the killer. The jury accepted Washington's testimony. Upon a review of the entire record, it is clear to us that Washington's testimony was neither inherently unreliable nor inherently unbelievable. Indeed, upon a careful review of the record before us, we find Washington's testimony to be entirely believable. However, we note, in passing, that our view of the credibility of witnesses is not what is important on the question of sufficiency of the evidence. What is important is our finding that the evidence in this case was sufficient to establish appellant's identity as the perpetrator of the aggravated murder.

Appellant also claims that the evidence is insufficient to show that he specifically intended to cause Jones's death, since the fatal shot had been fired into the upper portion of Jones's left arm. However, the evidence at trial established that the muzzle of the revolver was pressed against the victim's sweatshirt at the time the weapon was discharged. The projectile entered through the victim's left arm, entered his chest, perforated the main pulmonary artery, and came to rest near the base of the head. We therefore have great difficulty accepting appellant's characterization of the evidence as indicating nothing more than that the victim was "shot in the arm." The shot was fired in a manner that was likely to and did cause the victim's death. Additionally, "it is well-established that 'where an inherently

dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill.'" *State v. Esparza* (1988), 39 Ohio St. 3d 8, 14, 529 N.E.2d 192, 199, quoting *State v. Jester* (1987), 32 Ohio St. 3d 147, 152, 512 N.E.2d 962, 968. The evidence was clearly sufficient to show that appellant specifically intended to cause the death of his victim.

Upon a careful review of the entire record, we find that the evidence was more than sufficient to establish appellant's identity as the perpetrator of the aggravated murder and to show that he specifically intended to cause the death of his victim. Accordingly, we reject appellant's eight proposition of law.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 565-566, 709 N.E. 2d 1166, 1181-1183 (1999).

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(*en banc*). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was adopted as a matter of Ohio case law in *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991). It is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them

beyond a reasonable doubt. *In re Winship, supra.* Upon a sufficiency of the evidence claim in habeas

corpus review, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and

then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v.*

*Palmer*, 541 F.3d 652 (6th Cir. 2008).

> In an appeal from a denial of habeas relief, in which a petitioner
> challenges the constitutional sufficiency of the evidence used to
> convict him, we are thus bound by two layers of deference to groups
> who might view facts differently than we would. First, as in all
> sufficiency-of-the-evidence challenges, we must determine whether,
> viewing the trial testimony and exhibits in the light most favorable to
> the prosecution, any rational trier of fact could have found the
> essential elements of the crime beyond a reasonable doubt. See
> *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d
> 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate
> the credibility of witnesses, or substitute our judgment for that of the
> jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).
> Thus, even though we might have not voted to convict a defendant had
> we participated in jury deliberations, we must uphold the jury verdict
> if any rational trier of fact could have found the defendant guilty after
> resolving all disputes in favor of the prosecution. Second, even were
> we to conclude that a rational trier of fact could not have found a
> petitioner guilty beyond a reasonable doubt, on habeas review, we
> must still defer to the state appellate court's sufficiency determination
> as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. Ohio 2009.)

After a thorough review and upon consideration of all the evidence in light most favorable

to the prosecution, this Court holds that a reasonable juror could have found by proof beyond a

reasonable doubt that the State has proven the essential element of identity. The state court decision

listed in great specificity the evidence presented.[9] After its own review, this Court finds that the state

court decision was neither contrary to nor an unreasonable application of clearly established federal

---

[9] Due to the thorough description of evidence in the court of appeals' decision, and as to avoid being
repetitive this Court declines to again list all the same evidence which it considered in this claim.

law, to wit, *Jackson v. Virginia, supra*.  When viewed in favor of the prosecution there was ample

evidence; including a confession by Washington, a co-participant in the crime, who both identified

Petitioner and gave details as to the crime.  These details were corroborated with details given by the

surviving victim as well as other witnesses, included one that witnessed the shooting.

The Tenth Claim for Relief should be dismissed with prejudice and Petitioner should be

denied a certificate of appealability.


**Eleventh Claim for Relief**

Petitioner's right against cruel and unusual punishment and his right
to due process were violated by multiple errors in the jury instructions
at the penalty phase. U.S. Const. amends. VIII, XIV.

A.    The trial court failed to adequately instruct the jury as
to what the aggravating circumstances were that the
jury had to weigh to determine whether to sentence
petitioner to death.

B.    The trial court failed to merge duplicative
specifications for the jury's weighing process.

C.    The jury improperly weighed both the "principal
offender" and "prior calculation and design" elements
of the felony murder capital specifications.

This Claim was dismissed by the District Court as procedurally defaulted (Opinion, Doc. No.

30), and that conclusion remains the law of the case.


**Twelfth Claim for Relief**


In his Twelfth Claim for Relief, Petitioner argues that the improper jury instructions created

a reasonable likelihood that the jury was not able to give "full mitigating effect" to all of his mitigation evidence. (Petition, Doc. No. 3 at 43); (Traverse, Doc. No. 27, PAGEID 379.) Respondent counters that this ground is without merit. (Return of Writ, Doc. No. 24, PAGEID 243.) On appeal the Ohio Supreme Court held:

> Appellant was charged with and found guilty of committing one R.C. 2929.04 (A)(3) and two 2929.04(A)(7) specifications of aggravating circumstances in connection with the aggravated (felony) murder of Jones. The R.C. 2929.04(A)(3) specification alleged that the aggravated murder was committed for the purpose of escaping detection, apprehension, trial, or punishment for the commission of another offense committed by the offender. One R.C. 2929.04(A)(7) specification alleged that the aggravated murder was committed during the course of an aggravated robbery and that appellant was either the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design. The other R.C. 2929.04 (A)(7) specification alleged that the aggravated murder was committed during the course of a kidnapping and that appellant was either the principal offender in the murder or, if not, committed the murder with prior calculation and design.

> In the penalty phase, the trial court gave the following instruction to the jury:

> "Members of the Jury, you've heard the evidence and the arguments of counsel, and you will now decide whether you'll recommend to the Court that the sentence of death shall be imposed upon the Defendant and, if not, whether you recommend [one of two life sentencing options]. You will consider all the evidence, the arguments, the statement of the Defendant, and all other information and reports which are relevant to the nature and circumstances of the aggravating circumstances. Among the circumstances that are listed in the statute and there are eight references have been made and you have found these aggravating circumstances. One is that if the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender. Another of those aggravating circumstances is if the offense was committed while the offender was committing, or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping. Then they list a number of others: Kidnapping and rape; aggravated robbery; or aggravated burglary; and either the

offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design. You will consider all the evidence, the arguments, the statement of the Defendant, and all of the information and reports that are relevant to the nature and circumstances of the mitigating facts, and the mitigating facts include but are not limited to the nature and circumstances of the offense, and the history, character, and background of the Defendant; and you may consider, I guess, should consider any facts that are relevant to the issue of whether the Defendant should be sentenced to death. The prosecutor has the burden to prove beyond a reasonable doubt that the aggravating circumstances of which the Defendant was found guilty outweighs [sic] the facts in mitigation of imposing the death sentence. You shall recommend the sentence of death if you unanimously, that's all twelve, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating facts. If you do not so, fine, you shall unanimously, all twelve, recommend [one of two life sentencing options]."

While the trial court's instructions to the jury appear to be somewhat confusing the instructions clearly do not rise to the level of plain error. The trial court correctly instructed the jury on the R.C. 2929.04(A)(3) aggravating circumstances the jury had previously found appellant guilty of committing. However, in referring to the R.C. 2929.04(A)(7) aggravating circumstances premised on the kidnapping and aggravated robbery, the trial court referred to a number of felonies listed in R.C. 2929.04(A)(7) for which appellant was neither charged nor convicted, i.e., rape, aggravated arson, and aggravated burglary. Nevertheless, it is a stretch to argue as appellant does now that the trial court "appeared to be telling the jury that there [were] eight aggravating circumstances" in this case. A review of the record clearly reveals that the jury was made aware throughout the trial that there were three- - not eight- - specifications of aggravating circumstances at issue in this case. Moreover, there was never any evidence offered of arson, rape, or aggravated burglary that may have led the jury to believe that appellant was guilty of committing an R.C. 2929.04 (A)(7) aggravating circumstance premised upon those particular felonies. The trial court's references to arson, rape, and aggravated burglary should not have been made, but the references do not amount to plain error.

Additionally, during its deliberations in the penalty phase, the jury sent a note to the trial judge requesting a clarification of the aggravating circumstances and mitigating factors. The note stated, "We would like a summary of the elements that make up the

mitigating and aggravating circumstances/factors. For example, character of [defendant], testimony of [defendant], etc." (emphasis sic.) The trial court responded, "The aggravating circumstances are those that you have found in previous specifications and the mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant." We find that the trial court's response to the jury's question clarified that there were only three aggravating circumstances the jury was to consider and weigh in the penalty phase, i.e., the three specifications of aggravating circumstances the jury had previously found appellant guilty of committing.

