# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DAVEL CHINN,

:

      Petitioner,                    Case No. 3:02-cv-512

                         :         District Judge Edmund A. Sargus, Jr.

     -vs-                         Magistrate Judge Michael R. Merz

WARDEN, Mansfield Correctional
  Institution,

                         :

      Respondent.

---

# SUPPLEMENTAL REPORT AND RECOMMENDATIONS

---

This capital habeas corpus case is before the Court on Petitioner's Objections (Doc. No. 63) to the Magistrate Judge's Report and Recommendations on the merits of the case as it stood before the 2012 Amended Petition (the "Original Report," Doc. No. 60).  The Warden has filed a Response to the Objections (Doc. No. 66) and Judge Sargus has recommitted the matter to the Magistrate Judge for a supplemental report and recommendations in light of the Objections and Response (Doc. No. 76).

### Procedural Status of the Case

The murder in this case occurred January 30, 1989.  The case was in the Ohio courts continuously from the time Chinn was indicted on March 3, 1989, until he filed his Petition here November 4, 2002.  As filed, the Petition included twenty claims for relief (Doc. No. 3).  On

Respondent's Motion, Judge Sargus dismissed Claims for Relief 5(C), 7, 11, 14, 17, and 19 as procedurally defaulted and Claims for Relief 9(D) and 9(I) on the merits (Opinion and Order, Doc. No. 30). The Original Report recommended that the remaining claims be dismissed with prejudice and that a certificate of appealability issue as to Claims for Relief One, Three, Five(A) and Thirteen (Doc. No. 60, PageID 923). The Warden filed no objections on the certificate of appealability issues, but Chinn objects to the recommended disposition of all the claims covered in the Original Report (Objections, Doc. No. 63).

After the present Objections became ripe, Chinn filed an Amended Petition adding Grounds for Relief Twenty-One and Twenty-Two relating to Ohio's current lethal injection protocol (Doc. No. 72). The Warden filed a Return to the Amended Petition (Doc. No. 79), Chinn filed a Reply (Doc. No. 81) and the Warden has filed a Sur-Reply (Doc. No. 84). The issues raised by the Amended Petition have not yet been the subject of a report and recommendations and are not dealt with in this Supplemental Report, pending determination that those claims are ripe for decision.

## Background Facts

The background facts of this case, as recited by the Ohio Supreme Court, are as follows:

> On the evening of January 30, 1989, Davel "Tony" Chinn, appellant, completed a midterm examination at Cambridge Technical Institute in Dayton. Later that night, fifteen-year-old Marvin Washington saw appellant near Courthouse Square in downtown Dayton. Washington, who had known appellant for approximately one year, knew him only by the name of "Tony." Washington and appellant spent part of the night drinking beer and loitering around the downtown area. At some point, appellant showed Washington a .22 caliber nickel-plated revolver and suggested that they look for someone to rob. At approximately

11:00 p.m., Washington went into an adult bookstore on South Ludlow Street and was ejected from the store because of his age. Thereafter, Washington and appellant loitered in the area of South Ludlow Street looking for someone to rob.

Meanwhile, Gary Welborn and Brian Jones had pulled their cars into a parking lot at the corner of South Ludlow Street and Court Street and had parked side-by-side in opposite directions to converse with each other through their driver's side windows. Appellant and Washington spotted the two men and decided to rob them. Washington approached Jones's vehicle from the rear, and appellant approached Welborn's car from the rear. Appellant pulled out a small silver revolver, pressed it against the side of Welborn's head, and demanded money. Welborn saw Washington's face, but he was unable to see the face of the gunman. Welborn handed his wallet to Washington, and Jones handed his wallet to the gunman. According to Welborn, "the guy with the gun said we'd better have at least a hundred dollars between us or he'd kill us both." After emptying the victims' wallets of money, the two assailants began discussing which car they wanted to steal. Following a brief discussion, they decided to steal both cars. Washington got into the driver's side of Jones's car and forced Jones into the passenger's seat. Appellant instructed Welborn to remain still. As appellant began walking toward the back of Welborn's vehicle, Welborn seized the opportunity to escape. At trial, Welborn testified, "The guy, he comes around. He starts walking around my car, telling me not to touch my keys. He still has the gun pointed at me. I watch him in my rearview mirror and sideview mirror. As soon as he gets behind my car, I duck down. I thought he was going to kill me now or later anyway so I ducked down in my car seat, threw it in drive, and took up off [sic] Ludlow the wrong way, straight to the police station." Welborn arrived at the station at approximately 11:30 p.m., and reported the incident to police.

After Welborn had escaped, appellant got into the back seat of Jones's car and held the revolver to Jones's neck while Washington drove the car away from Dayton and toward an area in Jefferson Township. At some point, appellant instructed Washington to turn the vehicle around and to pull over to the side of the road. Washington complied with appellant's instructions. After Washington had stopped the car, he leaned forward in the driver's seat so that appellant could exit the two-door vehicle from the driver's side. According to Washington, appellant got out of the car and walked around to the passenger's side. Appellant then got Jones out of the car and shot him. Appellant and Washington

3

drove away from the scene in Jones's automobile. While fleeing from the scene, appellant told Washington that he shot Jones because Jones could have identified them and because Jones "didn't have enough money." Appellant told Washington that he had shot Jones in the arm.

Stacy Ann Dyer lived at 5500 Germantown Pike in Jefferson Township. Dyer witnessed the shooting but did not see the gunman's face. Dyer testified that on January 30, 1989, at approximately 11:30 p.m., she had just arrived home and parked in her driveway facing the street. At that time, Dyer saw a black two-door Chevrolet Cavalier pull off to the side of the road on Germantown Pike. Dyer observed a man get out of the driver's side of the vehicle and walk over to the passenger's side. She also saw the silhouette of a person exiting the vehicle from the passenger's side. The two people then walked to the back of the car. At that moment, Dyer heard a gunshot and a scream. The victim ran through Dyer's yard and fell to the ground in her neighbor's yard. Dyer then saw the black car speed away from the scene. Dyer ran inside her house and informed her father and her sister what had happened. Dyer's sister called police, and Dyer and her father went outside to check on the victim. They found the victim, Brian Jones, on his knees with his face to the ground. Dyer asked the victim whether he was injured, but Jones did not respond. When police and paramedics arrived at the scene, Jones was still breathing but was unconscious. He never regained consciousness and was pronounced dead on arrival at the hospital.

Dr. David M. Smith performed the autopsy. Smith found that Jones had died as a result of a massive acute hemorrhage due to a gunshot wound to his arm and chest. Smith found that the projectile had entered through Jones's left arm, had proceeded directly into Jones's chest, and had perforated the main pulmonary artery. Smith recovered the .22 caliber lead projectile from an area near the base of Jones's heart. Carl H. Haemmerle, an expert in firearms, examined the .22 caliber projectile and determined that it had been fired from a revolver. He also examined the sweatshirt that Jones had been wearing at the time of the shooting. Evidence revealed that the muzzle of the weapon had been in direct contact with the garment at the time the shot was fired.

Following the shooting, Washington and appellant drove in Jones's car to 5214 Lome Avenue in Dayton. There, Washington introduced appellant to Christopher "Bay" Ward. Ward testified that, on January 31, 1989, at approximately 12:30 or 1:00 a.m., Washington had pulled up to 5213 Lome Avenue in the black

Chevrolet Cavalier and had introduced Ward to a man named "Tony," who was seated in the front passenger's seat. Ward spoke to Washington for approximately thirty to forty-five minutes until Washington and the man he was with drove away. Later that night, Washington returned to Lome Avenue and told Ward that "Tony" had shot someone in Jefferson Township.

On February 5, 1989, police arrested Washington based on information they had received from Ward. Washington confessed to police and named Tony as the killer. However, Washington was unable to give police the suspect's last name and address. On February 7, Washington helped police prepare a composite sketch of Tony. Later, after police had nearly exhausted all leads in their search for Tony, the composite sketch was released to the news media. On Wednesday, February 22, 1989, a Dayton area newspaper printed the composite sketch along with an article indicating that the suspect's name was Tony.

Shirley Ann Cox worked as a receptionist in her husband's law office. On Thursday, February 23, two men walked into the office. One of the men identified himself as Tony Chinn and requested to see Cox's husband. Cox informed the man that her husband was not available. That night, while Cox was reading the previous day's newspaper, she saw the composite sketch of the suspected killer. She said to her husband, "My God, I don't believe this." "This Tony Chinn that was in [the office] this morning is in the paper." On Friday, February 24, Cox called police to inform them that she had seen the suspect and that his name was Tony Chinn.

After speaking to Cox, police obtained a photograph of appellant and placed it in a photo array with the pictures of five other men. On February 24, police showed the photo array to Washington and to Ward. Washington positively identified appellant as the killer. Additionally, Ward identified appellant as the man he had seen in the passenger's seat of the victim's car-the man Washington had referred to as "Tony." That same day, on February 24, police arrested appellant in connection with murder.

On February 27, police conducted a lineup. Washington, Ward, Cox, Dyer, and Welborn all viewed the lineup. Dyer and Welborn could not identify appellant. Welborn attempted to make a selection based on the voices of the subjects but chose someone other than appellant.  Ward and Cox were able to positively identify appellant. Washington initially indicated that the killer was not in the lineup. However, after leaving the room where the lineup was conducted, Washington summoned Detective David

5

> Lantz into an interview room and told him that number seven in the lineup (appellant) was the killer.  Washington explained to the detective that he had previously indicated that appellant was not in the lineup out of fear that appellant was able to see him through the screen in the room where the lineup was conducted.

*State v. Chinn*, 85 Ohio. St. 3d 548, 553 (1999).

## Analysis

### First Ground for Relief:  Failure to Disclose *Brady* Material

In his first claim for relief Chinn argues that his conviction must be reversed because the State failed to disclose impeaChinng evidence about its witness Marvin Washington, specifically that Washington was moderately retarded with neuropsychological deficits which might have impacted his credibility. (Petition, Doc. No. 3 at 8); (Traverse, Doc. No. 27, PageID 285.)

The Ohio Second District Court of Appeals decided this claim on the merits, applying *Brady v. Maryland,* 373 U.S. 83 (1963).  *State v. Chinn*, 2001 Ohio App. LEXIS 3127 (2nd Dist. 2001).  Because the state courts decided this claim on the merits, the Original Report concluded our review was required to be deferential under 28 U.S.C. § 2254(d)(1)(Original Report, Doc. No. 60, PageID 783).

For the most part Petitioner's Objections reiterate what was argued in his Petition and Traverse (Objections, Doc. No. 63, PageID 944-952).  He takes exception to the holding that, although the material could have been used to impeach Washington, it failed to meet the other *Brady* prongs. "It does not follow that the impeachment of the State's key witness would be immaterial, although the Magistrate Judge somehow came to that conclusion." (Objections, Doc. No. 63, PageID 945.)

Under *Brady*, evidence is material if there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-470 (2009).  Reasonable probability means the likelihood of a different result is great enough to "undermine confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).   "[E]vidence impeaChinng an eyewitness may not be material *if the State's other evidence is strong enough to sustain confidence in the verdict*." (Objections, Doc. No. 63, PageID 944) *citing Smith v. Cain*, ___ U.S. ___, 132 S. Ct. 627, 630 (2012)(emphasis added).

Petitioner argues that the State's evidence against him was not strong and the jury's verdict was dependent on the testimony of Marvin Washington.  As support he cites to the Ohio Supreme Court's opinion that "[t]he state's case against [him] hinged on the testimony of Marvin Washington.  If the jury accepted Washington's testimony, the jury was certain to convict appellant, but if the jury did not believe Washington, it was certain to acquit appellant of all charges." *State v. Chinn*, 85 Ohio St. 3d 548, 561 (1999).  Chinn maintains that in the Original Report, "[t]he Magistrate Judge listed reasons the jury *might* still believe Washington's testimony [if they had had the additional impeachment evidence], but gave no reasons that show the jury *would* have still believed Washington." (Objections, Doc. No. 63, PageID at 945.)  Additionally, Chinn objects that the Original Report listed the evidence available at trial to support the conviction, but other than the testimony of Washington, fails to specify what evidence was considered.