Nevertheless, appellant claims that the trial court's response to the jury's question merely "added to the confusion." Specifically, appellant argues that "by telling the jury that the aggravating circumstances were the same as the specifications, the court instructed the jury to weigh a nonstatutory aggravating circumstance, the firearm specification, which was attached to each substantive count in the indictment." However, the record does not support appellant's arguments in this regard. The record clearly demonstrates that the trial court's statement that "the aggravating circumstances are those that you have found in previous specifications" referred only to the death penalty specifications for which the jury had previously found appellant guilty of committing. The firearm specifications were submitted to the jury only in the guilt phase and were not even identified as "specifications" on the verdict forms that were returned by the jury at the conclusion of the guilt phase. The only specifications that were identified as such on the verdict forms in the guilt phase of appellant's trial were the three death penalty specifications that had been submitted to the jury in connection with Count One of the specifications. For these reasons, it is clear that the trial court's response to the jury's question in the penalty phase did not invite the jury to consider the firearm specifications as nonstatutory aggravating circumstances.

Appellant also contends that the trial court's response to the jury's question concerning aggravating circumstances and mitigating factors led the jury to consider and to weigh the nature and circumstances of the offense as nonstatutory aggravating factors. We disagree. The trial court's response to the jury's question listed the nature and circumstances of the offense among the mitigating factors to be considered by the jury.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 554-557, 709 N.E. 2d 1166, 1174-1176 (1999).

In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned; taken as a whole they must be so infirm that they rendered the entire trial fundamentally unfair. *Henderson v. Kibbe,* 431 U.S. 145 (1977). The only question for a habeas court to consider is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62 (1991), *quoting Cupp v. Naughten*, 414 U.S. 141 (1973). The category of infractions that violate fundamental fairness is very narrow. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *citing Dowling v. United States*, 493 U.S. 342, 352 (1990).

Here Petitioner is objecting to the following instructions as given by the trial court:

> You will consider all the evidence, the arguments, the statement of the Defendant, and all of the information and reports that are relevant to the nature and circumstances of the mitigating facts, and the mitigating facts include but are not limited to the nature and circumstances of the offense, and the history, character, and background of the Defendant; and you may consider, I guess, should consider any facts that are relevant to the issue of whether the Defendant should be sentenced to death.

(Trial Tr. Vol. IV at 731.)

For clarification purposes the jurors sent a note to the trial judge requesting: "[w]e would like a summary of the elements that make up the mitigating and aggravating [sic] circumstances/factors . . . ." The trial court responded to the question by reiterating that, "[t]he mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant."

Petitioner contends that in this response "the trial court completely eliminated nonstatutory

-141-

or "catchall" mitigation from the jury's consideration. The trial court's response omitted any reference to O.R.C. 2929.04(B)(7) mitigation: "any other factors that are relevant to the issue of whether the offender should be sentenced to death." Accordingly, the jury's ability to consider or give "full mitigating effect" was eviscerated by the court's truncated instruction on nonstatutory mitigating factors. (Traverse, Doc. No. 27, PAGEID 381.) The Ohio Supreme Court held "the arguments raised . . . are not supported by a fair and impartial review of the record. Nothing in the trial court's penalty phase instructions or in its response to the jury's questions supports [Chinn's] assertion that the jury was precluded from considering mitigation." This Court agrees. The judge's original definition of mitigating factors to the jury contained a "catch-all" phrase. (Trial Tr. Vol. IV at 731.) In response to the jury question, the trial judge responded that the mitigation factors "include, but are not limited to." While perhaps neither were stated in the most articulate manner possible, both the original instruction and the response conveyed to the jurors that the mitigating factors to be considered were left to the individual juror's discretion. Thus, the instruction does not limit what the jurors may consider as a mitigating factor, but rather reiterates the circumstances, factors, or elements which the jurors may give consideration which excuses or lessens the defendant's culpability in the crime. Such "catch-all" phrase has been held to be constitutional. *Boyde v. California*, 494 U.S. 370 (1990).

The Twelfth Claim for Relief should be dismissed with prejudice and Petitioner should be denied a certificate of appealability on this claim.


## Thirteenth Claim for Relief

Petitioner's right to due process and his right against cruel and unusual punishment were violated because he was denied his right to present all relevant mitigating evidence to the sentencer, on remand to the trial

-142-

court and he was also sentenced to death without a valid recommendation from his trial jury on remand to the trial court. U.S. Const. amends. VIII, XIV.

A.  The original death penalty recommendation of petitioner's trial jury was void after Chinn I.

B.  Petitioner's right to present all relevant mitigating evidence was violated after Chinn I.

In his next ground for relief Petitioner argues that upon the remand from the court of appeals to the trial court for a sentencing error, the original jury recommendation for a sentence of death became void. (Petition, Doc. No. 3 at 45); (Traverse, Doc. No. 27, PAGEID 382.)  Additionally he argues that the trial court erred in refusing to consider additional mitigation evidence upon remand.(Petition, Doc. No. 3 at 45.)  Because he was denied the opportunity to present all relevant mitigation evidence, he claims he was sentenced to death without a proper weighing and balancing by the factfinders. *Id*.

A capital defendant has a constitutional right to mitigate his sentence. *Lockett v. Ohio*, 438 U.S. 586, 608 (1978); *Furman v. Georgia*, 408 U.S. 238 (1972).  A court may not refuse to consider a mitigating factor on which a capital defendant has introduced evidence. *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Chinn 1st DirApp*, 1991 Ohio App. LEXIS 6497, *49 (2nd Dist. 1991).  "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry v. Lynaugh*, 492 U.S. 302 (1989).  Thus, a court must consider the offered mitigating evidence though it need not give any particular weight to it; ignoring such evidence presented, however, is tantamount to refusing to consider it. *Eddings, supra*.  During the mitigation phase of his trial Chinn offered evidence regarding the effect of his father's murder as well as claims of innocence, or residual doubt.

*Chinn 1st DirApp*, 1991 Ohio App. LEXIS 6497, *52 (2nd Dist. 1991). The trial court ignored these factors in its independent weighing. For this reason the court of appeals remanded the case to the trial court.[10] *Id*. at 56.

On remand Chinn was not granted a full resentencing hearing, but rather only an opportunity for the trial judge to re-evaluate the aggravating circumstances against the mitigating factors:

> Although it does present a rather novel question, we find that when a sentencing error was committed solely by the trial judge in his review of the jury's recommendation, it is analogous to a situation in which the defendant's case was heard by a three-judge panel which committed a sentencing error. The Supreme Court has held that
>
> When a reviewing court vacates the death sentence of a defendant imposed by a three-judge panel due to error occurring at the penalty phase . . . such reviewing court may remand the action to that trial court for a resentencing hearing at which the state may seek whatever punishment is lawful, including, but not limited to, the death sentence.
>
> *State v. Davis* (1988), 38 Ohio St. 3d 362, syllabus. Accordingly, we will vacate Chinn's death sentence and remand the issue of sentencing to the trial court so that it may weigh the proper mitigating factors against the single aggravating circumstance. Pursuant to this reevaluation, the trial court may impose whatever lawful punishment it deems appropriate, including but not limited to a sentence of death.

*Id. at* *67. The trial court again sentenced Petitioner to death. Chinn appealed and the court of appeals distinguished this particular situation from the *Lockett*, *Eddings*, and *Skipper* cases as the defendants in those cases had been denied the opportunity to present mitigation evidence and therefore were remanded for full resentencing hearings.[11] *Chinn 2nd DirApp*, 1996 Ohio App. LEXIS

---

[10] The court of appeals remanded the case back to the trial court because: 1) the trial court failed to consider all relevant mitigation presented by Chinn; 2) the trial court failed to merge two duplicative aggravating circumstances into the remaining O.R.C. 2929.04(A)(7) specification; and 3) the trial court weighed both the principal offender and prior calculation and design elements of the O.R.C. 2929.04(A)(7) specification against the mitigation in violation of *State v. Penix*. *State v. Chinn*, 1996 Ohio App. LEXIS 2530 at * 4 (2nd Dist. Ohio 1996).

[11] *Lockett v. Ohio*, 438 U.S. 586, 608 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

2530, *4 (2nd Dist. 1996).[12] Chinn had presented mitigation evidence at trial, but the court failed to consider all the evidence that had been presented. *Id*. Likewise, none of the above mentioned cases addressed the presentation of *additional* mitigation evidence prior to the resentencing when no error had occurred at the original sentencing proceeding. *Id*. The court of appeals held that when they remanded this case there was "no compelling reason why Chinn should have been afforded a second opportunity to present mitigating evidence prior to sentencing." *Id*. Chinn was given a full opportunity to present such evidence at the initial sentencing hearing." *Id.* at *6. The error for which the court of appeals remanded the case occurred after the mitigating evidence had been presented and the jury had made its recommendation.[13] *Id.* at *6,*9; *see also Chinn 3rd DirApp*, 1997 Ohio App. LEXIS 3614, *2 (2nd Dist. 1997).[14] Therefore, on remand the trial court was required to proceed from the point at which the error had occurred. *Chinn 2nd DirApp*, 1996 Ohio App. LEXIS 2530, *6 (2nd Dist. 1996). The court of appeals continued by holding that if Chinn had been permitted to present additional mitigation evidence than his case would have proceeded in contrast to Ohio's capital sentencing framework as the court would have had additional evidence to consider that had not been before the jury when they made their recommendation. *Id*. at *6-7. The court of appeals conducted its own independent weighing of the aggravating circumstances with the mitigating factors and held the sentence of death was appropriate. *Id.* at *13-15; *Chinn 3rd DirApp*, 1997 Ohio App. LEXIS 3614, *6-8 (2nd Dist. 1997). The Ohio Supreme Court summarized the mitigation evidence and then addressed this claim as follows:

---

[12] Referred to as *Chinn I*.