Chinn cites to various discrepancies within Washington's testimony, to wit; that he had difficulty remembering details accurately, specifically as to Chinn's number in the photo array and police lineup and that he had met Chinn through Henry Walker and Stephanie Woods. (Objections, Doc. No. 63, PageID 946-49.)  He also notes discrepancies in various reports as to

the height of the man with Washington and Jones, all of which place the shooter closer to the

height of the victim (about 5'10) whereas Chinn is only about 5'6. *Id.*   Finally, he reiterates that

he had an alibi on the night of the murder.

The evidence cited above by Chinn was before the jurors and trial judge.  As quoted in

the Original Report, the evidence relied on by both the state courts and this Court included:

> From the time of his interview to the time of his trial testimony,
> Washington's version of events remained consistent, coherent, and
> plausible.  When making his subsequent identifications of Chinn,
> Washington identified him from a second photo spread after
> stating that the defendant was not present in the first spread.  He
> later identified Chinn after a line-up.  There was a corroboration of
> events and identification by other witnesses.  Additionally, there
> was testimony as to Washington's high level of adaptive
> functioning.  Finally, defense counsel himself testified that he
> *might* have used the information contained within the records for
> impeachment purposes, but he did not feel Washington would have
> met the criteria for mental retardation. (Trial Tr. Vol. VI at 129-
> 134.)  The juvenile records were not material to guilt, nor is there a
> reasonable probability that had they been disclosed, the result of
> the proceeding would have been different.

(Original Report, Doc. No. 60 at PageID 788-89.)  The corroboration included detailed testimony

from Christopher Ward, who spoke with Washington and "Tony" for about half an hour on the

night of the murder.  In addition, the depiction of the sequence of events from Stacy Dyer

corroborated the testimony of Washington.  Information was before the jury as to Washington's

identification of Chinn, and initial lack thereof, in the police lineup, as well as the discrepancy as

to what number he selected from the photo array.  Likewise, the jury was made aware through

the trial testimony of Detective Lantz that Washington told him that he met Chinn through Henry

Walker and Stephanie Woods, but when questioned, both Walker and Woods denied knowing

Chinn.  It is up to the trier of fact to make a determination on both credibility and as to how

much weight each piece of evidence should be afforded.

When determining whether the withheld information was material and therefore

prejudicial, habeas courts consider it in light of the evidence available for trial that supports the petitioner's conviction. *See Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004). As stated in the Original Report, Petitioner has established the first prong of a *Brady* violation, that the omitted records could have been used for impeachment purposes. However the remaining prongs have not been established: that the evidence was material to the outcome of his trial, and that there was prejudice resulting from the omission of this evidence. Given the evidence presented at trial, the juvenile records showing neuropscychological defects were not material, nor is there a reasonable probability that had they been disclosed, the result of the proceeding would have been different. The decision of the state court of appeals was therefore neither contrary too, nor an unreasonable application of *Brady*.

The Magistrate Judge again concludes the First Ground for Relief should be denied on the merits but deserves the encouragement to proceed further which would be implicit in granting a certificate of appealability.

### Second Ground for Relief:  Prosecutorial Misconduct

In his Second Ground for Relief, Chinn asserts he was deprived of a fair trial, in both the guilt and penalty phases, by pervasive prosecutorial misconduct (Petition, Doc. No. 3, PageID 669-673; Traverse, Doc. No. 27, PageID 302). This claim was decided on the merits in the state courts, and the Original Report concluded that the state courts' decision was neither contrary to nor an objectively unreasonable application of United States Supreme Court precedent (Original Report, Doc. No. 60, PageID 814). The Original Report recommended that the claim for relief be denied on the merits and that a certificate of appealability also be denied. *Id.*

**Asserted Guilt Phase Misconduct**

In his Objections, Chinn again challenges the prosecutor's conduct by arguing that he vouched for credibility of witness Marvin Washington; he vouched for the police by misstating evidence; he urged the jurors to consider that "victims have rights too"; and he challenged Petitioner's alibi evidence by making references to a witness who did not testify. (Objections, Doc. No. 63, PageID 953.) Chinn specifically argues that the State was offering opinions as to the credibility of the witnesses and the strength of their case, taking exception to the trial judge's finding that the prosecutor only "asked the jury to assess the credibility of these witnesses." *Id*.

The only addition Chinn makes in the Objections to the arguments made in the Petition and Traverse is that he disagrees with the Court's findings that the prosecutor was asking the jurors to assess the credibility of witnesses, as the evidence shows that the State was actually offering an opinion as to the credibility and strength of the witnesses. *Id*. He relies on *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other grounds by Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000), for the proposition that a prosecutor may not express personal opinions as to these matters. *Id*., *citing Caldwell*. He argues that the prosecutor's comments here, as in *Caldwell*, go beyond merely arguing the case and imply that the prosecutor knows something that is not being presented, thus jeopardizing the defendant's right to be tried solely on the evidence presented before the court. (Objections, Doc. No. 63, PageID 954.) However, the *Caldwell* court continued in its analysis and held that, "[b]y contrast, a state's attorney is free to argue that the jury should arrive at a particular conclusion based upon the record evidence, including the conclusion that the evidence proves the defendant's guilt." *Caldwell v. Russell*, 181

10

F.3d 731, 737 (6th Cir. 1999).

As the state courts recognized, prosecutorial misconduct will warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial unfair to a degree tantamount to a deprivation of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). *See State v. Chinn*, 85 Ohio St. 3d 548 (1999), holding "[t]he instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial and a fair and reliable sentencing determination." *Id.* at 559.

Chinn next argues that the Court failed to consider the cumulative impact of the prosecutorial misconduct at the culpability phase of trial (Objections, Doc. No. 63, PageID 955, *citing United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004), holding that "errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair." *Id.* at 614, *quoting United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000) and *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983).

The Original Report rejected each of the guilt-phase prosecutorial misconduct claims on the merits, holding

1. There was no misconduct on the claim the prosecutor was vouChinng for the credibility of witnesses (Original Report, Doc. No. 60, PageID 799 – 800).

2. There was no prejudice from the brief reference in closing argument to testimony which had not been given (Original Report, Doc. No. 60, PageID 801).

3. There was no prosecutorial misconduct violating the United States Constitution in reference to the absent alibi witness, Darryl Chinn (Original Report, Doc. No. 60, PageID 802-803).

4.      The prosecutor's comment that it was the defense which asked for an involuntary manslaughter instruction, while improper, was not prejudicial (Original Report, Doc. No. 60, PageID 804).

5.      The prosecutor's comment that "victims have rights to" was not misconduct (Original Report, Doc. No. 60, PageID 804-805).

6.      There was no prosecutorial misconduct in calling Shirley Cox as a witness (Original Report, Doc. No. 60, PageID 805).

       *Trujillo*, relied on by Chinn in his Objections, is not an application of *Donnelly* or other Supreme Court precedent on evaluating the cumulative effect of prosecutorial misconduct. Rather, it states the test for reviewing cumulative error made by a trial judge in a criminal case tried in federal court.

       The Original Report did not expressly state the Magistrate Judge's conclusion, stated now, that the two instances of prosecutorial misconduct in the guilt phase did not render the trial fundamentally unfair.  The state courts' conclusion to that effect is neither contrary to nor an objectively unreasonable application of *Donnelly*.

**Asserted Penalty Phase Misconduct**

       The Original Report also rejected Chinn's claims of prosecutorial misconduct in the penalty phase of the trial (Doc. No. 60, PageID 805-814).

       Chinn objected to the prosecutor's comment on the absence of proof by Chinn of one of the statutory mitigating factors, to wit, that he was underprivileged.  The Original Report concluded there was no constitutional violation in the comment. *Id.* at PageID 810-811.

       Chinn objects that somehow the comment precludes the jury from considering "any

relevant mitigating factor," (Objections, Doc. No. 63, PageID 956, *citing Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). The prosecutor's comment here was that there was evidence which showed the absence of a mitigating factor, that is, showing that Chinn was not underprivileged. There is no law known to this Court which permits a jury to speculate on the possibility of a mitigating factor when evidence has been produced that that factor is not present in a case. *Eddings* and its progeny make clear that mitigating evidence must be admitted, but the absence of evidence of a statutorily prescribed mitigating factor focuses the jury's attention on the evidence, not on speculation.

The Original Report also concluded that, if there was any error here, it was cured by appellate reweighing (Original Report, Doc. No. 60, PageID 811, *citing Clemons v. Mississippi*, 494 U.S. 738 (1990). Chinn objects (Objections, Doc. No. 63, PageID 956). He concedes that *Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006) is to the contrary, but argues that Lundgren "is an incorrect statement of law and Chinn reserves the right to challenge it on appeal." *Id.* Any right to challenge the *Lundgren* on appeal depends on Chinn's receiving a certificate of appealability on this issue. In the Original Report, the Magistrate Judge recommended denying a certificate on this claim and Chinn makes no new argument in his Objections (see particularly PageID 958-959).

The Magistrate Judge again respectfully recommends that the Second Ground for Relief be denied and that Chinn be denied a certificate of appealability on these claims.

### Third Ground for Relief: Admission of Testimony of Shirley Cox

In his Third Ground for Relief, Chinn asserts he was denied a fair trial by admission of

the testimony of Shirley Cox.  Ms. Cox worked in the downtown Dayton law office of her husband, Bobby Joe Cox.  On the morning of February 23, 1989, Chinn came into that office, identified himself as "Tony Chinn," and spoke to her for about fifteen minutes.  That evening she saw in the newspaper a police composite sketch of the perpetrator of the Jones shooting and identified him to the Dayton Police as the person she had met that morning.  The entirety of Ms. Cox's brief testimony is reproduced in the Original Report at PageID 817-823.

Chinn claims this testimony illogically bolstered the identity evidence and allowed the jury to infer that he was seeking legal advice.  Both the Second District Court of Appeals and the Ohio Supreme Court found that the portion of Ms. Cox's testimony about where she met Chinn should have been excluded, but the Ohio Supreme Court concluded its admission was harmless beyond a reasonable doubt.  *State v. Chinn*, 85 Ohio St. 3d 548, 560-561 (1999).  The Original Report found this conclusion was neither contrary to nor an objectively unreasonable application of clearly established Supreme Court precedent.  (Doc. No. 60, PageID 827.)

Chinn objects that this Court is required to review the admission of this evidence *de novo* under the standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993)(Objections, Doc. No. 63, PageID 964, *citing Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009).)   The Original Report noted that the Ohio Supreme Court had found the admission of this testimony was harmless beyond a reasonable doubt (Doc. No. 60, PageID 827).  Although that court did not cite *Chapman v. California*, 386 U.S. 18 (1967). it was obviously applying the *Chapman* test: harmlessness beyond a reasonable doubt.  The Original Report concluded "[b]ecause the Ohio Supreme Court's finding of harmless beyond a reasonable doubt would have satisfied the *Chapman* standard, *a fortiori* it satisfies *Brecht*."  (Doc. No. 60, PageID 827.)

That conclusion is completely consistent with *Ruelas*.  In that case, Judge Martin wrote:

[I]n *Fry [v. Pliler*, 551 U.S. 112 (2007)] the Justices also told us that *Brecht's* "substantially injurious" test "obviously subsumes" the question whether *Chapman* was reasonably applied: How could the determination that something was harmless beyond a reasonable doubt be unreasonable if it did not also have a "substantially injurious" effect on the jury? Moreover, because "it certainly makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*)," *Fry*, 551 U.S. at 120, *Fry*, as a practical matter, "subsumes" Esparza. *[Mitchell v. Esparza,* 540 U.S. 12, 17-18 (2003)].   But again: *Esparza* was not overruled. Per that case, a habeas court remains free to, before turning to *Brecht*, inquire whether the state court's *Chapman* analysis was reasonable. If it was reasonable, the case is over. But in *Fry* the Justices also emphatically stated (there was no dissent regarding this point), that a habeas court may go straight to *Brecht* with full confidence that the AEDPA's stringent standards will also be satisfied.

*Ruelas*, 580 F.3d at 412-413.