[13] Under Ohio law after a jury recommends a sentence of death, the trial court must independently weigh the aggravating circumstances and mitigating factors and make a determination as to whether or not a sentence of death is warranted. O.R.C. 2929.03 (D)(3).

[14] Referred to as *Chinn II*.

In mitigation, appellant presented evidence concerning his history, character, and family background. Appellant's father was murdered in 1972. Appellant's grandmother testified that appellant, as a child, was "very emotionally upset" over his father's death. She also testified that appellant is deeply devoted to his nieces and nephews and to his entire family. Appellant's brother and sister testified that appellant helped them spiritually and that he is close to his family and helpful to family members. Appellant's mother, Anna Less, testified that appellant was born in 1957. Lee testified that appellant, during childhood, had no disciplinary problems and was a "very sensitive" and "active child." According to Lee, appellant became even more sensitive following his father's death. During childhood, appellant read from the Bible, believed in God, and was devoted to his family members. Lee testified that appellant had enrolled in Cambridge Technical Institute to better his life through education. Appellant gave an unsworn statement in which he proclaimed that he was innocent. Appellant stated that he had been involved in sports and certain civic organizations and activities during his childhood. He expressed his belief in God, his devotion to family, and his bitterness over his father's death. Appellant claimed to be "a compassionate and concerned human being." He also indicated that he had enrolled in Cambridge Technical Institute to better himself and that he was proud of his accomplishments in school.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 577-78, 709 N.E. 2d 1166, 1189 (1999).

In his seventh proposition of law, appellant contends that he was ineligible for the death penalty on remand from the court of appeals' 1991 decision vacating his original death sentence. Appellant claims that "when the court of appeals vacated Chinn's death sentence it also vacated the trial jury's sentencing recommendation." We disagree. In neither case where the court of appeals vacated appellant's death sentence did the appellate court purport to vacate the jury's verdict recommending imposition of the death penalty. Nor was the court of appeals required to vacate the jury's recommendation in this case. The appellate court specifically determined, and we agree, that the recommendation of the jury was untainted by error. Moreover, contrary to appellant's contentions, *Penix* does not preclude the trial court from imposing the death sentence on remand. The reason, of course, is that the errors identified and relied upon by the court of appeals in vacating appellant's original death sentence in 1991 related to the trial judge's independent evaluation of sentence. These errors were committed *after* the jury had returned its verdict in the penalty phase. Under these circumstances, the court of appeals correctly determined that *Penix* does not prohibit the trial judge, on remand,

from accepting the jury's 1989 sentencing recommendation. Rather, as the court of appeals recognized, the trial court was required to proceed on remand from the point at which the errors had occurred, *i.e.*, after the jury had returned its recommendation of death.

In this proposition, appellant also argues that he had "an absolute right to present any new mitigating evidence at his resentencing hearing in 1994." In support of this proposition, appellant relies on several United States Supreme Court opinions requiring that the sentencer not be precluded from considering relevant mitigating evidence in a capital case. See, e.g., *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L. Ed. 2d 973; *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1; and *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S. Ct. 1821, 95 2d 347. However, each of those cases involved a situation where the capital sentencer was prohibited, in some form or another, from considering relevant mitigating evidence at trial. In the case at bar, no relevant mitigating evidence was ever excluded from consideration during the penalty phase of appellant's 1989 trial. Therefore, the case at bar is clearly distinguishable from the United States Supreme Court's pronouncements in *Lockett*, *Skipper*, and *Hitchcock*. Accordingly, as was the case in *State v. Davis* (1992), 63 Ohio St. 3d 44, 46, 584 N.E. 2d 1192, 1194-1195, we find *Lockett*, *Skipper*, and *Hitchcock* to be inapplicable here. It is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation phase of his 1989 trial. In this case, as in *Davis*, the errors requiring resentencing occurred after the close of the mitigation phase of the trial. Under these circumstances, the trial court is to proceed on remand from the point at which the error occurred. Appellant's arguments to the contrary are not well taken. In addressing this issue, the appellate court stated, "In sum, Chinn was not entitled to an opportunity to improve or expand his evidence in mitigation simply because we [the court of appeals] required the trial court to reweigh the aggravating circumstance and mitigating factors." *Chinn*, Montgomery App. No. 15009, unreported, at 6. We agree with the court of appeals' assessment of this issue.

Additionally, appellant takes issue with the fact that in its 1996 sentencing entry the trial court simply stated, "it is the conclusion of this Court that the verdict of the jury recommending death be accepted." Appellant contends that the trial court failed to independently weigh the aggravating circumstance and the mitigating factors in reimposing the death sentence in 1996 and failed to comply

with the requirements for the issuance of a sentencing opinion under R.C. 2929.03(F). However, the trial court's 1994 sentencing option fully complied with the requirements of R.C. 2929.03(F). The mere fact that the trial court did not specifically incorporate its 1994 sentencing opinion into its 1996 sentencing entry does not rise to the level of reversible error. Furthermore, appellant failed to raise this issue during his final appeal to the court of appeals and, therefore, appellant's arguments have been waived.

Accordingly, for all of the foregoing reasons, we reject appellant's seventh proposition of law.

*Chinn OhioSCt*, 85 Ohio St. 3d at 563-564, 709 N.E. 2d 1166, 1180-1181 (1999).

Chinn first argues that his sentence is unconstitutional because when the court of appeals remanded the case back to the trial court for sentencing, it voided the original jury recommendation. *Id*. The Sixth Circuit has noted that "the state courts of Ohio have construed the state statute at issue to apply only when a jury, not a three-judge panel, recommends a sentence of death." *See Davis v. Coyle*, 475 F.3d 761, 775 (6th Cir. 2007); *Davis II*, 38 Ohio St. 3d 361, 372, 528 N.E.2d 925, 936 (1988) . Here Chinn was in fact tried by a jury, but the alleged errors did not occur until *after* the jury had made a recommendation. As such, and as stated by the Ohio state courts, that portion of his trial was not defective. The case was remanded to the trial judge to cure the errors *he made* in determining whether or not to accept the jury recommendation. The effect of the reversal of the sentence by the state court of appeals is, in any event, a question of state law. No United States Supreme Court precedent commands a re-trial under those circumstances.

Additionally, Petitioner argues that the decision of the Ohio Supreme Court unreasonably applied federal law and constrained the legal principles of *Lockett* and *Skipper* to only mitigation evidence that had been presented in the original 1989 trial. (Traverse, Doc. No. 27, PAGEID 382.) Once his case was remanded to the trial court, Chinn filed motion to present additional mitigation evidence. (Traverse, Doc. No. 27, PAGEID 383.) Multiple affidavits attest to an in-chambers

conference and state that there was no additional hearing on the matter and that Chinn proffered all his additional mitigation evidence. (Return of Writ, Doc. No. 24, Apx. Vol. VI at 67-74.) The proffer included a report from the Montgomery County Sheriff's Office that said Chinn had not caused any discipline problems with either jailers or other inmates during the time he had been incarcerated in the county jail **awaiting and during** his 1989 trial. *Id.* He also proffered "evidence undermining the reliability of his conviction and the credibility of his co-defendant," with testimony that he was at home when the crime occurred and with testimony from Dr. Solomon Fulero regarding the unreliability of eyewitness testimony. *Id.* Additionally, he offered evidence impeaching the State's key witness, Washington, because of a mental impairment, testimony from Dr. Caroline Everington regarding the impact of mental retardation and its effect on the ability to make identifications, and testimony regarding an incident that occurred before Washington's testimony when Washington was brought into the courtroom so someone could point Chinn out to him. *Id.* He also proffered Washington's juvenile records including psychological reports, neuropsychological reports, chemical abuse assessment, a social history and updates, a supplemental police report, and a statement made to police describing Tony. *Id.* Chinn argues that because he was precluded from presenting this additional mitigation evidence, this was a *Skipper* violation resulting in a denial of his Eighth Amendment and Fourteenth Amendment rights. (Traverse, Doc. No. 27, PAGEID 386.)