The next sentence of the Original Report reads "[a]nd this Court cannot say that it [the Ohio Supreme Court's decision] is contrary to or an unreasonable application of *Brecht*." (Doc. No. 60 at 827.)   It should have read and is hereby amended to read that the Ohio Supreme Court's decision was neither contrary to nor an objectively unreasonable application of *Chapman*.   The Ohio Supreme Court's reasoning in this regard is persuasive.   Ms. Cox was not permitted to testify what it was that Chinn wanted to consult her husband about.   An error is harmless if it played such an inconsequential role in the actual trial in which it occurred that it assuredly had no impact on the trial's verdict. *Wilson v. Mitchell,* 498 F.3d 491 (6th Cir. 2007), *citing* 2 R. Hertz & J. Liebman, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE § 31.4d (5th ed. 2005).   She had to give context to her meeting with Chinn and all are agreed that, if she had merely said it was at her husband's business, there would have been no difficulty.   Although Mr. Cox is known to this Court as having a practice concentrated in criminal defense, that was not disclosed to the jury.   There is nothing *per se* incriminating about consulting an attorney and the

visit to Mr. Cox's office was nearly a month after the crime in suit was committed.

Chinn's Objections as to the Third Ground for Relief are not persuasive and the Magistrate Judge again recommends it be denied on the merits.  Because the Ohio courts found constitutional error here, albeit harmless error, the Original Report recommended that a certificate of appealability issue on this Ground for Relief and Respondent has not objected.


### Fourth Ground for Relief:  Restriction of Cross-Examination of Christopher Ward


In his Fourth Ground for Relief, Chinn asserts his Confrontation Clause rights were violated when he was prevented from cross-examining Christopher Ward about a statement he allegedly made to Major McKeever of the Jefferson Township Police regarding how much attention he had paid to Chinn when he saw him on the night of the murder.   Chinn's counsel wanted to ask the following questions:  Did Ward make an oral statement to Major McKeever on February 5, 1989?  If so, did he say that he did not pay "any attention to the other man in the car whose name was Tony?"  Trial counsel's basis for the question was Major McKeever's police report, not a statement signed by Ward at the time of his interview which apparently also exists.

The court of appeals found error in the refusal to permit this cross-examination, but that the error was not prejudicial.  *State v. Chinn*, 1991 Ohio App. LEXIS 6497 (Ohio App. 2nd Dist. 1991).  The Ohio Supreme Court on further direct appeal[1] concluded that "the error, if any, . . . did not unfairly prejudice appellant."  *State v. Chinn*, 85 Ohio St. 3d 548, 571  (1999).  The court expressly applied the *Chapman* test, concluding "The error, if any, was harmless beyond a reasonable doubt."  *Id.* at 573.

---

[1] Because the crime in suit occurred before January 1, 1995, Chinnn was entitled to direct appellate review at both the intermediate court of appeals and in the Ohio Supreme Court.

The Original Report recommended dismissal of this Ground for Relief with prejudice because "Petitioner has not shown prejudice arising from the inability to cross-examine this witness on this statement." (Doc. No. 60, PageID 834.)

In his Objections, Chinn argues that his Confrontation Clause right "encompasses the right to impeach adverse witnesses with their own prior statements," (Doc. No. 63, PageID 968, *citing Lewis v. Wilkinson*, 307 F.3d 413, 419 (6th Cir. 2002)). At issue in that case was an entry in the diary of the complaining witness in a rape case which went directly to the issue of consent and motive for pressing charges. The statement was unquestionably that of the victim. The trial court had excluded the diary entry from use on cross-examination under the Ohio rape shield law, Ohio Revised Code § 2907.02(D). In *Lewis*, the Sixth Circuit relied on its prior decision in *Boggs v. Collins*, 226 F.3d 728 (6th Cir. 2000). In *Boggs* the court recognized as a general matter that a trial court has discretion "to impose limits [on cross-examination] based on concerns about harassment, prejudice, confusion of the issues, witness safety, or interrogation that is only marginally relevant." 228 F.3d at 736, *citing Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

In this case the trial judge refused to permit defense counsel to question Ward about a purported prior statement of his because it was reported in a police report, i.e., it was a purported prior oral statement which the witness had not adopted. The trial judge's ruling, quoted in the Ohio Supreme Court opinion, was "The Court: Police reports are inherently inaccurate and that is the very reason why under criminal rule 16 they are not to be made available and not to be used on cross-examination of any witnesses. On that basis, the Court sustains the objection," quoted at 85 Ohio St. 3d 548, 571. The court of appeals found the ruling was error because "[t]he question propounded by Appellant did not concern a police report, but a prior statement of

the witness to a police officer. Any constraints on the use or introduction of a police report in which the same matter might appear were not in issue." *State v. Chinn,* 1991 Ohio App. LEXIS 6497 *86 (Ohio Ct. App., Montgomery County Dec. 27, 1991). The Ohio Supreme Court declined to decide if it was error and held there was "no prejudicial impact whatsoever." *Chinn*, 85 S. Ct. at 573. Both courts were presented with Confrontation Clause claims and decided them without citing to any United States Supreme Court precedent.

On the underlying question of whether it is a violation of the Confrontation Clause to prevent cross-examination about a purportedly inconsistent prior statement, the Objections rely on *Giles v. Maryland*, 386 U.S. 66 (1967)(Objections, Doc. No. 63, PageID 968). There was no majority opinion in *Giles.* The petitioners had claimed state suppression of favorable evidence and knowing use of perjured testimony. Without deciding those constitutional questions, the Court remanded the cases for the Maryland courts to consider two police reports made part of the record at the Supreme Court level. Plainly, *Giles* does not include a holding of the Supreme Court that the Confrontation Clause is violated whenever questioning about a purported prior inconsistent statement is prevented. And a state court decision on a constitutional issue can be reversed in habeas corpus only if it is contrary to or an objectively unreasonable application of the holding of a Supreme Court decision. The fact that the Ohio court did not explain this portion of its decision does not preclude AEDPA deference. *Harrington v. Richter,* 562 U.S. ___, 131 S.Ct. 770, 785 (2011).

The other constitutional decision made by the Ohio Supreme Court on this Ground for Relief is that any error in preventing the questioning was harmless beyond a reasonable doubt. As with the Third Ground for Relief, the state court was clearly applying the *Chapman* test, although it again did not cite *Chapman*.

The Ohio Supreme Court's application of *Chapman* was not objectively unreasonable. First of all, it is unclear from the record that Ward actually made the statement about which defense counsel wished to ask him[2].  When the author of the report, Major McKeever, was himself questioned about the report, he indicated that the purported statement by Ward was really more his own observation than Ward's statement.  That admission by McKeever is lent credibility by the fact that its content was contrary to the State's interest, i.e., it diminished the credibility of Ward's identification of Chinn.

Secondly, as the Ohio Supreme Court also noted, there were a number of other identifications of Chinn by Ward. *Chinn*, 85 Ohio St. 3d at 573.  Finally, as the Ohio Supreme Court also found, "the alleged inconsistent statement, even if Ward had made it, was not inconsistent with any of Ward's trial testimony."  *Id.*  Chinn argues in his Objections both that this was Ward's prior statement (there is no evidence to that effect) and that it has a "glaring inconsistency" with his trial testimony (Objections, Doc. No. 63, PageID 969).  The record does not support either of those conclusions.

The Ohio Supreme Court's decision on the question presented in the Fourth Ground for Relief is neither contrary to nor an objectively unreasonable application of clearly established Supreme Court precedent.  The Magistrate Judge again respectfully recommends it be denied on the merit and Petitioner be denied a certificate of appealability.


## Fifth Ground for Relief:  Admission of Hearsay


In his Fifth Ground for Relief, Chinn argues the trial court violated his constitutional rights when, on three occasions, it allowed hearsay testimony into evidence.  Sub-claim C was

---

[2] This observation in no way implies that there was not a good faith basis for the question.

dismissed by Judge Sargus as procedurally defaulted.

**Sub-claim A** asserts error in allowing Detective Lantz to testify that Shirley Cox picked Chinn from a line-up.  The Ohio Supreme Court rejected this claim on the merits and the Original Report concluded this was not an objectively unreasonable application of Supreme Court precedent (Doc. No. 60, PageID 842).

Ms. Cox testified but was not asked about her line-up identification of Chinn on direct. She could have been asked about it on cross,[3] but it would not have made good sense for the defense to introduce that identification to the jury.  After she testified, the State called Detective David Lantz who was permitted to testify, over objection, to Ms. Cox's identification.  The Ohio Supreme Court held Lantz's testimony about Ms. Cox's identification is excluded from the Ohio Rules of Evidence definition of hearsay as a statement of "identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification and the declarant testifies at trial and is subject to cross-examination."   Ohio R. Evid. 801(D)(1)(c).

The Objections do not quarrel with the finding in the Original Report that Ms. Cox did not become unavailable when she was excused, because she worked less than two blocks from the courthouse; she could have been recalled by the defense if there was any reason to believe she would recant her identification.

Instead, the Objections assert that admission of this testimony does not come within the then-governing rule of *Ohio v. Roberts*, 448 U.S. 56 (1980), which required as a matter of Confrontation Clause law that, as to an unavailable declarant, hearsay could be admitted if it (1) bears particularized guarantees of trustworthiness or (2) falls within a firmly-rooted hearsay

---

[3] The permissible scope of cross-examination under Ohio law is "all relevant matters and matters affecting credibility."  Ohio R. Evid. 611(B).

exception (Objections, Doc. No. 63, PageID 973, *citing Miller v. Stovall,* 608 F.3d 913 (6th Cir. 2010)).  To show that "an out-of-court identification at a police lineup does not fall within either one of these exceptions," the Objections rely on *Mitchell v. Hoke*, 930 F.2d 1 (2nd Cir. 1991). However, *Mitchell v. Hoke* says nothing about the exclusion of an out-of-court identification from the definition of hearsay.  It holds that a lineup identification does not come within the residual hearsay exception codified in Fed.  R. Evid.  803(24), even assuming that exception is "firmly rooted." 930 F.2d at *2-3. It was admitted that the declarant was available, but had recanted his identification, which undercut any notion it was highly probative as required by Fed. R. Evid.  803(24).  *Id.* The case nowhere holds that out-of-court lineup identifications are inherently unreliable.

Even if *Mitchell* were in point, which it is not, it is also not a decision of the United States Supreme Court.  A lower court may not use circuit precedent "to refine or sharpen a general rule of Supreme Court jurisprudence into a specific rule that" the Supreme Court has not announced.  *Marshall v. Rodgers*, 569 U.S. ___ 133 S. Ct. 1446; 185 L. Ed. 2d 540 (2013)(*per curiam*).

In sum, Ms. Cox was available for cross-examination.  Had she been prepared to discredit Detective Lantz's testimony in any way, she could have been recalled to the stand.  In any event, Lantz's testimony fits squarely within the definition of non-hearsay in Ohio  R. Evid.  801[4] and no United States Supreme Court precedent holds that the admission of such a state violates the Confrontation Clause.  The Magistrate Judge again respectfully recommends that Sub-claim A be denied on merits but that a certificate of appealability be issued.

**Sub-claim B** asserts error in allowing Detective Lantz to present hearsay testimony of a statement by witness Marvin Washington that he could make an identification from the lineup

---

[4] The Ohio Rule is not esoteric.  See Fed.  R. Evid.  801(d)((1)(C).

but had not done so because he was frightened that Chinn could see him.  Sub-claim B is without merit for the same reasons as Sub-claim A.  In addition, Washington testified to the same facts at trial and was subject to cross-examination about them, so there is no "unavailability" issue. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this sub-claim.

**Sixth Ground for Relief:  Ineffective Assistance of Trial Counsel:  Expert Witnesses**

In his Sixth Ground for Relief, Chinn claims his trial counsel provided ineffective assistance by not calling an expert witness on the potential fallacies of eyewitness identification and on the likely effects of mental retardation on testimony.  These claims were presented first to the state courts in post-conviction where the trial court decided them after an evidentiary hearing at which two experts and trial counsel testified.  The trial court's denial of relief was affirmed by the court of appeals after a thorough discussion of the evidence.  *State v. Chinn*, 2001 Ohio App. LEXIS 3127 (2nd Dist. 2001)(quoted at length in the Original Report, Doc. No. 60,  PageID 843-854).  Since the Ohio Supreme Court declined jurisdiction over a requested appeal, the court of appeals' decision is the last reasoned state court judgment on this claim.