In support of this claim, Petitioner cites to *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Skipper v. South Carolina*, 476 U.S. 1 (1986), as well as cases from various circuits and state supreme courts, which he claim show that he was entitled to present additional mitigating evidence. *Creech v. Arave*, 947 F.2d 873, 881-82 (9th Cir. 1991); *Songer v. Wainright*, 769 F.2d 1488 (11th Cir. 1985); *Sivak v. State*, 731 P.2d 192, 195 (Idaho 1986); *State v. Tison*, 774 P.2d 805, 806 (Ariz. 1989).

Since the time this case was briefed, the Sixth Circuit has issued the *Davis* decision, its

holding consistent with findings in sister circuits. *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007). This *Davis* case is the Sixth Circuits habeas review and decision on the Ohio Supreme Court case on which the second district court of appeals relied when remanding Chinn's case. *State v. Davis*, 38 Ohio St. 3d 361, 528 N.E. 2d 925 (1988).

In *Davis*, Petitioner Von Clark Davis specifically argued that his Constitutional rights, specifically the Eighth and Fourteenth Amendments, had been violated as he had been denied the opportunity to present evidence of his good behavior in prison during the five years he spent on death row between the first and second sentencing hearing. *Id*. The Ohio court of appeals concluded that appellant had been permitted to introduce ample evidence in mitigation at the original sentencing hearing. The Ohio Supreme Court affirmed this decision, concluding that *Skipper* forbids only the exclusion of defendant's good prison record between his arrest and trial and does not have applicability to post-trial behavior. Following the unsuccessful appeal, Davis filed a petition for writ of habeas corpus in federal court advancing his argument that his rights were violated "because the decisions in the Ohio courts rejecting this contention and upholding the sentencing order were both contrary to and unreasonable applications of the rule announced by the Supreme court in *Skipper*." *Id*.

The *Davis* court cited *Lockett* in that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Davis*, 475 F.3d 761, 771 (6th Cir. 2007), *citing Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings,* 455 U.S. at 114-115 (extending *Lockett* and finding it unconstitutional when a trial judge excludes evidence of family history.) The *Skipper* court extended *Lockett* even further in holding that evidence of good behavior

during incarceration is relevant to future dangerousness and "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." *Skipper*, 476 U.S. at 5.

The *Davis* court elaborated that the right of the defendant to present *Skipper* evidence is particularly relevant when predicting future dangerousness–which may figure prominently in a prosecutor's plea for the death penalty as the past conduct is indicative of probable future behavior. Thus, "it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence [of good behavior in prison]; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" *Davis*, 475 F.3d 761, 771 (6th Cir. 2007), *quoting Gardner v. Florida*, 430 U.S. 349, 362 (1977). Davis was not permitted to offer any additional evidence to mitigate the crime, but by resentencing, the State was again arguing for the death penalty. The Sixth Circuit cited to *Ayers v. Belmontes*:

> Just as precrime background and character and postcrime rehabilitation may "extenuat[e] the gravity of the crime," so may some likelihood of future good conduct count as a circumstance tending to make a defendant less deserving of the death penalty. Cf. *Skipper*, 476 U.S., at 4-5 (explaining that while inferences regarding future conduct do not "relate specifically to [a defendant's] culpability for the crime he committed," those inferences are "'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'"

549 U.S. 7, 15 (2006); *Davis*, 475 F.3d at 774.

The court also noted that:

> Moreover, we are not alone among our sister circuits in recognizing that the holding in *Skipper* that a defendant be 'permitted to present any and all relevant mitigating evidence that is available,' *Skipper*, 476 U.S. at 8, requires that, at resentencing, a trial court must consider any new evidence that the defendant has developed since the initial sentencing hearing."*See, e.g., Robinson v. Moore*, 300 F.3d 1320,

1345-48 (11th Cir. 2002)(counsel is obliged to present newly available evidence at resentencing, although failure to do so in that case was not prejudicial); *Smith v. Stewart*, 189 F.3d 1004, 1008-14 (9th Cir. 1999)(failure to investigate and present additional evidence at resentencing constitutes ineffective assistance of counsel); *Spaziano v. Singletary*, 36 F.3d 1028, 1032-35 (11th Cir. 1994)(Lockett requires trial court to consider any new evidence that the parties may present at a resentencing hearing); *Alderman v. Zant*, 22 F.3d 1541, 1556-57 (11th Cir. 1994)(at resentencing hearing, trial court must consider reliable evidence of relevant developments occurring after defendant's initial death sentence).

*Davis v. Coyle*, 475 F.3d at 774.

The *Davis* court noted that it is clearly established law that "[t]he sentencer[s] . . . may determine the weight to be given [the] relevant mitigating evidence," but "may not give it no weight by excluding such evidence from their consideration[,]" however the mitigating evidence was not considered here. *Davis*, 475 F.3d 761, 771 (6th Cir. 2007), *citing Eddings*, 455 U.S. at 114-115. The Sixth Circuit concluded that the decision to disallow the proffered evidence by the Ohio courts was an unreasonable application of U.S. Supreme Court law. *Id.* at 773.

The evidence proffered by Chin on remand in this case is not *Skipper/Davis* evidence. That is, it does not purport to show anything about Petitioner's behavior **after** the jury made its death sentence recommendation. Rather, it is new mitigating evidence which would have been available for presentation to the jury at the time of trial but was not presented. Nor did the prosecutor on re-sentencing make any argument about future dangerousness that would have made post-verdict behavior of the Petitioner relevant in mitigation of that argument.

In *Davis*, "the trial court . . . refused to allow Davis to present witnesses who would have testified as to his adaptation to death row." 475 F.3d at 772. The Sixth Circuit noted that "[a]lthough neither side was permitted to introduce additional evidence at Davis's resentencing, the state used this opportunity to argue that Davis's status as a repeat offender rendered him too dangerous for anything

other than a death sentence." *Id.* Ultimately the Circuit held that the Ohio courts' holding in *Davis* was "contrary to" the relevant Supreme Court precedent. *Id.*

If Petitioner's proffered evidence on re-sentencing had been of the same sort as that proffered in *Davis* – evidence of post-sentencing rehabilitation – this Court would conclude that Petitioner was entitled to relief on this claim. Had the court of appeals vacated the jury verdict and remanded for a new sentencing trial, without doubt Petitioner would have been entitled to present the evidence he proffered.

The Court notes that the *Davis* court bolstered its conclusion by pointing to the United States Supreme Court decision in *Ayers v. Belmontes*, 549 U.S. 7 (2006), which emphasized the relevance of postcrime rehabilitation evidence to a resentencing decision. Again, that is not the sort of evidence proffered here.

The Magistrate Judge concludes that the Ohio courts' decision on this claim is neither contrary to nor an objectively unreasonable application of clearly established Supreme Court precedent. However, the case is sufficiently close to *Davis* that reasonable jurists could disagree with this conclusion and Petitioner should be granted a certificate of appealability.

### Fourteenth Claim for Relief

> Petitioner's right to due process and his right against cruel and unusual punishment were violated when his jury was misinstructed to be unanimous in order to find that aggravating circumstances did not outweigh mitigating factors. U.S. Const. amends. VIII, XIV.

This claim has been dismissed as procedurally defaulted by the District Court and that remains the law of the case (Opinion, Doc. No. 30.)

## Fifteenth Claim for Relief

> Petitioner's right to the effective assistance of counsel was violated by
> counsel's prejudicially deficient performance in failing to investigate,
> prepare, and present compelling mitigation evidence during the
> penalty phase of Petitioner's trial. U.S. Const. Amends. VI, VIII, XIV.

In his Fifteenth Ground for Relief, Chinn asserts that counsel was ineffective in their failure

to effectively investigate, identify, and present all available mitigation evidence. (Petition, Doc. No.

3 at 53); (Traverse, Doc. No. 27, PAGEID 403.) Specifically; evidence of good prison conduct while

awaiting trial at the Montgomery County jail and additional evidence of residual doubt, including,

alibi evidence that Petitioner was home when the crime happened, presenting an expert on the issue

of reliability of eyewitness, presenting an expert to challenge the testimony of Marvin Washington

as there is evidence he may have been mentally retarded, presenting Washington's juvenile records,

presenting a supplemental police report from Ward which may also call into question Ward's mental

capacity. (Traverse, Doc. No. 27, PAGEID 403.) Respondent argues that this ground for relief is

without merit. (Return of Writ, Doc. No. 24, PAGEID 253.)

The state courts originally addressed these issues on the first direct appeal, finding:

> A capital defendant's right to mitigate his sentence is not merely
> statutory, but a constitutional guarantee. *Lockett v. Ohio* (1978), 438
> U.S. 586, 608; *Furman v. Georgia* (1972), 408 U.S. 238, rehearing
> denied (1972), 409 U.S. 902. A factor that could never possibly tip
> the scales in favor of life imprisonment would be "mitigating" in name
> only. The Eighth Amendment requires that any mitigating evidence,
> given the right factual circumstances, have the potential of precluding
> the death penalty. *Id.* The precise weight to assign to a factor lies, in
> the first instance, in the sound discretion of the sentencing court.
> However, in this case the trial court abused its discretion by
> completely ignoring the factor of residual doubt.
>
> *Scott* cannot be read as eviscerating the mitigation value of residual
> doubt. Rather, *Scott* serves as a reminder to the court that the

defendant's continued protestations of innocence must be viewed in light of fact that the issue of guilt has already been resolved. Residual doubt is, as the name implies, the gap between "beyond a reasonable doubt" and absolute certainty. The size of this gap is, necessarily, dependent upon the facts in the case. In *Scott, supra*, the Supreme Court found that the only fact which contributed to residual doubt was the defendant's continued protestations of innocence, and therefore the factor had little mitigating effect. However, in the case at bar there are a number of facts in addition to Chinn's claims of innocence which cause the gap between reasonable doubt and absolute certainty to be far broader than in *Scott*.