In the Original Report, the Magistrate Judge concluded that the court of appeals' decision was neither contrary to nor and objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

As regards presentation of an expert on the potential fallacies of eyewitness identification, Chinn relies in his Objections on *Forensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007).

*Forensic* is not an ineffective assistance of trial counsel case, but rather one where a proffered expert on eyewitness identification was excluded because the expert's report was produced in an untimely manner.  In that case, the Sixth Circuit emphasized the utility of eyewitness expert testimony in dispelling common misunderstandings about the reliability of eyewitness identification testimony and noted that the jury in that case seemed hesitant about identification. 501 F.3d at 482.  However, nothing in the *Forensic* decision suggests it is ineffective assistance of trial counsel to fail to present such an expert.  Nor is there anything in the appellate court decision here which suggests a categorical rejection of such experts.  Instead, the court compared the testimony on this subject in post-conviction of Dr. Solomon Fulero[5] with the actual eyewitness identifications in this case.  Chinn notes two points on which an expert might have dispelled common misperceptions.  He says most people do not realize that a witness' memory can be changed after the event or that a witness's certainty is not a guaranty of accuracy (Objections, Doc. No. 63, PageID 979).

    In rejecting this portion of the ineffective assistance of trial counsel claim, the court of appeals wrote:

> The factors about which Fulero testified were not particularly relevant to the testimonies of Cox and Ward. Cox testified that Chinn was in her presence for ten to fifteen minutes. Thus, she apparently had sufficient time to view his face. Ward testified that he had been in Chinn's presence for thirty to forty-five minutes. Thus, he had sufficient time to view his face. Neither Cox nor Ward testified about the presence of any salient detail and neither reported that they had been in fear while in Chinn's presence. Although Cox's race is unknown from the record, both Ward and Washington were black. There was no evidence that Cox or Ward were mentally retarded. There was no evidence that Cox was alcohol-impaired at the time she witnessed "Tony." Ward testified that he had not been drinking or smoking marijuana on the night he

---

[5] Dr. Fulero, resident in the Dayton area until his untimely death April 29, 2011, was a nationally-recognized expert on the potential fallacies of eyewitness testimony and frequently appeared as an expert witness and continuing legal education lecturer on that subject.

had met Chinn. Further, there was no evidence presented that would support the conclusion that either Cox or Ward had received post-event information which would have changed their identifications of Chinn. Thus, pursuant to the record, none of the factors discussed by Fulero were relevant to the testimonies of Cox or Ward.

The main witness against Chinn was Washington. On the night of the crime, Washington was with "Tony" from approximately 7:00 p.m. to midnight, a significant length of time. Further, Washington knew "Tony" before the night of the crime because he had previously met and "partied" with him. In fact, the two were together awhile before they decided to rob someone and ultimately spent the entire evening together. Washington knew that Chinn was carrying a gun before the crime was committed, but it apparently was not visible to him during most of the evening. Washington did not report being in fear at any time during the night. Although he might have experienced fear or stress during the actual crime, he was not the victim of the crime.

Both Washington and Chinn were black. Washington testified that when he had met Chinn on the evening of the crime, Chinn had been drinking alcohol. Washington, who had not had any alcohol before meeting Chinn, then began drinking with Chinn and the two eventually purchased more beer and consumed it before committing the crime. Washington testified that he had felt intoxicated by the time he had arrived at the scene where the crime had been committed. Although Washington might have been alcohol-impaired at the time of the crime, he had not had alcohol at the time he originally saw and recognized Chinn.

There is no evidence that Washington acquired post-event information about the crime that altered his memory. In fact, Detective Lantz testified that at the time Washington gave his first account of the events of that evening, Lantz had not given him any information about the crime. Lantz also said that until Washington had implicated "Tony," investigators had never suspected anyone linked to that name. Further, Lantz testified that Washington's testimony at Chinn's trial had been consistent with his original story. Thus, none of the factors discussed above would have been particularly relevant to Washington's testimony.

*State v. Chinn*, 2001 Ohio 1550, 2001 Ohio App. LEXIS 3127 *21-24 (2nd Dist. 2001). The court

of appeals applied the correct standard under *Strickland v. Washington,* 466 U.S. 668 (1984), and

Chinn has not demonstrated its application to the proposed expert eyewitness identification testimony is contrary to or an unreasonable application of *Strickland*.  Indeed, Chinn has pointed to no case finding ineffective assistance of trial counsel for failure to present a witness such as Dr. Fulero.

Chinn also claims it was ineffective assistance of trial counsel to fail to present an expert on the effects of mental retardation on a witness's testimony.  The Original Report also rejected this claim on the basis of the court of appeals' opinion on appeal from denial of post-conviction relief (Original Report, Doc. No. 60, PageID 859-860).  In dealing with this sub-claim, the court of appeals wrote:

> The only factor that might have been relevant was the effect of mental retardation on Washington's ability to perceive and remember information.
>
> At the post-conviction relief hearing, Everington testified that Washington had suffered from moderate range mental retardation, had had a limited ability to comprehend, had been easily swayed by others, had been eager to please authority figures, could have been easily distracted, had had significant weakness in long-term recall, and had distorted and confused new information. Fulero testified that mentally retarded people show a decreased accuracy rate in making later identifications and are also more suggestible and often have desires to please authority and to hide their mental retardation.
>
> On the other hand, Monta, an experienced criminal attorney, testified that, after meeting Washington, he had thought Washington probably would have passed psychological "muster." He also stated that the case was probably not centered solely on Washington's identification of Chinn because other witnesses who testified had implicated Chinn in the commission of the crime. Although DeVoss testified positively about Washington's characteristics and abilities, we note that she met Washington in April 1989 and thought he was a "blooming idiot" at that time. During her contact with him between April 1989 and 1992, she decided otherwise, but Chinn's trial was in August 1989, so DeVoss most likely would not have been available to testify positively about Washington's characteristics at the time of Chinn's

trial.

Lantz testified that Washington had understood questions and had appropriately answered them. He said that in his interactions with Washington, nothing had led him to think that Washington had been mentally retarded or had been unable to give a truthful account of the events in question. Dr. Martin testified that little can be known by looking solely at a person's IQ scores and that IQ scores do not give information about a person's level of adaptive functioning.

Considering all of this evidence, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had Chinn's counsel called experts to testify about eyewitness identification and Washington's mental retardation. The only eyewitness identification factor that was relevant in the case was Washington's alleged mental retardation and the effects of that retardation were disputed. Although Everington could have testified as to her beliefs about Washington, such testimony was contradicted by the testimonies of Monta, Lantz, and Martin.

Further, we have carefully reviewed Washington's testimony at Chinn's trial. His testimony is remarkably coherent and consistent. We do not agree with Everington's testimony that, during Chinn's trial, Washington had been unable to recall important facts from the night of the crime, had not understood questions, and had given inconsistent and inappropriate answers. Although Washington was unable to give times for many of the events during the evening,  he testified that he had not been wearing a watch. While Washington was unable to remember some facts about the evening of the crime, such as with which hand Chinn had held the gun, Washington did remember other very specific facts, such as what he had worn on the night of the crime, the general type of clothing that Chinn had worn, that Jones' car had had a digital clock, and that Chinn had been drinking a sixteen ounce "big mouth Micky" when he had first seen him. Further, although Washington admitted during his testimony that he could not read or write in cursive, we do not believe that such abilities were required for Washington to accurately identify Chinn.

Washington picked Chinn from a photo spread, after not picking suspects from earlier photo spreads that had not contained Chinn's photograph. Thus, although mentally retarded people might be eager to please authorities, assuming Washington was mentally retarded, he must not have been eager enough to please authorities to immediately pick a suspect from the first photo spread or to

26

immediately identify Chinn during the police lineup. Finally, although mentally retarded people might generally have a decreased accuracy rate in making later identifications, such decreased accuracy rate does not mean Washington's identification of Chinn was wrong. In fact, Washington's familiarity with Chinn prior to the night of the crime likely increased his accuracy rate in identifying him. As Martin testified, a person's level of adaptive functioning is not apparent from his IQ scores. The witnesses who came in contact with Washington prior to Chinn's trial thought that, while Washington might not have been especially bright, he would have passed "muster" and that his story was consistent and plausible.

Considering all of the evidence on the record, we cannot conclude that there is a reasonable probability that had Chinn's counsel called experts on eyewitness identification and mental retardation, the result of the trial would have been different. Thus, we will not conclude that the trial court erred in concluding that Chinn's counsel was not ineffective for failing to call experts on eyewitness identification and mental retardation.

*State v. Chinn, supra*, at *24-28.  Here again Chinn has failed to demonstrate that this decision is an unreasonable application of *Strickland*.

The Magistrate Judge again respectfully recommends this Ground for Relief be denied and a certificate of appealability be denied.

**Seventh Ground for Relief:  Failure to Define "Principal Offender"**

In his Seventh Ground for Relief, Chinn claims he was denied due process when the trial judge failed to give the jury a definition of "principal offender."  The Original Report noted this claim had been dismissed as procedurally defaulted and that ruling remained the law of the case. Chinn has made no objection to that conclusion.

**Eighth Ground for Relief:  Failure to Provide *Brady* Material and Follow the Local "Case Management" Plan**

**Equal Protection Sub-claim**

The first part of Chinn's Eighth Ground for Relief is that he was denied equal protection of the laws when the trial court refused to enforce the local rule of the Montgomery County Common Pleas Court providing for "open file" discovery in criminal cases.  On direct appeal the Ohio Supreme Court put to one side the question of the value of "open file" discovery and concluded Chinn actually had much of the material he would have obtained from the prosecutor's file and had failed "utterly" to show any prejudice from failure to receive the balance of the information.  *State v. Chinn*, 85 Ohio St. 3d 548, 569 (1999).

The Original Report found this claim not to be cognizable in habeas corpus because it sought enforcement of a local rule which was not constitutionally compelled (Doc. No. 60, PageID 862).  In his Objections, Chinn emphasizes that this is a constitutional claim under the Equal Protection Clause, to wit, that treating Chinn differently from other criminal defendants in the Montgomery County Common Pleas Court was constitutionally invidious discrimination (Objections, Doc. No. 63, PageID 986-988).  Although this claim is cognizable in habeas corpus, it is without merit.

Chinn argues that "[w]hen state action interferes with a fundamental right, the Court should evaluate the equal protection challenge to that action under a strict scrutiny standard of review."  (Objections, Doc. No. 63, *citing San Antonio School District v. Rodriquez*, 411 U.S. 1 (1973).)  As a general proposition of law, that is certainly correct.  See, e.g., *Plyler v. Doe*, 457

U.S. 202, 216-17 (1982).  The question then is whether the particular decision complained of interfered with a "fundamental right."  Chinn identifies the right in question as the "right to a fair trial."  (Objections, Doc. No. 63, PageID 986.)  That is far too general a description.  That way of characterizing failure to enforce this particular local rule would elevate every local criminal rule to the level of a "fundamental right."  Chinn cites no authority for the proposition that local criminal discovery rules rise to the level of fundamental rights.  It would be hard to reconcile such a characterization with the well-established rule that there is no constitutional right to discovery at all in a criminal case.  *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977); *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002).

The Objections criticize the Report for "apparently" requiring Chinn to show that there were similarly-situated person who were granted this discovery (Doc. No. 63).  On the contrary, it was Chinn who suggested the need for such proof by alleging that there were such similarly-situated person and then providing no examples.  (See Original Report, Doc. No. 60, PageID 861, n. 6.)

Since there is no fundamental right to discovery in a criminal case, the trial judge's action in denying Chinn application of the "Case Management Plan" must be judged on rational basis scrutiny.  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  The states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference. *Id.; Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).

Rational-basis review in equal protection analysis "is not a license for courts to judge the wisdom, fairness or logic of legislative choices." *FCC v. Beach Communication, Inc*., 508 U. S.