It is uncontroverted that Chinn is five feet five inches tall. (T.702). However, everyone who saw "Tony" claimed that he was much taller. Couch, the bookstore employee, testified that 'Tony" was "certainly taller" than Washington, who also stands five feet five inches, and estimated "Tony's" height at five feet seven to nine inches. (T. 74-75). Dyer, who witnessed the murder of Jones, testified that the victim and the murderer were the same height. (T.90). Jones was five feet ten inches tall. (T. 23). Welborn, the man whom "Tony" robbed, told police that "Tony" was five feet nine inches tall. (T. 126). Finally when Washington originally described "Tony" to the police, he too said that he was taller than himself, standing at least five feet seven inches. (T. 265).

Further residual doubt may have been created by the fact that witnesses were unable to pick Chinn out of a lineup. Welborn was able to positively identify Washington, but identified someone other than Chinn as being "Tony". (T. 132). Dyer and Couch were also unable to identify Chinn. Washington did not identify Chinn in a line-up, but then changed his story. He testified that he had deliberately misidentified Chinn from fear of being seen through the one way mirror.

Washington's testimony was crucial to Chinn's conviction, but given Washington's admitted culpability in the murder of Jones his testimony is inherently suspect. This suspicion is intensified by the fact that Washington testified that he had been introduced to "Tony" and his girlfriend Stephanie Woods by Henry Walker one year before the night of the murder. (T. 257). Detective Lantz testified that he had spoken to both Walker and Woods, and both claimed not to know anyone named "Tony", and neither could identify Chinn by his picture. (T. 412-413). Washington's friend, Ward, was also able to identify Chinn. However, Ward initially told police that [sic] did not get a clear look at "Tony", (T. 158), and before making the

identification inquired into the availability of a reward. (T. 181).

It must also be remembered that Chinn produced evidence from several sources that he was elsewhere taking an examination for school at the time when Washington said he met "Tony" and was at home with his mother and brother thereafter. Furthermore, neither the murder weapon nor any other incriminating evidence was discovered which would implicate Chinn. The totality of these circumstances may create a substantial amount of residual doubt as to whether Chinn actually was "Tony".

Since Jones was shot once in the arm, there may also be residual doubt as to whether "Tony" intended to kill Jones.

The trial court erred in not considering these mitigating factors.

*Chinn 1st DirApp,* 1991 Ohio App. LEXIS 6497, *52-56 (2nd Dist. 1991). The case was sent back to the trial court and the court held a resentencing hearing, taking into consideration residual doubt. Upon again being sentenced to death, Chinn appealed to the court of appeals for a second time. This time the court held:

The only other mitigating factor, residual doubt, also is entitled to limited weight. In his brief to this court, however, Chinn suggests that we found "a substantial amount of residual doubt" in *Chinn I*, yet harbored "little residual doubt" when reviewing the same facts four years later in *Chinn II*. We cannot agree with Chinn's characterization of our prior rulings. In *Chinn I*, we held that the trial court erred by failing to consider as a mitigating factor residual doubt concerning Chinn's guilt. In connection with that ruling, we proceeded to identify specific evidence presented at trial that we noted "may create a substantial amount of residual doubt" about Chinn's guilt. *Chinn I, supra.*

In *Chinn II*, however, this court actually evaluated the residual doubt evidence and, after that review, explained why the residual doubt factor was entitled to little weight in mitigation. In fact, given our pronouncement in *Chinn I* that a substantial amount of residual doubt might exist, in *Chinn II* we stated with particularity the evidence leading us to conclude that the residual doubt factor was entitled to little mitigating weight. For the reasons explained in *Chinn II*, we continue to harbor little residual doubt about Chinn's guilt, and we accord that factor little weight in mitigating.

-156-

> Consequently, having considered and independently weighed the aggravating circumstance and mitigating factors, and having considered both the offense and the offender, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. We reach this conclusion based in part upon our belief that Chinn's scant mitigating evidence withers when weighed against his callous murder of Jones while committed an aggravated robbery.

*Chinn 3rd Dir App,* 1997 Ohio App. LEXIS 3614, *7-8 (2nd Dist. 1997). The courts again addressed this issue during Chinn's post-conviction relief proceedings. This was the last reasoned state court decision on this claim:

> The third and fourth claims raised by Chinn in his petition for post-conviction relief involve his contention that his conviction and sentence are void or voidable because: (1) his trial attorney rendered ineffective assistance of counsel by failing to investigate and present mitigating evidence; and (2) the one aggravating circumstance present in his case does not outweigh the mitigating factors. Specifically, Chinn argued that trial counsel failed to present evidence of his good conduct in prison while awaiting trial, and failed to present "additional evidence of residual doubt." He also argued that the death sentence was inappropriate because the aggravating circumstance did not outweigh all of the mitigating factors; i.e., both those factors presented to the judge and jury and those not presented.

> The trial court denied both of these claims under the doctrine of *res judicata*. The court stated that the claim of ineffective assistance of counsel could have been raised on direct appeal. The court further stated that the mitigating factors had been considered by this court in a prior direct appeal.

> We find that although we had previously weighed the aggravating circumstance and mitigating factors in the prior direct appeals, the post-conviction petition claims involve mitigating factors that were not raised in those appeals. Furthermore, all of the mitigating evidence that Chinn referred to in support of this claim is *dehors* the record, and was therefore not capable of being presented on direct appeal. We conclude that the trial court did err by ruling that the claim of ineffective assistance of counsel was barred by the doctrine of *res judicata*. However, we must affirm the trial court's decision on other grounds.

In the prior direct appeals, we addressed, and independently weighed, the aggravating circumstance and mitigating factors present in this case. Indeed, we concluded that the aggravating circumstance outweighs the mitigating factors presented at sentencing. Therefore, we must now determine whether our assessment of the mitigating factors and aggravating circumstance would change based upon the additional evidence.

In Ohio, good behavior while in jail awaiting trial has been recognized as a mitigating factor. See e.g., *State v. Moreland* (1990), 50 Ohio St. 3d 58, 70, 552 N.E.2nd 894. Therefore, we will presume for the sake of argument that the failure to present this evidence did constitute ineffective assistance of counsel. In order to prevail on this issue, Chinn must show a "reasonable probability that the outcome would have been different but for the ineffective assistance of counsel." *State v. Lascola* (1988), 61 Ohio App. 3d 228, 236, 572 N.E.2nd 717. Evidence of good conduct in jail is entitled to very little weight in mitigation. *Moreland*, at 70. We cannot conclude that the requested evidence would have changed the outcome of the sentencing hearing. Therefore, we find that Chinn's claim of ineffective assistance prejudicial to his rights is not well-taken.

Likewise, we find that Chinn's claim that trial counsel should have presented additional evidence of residual doubt "is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death." *State v. McGuire* (1997), 80 Ohio St. 3d 390, 686 N.E.2nd 1112, paragraph 1 of the syllabus. Therefore, since any evidence regarding residual doubt would not be relevant to the sentence imposed, we cannot say that counsel was ineffective for failing to present such evidence.

Accordingly, we find that the trial court's denial of Chinn's claim of ineffective assistance of counsel for failure to present mitigating evidence, as well as his claim that the aggravating circumstance did not outweigh the available mitigating factors was correct, albeit for reasons differing from than those relief upon by the court. Since we conclude that Chinn's claim is not meritorious, we further find that the trial court did not err by failing to conduct an evidentiary hearing on this issue.

*Chinn 1st PcApp,* 1998 Ohio App. LEXIS 3857, *9-13 (2nd Dist. 1998).

The Court must analyze whether this claim meets the standards under *Strickland*. This

requires a showing that counsel made errors so serious that counsel was not functioning as "counsel"

guaranteed the Defendant by the Sixth Amendment.  Second, the Defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 680 (1984) In evaluating whether or not the representation of counsel fell into the category of ineffective it must be evaluated for "reasonableness under prevailing professional norms." *Id.*  When analyzing an ineffectiveness claim for failure to investigate, the court must consider the claim by assessing the reasonableness of the decision and by giving heavy deference to counsel's judgment. *Id.* at 691; *but see Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995); *see also Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997); *see further Skaggs v. Parker*, 235 F.3d 261, 269, 271 (6th Cir. 2000).  There is a constitutional duty on the part of counsel to investigate as effective assistance requires making professional decisions and informed legal choices, which can only be rendered after investigation. *Strickland*, 466 U.S. at 680; *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000)(Counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to [the utility of mitigating factors offered by defendant].")