307 (1993). See also, e.g., *Dandridge v. Williams*, 397 U. S. 471, 486 (1970). Nor does it authorize "the judiciary [to] sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U. S. 297, 303 (1976) (per curiam). For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. See, e.g., *Beach Communications, supra,* at 508 U.S. 307 (slip op., at 7); *Kadrmas v. Dickinson Public Schools*, 487 U. S. 450, 462 (1988); *Hodel v. Indiana,* 452 U. S. 314, 331-332 (1981); *Massachusetts Bd. of Retirement v. Murgia*, 427 U. S. 307, 314 (1976) (per curiam). Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. See, e.g., *Nordlinger v. Hahn*, 505 U. S. 1 (1992); *Dukes, supra,* at 303. Further, a legislature that creates these categories need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger, supra,* at 505 U.S. 1 (slip op., at 13). *See also, e.g., United States R. Retirement Bd. v. Fritz,* 449 U. S. 166, 179 (1980); *Allied Stores of Ohio, Inc. v. Bowers*, 358 U. S. 522, 528 (1959). Instead, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications, supra.* See also, e.g., *Nordlinger, supra;  Sullivan v. Stroop,* 496 U.S. 478, 485 (1990); *Fritz, supra*, at 174-179; *Vance v. Bradley,* 440 U. S. 93,111 (1979); *Dandridge v. Williams, supra,* at 484-485.

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications*, supra,. *See also, e.g., Vance v. Bradley, supra*, at 111; *Hughes v. Alexandria*

*Scrap Corp.,* 426 U. S. 794, 812 (1976); *Locomotive Firemen v. Chicago R.I. & P.R. Co.,* 393 U. S. 129, 139 (1968). A statute is presumed constitutional, see supra, at 6, and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U. S. 356, 364 (1973), whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it "'is not made with mathematical nicety or because in practice, it results in some inequality.'" *Dandridge v. Williams, supra,* at 485, *quoting Lindsley v. Natural Carbonic Gas Co*., 220 U. S. 61, 78 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations-illogical, it may be, and unscientific." *Metropolis Theatre Co. v. Chicago,* 228 U.S. 61, 69-70 (1913). See also, *e.g., Burlington Northern R. Co. v. Ford,* 504 U. S. 648 (1992); *Vance v. Bradley, supra*, at 108, and n. 26; *New Orleans v. Dukes, supra,* at 303; *Schweiker v. Wilson*, 450 U. S. 221, 234 (1981). We have applied rational-basis review in previous cases involving the mentally retarded and the mentally ill. See *Cleburne v. Cleburne Living Center, Inc*., 473 U. S. 432 (1985); *Schweiker v. Wilson, supra*. In neither case did we purport to apply a different standard of rational-basis review from that just described.   True, even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation.  In an equal protection rational basis review, the burden is on the one attacking the governmental arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.  *Heller v. Doe*, 509 U.S. 312 (1993).

Here the trial judge, a part of the court which adopted the Case Management Plan,

articulated its purpose – to promote settlement of criminal cases.  Noting that this case was headed for trial in any event, he found that applying the Case Management Plan would not further the state purpose for which it was adopted.  That is surely a rational basis for declining to apply the local rule.  Chinn has therefore not demonstrated an Equal Protection violation as to this part of his Eighth Ground for Relief.[6]

### *Brady v. Maryland* sub-claim

Chinn's claim under *Brady v. Maryland,* 373 U.S. 83 (1963), in his Eighth Ground for Relief is that the delayed disclosure of Gary Welborn's statement that he saw a third person (other than Washington) with Chinn prior to the crime, i.e., in the vicinity of Ludlow and Court Streets in Dayton.

The Original Report noted defense counsel had been able to cross-examine Welborn about this third person  and quoted the court of appeals' decision that there was no *Brady* violation (Doc. No. 60, PageID 864-66).  Chinn objects "to the Magistrate Judge's reliance on '[t]he Court of Appeals' conclusion that there was no  prejudice from the delay in disclosure of this information' because the state court of appeals never made that conclusion with regard to the Welborn statement."  (Objections, Doc. No. 63, PageID 988.)  However, the relevant language from the court of appeals' opinion quoted in the Original Report was "we see no reasonable possibility that Chinn would have been acquitted if he had known this information."  (Doc. No. 63, PageID 866, *quoting State v. Chinn*, 1991 Ohio App. LEXIS 6497, *74 (2nd Dist.1991).  That is precisely the standard to be applied in deciding if there is prejudice from a failure to disclose:

---

[6] The Magistrate Judge passes over without comment Chinn's claim that "*Bush v. Gore*, 531 U.S. 98, 104-105 (2000), is instructive."  (Objections, Doc. No. 63, PageID 987.)  *Bush v. Gore* was decisive, but has never again been cited by the Supreme Court, and drawing any "instruction" from it is extremely hazardous.

> To establish prejudice, Belmontes must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S., at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. That showing requires Belmontes to establish "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 535, 536, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

*Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009).

The Original Report concluded that Chinn had not shown prejudice (Doc. No. 63, PageID 867).  Chinn objects that, if the defense had had the description of the third person and his car earlier, they might have been able to track him down and he might have impeached Washington. But this is all speculative.  With the descriptions, the third person had not been found nor had his statement been taken by the time of the post-conviction process, which took many years, in part because of a remand for an evidentiary hearing.  The court of appeals' conclusion that prejudice had not been shown is not an unreasonable application of *Brady* and the Eighth Ground for Relief should be dismissed on the merits.

### Ninth Ground for Relief:  Ineffective Assistance of Trial Counsel

In his Ninth Ground for Relief, Chinn asserts he was deprived of the effective assistance of trial counsel in in nine different ways, making sub-claims 9(A) through 9(I).  Chinn's objections to the proposed dispositions of the sub-claims are dealt with seriatim.

**Sub-claim A:  Failure to Object to Instructions on Both "Principal Offender" and "Prior Calculation and Design" Components of the Felony Murder Capital Specification**

Ohio Revised Code § 2929.04 provides as a possible capital specification that the offense

of aggravated murder was committed in connection with certain designated felonies and "either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." Sub-claim 9(A) asserts ineffective assistance of trial counsel for failure to object to the fact that the trial judge instructed on both "principal offender" and "prior calculation and design" components. The Original Report found there was no prejudice in the failure to object because the Ohio Supreme Court considered the asserted trial court error on the merits and did not find it defaulted for failure to object (Doc. No. 63, PageID 874).

The Ohio Supreme Court found no error in the disjunctive instruction on these two elements actually given by the trial judge. *State v. Chinn*, 85 Ohio St. 3d 548, 558-59 (1999). Chinn's position is premised on the notion that if counsel had objected, the trial judge would have chosen some other instruction which would have been more easily understandable to the jury and on that instruction the jury would not have recommended a capital sentence (Objections, Doc. No. 63, PageID 996). However, it cannot be deficient performance for a lawyer to fail to object to a legally correct jury instruction even if an instruction more favorable to the defendant can be imagined and would have also been lawful.

**Sub-claim B: Failure to Object to the Failure of the Trial Court to Merge Kidnapping and Aggravated Robbery Aggravating Circumstances**

In Sub-claim 9(B), Chinn claims ineffective assistance of trial counsel from counsel's failure to object to the trial court's failure to merge the kidnapping and aggravated robbery aggravating circumstances. While finding error in the lack of merger, both the court of appeals and the Ohio Supreme Court independently re-weighed the aggravating circumstances and

mitigating factors and merged these two components for that purpose. The Original Report concluded that this reweighing was sufficient to cure the error (Doc. No. 60, PageID 875-76). In his Objections, Chinn concedes that the Sixth Circuit has approved re-weighing as a cure for ineffective assistance of trial counsel in *Post v. Bradshaw*, 621 F.3d 406 (6th Cir. 2010). Chinn asserts "*Post* is an incorrect statement of law. . . ." Be that as it may, it is binding on this Court.

Furthermore, it is unclear that re-weighing as a cure for ineffective assistance of trial counsel is what is involved here. Both the court of appeals and the Ohio Supreme Court engaged in reweighing the aggravators and mitigators after merging these two components even though the court of appeals found the claim procedurally defaulted. *State v. Chinn*, 1991 Ohio App. LEXIS 6497, *37 (2nd Dist. 1991). If the Ohio courts did not enforce the default but proceeded to consider the asserted error on the merits, Chinn suffered no prejudice from counsel's failure to object.

### Sub-claim C: Failure to Object to Jury Instruction Which Could Have Led the Jury to Treat a Firearm Specification as an Aggravating Circumstance

In Sub-claim 9(c), Chinn claims he received ineffective assistance of trial counsel when his attorney did not object to a penalty phase instruction which, he claims, permitted the jury to treatment a firearm specification which it had found as to one of the underlying felonies as if it were an aggravating circumstance on the aggravated murder.

Chinn raised the underlying claim of trial court error in Proposition of Law No. 1 in the Ohio Supreme Court. *State v. Chinn*, 85 Ohio St. 3d 548, 554 (1999). The Ohio Supreme Court found there was no trial court error because

> The firearm specifications were submitted to the jury only in the
> guilt phase and were not even identified as "specifications" on the

> verdict forms that were returned by the jury at the conclusion of
> the guilt phase.  The only specifications that were identified as
> such on the verdict forms in the guilt phase of appellant's trial
> were the three death penalty specifications that had been submitted
> to the jury in connection with Count One of the indictment, i.e., the
> R.C. 2929.04(A)(3) specifications and the two R.C. 2929.04(A)(7)
> specifications.

*Id.* at 557.

The Original Report concluded that if there was no trial court error, there could not have been ineffective assistance of trial counsel from failure to object (Doc. No. 63, PageID 878). Chinn objects that the "plain language of the supplemental instruction clearly invited the jury to consider the noncapital firearm specifications as aggravating circumstances that could support a death sentence." (Objections, Doc. No. 63, PageID 998.)  This, says Chinn, is because the jury was told that the aggravating circumstances are those that you have found in the previous specifications.  However, the only "specifications" which the jury had found were the specifications that qualified Chinn for the death sentence. In other words, although the guilt phase verdicts had firearms findings, they were not labeled "specifications."  Because there was no trial court error, there is no prejudice from counsel's failure to object.


**Sub-claim D:  Dismissed by Judge Sargus.**


**Sub-claim E:  Failure to Object to Instruction on Nature and Circumstances.**

The Original Report found this claim was barred by the decision in *Cooey v. Coyle*, 289 F.3d 882 (6th Cir. 2002).  Chinn objects that, although that is the holding in *Cooey*, "*Cooey* is an incorrect statement of the law."  (Objections, Doc. No. 63, PageID 999).  "Correct" or not, *Cooey* is binding on this Court.

**Sub-claim F:  Failure to Object to Victim Impact Testimony**

In Sub-claim 9(F), Chinn asserts that the victim impact statement made by the victim's mother was improper and it was ineffective assistance of trial counsel not to object.   The Original Report found this sub-claim barred by *Payne v. Tennessee,* 501 U.S. 808 (1991)(Doc. No. 60, PageID 878-79).  Chinn objects that the testimony here went beyond *Payne* and the Sixth Circuit's allowance of cure by appellate re-weighing in *Post v. Bradshaw*, 621 F.3d 406 (6th Cir. 2010), is not a correct statement of the law.  It is nonetheless governing precedent.


**Sub-claim G:  Failure to Request Limiting Instruction for Shirley Cox's Testimony**


In Sub-claim 9(G) Chinn argues his counsel were ineffective for failure to request a limiting instruction regarding Shirley Cox's testimony that she met Chinn when he came to her husband's law office.  The Original Report noted that defense counsel had fought hard to keep this fact away from the jury and that getting a limiting instruction would likely re-emphasize the fact of their meeting place (Doc. No. 60, PageID 879).   Therefore the Magistrate Judge concluded it was not deficient performance to fail to ask for the instruction.  *Id.*

Chinn objects that the Sixth Circuit has held it is deficient performance to fail to request a limiting instruction when the jury's attention has already been focused on the evidence at issue (Objections, Doc. No. 63, PageID 1001, *citing Mackey v. Russell*, 148 Fed. Appx. 355, 365-66 (6th Cir. 2005).  *Mackey*, as an unpublished opinion, does not have precedential weight.  Even if *Mackey* stated the law on this point, that case was decided fifteen years after Chinn's trial and counsel cannot be expected to have anticipated its ruling.  *See Strickland, supra*, at 689, on

avoiding hindsight in evaluating counsel's performance.  Finally, the *Mackey* court noted that "[t]he vast majority of cases hearing ineffective assistance claims based on failure to request a limiting instruction have determined that no prejudice resulted from counsel's failures." *Id.* at 367, *citing Mitzel v. Tate,* 267 F.3d 524, 538 (6th Cir. 2001).   The Objections are thus unpersuasive on this sub-claim.