Furthermore, as established in *Strickland* and reiterated in *Wiggins*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. 668, 690-691; *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).  The investigation does not need to be exhaustive, but must be reasonably substantial in examining the facts, circumstances, pleadings and the laws involved. *Strickland*, 466 U.S. at 680.

The American Bar Association set forth Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. (1989); (2003).  The Supreme Court of the United States has held that these guidelines "provide the guiding rules and standards to be used in defining the 'prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510 (2003)(reinforcing rulings in *Glenn v. Tate*,

71 F.3d 1204, 1206-08 (6th Cir. 1995); *Austin v. Bell*, 126 F.3d 843, 847-48 (6th Cir. 1997); *Coleman v. Mitchell*, 268 F.3d 417, 449-52 (6th Cir. 2001)).  The Sixth Circuit held in *Hamblin* that the standards of the 1989 ABA rules merely represented:

> a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.  The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*.  They are the same type of longstanding norms referred to in *Strickland* in 1984 as "prevailing professional norms" as "guided" by "American Bar Association standards and the like."

*Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003).  The Guidelines provide that:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (C), p 93 (1989) . . . .

> [T]hat among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p 133

*Wiggins*, 539 U.S. 510 (emphasis in original).

As noted previously, the Ohio Supreme Court summarized the evidence presented in mitigation as follows:

> In mitigation, appellant presented evidence concerning his history, character, and family background.  Appellant's father was murdered in 1972.  Appellant's grandmother testified that appellant, as a child, was "very emotionally upset" over his father's death. She also testified that appellant is deeply devoted to his nieces and nephews and to his entire family.  Appellant's brother and sister testified that appellant helped them spiritually and that he is close to his family and helpful to family members.  Appellant's mother, Anna Lee, testified that appellant was born in 1957.  Lee testified that appellant, during childhood, had no disciplinary problems and was a "very sensitive"

and "active child." According to Lee, appellant became even more sensitive following his father's death. During childhood, appellant read from the Bible, believed in God, and was devoted to his family members. Lee testified that appellant had enrolled in Cambridge Technical Institute to better his life through education. Appellant gave an unsworn statement in which he proclaimed that he was innocent. Appellant stated that he had been involved in sports and certain civic organizations and activities during his childhood. He expressed his belief in God, his devotion to family, and his bitterness over his father's death. Appellant claimed to be "a compassionate and concerned human being." He also indicated that he had enrolled in Cambridge Technical Institute to better himself and that he was proud of his accomplishments in school.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 577-78, 709 N.E. 2d 1166, 1189 (1999).

Chinn argues that additional mitigation testimony was available and could have been presented to give the jury a better understanding of his circumstances, specifically evidence of his good behavior in jail while awaiting trial and additional evidence going to residual doubt. (Petition, Doc. No. 3 at 53); (Traverse, Doc. No. 27, PAGEID 403).

At the time of Chinn's trial, the Ohio courts recognized residual doubt as a mitigating factor. Thereafter, however, in *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), the Ohio Supreme Court explained that:

> Residual or lingering doubt as to the defendant's guilt or innocence is not a factor relevant to the imposition of the death sentence because it has nothing to do with the nature and circumstances of the offense or the history, character, and background of the offender....Our system requires that the prosecution prove all elements of a crime beyond a reasonable doubt. Therefore, it is illogical to find that the defendant is guilty beyond a reasonable doubt, yet then doubt the certainty of the guilty verdict by recommending mercy in case a mistake has occurred. Residual doubt casts a shadow over the reliability and credibility of our legal system in that it allows the jury to second-guess its verdict of guilt in the separate penalty phase of a murder trial. . . .

*See also Coleman v. Mitchell*, 244 F.3d 533, 544 (2001), *quoting State v. McGuire*, 80 Ohio St. 3d 390; *cited approvingly in Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001).

Chinn asserts that counsel was ineffective in presenting residual doubt because they failed to hire experts or investigate the underlying factors to support the residual doubt. Specifically in that they: failed to obtain an expert in eyewitness identification to challenge the reliability of the witnesses, failed to obtain an expert in mental retardation to challenge the testimony of Washington, failed to obtain Washington's juvenile records, and failed to obtain Ward's police statement. (Traverse, Doc. No. 27, PAGEID 403.) The Court notes that during state post-conviction proceedings Chinn was permitted an evidentiary hearing on this very matter and that both the trial court and the court of appeals found that after considering all the evidence, they could not conclude that there was a reasonable probability that had counsel presented testimony from these experts that the result of the trial would have been different. *See* Trial Tr. Vol. VI; *Chinn 2nd PcApp*, 2001 Ohio App. LEXIS 3127, *28 (2nd Dist. 2001).

For reasons set forth previously in this Report and Recommendation, this Court has not found error in the failure to obtain various experts in eyewitness identification and mental retardation. Furthermore, Petitioner fails to show that these alleged errors would have likely undermined the reliability of, or confidence in, the result of his trial. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996), *citing Lockhart v. Fretwell*, 506 U.S. 364 (1993). Petitioner cannot meet either prong of *Strickland*, 466 U.S. 668.

Next Petitioner argues that counsel was ineffective because they failed to offer pre-trial detention behavior as *Skipper* evidence in the mitigation phase of his trial. (Traverse, Doc. No. 27, PAGEID 403.) This sub-claim, contrasted with the Thirteenth Ground for Relief, is not that evidence was proffered and the court failed to consider it, but rather that counsel never presented the mitigation evidence in the first place. Even assuming that this was not strategy and that counsel was in fact ineffective in failing to present evidence of good behavior during pre-trial incarceration, Petitioner

does not establish prejudice. The test is whether counsel's errors have likely undermined the reliability of, or confidence in, the result. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996), *citing Lockhart v. Fretwell*, 506 U.S. 364 (1993). "Counsel is constitutionally ineffective only if [his or her] performance below professional standards caused the defendant to lose what he otherwise probably would have won." *United States v. Morrow,* 977 F.2d 222 (6th Cir. 1992). Defects in assistance that have no probable effect on the trial's outcome do not establish a constitutional violation. *Mickens v. Taylor,* 535 U.S. 162, 166 (2002). This Court cannot say that the evidence of good behavior pending trial was so persuasive that failure to present it was ineffective assistance of trial counsel. The decision of the state courts finding no ineffective assistance of trial counsel is neither contrary to nor an unreasonable application of United States Supreme Court law. The Fifteenth Claim for Relief should therefore be dismissed with prejudice and Petitioner should be denied a certificate of appealability on this claim.

## Sixteenth Claim for Relief

> Petitioner's due process right to a fair trial was violated because he was denied his right to be present when the trial court gave supplemental jury instructions. U.S. Const. amend. XIV.

Next, Petitioner argues that his rights were violated when the court held discussions with the jurors regarding clarification on instructions, outside of Petitioner's presence. (Petition, Doc. No. 3 at 55); (Traverse, Doc. No. 27, PAGEID 407.) Respondent argues that this claim is without merit. (Return of Writ, Doc. No. 24, PAGEID 255.) In addressing this claim the Ohio Supreme Court held:

> Appellant contends that he is entitled to a new trial because there is nothing in the record to indicate that appellant and defense counsel were present on two occasions involving communications between the

-163-

> trial court and the jury. However, we are unwilling to presume that
> appellant and his attorneys were not present during the times in
> question. Rather, "the record must *affirmatively indicate the absence*
> of a defendant or his counsel during a particular stage of the trial."
> (Emphasis added.) *State v. Clark* (1988), 38 Ohio St. 3d 252, 258, 527
> N.E.2d 844, 851. The record does not affirmatively so indicate and,
> therefore, we reject appellant's tenth proposition of law.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 568, 709 N.E. 2d 1166, 1183 (1999).

Petitioner alleges that he and counsel were absent at a critical stage of trial, when the court, upon receiving a request from the jury, clarified selection factors for purposes of weighing aggravating circumstances and mitigating factors. (Traverse, Doc. No. 27, PAGEID 407.) Chinn notes that in total there were seven exchanges between the court and the jury. *Id*. The record shows that in five of these interactions both parties were present, however, in the other two meetings there is no such notation. *Id*. at 408. As he previously alleged in his eleventh and twelfth claims for relief, Chinn argues that during his absence in this particular instance, the court improperly instructed the jurors, and if defense counsel had been present most likely an objection would have been raised. *Id*.

The note from the jurors stated:

> Judge, We would like a summary of the elements that make up the
> mitigating and aggravating [sic] circumstances/factors. For example,
> character of defendant, testimony of defendant, etc.
> Joe Gajda. Foreman

The court responded by reiterating that:

> The aggravating circumstances are those that you have found in
> previous specifications and the mitigating factors are those which are
> relevant to the issue of whether the defendant should be sentenced to
> death, and they include, but are not limited to, the nature and
> circumstances of the offense and the history, character and
> background of the defendant.