**Sub-claim H:  Failure to Object to Prejudicial Hearsay Testimony**

In Sub-claim 9(H) Chinn claims he received ineffective assistance when trial counsel failed to object to hearsay testimony, to wit, out-of-court statements of Marvin Washington offered through Detective Lantz and Christopher Ward.  The Original Report found this sub-claim to be without merit because Washington testified to the same information in open court (Doc. No. 60, PageID 880).  Chinn objects for the reason given as to his Fifth Ground for Relief (Doc. No. 63, PageID 1001) and the Magistrate Judge relies on the analysis given there.

**Sub-claim I:  Failure to Object to Prosecutorial Misconduct**

In Sub-claim 9(I) Chinn alleges he received ineffective assistance when trial counsel failed to object to "prosecutorial misconduct throughout this capital trial."  (Petition, Doc. No. 3, PageID 695-96.)  The Original Report found that this entire sub-claim had been dismissed by Judge Sargus (Doc. No. 60, PageID 880).

The Objections note that while Judge Sargus' opinion said that it was dismissing claim 9(I), "it is apparent from the record that the District Court was actually referring to one of the

components of claim 9 (H) (Objections, Doc. No. 63, PageID 1002-03). Upon examination, the Magistrate Judge finds that there is a typographical error in Judge Sargus' Decision and Order (Doc. No. 30) at PageID 542-43 in the reference to "claim nine (I)" when the reference should have been to a different sub-claim. Because of this typographical error, the Magistrate Judge did not address Sub-claim 9(I) in the Original Report.

However, in dealing with the Second Ground for Relief, the Magistrate Judge has concluded that the state court decision on these claims was neither contrary to nor an objectively unreasonable application of Supreme Court precedent. Given that the state courts reached the merits and found no error, there cannot have been ineffective assistance of trial counsel in failing to raise these claims.

**Sub-claim J:  Cumulative Prejudice**

Chinn claims in his Petition that the cumulative prejudice from counsel's error is sufficient to warrant habeas relief (Petition, Doc. No. 3, PageID 696). The Original Report rejected this claim summarily (Doc. No. 60, PageID 880). Chinn objects that "given the multitude of errors that Chinn's trial lawyers committed, there is clearly a reasonable probability that Chinn would have received a more favorable verdict or sentence when the prejudicial effect of the errors is considered cumulatively as required by *Strickland*." (Objections, Doc. No. 63, PageID 1003.) Having found no prejudice on any of the sub-claims, there is no prejudice to accumulate.

**Tenth Ground for Relief:  Insufficient Evidence of Identity**

In his Tenth Ground for Relief, Chinn asserts that there was constitutionally insufficient evidence to identify him as the perpetrator of this crime.  The Original Report concluded that the Ohio Supreme Court applied the appropriate federal standard adopted  in *Jackson v. Virginia*, 443 U.S. 307 (1979), and that its application was not objectively unreasonable (Doc. No. 60, PageID 881-885).

Chinn objects that "the Magistrate Judge failed to examine the credibility and reliability of [witness Marvin] Washington before relying on his testimony."  (Objections, Doc. No. 63, PageID 1007.)  Chinn notes that the court of appeals described Washington's testimony as "inherently suspect."  (Objections, Doc. No. 63, *citing State v. Chinn*, 1991 Ohio App. LEXIS 6497 *55), but this was in the context of criticizing the trial court's weighing of mitigating factors, not in suggestion there might have been insufficient evidence of identity.

Chinn relies on *United States v. Cravero,* 530 F.2d 666 (5th Cir. 1976), for the proposition that testimony which is "unbelievable on its face" is insufficient to support a verdict.  *Cravero*, however, is not a case where the Court of Appeals overturned a verdict on such a basis.  In fact, the court overturned a Crim. R. 29 decision by a judge and reinstated a jury verdict precisely because deciding credibility was for the jury:

> We believe that for the testimony to be incredible it must be unbelievable on its face. The fact that Lipsky has consistently lied in the past, engaged in various criminal activities, thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible. Lipsky's testimony on direct is quite plausible. This is not a case where a witness testifies to facts that he physically could not have possibly observed or events that could not have occurred under the laws of nature. *See, Geigy Chemical Corp. v. Allen*, 224 F.2d 110, 114 (5th Cir. 1955).* To be sure Lipsky was thoroughly impeached on cross-examination, but one cannot say that his testimony could not have been believed by a reasonable jury. [Footnote omitted.] *See, e.g.,*

*United States v. Hill*, 463 F.2d 235 (5th Cir. 1972); *United States v. Justice*, 431 F.2d 30 (5th Cir. 1970).

530 F.2d at 670-71.  In any event, *Cravero* was decided on direct appeal and long before the adoption of the AEDPA which requires double deference in dealing with a sufficiency of the evidence claim.  *Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam)*.  Chinn's Tenth Ground for Relief is without merit.


### Eleventh Ground for Relief:  Multiple Penalty Phase Jury Instruction Errors


The Original Report noted that this Ground for Relief had been dismissed by Judge Sargus as procedurally defaulted (Doc. No. 60, PageID 885).  Chinn makes no objection to this conclusion.


### Twelfth Ground for Relief:  Improper Mitigation Jury Instructions


In his Twelfth Ground for Relief, Chinn claims that improper jury instructions created a reasonable likelihood that the jury was not able to give "full mitigating effect" to his mitigation evidence (Petition, Doc. No. 3 at 43).  The Original Report recommended denying this Ground for Relief on the merits (Doc. No. 60, PageID 890).

The Warden did not object to the Original Report's failure to consider a procedural default, but comments in response to Chinn's Objections that the Court is permitted to consider procedural default *sua sponte*.  The Magistrate Judge declines to do so in the absence of an objection by the Warden.

Although we ignore the procedural default, Chinn argues we should also give no AEDPA deference to the Ohio Supreme Court's opinion because that court did not ignore the default and performed plain error review (Objections, Doc. No. 63, PageID 1015).   However, the opinion of a state court on plain error review is still entitled to AEDPA deference if the federal court reaches the merits despite the procedural default, which is what this Court has done.  *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

Chinn argues *Metrish* is not controlling precedent because it is subsequent in time to *Jells v. Mitchell*, 538 F.3d 478 (6th Cir. 2008), relying on the well-settled rule that a subsequent three-judge panel cannot overrule the published decision of a prior panel (Objections, Doc. No. 63, PageID 1015, *citing United States v. McMurray,* 653 F.3d 367 (6th Cir. 2011), and *Salmi v. Sec'y. of HHS*, 774 F.2d 685 (6th Cir. 1985)).

In *Fleming*, Judge Gilman wrote for the court that plain error review by a state court did not eliminate the obligation to give AEDPA deference to the merits of a decision by the state court:

> First, none of the cases cited by the dissent decide the question of whether a claim reviewed for plain error by a state court dispenses with our obligation to apply AEDPA deference to the merits of the decision reached by that court. They instead discuss the analytically prior question of whether a federal court is permitted to hear an issue in the first place under the doctrine of procedural default. See, e.g., *Jells v. Mitchell*, 538 F.3d 478, 511 (6th Cir. 2008) (holding that a claim not raised before the Ohio Court of Appeals was procedurally defaulted even though the Ohio Supreme Court reviewed the claim for plain error on direct appeal); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) (holding that "a state court's plain error analysis does not save a petitioner from procedural default"); *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000) (holding that habeas petitioners cannot resurrect procedurally defaulted claims on the sole basis that a state court has applied plain-error review to the issue on direct appeal). We of course agree with these cases to the extent that they stand for the well-established rule that a state court's application of plain-

error review does not revive a habeas petitioner's otherwise procedurally defaulted claim on collateral review. But we disagree with our colleague's view that they control not only this court's ability to address a habeas petitioner's claim, but also the appropriate standard of review to apply once we have determined that the claim is reviewable on the merits.

Second, the question of whether a claim should be addressed on collateral review under the judicially created doctrine of procedural default is independent of the question of whether Congress requires deference pursuant to AEDPA. This court declines to review procedurally defaulted claims out of respect for state-court enforcement of state procedural rules. *Clinkscale v. Carter*, 375 F.3d 430, 441 (6th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)) (observing that the purposes of the procedural-default rule include concerns of comity and federalism). Similarly, Congress enacted AEDPA "to further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000). But the fact that similar concerns motivate both the procedural-default doctrine and AEDPA does not permit us to ignore the latter simply because the former doctrine is deemed inapplicable. Instead, we believe that this court's jurisprudence is reasonably clear about when a state-court's consideration of a claim is to be considered "adjudicated on the merits" for the purpose of triggering our review under AEDPA. See 28 U.S.C. § 2254(d).

*Fleming v. Metrish*, 556 F.3d 520, 530-531 (6th Cir. 2009). Thus *Fleming* does not purport to overrule *Jells*, but to distinguish it. For a lower court, the question is not whether the distinction is persuasive, but whether it was made by a majority of a Sixth Circuit panel in a published decision. The Magistrate Judge finds *Fleming* is precedential. Chinn claims that *Fleming* is an "incorrect statement of the law," but it is nonetheless binding on this Court.

The portion of the instructions to which Chinn objects in this Ground for Relief reads as follows:

You will consider all the evidence, the arguments, the statement of the Defendant, and all of the information and reports that are relevant to the nature and circumstances of the mitigating facts,

> and the mitigating facts include but are not limited to the nature and circumstances of the offense, and the history, character, and background of the Defendant; and you may consider, I guess, should consider any facts that are relevant to the issue of whether the Defendant should be sentenced to death.

(Trial Tr. Vol. IV at 731, quoted in Objections, Doc. No. 63, PageID 1013.)  Responding to a request from the jury during deliberations for "a summary of the elements that make up the mitigating and aggrevating [sic] circumstances/factors," the judge gave this supplemental instruction:

> The aggravating circumstances are those that you have found in previous specifications and the mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant.

(Return of Writ, Apx. Vol. 1 at 289).

Chinn claims that these two instructions, taken together, somehow prevented the jury from considering all of the mitigating evidence he had presented.  First of all, Chinn reads the first instruction as saying the jury was "free to completely ignore Chinn's mitigating evidence." (Objections, Doc. No. 63, PageID 1014).  No juror familiar with ordinary English usage would construe those words in that way.  The trial judge said "may consider" and then corrected himself to say "should consider."  Using the words "I guess" in between would signify to the ordinary listener that the judge had caught his mistake and corrected it.  Certainly there can be no objection to the words "should consider" taken alone.  Certainly there can be no objection to the judge's correcting his mistake of saying "may consider."  And there is no clearly established United States Supreme Court precedent holding that the manner in which the correction was made somehow violates Chinn's constitutional rights.

All the supplemental instruction does is to distinguish – accurately – between aggravating

circumstances (which in this and any Ohio case are only the capital specifications already found by the jury to have been proven beyond a reasonable doubt) and mitigating factors (which includes all evidence presented by the defendant relevant to whether he should be sentenced to death, including without limitation the nature and circumstances of the offense and the history, character and background of the defendant). The instructions do not comment on any of the mitigating evidence offered by Chinn or suggest that any of it is worth less consideration than any other or exclude any of it from consideration.

Jury instructions are not like ritual liturgical language which is required to be recited verbatim. Chinn has failed to show, or even intelligibly argue, how a reasonable juror could have misconstrued what the trial judge said so as to refuse to consider fully any relevant mitigating evidence Chinn offered. Ground Twelve should be dismissed with prejudice, whether considered after giving AEDPA deference to the Ohio Supreme Court decision or decided *de novo*.