(Return of Writ, Doc. No. 24, Apx. Vol. II at 350.)

The record is silent as to whether or not Petitioner and his counsel, as well as counsel for the State, were present during this exchange. If Petitioner is absent, *ex parte* communications should be strongly discouraged as to ensure that defendants are afforded the right to be present at all critical stages of their trial and to guarantee an opportunity to be heard. As such, questions from the jury should be answered on the record in open court. *See Rogers v. United States*, 422 U.S. 35, 39 (1975); *United States v. Reynolds*, 489 F.2d 4, 7-8 (6th Cir. 1973); *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76 (1919)(holding that "the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the partes who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict.") If it is not answered in open court, a judge has a duty to disclose on the record the nature and circumstances of the communication. *Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813, 828 (6th Cir.1978)(holding *ex parte* communication was improper as it was not on record and defendant was not afforded an opportunity to make an objection to such communication during his trial); *see also Rushen v. Spain*, 464 U.S. 114, 119-120 (1983). *Ex parte* communication between a judge and jurors will not, however, necessarily constitute reversible error. *Rushen v. Spain*, 464 U.S. 114 (1983); *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1468 (6th Cir. 1993).

In order to establish a constitutional violation grave enough to result in reversible error there must be a reasonable possibility that the *ex parte* communication affected the verdict of the trial. *See Rushen v. Spain*, 464 U.S. 114, 119-120 (1983). To determine this the court must look at the nature of what was conveyed and the manner in which it was conveyed. *Rogers*, 422 U.S. 35, 40. Similar to *Rogers v. United States*, 422 U.S. 35, 38 (1975) and *Shields v. United States*, 273 U.S. 583 (1927), this case involves a written communication from the jury to the judge asking about instructions.

Chinn argues prejudice in that he was denied the right to counsel and had counsel been present he would have objected to the instructions as given. This case is different from the prior two cited cases however, because while those jurors sought advice on their inability to agree and on the recommendation of mercy, here the jurors sought only clarification of the instructions that had already been given by the court. Despite that distinction however, it would be improper for the court to respond *ex parte* as counsel should have been given the right to be present and object. At the very least the court would have had a duty to disclose to counsel in open court the nature of the communication. However, in looking at the nature of the information conveyed to the jury it appears that it was a reiteration of an instruction that had been given to the jury previously, that the aggravating circumstances were the circumstances that the jury had found in the guilt phase, the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the defendant, offense was committed while the offender was committing or attempting to commit, or fleeing immediately after committing or attempting to commit. (Trial Tr. Vol. IV at 731-732.) In the Ninth Ground for Relief, this Court found that the instruction was not erroneous and counsel was not ineffective in their failure to object.

The Ohio Supreme Court decided this claim on the familiar basis that error will not be presumed from a silent record. In his Traverse, Petitioner turns the presumption upside down by arguing that his waiver of his right to be present cannot be presumed from a silent record (Traverse, Doc. No. 27, PageID 132-135). While that is true, it begs the question. Petitioner does not rely on any record evidence that shows directly that he was not present, but only on inferences from proof in the record that he was present on other occasions when supplementary instructions were given. Moreover it was established law at the time of trial that absence had to be shown of record, but even in the Traverse the Petitioner points to no such direct evidence.

Finally, even assuming Petitioner was absent and should have been presented, there is no showing of prejudice because the supplemental instruction given was not error.

The Sixteenth Claim for Relief should be dismissed with prejudice and Petitioner should be denied a certificate of appealability.

## Seventeenth Claim for Relief

> Petitioner's right to be tried and sentenced by a fair and impartial tribunal was violated because the State trial judge presiding over Petitioner's trial and sentencing was biased. U.S. Const. amends. V, VI, VIII, IX, XIV.

Next, Petitioner alleges a violation of his constitutional rights because his case was tried before a judge that was biased against him. (Petition, Doc. No. 3 at 57);(Traverse, Doc. No. 27, PAGEID 411.) This claim was dismissed by the District Court and that remains the law of the case (Doc. No. 30, PAGEID 558-562.)

## Eighteenth Claim for Relief

> Petitioner's right against cruel and unusual punishment and the right to due process were violated when a victim impact statement with opinions about punishment and petitioner's potential for rehabilitation was made at the capital sentencing hearing. U.S. Const. amends. VIII, XIV.

Next, Petitioner alleges that his constitutional rights were violated as a result of the trial judge's hearing and considering victim impact statement evidence prior to sentencing. (Petition, Doc. No. 3 at 60.) Respondent does not allege procedural default but rather argues that this ground is

without merit. (Return of Writ, Doc. No. 24, PAGEID 260.)  The Ohio Supreme Court wrote:

> Appellant's twenty-first proposition of law concerns alleged victim-impact evidence that was heard by the trial judge after the jury was discharged but immediately before the trial court pronounced sentence on all of the crimes appellant was found guilty of committing. Appellant claims that the evidence included an expression of opinion by Brian Jones's mother that appellant should be sentenced to death. However, Mrs. Jones never specifically stated her opinion as to the appropriate punishment.  Rather, she stated that "now we feel that the time has come for [appellant] to be punished according to the law of Ohio."   Appellant also complains that Mrs. Jones stated or implied that appellant was incapable of rehabilitation.  However, the record does not fully support appellant's claims in this regard.  Moreover, and in any event, there is absolutely nothing in the record to suggest that the trial court was influenced by irrelevant factors in sentencing appellant for the capital crime.  Therefore, we find no reversible error here.

*Chinn OhioSCt*, 85 Ohio St. 3d 548, 575-76, 85 N.E. 2d 1166, 1188 (1999).

In *Booth v. Maryland*, the Supreme Court held that victim impact evidence "at the sentencing phase of a capital murder trial violates the Eighth Amendment." 482 U.S. 496, 509 (1987).  The Court distinguished categories of victim impact information, evidence that related to the victim and the impact of the victim's death on the victim's family, and the family member's opinions as to the nature of the crime, the defendant, and an appropriate sentence. *Id*. at 503, 508.

In 1991, *Payne v. Tennessee*, expressly overruled a portion of *Booth* by holding that:

> [I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.  There is no reason to treat such evidence differently than other relevant evidence is treated.

501 U.S. 808, 827 (1991).  The Court therefore overruled *Booth* to the extent that it excluded victim impact "evidence and argument relating to the victim and the impact of the victim's death on the

victim's family." *Id.* at 830. The reasoning was that these types of statements were a permissible way of "informing the sentencing authority about the specific harm caused by the crime in question." *Id.* at 825. The Court did not, however, overrule *Booth*'s prohibition against statements about "the crime, the defendant, and the appropriate sentence." *Id.* These types of statements are inadmissible and violate the Eighth Amendment, and if the comments are so prejudicial as to render the trial fundamentally unfair, then it is a Due Process violation.

Petitioner argues that the victim impact statement made by the victim's mother exceeded the proper scope allowed under the Eighth Amendment. (Traverse, Doc. No. 27, PAGEID 415.) Specifically, because she expressed her views on rehabilitation and because life without parole was not an option at the time of Petitioner's trial, Mrs. Jones' concerns and views on Chinn's rehabilitation was essentially a push for the imposition of a sentence of death. (Traverse, Doc. No. 27, PAGEID 421.) Chinn argues that it was error for the sentencer to consider opinions about the defendant's character, potential for rehabilitation, and opinion on proper punishment and that the state court decision was unreasonable when it found she did not express any improper opinions and the record did not support the Eighth Amendment claim. (Traverse, Doc. No. 27, PAGEID 420.) Under clearly established law, he says, her opinions were improper, Chinn's Constitutional rights were violated, and the state courts' reasoning in view of the record was an unreasonable and improper application of established U.S. Supreme Court law. (Traverse, Doc. No. 27, PAGEID 421.)

The statement in question was made by Mrs. Jones to the judge after the jury had made its recommendation of a sentence of death but prior to the court's sentencing. Her statement, which is comprised of approximately two pages of transcript, related the effect of Brian's death on his family. (Trial Tr. Vol. V at 740-741.) It expressed feelings of loss and her constant fear for the well-being of other family members. *Id.* Specifically, Mrs. Jones spoke of a "[t]errible threatening fear that we

live with . . . We really do feel threatened by this Defendant and what he might do our family[sic]." *Id.* She continued by stating "[w]ith his previous record, if he had been put away where he should have been, my son may be living today. Your Honor, this makes me very ill inside to think that if this Defendant had not been out there on the streets on January 30th, that my son would be with us . . . Your Honor, we feel that this Defendant has been given every opportunity that there is. He's been on shock probation, and by his own actions, has chosen not to accept any of them; and now we feel that the time has come for him to be punished according to the law of Ohio." (Trial Tr. Vol. V at 741-742.)