## Thirteenth Ground for Relief: Issues on Remand

## Refusal to Consider Additional Mitigating Evidence

In his Thirteenth Ground for Relief, Chinn asserts his constitutional rights were violated when the trial judge refused to admit into evidence and consider additional mitigating evidence proffered when the case was remanded for correction of the trial judge's errors in imposing the death sentence.

On the initial direct appeal in this case, the Ohio Court of Appeals decided that the trial judge's sentencing opinion did not show that it had given sufficient consideration of the

mitigating evidence which was presented.  *State v. Chinn*, 191 Ohio App. LEXIS 6497, *48-56 (2nd Dist, 1991).  It remanded the case not for a new sentencing trial, but for the trial judge to "weigh the proper mitigating factors against the single aggravating circumstance . . . [and] impose whatever lawful punishment it deems appropriate, including but not limited to a sentence of death."  *Id.* at *67.  On remand Chinn argued he should be allowed to present new mitigating evidence not presented at trial, but the trial judge limited his consideration to the evidence already presented and considered by the jury; he again imposed a death sentence.  On a second direct appeal, the court of appeals held this was proper procedure and the Ohio Supreme Court affirmed.  *State v. Chinn,* 1996 Ohio App. LEXIS 2530 (2nd Dist. 1996); *State v. Chinn*, 85 Ohio St. 3d 548 ( (1999).  On this particular issue, the Ohio Supreme Court held:

> In this proposition [of law seven], appellant also argues that he had "an absolute right to present any new mitigating evidence at his resentencing hearing in 1994." In support of this proposition, appellant relies on several United States Supreme Court opinions requiring that the sentencer not be precluded from considering relevant mitigating evidence in a capital case. See, *e.g*., *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973; *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1; and *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347. However, each of those cases involved a situation where the capital sentencer was prohibited, in some form or another, from considering relevant mitigating evidence at trial. In the case at bar, no relevant mitigating evidence was ever excluded from consideration during the penalty phase of appellant's 1989 trial. Therefore, the case at bar is clearly distinguishable from the United States Supreme Court's pronouncements in *Lockett*, *Skipper*, and *Hitchcock*. Accordingly, as was the case in *State v. Davis* (1992), 63 Ohio St. 3d 44, 46, 584 N.E.2d 1192, 1194-1195, we find *Lockett*, *Skipper*, and *Hitchcock* to be inapplicable here. It is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation phase of his 1989 trial. In this case, as in *Davis*, the errors requiring resentencing occurred after the close of the mitigation phase of the trial. Under these

> circumstances, the trial court is to proceed on remand from the point at which the error occurred. Appellant's arguments to the contrary are not well taken. In addressing this issue, the appellate court stated, "In sum, Chinn was not entitled to an opportunity to improve or expand his evidence in mitigation simply because we [the court of appeals] required the trial court to reweigh the aggravating circumstance and mitigating factors." *Chinn*, Montgomery App. No. 15009, unreported, at 6. We agree with the court of appeals' assessment of this issue.

*Id.* at 564-65.

The Original Report concluded the Ohio Supreme Court's decision in this claim was neither contrary to nor an unreasonable application of the relevant United States Supreme Court precedent (Doc. No. 60, PageID 895-901).

Chinn argues the Ohio Supreme Court's refusal to extend *Skipper v. North Carolina*, 476 U.S. 1 (1986), to this case was objectively unreasonable.  He argues that "[t]he fact that the evidence was available at the time of Chinn's initial sentencing is completely irrelevant." (Objections, Doc. No. 63, PageID 1021.)  What the Ohio Supreme Court held was that "the errors requiring resentencing occurred after the close of the mitigation phase of the trial.  Under these circumstances, the trial court is to proceed on remand from the point at which the error occurred."  The unspoken premise is that the State had a substantial interest in the error-free jury verdict and recommendation of a capital sentence.   The purpose of the remand was to have the trial judge decide on a sentence on the basis of the same evidence the jury had considered, which is completely consistent with Ohio's capital sentencing scheme.  Nothing in *Skipper*, *Lockett*, or *Eddings* suggests that any of them require the evidence to be reopened when a case is remanded for correction of errors in a sentencing opinion.

In *Oregon v. Guzek*, 546 U.S. 517 (2006), the Supreme Court decided that *Lockett* did not prohibit a State from limiting the innocence-related evidence a capital defendant can introduce at

a sentencing proceeding to the evidence introduced at the original trial.  Chinn argues that state court decisions must be measured against Supreme Court precedent at the time they are handed down, citing, correctly, *Greene v. Fisher*, 132 S. Ct. 38 (2011)(Objections, Doc. No. 63, PageID 1022).  But *Guzek* did not overrule earlier Supreme Court precedent, instead refusing to extend it in a way parallel to what Chinn seeks here.  What it shows instead is that it was not objectively unreasonable to refuse to extend *Lockett* or *Eddings* because all eight justices who participated in *Guzek* – all presumably reasonable jurists -- did not think such an extension was required by precedent.

**Refusal to Void the Death Sentence Altogether**

In the Thirteenth Ground for Relief Chinn also claims that the original jury's death penalty recommendation became void when the court of appeals remanded the case for resentencing (Petition, Doc. No. 3 at 45).  The Original Report rejected this claim on the basis that "[n]o United States Supreme Court precedent commands a re-trial under those circumstances," i.e., the circumstances presented by this remand where the error occurred after the jury made its recommendation.

Chinn objects that the Ohio Supreme Court's decision in this case violates the Due Process Clause because it represents "a marked and unpredictable departure from existing precedent." (Objections, Doc. No. 63, PageID 1023.)  The previously existing precedent on which Chinn relies is *State v. Penix*, 32 Ohio St. 3d 369 (1987).  But the Ohio Supreme Court in this case did not overruled *Penix* and the decision here is not inconsistent with *Penix*.  As the Ohio Supreme Court explained in *State v. White*, 132 Ohio St. 3d 344 (2012), it had held in

*Penix* that the trial jury which recommends the death sentence must be the same trial jury that convicted the offender in the guilt phase. *Id.* at ¶ 5. That is precisely what happened here. There is no retroactive application of an overruling of *Penix* which must be justified under Supreme Court retroactivity jurisprudence. And as *Rogers v. Tennessee*, 532 U.S. 451 (2001), makes clear, even a state court decision which declines to follow any longer a very well-settled common law rule (to wit, it is not murder unless the victim dies within a year and a day), is not void on retroactivity grounds.

### Fourteenth Ground for Relief:  Improper Unanimity Instruction

The Original Report noted that this Ground for Relief had been dismissed by Judge Sargus as procedurally defaulted (Doc. No. 60, PageID 901). Chinn makes no objection to this conclusion.

### Fifteenth Ground for Relief:  Ineffective Assistance in Mitigation

In his Fifteenth Ground for Relief, Chinn claims he received ineffective assistance of trial counsel in mitigation when his defense counsel did not present certain enumerated mitigating evidence, to wit, evidence of good behavior while incarcerated (admissible under *Skipper, supra*) and additional evidence supporting a residual doubt conclusion.

The additional evidence was considered by the court of appeals on appeal from denial of Chinn's application for post-conviction relief. It concluded that the *Skipper* evidence, if presented, would not have changed the outcome of the sentencing proceeding and that the

residual doubt evidence was irrelevant to "the issue of whether the defendant should be sentenced to death." *State v. Chinn,* 1998 Ohio App. LEXIS 3857 *12 (2nd Dist. 1998). The Original Report concluded this decision was neither contrary to nor an unreasonable application of the relevant United States Supreme Court precedent (Doc. No. 60, PageID 910-11).

Chinn objects that the *Skipper* evidence is persuasive (Objections, Doc. No. 63, PageID 1026). However, he presents no authority to show the court of appeals conclusion is contrary to Supreme Court precedent. *Skipper* requires that behavior while incarcerated evidence be admitted if offered, but does not provide what weight must be given to it.

Chinn also complains that, in rejecting residual doubt as a mitigating factor, the court of appeals was improperly applying standards of professional conduct which were adopted after the trial, rather than those prevailing at the time of the trial (Objections, Doc. No. 63, PageID 1026-27). That is not what the court of appeals did. Rather, that court recognized that the Ohio Supreme Court had allowed residual doubt evidence in mitigation prior to 1997, but had begun excluding it as of its decision in *State v. McGuire*, 80 Ohio St. 3d 390 (1997). What changed in *McGuire* was not professional standards for attorneys litigating capital cases, but the evidence which is relevant in mitigation in those cases. Moreover, the timing of *McGuire* reinforces the correctness of the court of appeals' decision: while *McGuire* was decided after this case was tried, it was decided well before this case was decided on direct appeal by the Ohio Supreme Court in 1999. Thus had defense counsel presented the proffered residual doubt evidence in mitigation at trial, it would have been disregarded as irrelevant when the case reached the Ohio Supreme Court. It was thus not ineffective assistance of trial counsel to fail to present it.


### Sixteenth Ground for Relief:  Chinn's Absence During a Critical Stage of the Trial

In his Sixteenth Ground for Relief, Chinn claims he was absent when the trial court clarified instructions with the jury.  The Ohio Supreme Court denied this claim on the merits, finding that the record did not show he or his attorney was absent and Ohio law required an affirmative showing of absence to justify a new trial.  *State v. Chinn,* 85 Ohio St. 3d 548, 568 (1999).  The Original Report recommended this claim be denied on the merits, noting that there was no record evidence that Chinn or his attorney was absent at the asserted times (Doc. No. 60, PageID 911-15).

Chinn objects that "[t]here is absolutely no indication in the record that either Chinn or his attorneys were present when this exchange between the judge and the jury took place" (Objections, Doc. No. 63, PageID 1031).  However, Chinn also cites to no direct evidence that he or his lawyers were absent at the relevant time.  He asks this Court instead to infer his absence from the silent record.  *Id.*

The Ohio rule followed by the Ohio Supreme Court in this case is that error will not be presumed from a silent record.  That rule is not esoteric; in fact it is followed by the Supreme Court.  *Walker v. Johnston*, 312 U.S. 275 (1941).  Chinn presents no authority requiring this Court to presume he was absent from a silent record.

Moreover, if it were the case that Chinn was absent, he has access to evidence *dehors* the record which he could have presented in post-conviction, to wit, his own affidavit and/or that of his defense counsel.  The absence of any such evidence strengthens the conclusion that he was in fact present.

But Chinn asserts the Ohio Supreme Court decision is contrary to clearly established Supreme Court law, to wit, *Johnson v. Zerbst*, 304 U.S. 458 (1938).  In *Johnson*, the Supreme

Court held that the waiver of a fundamental right could not be presumed from a silent record; *Johnson* is the fundamental precedent which leads to careful examination of defendants and recording of their responses any time a waiver is involved.

But *Johnson* is not applicable to this case because the Ohio Supreme Court did not presume Chinn had waived his right to be present and have his counsel present at every critical stage of the proceedings.  Instead, it presumed he and his attorney(s) were present because the record did not show the contrary.  The State has not claimed that Chinn waived his right to be present with counsel.  Waiver of the right is not in question.  Rather the question is one of fact: were they present?  Because he had a constitutional right that they both be present, the proceedings would have been "irregular" if he had not been present.  But no Supreme Court precedent holds that facts supporting the regularity of trial court proceedings cannot be presumed from a silent record.  And *Johnson* itself says that the regularity of a state court judgment is to be presumed.  *Id.* at 468

Chinn also objects that the Ohio Supreme Court never made a factual finding that Chinn and his lawyers were present and so the decision of the state court is not entitled to the presumption of correctness provided by 28 U.S.C. § 2254(e)(1).  The Magistrate Judge agrees that there is no factual finding that they were present, but no such finding is necessary where they were presumed to be present in the absence of evidence to the contrary and no rule of constitutional law prohibits that presumption.

**Seventeenth Ground for Relief:  Biased Trial Judge**

In his Seventeenth Ground for Relief, Chinn asserts he was denied his constitutional rights when he was tried by a biased judge.  The Original Report concluded this claim had been dismissed by Judge Sargus and no objections have been made to that conclusion.