The comments above do reflect Mrs. Jones opinion as to Petitioner's past rehabilitation attempts. The statements, do not however, go so far as to imply that the only option for punishment would be death, but rather she asks that he be punished in accordance with the laws of Ohio. *Id.* However, even if we find a violation, the statements must be so prejudicial as to render the trial fundamentally unfair. That is not the case here. The statement was made outside the presence of the jurors after they had given their recommendation to the trial court. In *Fautenberry v. Mitchell*, the Sixth Circuit questioned if *Booth* was applicable in cases where the victim impact statement was before a judge, rather than a jury. 515 F.3d 614, 639 (6th Cir. 2008). *Fautenberry* reasoned that the *Booth* court was concerned that the victim impact evidence might "distract the sentencing jury from its constitutionally required task [of] determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime . . ." and "divert the jury's attention away from the defendant's background and record[] and the circumstances of the crime . . . " or "create an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Id.* at 639; *citing Booth*, 482 U.S. at 505, 507. They held that this risk is severely diminished when the information is before a judge and not a jury, therefore giving Booth

"minimal releveance." *Fautenberry*, 515 F.3d at 639.  Absent evidence to the contrary, it is assumed

that the judge did not rely on the improper portion of the victim impact statement.  As the Sixth

Circuit stated in *Fautenberry*, "the Ohio Supreme Court's finding that there was no indication that

the three-judge panel relied on the victim-impact evidence was a 'factual finding that is presumed

to be correct under the AEDPA.'" *Id.*; *see also Cooey v. Coyle*, 289 F.3d 882, 910-11 (6th Cir. 2002)

(affirming the district court's deference to the Ohio Supreme Court's factual finding that there was

"no affirmative indication that the victim impact statements were considered in sentencing [the

petitioner] to death.")  Likewise, in this case, there is no indication made by the Ohio Supreme Court

that the trial judge considered and relied on that portion of the victim impact statement in rending

sentence.

Petitioner's Eighteen Claim for Relief is without merit and should be dismissed with

prejudice.  No certificate of appealability should be granted on this claim.

## Nineteenth Claim for Relief

Petitioner's right against cruel and unusual punishment and his right
to due process were violated because O.R.C. § 2929.03(D)(1) renders
O.R.C. § 2929.04 (A) and (B) unconstitutionally vague.  U.S. Const.
amends. VIII, XIV.

In his next ground for relief, Petitioner alleges that the Ohio death penalty statute is vague and

as a result violates the Eighth Amendment. (Petition, Doc. No. 3 at 62);(Traverse, Doc. No. 27,

PAGEID 423.)  The District Court dismissed this claim as procedurally defaulted and that remains

the law of the case. (Doc. No. 30 at PAGEID 562-564.)

## Twentieth Claim for Relief

Petitioner's right to due process was violated by the ineffective assistance of counsel in his first appeal as of right to the Ohio Court of Appeals of Montgomery County. U.S. Const. amend. XIV

A.    Counsel failed to assign as error the vagueness defect in Ohio's sentencing scheme. O.R.C. § 2929.03(D)(1) incorporates the nature and circumstances of the offense, a statutory mitigating factor under O.R.C. § 2929.04(B), into the aggravating circumstance. Accordingly, petitioner's death sentence is arbitrary. Godfrey v. Georgia, 446 U.S. 420 (1980); Stringer v. Black, 503 U.S. 222 (1993).

B.    Counsel failed to assign as error the trial court's failure to define "principal offender," which was an essential element of the O.R.C. § 2929.04(A)(7) aggravating circumstance in this case. See Cabana v. Bullock, 474 U.S. 376 (1986).

C.    Counsel failed to assign as error, the trial court's erroneous instruction on both the "principal offender" and "prior calculation and design" components of the O.R.C. § 2929.04 (A)(7) aggravating circumstance. Only one of those statutory alternative applied to this case and it was improper to instruct the jury on both. State v. Penix, 513 N.E.2d 744 (Ohio 1987). Counsel's failure to assign this issue as error was certainly prejudicial to petitioner because the court of appeals vacated his death sentence, inter alia, because the trial court considered both components in its original sentencing calculus. State v. Chinn, No. 1991 WL 289178, 15-17 (Ohio App. 2nd Dist. 1991).

D.    Last, appellate counsel were ineffective because they failed to assign as error trial counsel's failure to object to the errors in paragraphs A-C, supra. Strickland, 466 U.S. 668.

Petitioner next alleges ineffective assistance of appellate counsel. (Petition, Doc. No. 3 at 65);

(Traverse, Doc. No. 27, PAGEID 434-437.) Respondent does not ague procedural default but rather

argues that this claim is without merit. (Return of Writ, Doc. No. 24, PAGEID 264.) The Ohio

Supreme Court dismissed this claim summarily:

Appellant also argues that he was deprived of the effective assistance of counsel in the court of appeals. We find no merit to appellant's

contentions. The fact that appellant counsel was able to persuade the court of appeals to reverse the death sentence on two separate occasions over the course of the years is a testament to the effectiveness of appellant's counsel. None of the instances of alleged ineffective assistance of appellate counsel compels reversal here.

*Chinn OhioSCt,* 85 Ohio St. 3d 548, 576, 709 N.E. 2d 1166, 1188 (1999).

In his first sub-claim, Petitioner argues that appellate counsel were ineffective in their failure to argue Ohio's capital sentencing scheme is unconstitutionally vague. (Traverse, Doc. No. 27, PAGEID 436.), specifically that Ohio Revised Code § 2929.03 (B) permits the use of the nature and circumstances of the offense as a mitigating factor, but that Ohio Revised Code § 2929.03(D)(1) permits the sentencer to consider the nature and circumstances in aggravation. *Id*.

In making its procedural default determination of the underlying sub-claim, which is effectively Petitioner's Nineteenth Ground for Relief, the District Court considered the claim on the merits to the extent necessary to determine if ineffective assistance of counsel could excuse Chinn's failure to properly raise this claim on direct appeal. (Opinion, Doc. No. 30, PAGEID 562-569.) After a thorough analysis as to whether or not appellate counsel was ineffective in this regard, the District Court held "[e]ven assuming that counsel's decision was unreasonable, or that counsel omitted the issue out of pure oversight, the Court cannot conclude under the prejudice prong of *Strickland* that there is a reasonable probability that the outcome of petitioner's appeal would have been different had appellate counsel raised this issue." (Opinion, Doc. No. 30, PAGEID 568.)

In his next sub-claim, Chinn argues appellate counsel erred when they failed to object to the trial court's failure to define the "principal offender" element. (Traverse, Doc. No. 27, PAGEID 436.) He argues this was error as "principal offender" was an element of the charge that the jury needed to find to convict him of capital murder. *Id*.

Again, in making its procedural default decision of this underlying sub-claim, which is

Petitioner's Seventh Ground for Relief, the District Court considered the claim on the merits to the extent necessary to determine if ineffective assistance of counsel could excuse Chinn's failure to properly raise this claim on direct appeal. (Opinion, Doc. No. 30, PAGEID 535-540.) The Court previously held, "that neither trial counsel nor appellate counsel were ineffective, sufficient to excuse the default of petitioner's seventh claim for relief." *Id*. at 539.

Next, Petitioner alleges appellate ineffectiveness in failing to raise on appeal error in the penalty phase instruction directing the jury to find the "principal offender" and "prior calculation and design" elements of the felony murder specification. (Traverse, Doc. No. 27, PAGEID 435-436.) He argues that under Ohio law only one of the two elements may be considered and weighed. *Id*

The District Court also addressed this underlying claim in its previous opinion. Again, in making its determination on whether or not the ground for relief, here, the Eleventh Ground for Relief, sub-section c, was procedurally defaulted, the Court addressed the effectiveness of counsel to determine if there was cause and prejudice to excuse such default. (Opinion. Doc. No. 30, PAGEID 547, 554-556.) Thus, the Court addressed the underlying claim on both procedural default and on the merits and found that, "[t]his court is not persuaded either that counsel performed deficiently in failing to object or that petitioner was prejudiced by counsel's failure to object." *Id*. at 554. "For these reasons, the Court cannot find either that defense counsel performed deficiently in failing to object to an instruction that was not facially improper . . . ." *Id*. at 555. Because trial counsel was not ineffective, we cannot hold appellate counsel ineffective for their failure to raise trial counsel's alleged deficiency.

In his last sub-claim, Chinn argues ineffectiveness of appellate counsel in their failure to make the claim that trial counsel were ineffective in their failure to raise the above claims, for not objecting to the instruction containing both "principal offender" and "prior calculation and design," for failing

to object when "principal offender" was not defined and, for not challenging the vagueness defect in Ohio's statute. (Traverse, Doc. No. 27, PAGEID 437.)

Again, in making its procedural default decision of this underlying sub-claim, which is Petitioner's Ninth Ground for Relief, sub-claims a, d and e, the Court concluded that while not procedurally defaulted, sub-claim d is without merit. (Opinion, Doc. No. 30, PAGEID 540-543.)

In sum, the Twentieth Claim for Relief should be dismissed with prejudice and Petitioner should be denied a certificate of appealability on it.

## CONCLUSION

Based on the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice but that Petitioner be granted a certificate of appealability on Claims One, Three, Five A, and Thirteen.


October 14, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to

seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).