### Eighteenth Ground for Relief:  Victim Impact Statement

After the jury was discharged, the victim's mother made a statement to the trial judge in open court but before sentence was pronounced.  In his Eighteenth Ground for Relief, Chinn asserts that this statement violated his constitutional rights.  Mrs. Jones' statement in full is as follows:

> First of all, I want to say this is very hard and very difficult for us. We are here for our son, Brian Jones, who cannot be here to speak for himself, so we're here to speak on his behalf and for the rest of our family. First of all, we would like for you and everyone to know what a great loss that we have suffered, the pain has been and will be beyond what words could describe.  Only another person that has lost a child to such a tragedy could begin to feel the empty, lonely feelings.  Needless to say, we have suffered the greatest loss of our entire life. We know that nothing or no one is going to replace that empty and void feeling and that part of our lives are gone. Now, we must begin to try to pick up the pieces and put our lives back together as good as we can. I really don't feel that this will ever be possible because, first of all, we feel very threatened by this Defendant and his family. We have not done or said anything, your Honor, about them; but yet, we are afraid for our safety and we feel very threatened by them.  I'm afraid to leave my home alone. I'm afraid for my daughter to leave her home alone; and regardless of what I'm doing, if I know that she's leaving, I will quit whatever I'm doing and go and be with her because I fear what could happen to her. I fear of the morning when my husband leaves for work. I stand at the window.  He leaves just before daylight. I stand at the window and watch him until he gets in his car and pulls out our driveway. Never in my life have I ever done this before, I've been doing this ever since our son has been killed.  Your Honor, this terrible, threatening fear that we are living with is not a good feeling. We really do feel -- We really

do feel very threatened by this Defendant and what he might do our family.  With his previous record, if he had been put away where he should have been, my son may be living today. Your Honor, this makes me feel very ill inside to think that if this Defendant had not been out there on the streets, on January 30th, that my son would be with us. We would not be going through all of this pain that we're feeling. We would not be afraid and feel threatened as we do today.  Your Honor, we feel that this Defendant has been given every opportunity that there is. He's been on shock probation, and by his own actions, has chosen not to accept any of them; and now we feel that the time has come for him to be punished according to the law of Ohio. My family and I thank you and the Courts for being kind to us, and for everything you have done. Thank you a lot.

(Return of Writ, Trial Tr. Vol. V, pp. 740-42)

This claim was Chinn's twenty-first proposition of law before the Ohio Supreme Court which decided the claim as follows:

Proposition of Law No. XXI

Appellant's twenty-first proposition of law concerns alleged victim-impact evidence that was heard by the trial judge after the jury was discharged but immediately before the trial court pronounced sentence on all of the crimes appellant found guilty of committing. Appellant claims that the evidence included an expression of opinion by Brian Jones's mother that appellant should be sentenced to death. However, Mrs. Jones never specifically stated her opinion as to the appropriate punishment. Rather, she stated that "now we feel that the time has come for [appellant] to be punished according to the law of Ohio." Appellant also complains that Mrs. Jones stated or implied that appellant was incapable of rehabilitation. However, the record does not fully support appellant's claims in this regard. Moreover, and in any event, there is absolutely nothing in the record to suggest that the trial court was influenced by irrelevant factors in sentencing appellant for the capital crime. Therefore, we find no reversible error here.

*State v. Chinn*, 85 Ohio St. 3d 548, 575-76 (1999).  In the Original Report the Magistrate Judge agreed with this decision and found no constitutional violation had been proved.

In his Objections, Chinn relies on *Payne v. Tennessee*, 501 U.S. 808 (1991), for the proposition that "[t]he Eighth Amendment prohibits the introduction of victim impact statements consisting of the 'victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence.'" (Doc. No. 63, PageID 1039, *citing Payne*, 501 U.S. at 830, n. 2).

In *Payne*, while allowing some victim impact evidence, the Supreme Court left standing the prohibition from *Booth v. Maryland*, 482 U.S. 496, 509 (1987), of victim statements about "the crime, the defendant, or the appropriate sentence." *Payne*, 501 U.S. 808, 825. Mrs. Jones' statement does not speak about the crime. As to Chinn, she says she and her family feel threatened by him and his prior opportunities for rehabilitation had not been successful, which certainly constitute comments on the defendant. As to sentence, Mrs. Jones does not advocate for the death penalty, but rather that he should now be punished "according to the law of Ohio," which at the time allowed sentence of death, life with possible parole at thirty years, and life with possible parole at twenty years.

The Original Report held that, "even if we find a violation [of *Booth* and *Payne*], the statements must be so prejudicial as to render the trial fundamentally unfair." (Doc. No. 60, PageID 918). Chinn concedes that this is the proper standard for evaluating a Due Process claim relating to victim impact statements, but claims the proper standard for an Eighth Amendment claim is whether the statements had "a substantial and injurious effect on the penalty phase verdict." (Objections, Doc. No. 63, PageID 1041, *citing Hooper v. Mullins,* 314 F. 3d 1162, 1174 (10th Cir. 2002). The Tenth Circuit's opinion does not indicate it is addressing an Eighth as opposed to Fourteenth Amendment claim. In any event, the victim impact statement in that case expressly told the jury "that they believed Petitioner deserved to die." *Id.* The Tenth Circuit

found a constitutional error, but held it was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Hooper provides no precedential support for Chinn's argument on what prejudice must be shown.

The Original Report relied on *Fautenberry v. Mitchell,* 515 F.3d 614 (6th Cir. 2008), for the proposition that the risk of any improper influence on the sentence is severely diminished when it is heard only by the judge. Chinn claims *Fautenberry* is "an incorrect statement of the law," but the claim is purely conclusory: Chinn cites no Sixth Circuit or Supreme Court law to the contrary (Objections, Doc. No. 63, PageID 1040). *Fautenberry* is consistent with the usual rule that judges, as opposed to juries, are presumed to disregard irrelevant or immaterial evidence. Inadmissible evidence is presumed to be ignored by a judge in a bench trial. *Harris v. Rivera*, 454 U.S. 339, 346 (1981)(per curiam); *Wickline v. Mitchell*, 319 F.3d 813, 823-24 (6th Cir. 2003). Similarly, a three-judge panel in an Ohio death penalty case may be presumed to ignore inflammatory argument and inadmissible evidence. *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003).

In *Post v. Bradshaw*, 621 F.3d 406 (6th Cir. 2010), the court held error in admission of victim impact statements could be cured on reweighing. Chinn again claims this is an "incorrect statement of the law" and quotes from Judge Merritt's dissenting opinion in *Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005), that the Ohio Supreme Court does not understand its role in capital cases. However, neither the United States Supreme Court nor any published majority opinion of the Sixth Circuit has held that Ohio Supreme Court decisions are not entitled to AEDPA deference in appropriate circumstances. And of course in this case, where the crime occurred before January 1, 1995, reweighing occurred at both the intermediate appellate and supreme court levels.

Chinn claims no AEDPA deference is due to the Ohio Supreme Court's conclusion that Chinn's allegation that Mrs. Jones had said or implied he was incapable of rehabilitation was not what she had said.  Actually, the Ohio Supreme Court said this allegation was "not fully supported by the record."  85 Ohio St. 3d at 575.  That conclusion is, in the Magistrate Judge's opinion, a fair reading of her statement.  She says Chinn has been given opportunities and shock probation which he has not taken advantage of.  That statement partially supports Chinn's allegation, but she did not draw the conclusion that he could never be rehabilitated.  In particular, she stated that if he had been incarcerated for his prior offenses, he would not have been on the street to commit this murder.

Finally Chinn complains the Ohio Supreme Court improperly placed on Chinn the burden of proving that a *Payne* violation did not prejudice his position instead of requiring the State to prove the error was harmless beyond a reasonable doubt (Objections, Doc. No. 63, PageID 1044).  Of course, *Brecht* has replaced the harmless beyond a reasonable doubt standard of under *Chapman v. California*, 386 U.S. 18 (1967).  And if *Fautenberry* is followed, no Eighth or Fourteenth Amendment violation occurred.


### Nineteenth Ground for Relief:  Vagueness of the Ohio Death Penalty Statute


In his Nineteenth Ground for Relief, Chinn asserts the Ohio capital statute is vague and therefore its application to him violates his Eighth Amendment rights (Petition, Doc. No. 3 at 62.)  The Original Report found that Judge Sargues had dismissed this claim as procedurally defaulted (Doc. No. 60 at PageID 919).  Chinn has not objected to this conclusion.

**Twentieth Ground for Relief:  Ineffective Assistance of Appellate Counsel**

In his Twentieth Ground for Relief, Chinn claims he received ineffective assistance of appellate counsel in that his appellate attorneys failed to assign as error on his first appeal of right[7] the following matters:

> A. Counsel failed to assign as error the vagueness defect in Ohio's sentencing scheme. O.R.C. § 2929.03(D)(1) incorporates the nature and circumstances of the offense, a statutory mitigating factor under O.R.C. § 2929.04(B), into the aggravating circumstance. Accordingly, petitioner's death sentence is arbitrary. *Godfrey v. Georgia,* 446 U.S. 420 (1980); *Stringer v. Black,* 503 U.S. 222 (1993).

> B. Counsel failed to assign as error the trial court's failure to define "principal offender," which was an essential element of the O.R.C. § 2929.04(A)(7) aggravating circumstance in this case. See *Cabana v. Bullock*, 474 U.S. 376 (1986).

> C. Counsel failed to assign as error, the trial court's erroneous instruction on both the "principal offender" and "prior calculation and design" components of the O.R.C. § 2929.04 (A)(7) aggravating circumstance. Only one of those statutory alternative applied to this case and it was improper to instruct the jury on both. *State v. Penix,* 513 N.E.2d 744 (Ohio 1987). Counsel's failure to assign this issue as error was certainly prejudicial to petitioner because the court of appeals vacated his death sentence, inter alia, because the trial court considered both components in its original sentencing calculus. *State v. Chinn*, No. 1991 WL 289178, 15-17 (Ohio App. 2nd Dist. 1991).

> D. Last, appellate counsel were ineffective because they failed to assign as error trial counsel's failure to object to the errors in paragraphs A-C, supra. *Strickland*, 466 U.S. 668.

(Petition, Doc. No. 3 at 65.)

The Ohio Supreme Court summarily denied this claim on the merits on the basis that,

---

[7] As noted above, because the murder in this case occurred before January 1, 1995, the direct appeal was in the first instance to the Second District Court of Appeals.

because appellate counsel had obtained two reversals of the death sentence, they must have been effective and "[n]one of the instances of alleged ineffective assistance of appellate counsel compels reversal here." *State v. Chinn*, 85 Ohio St. 3d 548, 576 (1999).

The Original Report found that Judge Sargus had effectively found no merit to the first sub-claim when he held the Nineteenth Ground for Relief procedurally defaulted (Doc. No. 60, PageID 921). The same analysis applied to the second sub-claim by virtue of Judge Sargus' conclusion that the Seventh Ground for Relief was procedurally defaulted. *Id.* at 921-22. The third sub-claim had been similarly decided in Judge Sargus' dismissal of sub-claim c of the Eleventh Ground for Relief. *Id.* As to the last sub-claim, Judge Sargus had decided that the underlying claim, Ground Nine, sub-claim d, was without merit. *Id.* at PageID 923.

Chinn objects to the proposed disposition of Ground Twenty, but does not object to the Original Report's conclusion that Judge Sargus has already decided these claims (Doc. No. 63, PageID 1046-1049).

Chinn further asserts that the Ohio Supreme Court's decision on these claims is not entitled to AEDPA deference because it failed to consider the cumulative effect of appellate counsel's errors (Objections, Doc. No. 63, PageID 1049-1051). That argument ignores the fact that the Ohio Supreme Court found no appellate counsel errors to cumulate. A state appellate court need not write at length to be entitled to AEDPA deference. *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770 (2011).

**Conclusion**

Chinn's Objections are unpersuasive. The Magistrate Judge accordingly again respectfully recommends that the Petition be dismissed with prejudice, but that Chinn be granted a certificate of appealability on Grounds One, Three, Five A, and Thirteen.

June 28, 2013.

s/ *Michael R. Merz*
United States Magistrate Judge


**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).