**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**DAVEL CHINN,**

      **Petitioner,**

      **v.**

**WARDEN, Chillicothe Correctional**
  **Institution**

      **Respondent.**

**Case No. 3:02-cv-512**
**Judge Sarah D. Morrison**
**Magistrate Judge Michael R. Merz**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this

Court a habeas corpus action pursuant to 28 U.S.C. § 2254.   This matter is before the Court

upon the Magistrate Judge's Report and Recommendations (R&R) (ECF No. 60), in which the

Magistrate Judge recommended denying relief on all of Petitioner's habeas claims, Petitioner's

objections to the R&R (ECF No. 63), and the Warden's response (ECF No. 66.)   This matter is

also before the Court upon the Magistrate Judge's Supplemental Report and Recommendations

(Supplemental R&R) (ECF No. 86), in which the Magistrate Judge addressed a limited number

of Petitioner's objections and reiterated his recommendation that the habeas corpus petition be

dismissed with prejudice.   Petitioner filed objections to the Supplemental R&R (ECF No. 91),

and the Warden filed a response (ECF No. 94.)

Additionally, this matter is before the Court upon Petitioner's attempts to amend his

Petition to add lethal injection and *Hurst* claims, the Magistrate Judge's Decision and Orders and

Supplemental Memorandum denying those amendments (ECF Nos. 186, 190, 196, 201, 205),

1

and the ensuing objections by Petitioner (ECF Nos. 187, 193, 197, 202.)

As required by 28 U.S.C. § 636(b) and Federal Rules of Civil Procedure Rule 72(b), the Undersigned has made a de novo review of the record in this case. Upon said review, the Court finds all of Petitioner's objections to the various R&R's and the Decision and Orders of the Magistrate Judge to be without merit. For the following reasons, Petitioner's Objections (ECF Nos. 63, 91, 187, 193, 197, 202) are **OVERRULED**. The R&R, Supplemental R&R, and the decisions regarding amendments (ECF Nos. 186, 190, 196, 201 and 205) are **ADOPTED** and **AFFIRMED**. The Petition is **DENIED** and this action is **DISMISSED**.

## I. Factual Background and Procedural History

In 1989, and after a trial by jury in Montgomery County, Ohio, Petitioner Davel Chinn was convicted of Aggravated Murder, in violation of R.C. 2903.01(B), for purposely causing the death of Brian Jones in the course of a kidnapping and robbery. Petitioner was sentenced to death pursuant to R.C. 2929.02, *et seq*. The Magistrate Judge set forth the facts and procedural history of this case in the original Report and Recommendations, in which the Magistrate Judge quoted the Ohio Supreme Court's summarization of the facts of this case:

> On the evening of January 30, 1989, Davel "Tony" Chinn, appellant, completed a midterm examination at Cambridge Technical Institute in Dayton. Later that night, fifteen-year-old Marvin Washington saw appellant near Courthouse Square in downtown Dayton. Washington, who had known appellant for approximately one year, knew him only by the name of "Tony." Washington and appellant spent part of the night drinking beer and loitering around the downtown area. At some point, appellant showed Washington a .22 caliber nickel-plated revolver and suggested that they look for someone to rob. At approximately 11:00p.m., Washington went into an adult bookstore on South Ludlow Street and was ejected from the store because of his age. Thereafter, Washington and appellant loitered in the area of South Ludlow Street looking for someone to rob.
>
> Meanwhile, Gary Welborn and Brian Jones had pulled their cars into a parking lot at the corner of South Ludlow Street and Court Street and had parked side-by-side

2

in opposite directions to converse with each other through their driver's side windows. Appellant and Washington spotted the two men and decided to rob them.

Washington approached Jones's vehicle from the rear, and appellant approached Welborn's car from the rear. Appellant pulled out a small silver revolver, pressed it against the side of Welborn's head, and demanded money. Welborn saw Washington's face, but he was unable to see the face of the gunman. Welborn handed his wallet to Washington, and Jones handed his wallet to the gunman. According to Welborn, "the guy with the gun said we'd better have at least a hundred dollars between us or he'd kill us both." After emptying the victims' wallets of money, the two assailants began discussing which car they wanted to steal. Following a brief discussion, they decided to steal both cars. Washington got into the driver's side of Jones's car and forced Jones into the passenger's seat. Appellant instructed Welborn to remain still. As appellant began walking toward the back of Welborn's vehicle, Welborn seized the opportunity to escape. At trial, Welborn testified, "The guy, he comes around. He starts walking around my car, telling me not to touch my keys. He still has the gun pointed at me. I watch him in my rearview mirror and sideview mirror. As soon as he gets behind my car, I duck down. I thought he was going to kill me now or later anyway so I ducked down in my car seat, threw it in drive, and took up off [sic] Ludlow the wrong way, straight to the police station." Welborn arrived at the station at approximately 11:30 p.m., and reported the incident to police.

After Welborn had escaped, appellant got into the back seat of Jones's car and held the revolver to Jones's neck while Washington drove the car away from Dayton and toward an area in Jefferson Township. At some point, appellant instructed Washington to turn the vehicle around and to pull over to the side of the road. Washington complied with appellant's instructions. After Washington had stopped the car, he leaned forward in the driver's seat so that appellant could exit the two-door vehicle from the driver's side. According to Washington, appellant got out of the car and walked around to the passenger's side. Appellant then got Jones out of the car and shot him. Appellant and Washington drove away from the scene in Jones's automobile. While fleeing from the scene, appellant told Washington that he shot Jones because Jones could have identified them and because Jones "didn't have enough money."  Appellant told Washington that he had shot Jones in the arm.

Stacy Ann Dyer lived at 5500 Germantown Pike in Jefferson Township. Dyer witnessed the shooting but did not see the gunman's face. Dyer testified that on January 30, 1989, at approximately 11:30 p.m., she had just arrived home and parked in her driveway facing the street. At that time, Dyer saw a black two-door Chevrolet Cavalier pull off to the side of the road on Germantown Pike. Dyer observed a man get out of the driver's side of the vehicle and walk over to the passenger's side. She also saw the silhouette of a person exiting the vehicle from

3

the passenger's side. The two people then walked to the back of the car. At that moment, Dyer heard a gunshot and a scream.  The victim ran through Dyer's yard and fell to the ground in her neighbor's yard. Dyer then saw the black car speed away from the scene. Dyer ran inside her house and informed her father and her sister what had happened. Dyer's sister called police, and Dyer and her father went outside to check on the victim. They found the victim, Brian Jones, on his knees with his face to the ground. Dyer asked the victim whether he was injured, but Jones did not respond.   When police and paramedics arrived at the scene, Jones was still breathing but was unconscious. He never regained consciousness and was pronounced dead on arrival at the hospital.

Dr. David M. Smith performed the autopsy. Smith found that Jones had died as a result of a massive acute hemorrhage due to a gunshot wound to his arm and chest. Smith found that the projectile had entered through Jones's left arm, had proceeded directly into Jones's chest, and had perforated the main pulmonary artery. Smith recovered the .22 caliber lead projectile from an area near the base of Jones's heart. Carl H. Haemmerle, an expert in firearms, examined the .22 caliber projectile and determined that it had been fired from a revolver. He also examined the sweatshirt that Jones had been wearing at the time of the shooting. Evidence revealed that the muzzle of the weapon had been in direct contact with the garment at the time the shot was fired.

Following the shooting, Washington and appellant drove in Jones' car to 5214 Lome Avenue in Dayton. There, Washington introduced appellant to Christopher "Bay" Ward. Ward testified that, on January 31, 1989, at approximately 12:30 or 1:00 a.m., Washington had pulled up to 5213 Lome Avenue in the black Chevrolet Cavalier and had introduced Ward to a man named "Tony," who was seated in the front passenger's seat. Ward spoke to Washington for approximately thirty to forty-five minutes until Washington and the man he was with drove away. Later that night, Washington returned to Lome Avenue and told Ward that "Tony" had shot someone in Jefferson Township.

On February 5, 1989, police arrested Washington based on information they had received from Ward. Washington confessed to police and named Tony as the killer. However, Washington was unable to give police the suspect's last name and address. On February 7, Washington helped police prepare a composite sketch of Tony. Later, after police had nearly exhausted all leads in their search for Tony, the composite sketch was released to the news media. On Wednesday, February 22, 1989, a Dayton area newspaper printed the composite sketch along with an article indicating that the suspect's name was Tony.

Shirley Ann Cox worked as a receptionist in her husband's law office. On Thursday, February 23, two men walked into the office.   One of the men identified himself as Tony Chinn and requested to see Cox's husband. Cox informed the man

that her husband was not available. That night, while Cox was reading the previous day's newspaper, she saw the composite sketch of the suspected killer. She said to her husband, "My God, I don't believe this." "This Tony Chinn that was in [the office] this morning is in the paper." On Friday, February 24, Cox called police to inform them that she had seen the suspect and that his name was Tony Chinn.

After speaking to Cox, police obtained a photograph of appellant and placed it in a photo array with the pictures of five other men. On February 24, police showed the photo array to Washington and to Ward. Washington positively identified appellant as the killer. Additionally, Ward identified appellant as the man he had seen in the passenger's seat of the victim's car-the man Washington had referred to as "Tony." That same day, on February 24, police arrested appellant in connection with murder.

On February 27, police conducted a lineup. Washington, Ward, Cox, Dyer, and Welborn all viewed the lineup. Dyer and Welborn could not identify appellant. Welborn attempted to make a selection based on the voices of the subjects but chose someone other than appellant. Ward and Cox were able to positively identify appellant. Washington initially indicated that the killer was not in the lineup. However, after leaving the room where the lineup was conducted, Washington summoned Detective David Lantz into an interview room and told him that number seven in the lineup (appellant) was the killer. Washington explained to the detective that he had previously indicated that appellant was not in the lineup out of fear that appellant was able to see him through the screen in the room where the lineup was conducted.

In March 1989, appellant was indicted by the Montgomery County Grand Jury for the aggravated murder of Jones. Count One of the indictment charged appellant with purposely causing the death of Jones during the commission of an aggravated robbery. Count One of the indictment also carried three death penalty specifications: one alleging that the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense (R.C. 2929.04(A)(3)), a second alleging that the offense was committed during the course of aggravated robbery (R.C. 2929.04(A)(7)), a third alleging that the offense was committed during the course of kidnapping (R.C. 2929.04(A)(7)). Appellant was also indicted on three counts of aggravated robbery (Counts Two, Four, and Five), one count of kidnapping (Count Three), and one count of abduction (Count Six). Each count of the indictment also carried a firearm specification. Additionally, Counts Two through Six each carried a specification alleging that appellant had previously been convicted of robbery.

In August 1989, the matter proceeded to trial by jury on all counts and specifications alleged in the indictment, with the exception of the specifications

premised on appellant's prior robbery conviction, which were tried to the court. The defense presented several witnesses in the guilt phase of appellant's trial. Through these witnesses the defense attempted to establish that appellant had gone directly home from school on the evening of January 30, 1989, and that he was at home, where he lived with his mother and his brother, at the time of the crimes in question.   Following deliberations, the jury returned verdicts of guilt on all of the matters that were tried to the jury.   Appellant presented several witnesses in mitigation and gave an unsworn statement in which he denied any involvement in the crimes.   Following the mitigation hearing, the jury returned its verdict recommending that appellant be sentenced to death for the aggravated murder of Jones.   The trial court accepted the jury's recommendation and imposed the sentence of death.   The trial court also found appellant guilty of the prior conviction specifications that were tried to the court without a jury.

*State v. Chinn*, 85 Ohio St.3d 548, 553, 709 N.E.2d 1166 (1999).

On November 4, 2002, after exhausting his state court remedies, Petitioner filed the instant Petition for a Writ of Habeas Corpus, raising twenty grounds for relief.   (Petition, ECF No. 3.)   Previously, and on Respondent's motion, United States District Judge Edmund A. Sargus dismissed claims 5(C), 7, 11, 14, 17, and 19 as procedurally defaulted, and claim 9(D) and part of 9(H) on the merits.   (Opinion and Order, ECF No. 30.)   On October 14, 2011, the Magistrate Judge issued an R&R, recommending that the remaining claims in the Petition be "dismissed with prejudice but that Petitioner be granted a certificate of appealability on Claims One, Three, Five A, and Thirteen."   (Original R&R, ECF No. 60, PAGID 923.)   Petitioner filed objections challenging the Magistrate Judge's recommendation that the remaining claims be dismissed, as well as the Magistrate Judge's recommendation that a certificate of appealability only issue as to four of his claims.   (Objections, ECF No. 63.)   The Warden filed no objections on the certificate of appealability issues.

On June 28, 2013, the Magistrate Judge filed a Supplemental R&R after considering Petitioner's Objections (ECF No. 63), and Respondent's Response (ECF No. 66.)   In the

Supplemental R&R, the Magistrate Judge found Petitioner's objections to be without merit, and again recommended the Petition be dismissed with prejudice and that Petitioner be granted a certificate of appealability only on Grounds One, Three, Five(A) and Thirteen.   (ECF No. 86, at 60.)   Petitioner has filed Objections to the Supplemental R&R.   (ECF No. 91.)

After the initial objections became ripe for review, Petitioner made several attempts to amend his petition to add claims for relief challenging Ohio's lethal injection protocol.   Those proposed claims have been the subject of years of litigation in this Court and will be addressed in the final section of this Opinion and Order.

## II.        Standards of Review

This Court reviews *de novo* those portions of the Report and Recommendations to which the parties objected.   *See*, *e.g., Lardie v. Birkett*, 221 F. Supp. 2d 806, 807 (E.D. Mich. 2002). In that regard, Fed. R. Civ. P. 72(b)(3) provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.   The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).   Further, although "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings," *Thomas v. Arn*, 474 U.S. 140, 150 (1985), this Court has reviewed the Report and Recommendations *de novo*.   *See, e.g., Delgado v. Brown*, 782 F.2d 79, 82 (7th Cir. 1986).

Because this is a habeas corpus case, provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") that became effective prior to the filing of the instant petition, apply to this case.   *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).   The AEDPA limits the

circumstances under which a federal court may grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in a state court proceeding.   Specifically, the AEDPA directs us not to grant a writ unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).   Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), "[a] state court's adjudication of a claim is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Stojetz v. Ishee*, 892 F.3d 175, 192-93 (6th Cir. 2018) (quoting *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014)).   A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case.   *Id*. (citing *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007)).   A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.   *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001).   Rather, for purposes of 2254(d)(1), "clearly established federal law includes only the holdings of the Supreme Court,

excluding any dicta; and, an application of these holdings is 'unreasonable' only if the petitioner shows that the state court's ruling 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'"  *Stojetz*, 892 F.3d at 192-193 (quoting *White v. Woodall*, 572 U.S. 415 (2014)).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).   In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.   Lastly, our review is limited to the record that was before the state court that adjudicated the claim on the merits.   *Cullen v. Pinholster*, 563 U.S. 170 (2011).

A state prisoner who seeks a writ of habeas corpus in federal court does not have an automatic right to appeal a district court's adverse decision unless the court issues a certificate of appealability ("COA").   28 U.S.C. § 2253(c).   When a claim has been denied on the merits, a COA may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right."   *Id*.   To make such a showing, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).   Recently, the Sixth Circuit vacated a COA and dismissed an appeal, on the basis that a district court did not appropriately apply the correct

standard for granting a COA. *Moody v. Unites States*, 958 F.3d 485, 2020 WL 2190766 (6th Cir. 2020). In *Moody*, the Sixth Circuit cautioned that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect," and "[t]o put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*." *Id*. at *1 (emphasis in original). With respect to a claim that a state court has previously rejected on the merits pursuant to 28 U.S.C. § 2254(d), the Sixth Circuit advised that "[f]or that claim to warrant appeal, there must be a substantial argument that the state court's decision was not just wrong but *objectively unreasonable* under the stringent requirements of § 2254(d) (commonly knows an 'AEDPA' deference." *Id*. at *2 (emphasis in original).

Keeping these standards of review in mind, the Court has carefully reviewed the R&R, together with the Supplemental R&R issued by the Magistrate Judge. With respect to the merits of Petitioner's claims, this Court hereby **ADOPTS** the Magistrate Judge's R&R, ECF No. 60, as well as the Supplemental R&R, ECF No. 86. Additionally, and with respect to Petitioner's motion for leave to amend his Petition to add lethal injection and *Hurst* claims, the Court hereby **ADOPTS** the Magistrate Judge's Decision and Order (ECF No. 186), and the Supplemental Memoranda (ECF Nos. 190, 196, 201, 205).

While reaching the same conclusions contained in the above referenced R&R's, the Court adds the following summary and analysis.

### III. Petitioner's Claims

### First Claim for Relief:

Petitioner's rights under the Fifth, Sixth, and Fourteenth
Amendments were violated when the State of Ohio failed to

> provide the defense with exculpatory and favorable evidence prior
> to trial.  U.S. Const. Amends. V, VI, XIV.
> (ECF No. 3, at 8, PAGEID 667.)

Petitioner argues his conviction must be reversed because the State failed to disclose

impeachment evidence about its star witness – and Petitioner's accomplice – Marvin

Washington.   Washington, who was 15 years old at the time of the crime, testified that he

helped Petitioner rob and murder Jones.   Petitioner denied participating in the crime, claimed

not to know Washington, and asserted an alibi defense.

In his First Claim for Relief, Petitioner alleges the State failed to disclose juvenile records

indicating that Washington suffered moderate intellectual disability[1] with neuropsychological

deficits, had poor eyesight and refused to wear corrective lenses, had a poor memory and limited

ability to process information, and had a history of chemical abuse and "black-out" episodes, all

of which might have impacted his credibility as a witness.   (Petition, ECF No. 3, at 9, PAGEID

668.)   According to Petitioner, "[a]s the result of Marvin's deficits, he was susceptible to

influence by authority figures and he had problems processing and recalling events. The State's

case against Chinn was not overwhelming and so this impeaching evidence would have put the

case in a new light."   (Traverse, ECF No. 27, at 10.)

In response, the Warden-Respondent argues the Second District Court of Appeals

considered this claim on the merits and correctly applied prevailing legal standards.   (Return of

Writ, ECF No. 24, at 22.)   According to Respondent, the state courts thoroughly reviewed the

---

[1] Although the parties use the term "mental retardation," the Court will use the phrase
"intellectual disability" where possible.  *See Frazier v. Jenkins*, 770 F.3d 485, 490 n.1 (6th Cir. 2014) (citing *Hall v. Florida*, 572 U.S. 701, 704 (2014)).   Certain references will be made to older terminology as it was commonly used at the time of the previous proceedings in this case.

11

claim, reviewed trial records, ordered an evidentiary hearing, and concluded that the impeachment evidence was not as strong as Petitioner suggests. (*Id.*)

As noted by the Magistrate Judge, the Ohio Court of Appeals for the Second Appellate District decided this claim on the merits, in post-conviction, applying *Brady v. Maryland*, 373 US 83 (1963). *See State v. Chinn*, No. 18535, 2001 WL 788402, *12 (Ohio App. 2nd Dist. July 13, 2011). Because the state courts decided this claim on the merits, this Court's review is limited, pursuant to 28 U.S.C. § 2254(d), to a determination of whether the state court decision was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts in light of the evidence before the court.

In his state post-conviction proceedings, Petitioner presented two factually overlapping claims regarding Marvin Washington's testimony. In addition to the instant *Brady* claim, Petitioner also alleged that his trial counsel provided ineffective assistance, because they "should have presented an expert to testify about eyewitness identification and an expert to testify that Washington had suffered from mental retardation and that such retardation had affected his ability to remember and testify about the evening of the crime." *Chinn*, 2001 WL 788402, *2. As the Magistrate Judge noted, the state court's decisions regarding the two claims are "intertwined." (ECF No. 60, at 32.)

In connection with Petitioner's ineffective assistance of trial counsel claim, the court of appeals discussed the issue of Washington's possible intellectual disability:

> Considering all of this evidence, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had Chinn's counsel called experts to testify about eyewitness identification and Washington's mental retardation. The only eyewitness identification factor that was relevant in the case

12

was Washington's alleged mental retardation and *the effects of that retardation were disputed*. Although Everington could have testified as to her beliefs about Washington, such testimony was contradicted by the testimonies of Monta, Lantz, and Martin.

Further, we have carefully reviewed Washington's testimony at Chinn's trial. His testimony is remarkably coherent and consistent. We do not agree with Everington's testimony that, during Chinn's trial, Washington had been unable to recall important facts from the night of the crime, had not understood questions, and had given inconsistent and inappropriate answers. Although Washington was unable to give times for many of the events during the evening, he testified that he had not been wearing a watch. While Washington was unable to remember some facts about the evening of the crime, such as with which hand Chinn had held the gun, Washington did remember other very specific facts, such as what he had worn on the night of the crime, the general type of clothing that Chinn had worn, that Jones' car had had a digital clock, and that Chinn had been drinking a sixteen ounce "[b]ig mouth Micky" when he had first seen him. Further, although Washington admitted during his testimony that he could not read or write in cursive, we do not believe that such abilities were required for Washington to accurately identify Chinn.

Washington picked Chinn from a photo spread, after not picking suspects from earlier photo spreads that had not contained Chinn's photograph. Thus, although mentally retarded people might be eager to please authorities, assuming Washington was mentally retarded, he must not have been eager enough to please authorities to immediately pick a suspect from the first photo spread or to immediately identify Chinn during the police lineup. Finally, although mentally retarded people might generally have a decreased accuracy rate in making later identifications, such decreased accuracy rate does not mean Washington's identification of Chinn was wrong. In fact, Washington's familiarity with Chinn prior to the night of the crime likely increased his accuracy rate in identifying him. As Martin testified, a person's level of adaptive functioning is not apparent from his IQ scores. The witnesses who came in contact with Washington prior to Chinn's trial thought that, while Washington might not have been especially bright, he would have passed "muster" and that his story was consistent and plausible.

Considering all of the evidence on the record, we cannot conclude that there is a reasonable probability that had Chinn's counsel called experts on eyewitness identification and mental retardation, the result of the trial would have been different. Thus, we will not conclude that the trial court erred in concluding that Chinn's counsel was not ineffective for failing to call experts on eyewitness identification and mental retardation.

*Chinn*, 2001 WL 788402, *9-10 (emphasis added). The court of appeals concluded counsel

13

were not ineffective for failing to call an expert to testify about Washington's intellectual functioning, because the effects of his disability were disputed, Washington testified in a "coherent and consistent" manner, and because when considering all of the record evidence, the result of the trial would not have been different. *Id*.

In analyzing Petitioner's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), the court of appeals held:

> Chinn argues that the prosecutor's failure to disclose psychological reports, social history reports, neuropsychological reports, and juvenile court personnel evaluations from Washington's juvenile court records constituted a *Brady* violation. Assuming *arguendo,* that Chinn did not waive his argument regarding a *Brady* violation by failing to raise it in his original petition for post-conviction relief, we will address this argument.

> The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-1197; see *State v. Treesh* (2001), 90 Ohio St.3d 460, 475, 739 N.E.2d 749, 767. "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375.

> We cannot conclude that the non-disclosed records were evidence that was material to Chinn's guilt or punishment because we do not believe that there is a reasonable probability that, had the records been disclosed to the defense, the result of the trial would have been different. Chinn's own attorney, Monta, testified at the post-conviction relief hearing that had he had Washington's juvenile records prior to the trial, he "may very well" have had an expert examine Washington to see if his testimony could be impeached. Monta did not say definitively that he would have consulted an expert had he had the records. Further, Monta stated that the case was not centered solely on Washington's identification of Chinn, as other witnesses that testified had identified Chinn as well. Further, as we indicated above, Everington's testimony was contradicted by the testimonies of Martin and Lantz. Thus, because we cannot conclude that the non-disclosed records were material to Chinn's guilt,

14

there was no *Brady* violation.

The fourth assignment of error is overruled.

*Chinn*, 2001 WL 788402, *12.

The Magistrate Judge recommended denying Petitioner's claim as without merit, finding

Petitioner failed to establish the evidence at issue was material, or that Petitioner suffered

prejudice as a result of its omission.  (ECF No. 60, at 36-37.)  Applying the standard set forth in

*Brady v. Maryland*, 373 U.S. 83 (1963), the Magistrate Judge concluded as follows:

> In order to establish a *Brady* violation, the omitted evidence must be
> material either to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83 (1963).
> Petitioner has established the first prong of a *Brady* violation; the omitted records
> could have been used for impeachment purposes.  However the Petitioner has not
> established that the evidence was material to the outcome of his trial, nor is he able
> to demonstrate prejudice resulting from the omission of this evidence.  When
> determining whether the withheld information was material and therefore
> prejudicial, habeas courts consider it in light of the evidence available for trial that
> supports the petitioner's conviction.  *See Towns v. Smith*, 395 F.3d 251, 260 (6th
> Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004).  From the time
> of his interview to the time of his trial testimony, Washington's version of events
> remained consistent, coherent, and plausible. When making his subsequent
> identifications of Chinn, Washington identified him from a second photo spread
> after stating that the defendant was not present in the first spread.  He later
> identified Chinn after a line-up.  There was a corroboration of events and
> identification by other witnesses.  Additionally, there was testimony as to
> Washington's high level of adaptive functioning.  Finally, defense counsel himself
> testified that he might have used the information contained within the records for
> impeachment purposes, but he did not feel Washington would have met the criteria
> for mental retardation. (Trial Tr. Vol. VI at 129-134.)  The juvenile records were
> not material to guilt, nor is there a reasonable probability that had they been
> disclosed, the result of the proceeding would have been different.  The decision of
> the state court was therefore neither contrary to, nor an unreasonable application of
> U.S. Supreme Court law.  The First Claim for Relief under *Brady* should be
> dismissed with prejudice.

(ECF No. 60, at 40.)  The Magistrate Judge further recommended that a certificate of

appealability be issued on this claim.  (*Id*. at 43.)

15

In his objections, Petitioner argues this Court should accept the Magistrate Judge's finding that the State omitted records that could have been used for impeachment, but reject the Magistrate Judge's ultimate recommendation that the evidence was immaterial and no prejudice resulted. According to Petitioner:

> Davel Chinn objects to the determination by the Magistrate Judge that his First Ground for Relief does not warrant habeas relief. The State failed to disclose material impeaching evidence about its key witness, Marvin Washington. Washington's suppressed juvenile records contained a wealth of information that was material to Washington's general capacity to be a credible witness. For example, the records identified Washington as having a congenital cranial defect that caused him to 'distort and confuse new information.' (ROW 2/10/00 Hrng. Tr. 84.) And the records indicated that 'Marvin is easily swayed by others.' (*Id*. at 82.) This impeaching evidence undermines confidence in the verdict because it undermines confidence in the State's pivotal witness, Marvin Washington.

(Objections, ECF No. 63, at 12-13.) Petitioner faults the Magistrate Judge for not "actually listing the evidence," and instead providing an explanation of why the jury might still have believed Washington. (*Id*. at 13.) The Magistrate Judge, Petitioner argues, found that Washington's version of events "remained consistent, coherent, and plausible, but did not recognize that Washington's eagerness to please, ability to be swayed by others, and poor memory might cause him to go along with the police theory implicating Chinn." (*Id*. at 14.) Petitioner contends that Washington's "remarkably coherent and consistent" trial testimony "was so different from his day-to-day abilities that a juror might conclude that he had some assistance with 'remembering' the details." (*Id*.) Petitioner continues, arguing that Washington "may have been consistent, but he was consistently wrong about many facts." (*Id*.) Specifically, Washington was confused regarding how and when he may have met Petitioner, and according to Petitioner, Washington may have confused Petitioner with someone else named "Tony." (*Id*. at 14-15.) Washington also incorrectly recalled that he identified Petitioner as "number 7" in

16

the line-up and photo spread, when in fact, he had identified Petitioner as "number 2."  (*Id*. at

15.)

The crux of Petitioner's argument is that the impeachment evidence at issue could have

called into question the credibility of Washington's identification of Petitioner as Washington's

own accomplice.   Petitioner argues "the plausibility of Washington's version of events of the

night in question is not actually the issue.   Washington was with the killer the night that Brian

Jones was shot, so he did know how the night progressed.   But one area where the 'plausibility'

fell apart was when Chinn failed to fit the physical description of the man with Washington."

(*Id*. at 15.)   Petitioner asserts the case against him was weak, and Washington's questionable

identification of Petitioner as his accomplice is "shaky at best."   According to Petitioner:

> No physical evidence linked Chinn to the crime. The stolen car did not contain any
> fingerprints or other physical evidence to connect Chinn with the crime.   Police
> found no evidence in Mr. Chinn's house, even though they made a "very thorough
> search" of "every room."   Furthermore, there is a discrepancy in height between
> Chinn and the "Tony" who was with Washington that night.   Welborn observed
> the two men as they walked up to his car.   Welborn testified that the man with
> Washington was taller than Washington by three inches.   Washington also testified
> that "Tony" was taller than him, and he ruled out any special "elevator shoes or
> anything."   But the evidence at trial established that there was very little difference
> in height between Chinn and Washington: Chinn stands 5'5½" and Washington
> was 5'5" or 5'6" when this crime occurred.

(*Id*. at 17.)   Finally, Petitioner notes that he presented evidence of an alibi in the form of

testimony from his mother.

In the Supplemental R&R, the Magistrate Judge reiterated his initial finding that

Petitioner's *Brady* claim is without merit.   The Magistrate Judge determined that much of the

information Petitioner claims was relevant was in fact before the jury and trial judge:

> Chinn cites to various discrepancies within Washington's testimony, to wit;
> that he had difficulty remembering details accurately, specifically as to Chinn's

17

> number in the photo array and police lineup and that he had met Chinn through Henry Walker and Stephanie Woods. He also notes discrepancies in various reports as to the height of the man with Washington and Jones, all of which place the shooter closer to the height of the victim (about 5'10) whereas Chinn is only about 5'6. Finally, he reiterates that he had an alibi on the night of the murder.
>
> The evidence cited above by Chinn was before the jurors and trial judge.

(ECF No. 86, at 7-8.)   Additionally, the Magistrate Judge noted the record contained information that corroborated Washington's testimony and the identification of Petitioner as his accomplice.   Specifically, this corroboration included the testimony of Christopher Ward, who spoke with Washington and "Tony" for about 30 to 45 minutes on the night of the murder, as well as Stacy Dyer, whose description of the actual shooting corroborated the testimony of Washington.   (*Id.* at 8.)   In Petitioner's objections to the Magistrate Judge's Supplemental R&R, Petitioner argues that the Magistrate Judge relied too much on the strength of the state's case, and "gave virtually no weight to the strength of the defense evidence that was introduced at Chinn's trial." (ECF No. 91, at 3.)

In *Brady*, the Supreme Court held that the state has a duty to disclose exculpatory evidence to the defense under the Due Process Clause.   "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."   *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).   "With regard to the first element, the Supreme Court has held that the duty to turn over favorable evidence encompasses impeachment evidence as well as exculpatory evidence."   *Eakes v. Sexton*, 592 Fed. Appx. 422, 427 (6th Cir. 2014) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).   Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed.

*LaMar v. Houk*, 798 F.3d 405, 415 (6th Cir. 2015). A violation is established by showing that the favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *VanHook v. Bobby,* 661 F.3d 264, 267 (6th Cir. 2011) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). "The materiality of *Brady* evidence depends almost entirely on the value of the undisclosed evidence relative to the other evidence produced by the state." *Eakes v. Sexton*, 592 Fed. Appx. 422, 427 (6th Cir. 2014) (citing *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004)). That is, the materiality analysis necessarily involves weighing the value of the undisclosed evidence against other evidence produced by the state. *Bethel v. Bobby*, 2:10-CV-391, 2018 WL 1516778, at *2 (S.D. Ohio Mar. 28, 2018). "Where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *United States v. Ramer*, 883 F.3d 659, 672 (6th Cir. 2018) (quoting *Bales v. Bell*, 788 F.3d 568, 574 (6th Cir. 2015)).

This Court has reviewed the state court record, including the relevant documentation (Apx. Vol. XV, at 78-163; 131-6, PAGEID 5415-6500), as well as the R&R's of the Magistrate Judge, and finds that while the impeachment evidence touted by Petitioner may have proven useful during the cross examination of Marvin Washington, Petitioner cannot make an affirmative showing of prejudice to support a successful *Brady* claim in habeas corpus. As the starting point, the Court finds that the Ohio Second District Court of Appeals correctly identified the relevant and controlling legal standard to apply: *Brady v. Maryland*, 373 U.S. 83 (1963). The state appellate court gave careful consideration to the claim and applied that legal standard

in a reasonable way. In order to ensure Petitioner's claims concerning Washington's testimony were fully vetted, the appellate court remanded the case to the trial court for an evidentiary hearing. Although the remand pertained to Petitioner's allegations of ineffective assistance of trial counsel for failing to call expert witnesses as to eyewitness identification and the impact of Washington's intellectual functioning on his testimony, that claim is closely connected to the alleged *Brady* violation. *State v. Chinn*, No. C.A. 16764, 2000 WL 1458784, *4 (Ohio App. 2nd Dist. Aug. 21, 1998) ("[W]e conclude that the trial court should have conducted an evidentiary hearing to determine more fully the nature of the testimony of these two witnesses, as well as the strategical reasoning of trial counsel for not presenting this expert testimony.") On its second review, the state appellate court concluded that the evidence of Washington's moderate intellectual functioning was not as strong as Petitioner had suggested, and the court characterized Washington's testimony as "remarkably coherent and consistent." *State v. Chinn*, No. 18535, 2001 WL 788402, * 9 (Ohio App. 2nd Dist. July 13, 2001). This constitutes a factual finding under 28 U.S.C. § 2254(e), and it is entitled to a presumption of correctness. *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003) ("The presumption of correctness also attaches to the factual findings of a state appellate court based on the state trial record."). Petitioner has not provided any evidence, much less the clear and convincing evidence required by § 2254(e), to rebut the appellate court's finding.

This Court has reviewed the record of the February 10, 2000, post-conviction hearing. (Trial Tr. Vol. VI, at 1-208; ECF No. 132-7, PAGEID 9456-9521; ECF No. 132-8, PAGEID 9522-9663.) Petitioner's lead trial counsel, Michael Monta, was called as a witness. As the state appellate court noted, Attorney Monta testified that he did not receive records of

20

Washington's psychological reports, social history, or juvenile court evaluations, and that such information would have been helpful in his defense of Petitioner. Specifically, Monta testified that he could have used that information in determining how to cross-examine Washington, and to inquire about Washington's previous blackouts and his ability to remember events and people. (Trial Tr. Vol. VI, at 128-131; ECF No. 132-8, PAGEID 9583-9586); *Chinn*, 2011 WL 788402, at *5. However, Monta also testified that he had a chance to meet with Washington and Washington's attorney prior to trial, and that he perceived Washington to be "young, uneducated, not especially bright," but that Washington also "seemed to understand what the situation was and what he was doing there." (Trial Tr. Vol. VI, at 133; ECF No. 132-8, PAGEID 9588.) Monta testified "I'm not a psychologist but I've seen some psychology reports in my time; and I thought he probably would have passed that muster any way." (Trial Tr. Vol. VI, at 134; ECF No. 132-8, PAGEID 9589.)

This Court finds that the additional impeachment information, had counsel even chosen to use it, would not have so conclusively undermined Washington's testimony at the trial that it would have created a reasonable probability that the result of the trial would have been different. A *Brady* violation will not result in a new trial for a criminal defendant unless a court concludes that the improperly withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Here, it is not apparent whether or to what extent trial counsel would have used the juvenile records. Additionally, the jury was made aware of discrepancies in Washington's account, but still found him to be a credible witness. The jury was made aware that Washington sometimes had difficulty remembering details accurately such as Petitioner's number in the

lineup, Petitioner's height, which hand Petitioner held the gun, and how he had initially met Petitioner. Additionally, there was testimony that Washington could not read and write in cursive. Although the juvenile records may have been helpful to counsel, the Court cannot conclude that there was a reasonable probability that had they been disclosed, the result of the proceedings would have been different. Accordingly, the Court agrees with and adopts the Magistrate Judge's R&R, as well as the Supplemental R&R, and finds that Petitioner's First Claim for Relief is without merit.

The Magistrate Judge has recommended that the Court grant a certificate of appealability as to this claim. To warrant a COA, a petitioner must make a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(2*); see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983); *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063, 1073 (6th Cir. 1997). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy 28 U.S.C. § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court is cognizant of this "gatekeeping process for federal habeas appeals" recently discussed in *Moody v. U.S.*, 958 F.3d 485, 2020 WL 2190766, at *1–2 (6th Cir. 2020) However, the Court agrees with the Magistrate Judge's recommendation that a COA should issue as to this claim. This case was as much about Marvin Washington as it was Davel Chinn. As such, any claim concerning the impeachment of Washington as a witness is deserving of further review on appeal, and fair-minded jurists could find the Court's resolution of this claim debatable or wrong. The Court hereby grants Petitioner a COA as to his First Claim for Relief.

**Second Claim for Relief:**

> Petitioner's due process right to a fair trial and fair penalty phase
> was violated by the cumulative effect of prosecutorial misconduct.
> U.S. const. amend. XIV.

In his Second Claim for Relief, Petitioner raises a litany of allegations of prosecutorial

misconduct during both phases of his trial. The Magistrate Judge summarized the gist of

Petitioner's claim as follows:

> Specifically, he argues that because the case against him was not strong, the
> prosecutor re[sorted] to improper tactics to get a conviction. (Traverse, Doc. No.
> 27, PAGEID 302.) Examples of the alleged misconduct include; improperly
> vouching for witnesses, comments as to the alibi witness, relying on hearsay
> evidence, informing the jurors that the defendant had requested an instruction on a
> lesser included offense, misleading the jury by claiming to have additional
> knowledge, and making statements to appeal to the jurors' emotions. (Traverse,
> Doc. No. 27, PAGEID 302-319.)

(ECF No. 60, at 43-44.)

Petitioner presented his claims of prosecutorial misconduct on direct appeal to the Ohio

Second District Court of Appeals, as well as the Ohio Supreme Court. In denying his claim for

relief, the Second District Court of Appeals held:

> Chinn argues that the following acts of the prosecutor during the guilt phase of the
> trial constitute reversible error: (1) that he vouched for police (T. 573); (2) stated
> that Washington and Ward are telling the truth (T. 578); (3) attributed Washington's
> rationale for misidentifying Chinn at the lineup to Det. Lantz rather than
> Washington himself; and (4) said that "victims have rights, too" (T. 583). Chinn's
> failure to object to any of these statements waived objection, and we see no plain
> error. *Broom* and *Awan, supra.*
>
> Chinn did object to the following statements by the prosecutor during closing
> argument.
>
> Mr. Heck: "... Then you're also going to hear about involuntary manslaughter. I'm
> not going to get into it because in order for you to find involuntary manslaughter,
> you must find it was not a purposeful killing. I think that's absolutely ridiculous but

23

that's the next thing. Well, if you find that he was there, and if you find the ID was fine, which it was, well then just say, "I didn't really mean to kill him. I really didn't mean to. I meant to hurt him a little bit."

Mr. Monta: I object, your Honor. This wasn't argued.

The Court: Overruled, because the Court is going to give that instruction.

Mr. Monta: I'm objecting to this comment, not the instructions.

Mr. Heck: Well, *they asked for it,* your Honor.

Mr. Monta: I object to that, your Honor.

The Court: Overruled.
(T. 580-581) (Emphasis added.)

Chinn's first objection was without merit. In presenting its argument the State may go beyond the scope of a defendant's closing argument. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24-25. Therefore, because the involuntary manslaughter instruction was to be given by the court the State was not required to wait until Chinn mentioned it before discussing it.

The prosecutor's comment that "they asked for it", however, is far more objectionable. No instruction should be identified with a particular party. *Columbus v. Bee* (1979), 67 Ohio App.2d 65, 80. Therefore, it was clearly improper to inform the jury that Chinn had requested the lesser included offense instruction. However, the error was harmless since we find that Chinn would yet have been found guilty absent the prosecutor's comment. *Smith, supra.*

The prosecutor also commented to the jury on the fact that Chinn's brother, who was named on a witness list, did not testify to substantiate the alibi defense offered through Chinn's mother.

Do I think she's a liar? I'm not going to say that. I think she did what any mother we would expect to do, but it's incredible. You don't sit there when your son's charged, and she knew about it. She read it in the paper. So, she told you two days later and sit there and do nothing and come into the trial and say, "he's at home with his brother all night. I heard them." You must test that. You must test if you believe that. And the other things I want you to ask. Where is Darryl, if he's at home with his brother.

MR. MONTA: I object, Rule 16 before any comment on the Witness list.

24

THE COURT: Overruled.

MR. HECK: He was at home, they said, with his brother, but his brother didn't say that. Only mother says that. You can believe every Defendant's witness with the exception of his mother, and still find the Defendant very clearly guilty, beyond any doubt whatsoever.
(T. 576-577).

Crim.R. 16(C)(3) provides that "the fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at the trial." The Supreme Court has interpreted this to mean that once a person's name is placed upon a witness list there is an absolute bar upon mentioning his absence at trial. *State v. Hannah* (1978), 54 Ohio St.2d 84, 90.

....

We continue to hold to the view that the better interpretation is that the State is prohibited from mentioning the absence of a witness *in conjunction with* the fact that he was named on a witness list. However, this element, though apparently contained in the rule itself, is not required by *Hannah.* Courts have found no *Hannah* violation in previous cases because there was no evidence that the witness in question was actually named on a witness list. *See,* e.g., *Walton, Ingle,* and case cited therewith *supra.*

In this case Chinn's brother was named on a witness list. Therefore, the court should have ordered the comment of the prosecutor stricken. It was error to fail to do so. However, because we find that Chinn would yet have been found guilty even absent this comment, the error was harmless.

*State v. Chinn*, No. 11835, 1991 WL 289178, *6-7 (Ohio App. 2nd Dist. Dec. 27, 1991).

On further appeal, the Ohio Supreme Court held:

Appellant raises claims of prosecutorial misconduct, but many of appellant's arguments have been waived by his failure to object at trial.  We have carefully reviewed the record in its entirely and have considered all of appellant's claims of prosecutorial misconduct.  We have found no instance of prosecutorial misconduct that would rise to the level of reversible error.  The instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair and reliable sentencing determination.

*State v. Chinn*, 85 Ohio St.3d 548, 559, 709 N.E.2d 1166, 1177 (1999).

In the Original R&R, the Magistrate Judge gave careful consideration to each of

Petitioner's arguments and recommended that this Court deny Petitioner's claim in its entirety as without merit. The Magistrate Judge began by setting forth both the court of appeals and the Ohio Supreme Court's analysis and decisions rejecting Petitioner's allegations of prosecutorial misconduct. The Magistrate Judge then proceeded to set forth the case law governing claims of prosecutorial misconduct raised in habeas corpus, including a reminder that claims of prosecutorial misconduct are reviewed deferentially on habeas review. Finally, the Magistrate Judge concluded the state courts decided Petitioner's allegations of prosecutorial misconduct on the merits, and the decision of the state courts was neither contrary to nor an objectively unreasonable application of United States Supreme Court precedent. (ECF No. 60, at 66.) The Magistrate Judge recommended against granting a COA as to Petitioner's allegations of prosecutorial misconduct.

With respect to the allegations of guilt phase prosecutorial misconduct, the Magistrate Judge concluded the state did not improperly vouch for its witnesses, "but rather referr[ed] to what he believed to be the strength of the State's evidence, illustrating corroboration between witnesses and a lack of a motive to lie." (*Id*. at 51-52.) Additionally, the Magistrate Judge determined the prosecutor's reference to evidence not in the record was brief and isolated and cured by an instruction from the trial court that closing arguments are not evidence; the state's reminder to the jury that Petitioner's brother did not come forward to testify as an alibi witness was a fair comment on the weakness of Petitioner's alibi defense; the prosecutor's statement that "victims have rights too" could fairly be characterized as asking the jury to follow the law; and prosecutors did not exceed the limits imposed by the trial court with respect to the testimony of state's witness Shirley Cox. (*Id*. at 50-57.) As to the prosecutor's comments on the lesser

included offense of involuntary manslaughter, the Magistrate Judge concluded it was improper

for the state to argue "well, they asked for it," effectively identifying Petitioner as the party who

requested the instruction.   However, the Magistrate Judge concluded the comment itself was

brief and isolated, did not appear to be deliberate, and it was unlikely the jury would have been

misled or prejudiced by the comment.   (*Id*. at 56.)

The Magistrate Judge carefully considered all of Petitioner's claims of penalty phase

prosecutorial misconduct and found them to also lack merit.   First, the Magistrate Judge rejected

Petitioner's argument that the state deprived him of a fair sentencing proceeding by urging the

jury to consider evidence beyond the statutory aggravating circumstances, such as the facts and

circumstances of the crime.   Additionally, the Magistrate Judge concluded the state had some

leeway to refer to the facts and circumstances of the crime to dispel the mitigating

circumstances; the trial court's instruction at the penalty phase informed the jury what

aggravating circumstances they could properly consider; any error in the weighing of

aggravating and mitigating factors was cured by the Ohio Supreme Court's independent

reweighing; and the consideration of non-statutory aggravating circumstances, even if contrary to

state law, does not violate the United States Constitution.   (*Id*. at 57-66.)

Regarding Petitioner's argument that the state improperly encouraged the jury to consider

both the "principal offender" and "prior calculation and design" components of the Ohio Revised

Code § 2929.04(A)(7) specification, the Magistrate Judge determined that any confusion was

corrected by the trial court's instructions to the jury which listed the § 2929.04(A)(7)

components disjunctively.   (*Id*. at 60-62.)   Furthermore, the Magistrate Judge determined it was

not improper to urge the jury to give justice to the victim and punish Petitioner, because "[w]hen

considered in context of the entire closing, this was a comment on the case, on crime in general, and on the fact that guilty people should be punished." (*Id*. at 63.) Finally, the Magistrate Judge rejected Petitioner's argument that his rights were violated when the prosecutor disparaged his mitigating evidence by arguing he was not an underprivileged youth, (*Id*. at 62-63); found that it was not improper to admonish the jury that it should not consider sympathy and mercy, (*Id*., at 64-65); and concluded it was not improper to comment on the unsworn nature of Petitioner's statement, (*Id*. at 65.)

In his objections to the R&R, Petitioner repeats the instances of alleged misconduct and restates prior arguments set forth in the Petition and Traverse. Petitioner puts renewed emphasis on his allegation that the prosecutor vouched for his witnesses, and in his objection to the Supplemental R&R, complains the Magistrate Judge failed to give weight to the cumulative effect of the prosecutorial misconduct in the culpability phase of his trial. Specifically, Petitioner argues "[a]ll of these remarks encouraged the jury to consider matters beyond the scope of the evidence before it and attempted to circumvent the presumption of innocence in favor of a presumption of guilt that Chinn would have to overcome." (ECF No. 91, at 7-8.)

It is well settled that "[t]o grant habeas relief based on prosecutorial misconduct that does not violate a specific guarantee under the bill of Rights, the misconduct must be so egregious as to deny the Petitioner due process." *Lorraine v. Coyle*, 291 F.3d 416, 439 (6th Cir. 2002) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974)). A reviewing court must first determine whether prosecutorial misconduct occurred, and if so, whether the misconduct was prejudicial. In so doing, the reviewing court should consider the challenged remarks within the context of the entire trial to determine whether any improper remarks were prejudicial. *Cristini*

28

*v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). It bears reminding, with respect to prosecutorial misconduct claims, that the "[p]etitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000). Even misconduct that was improper or universally condemned does not warrant habeas corpus relief unless the misconduct was so flagrant and egregious as to deny the petitioner a fundamentally fair trial. *Donnelly*, 416 U.S. at 643-54. Finally, prosecutorial misconduct during the penalty phase of a capital trial may be "cured by appellate reweighing." *LaMar v. Houk*, 798 F.3d 405, 431 (6th Cir. 2015) (finding that "all the alleged prosecutorial misconduct during the penalty phase was cured when the Ohio Supreme Court independently reweighed aggravation and mitigation") (citing *Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006)); *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015) ("While we independently believe that any prosecutorial misconduct did not tip the scales against Trimble during the penalty phase, the Ohio Supreme Court's decision to reweigh the aggravating and mitigating factors definitively cures any potential error from the alleged prosecutorial misconduct.").

Here, the Court has carefully reviewed the Original R&R, ECF No. 60, the Supplemental R&R, ECF No. 86, and Petitioner's objections to both, ECF Nos. 63 and 91, and the Court agrees Petitioner's claim is without merit. To that point, this Court agrees with the Magistrate Judge's resolution of Petitioner's allegations of prosecutorial misconduct, and specifically adopts the Magistrate Judge's analysis of Petitioner's Second Claim for Relief. A prosecutor is entitled, as the Magistrate Judge noted, to argue the record, highlight inconsistencies or inadequacies in the defense, and to make and argue reasonable inferences from the evidence. Moreover, prosecutors are entitled to rely on the trial court's evidentiary rulings, and comment

29

on the evidence admitted at trial. *See Simmons v. Woods*, No. 16-2546, 2018 WL 618476, *3 (6th Cir. Jan. 30, 2018) ("Because the state appellate court deemed the testimony admissible, the prosecutor could not have acted improperly in eliciting it.") (citing *Cristini v. McKee*, 562 F.3d 888, 900 (6th Cir. 2008)). The Court has considered each alleged instance of improper argument individually and cumulatively, both within the context of closing arguments, as well as within the broader context of the trial in its entirety, and the Court agrees that no prosecutorial remarks were so egregious as to deprive Petitioner of a fundamentally fair trial. The Court also agrees with the Magistrate Judge that the state court's decisions rejecting Petitioner's claim did not contravene or unreasonably apply clearly established federal law.

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections (ECF No. 63, at 21-27; ECF No. 91, at 6-9), **ADOPTS** the Magistrate Judge's R&R (ECF No. 60, at 43-66; ECF No. 86, at 9-13), and hereby **DENIES** Petitioner's Second Claim for Relief. Further, the Court cannot plausibly conclude that reasonable jurists would find debatable or wrong the assessment of Petitioner's prosecutorial misconduct claim. Petitioner's Second Claim for Relief is not deserving of further review on appeal.

### Third Claim for Relief:

> Petitioner's due process right to a fair trial was violated by the introduction of the irrelevant and prejudicial testimony of State's witness Shirley Cox. U.S. Const. amend. XIV.

In his Third Claim for Relief, Petitioner argues that he was denied a constitutionally fair trial by the admission of witness Shirley Cox's testimony. The record reveals that Mrs. Cox worked at the Dayton law office of her husband, Bobby Joe Cox. On the morning of February

23, 1989, Petitioner went to that office and spoke to Mrs. Cox for approximately fifteen minutes, and identified himself as "Tony Chinn."   Subsequently, Mrs. Cox saw a newspaper article that contained a police composite sketch of the alleged shooter in the Jones murder.   Mrs. Cox contacted the Dayton Police Department and provided information regarding her meeting with Petitioner.   Petitioner argues that the testimony of Mrs. Cox bolstered the state's identity evidence and allowed the jury to infer that Petitioner was guilty because he was seeking legal counsel.   (Traverse, ECF No. 27, at 45.)   Both the Second District Court of Appeals and the Ohio Supreme Court found it improper that Mrs. Cox was permitted to testify as to where she met Petitioner, however both courts ultimately concluded the error was harmless.   *See State v. Chinn*, No. 11835, 1991 WL 289178, *14-16 (Ohio App. 2nd Dist. Dec. 27, 1991); *State v. Chinn*, 85 Ohio St.3d 548, 560-561 (1999).

The Magistrate Judge quoted the entirety of Mrs. Cox's testimony in the Original R&R, ECF No. 60, at 69-75:

**Q. [by assistant prosecutor]:** Would you state your full name for the Court, please?

**A.** Shirley Ann Cox.

**Q**. Your last name is spelled?

**A**. C-O-X.

**Q.** You are married; is that right?

**A.** Yes. I am married to Bobby Cox.

**Q.** Are you employed?

**A.** Yes. I am for my husband, Bobby Cox.

**Q.** What do you do for him?

31

**A**. I'm sort of a receptionist, and I do all the billing and I work in his law office.

**Q.** Where is that law office located?

**A.** It's located in the Hulman Building on the third floor.

**Q**. Now, I'm going to ask you, Mrs. Cox, if you would, to refer your attention to Thursday, February the 23rd of 1989, at about 9:30 in the morning. I'd like you to tell the Jury where you were?

**A.** I was in the law office, at the front of the desk. I work at the front of glass doors in my husband's law office in the Hulman Building.

**[Defense counsel]:** Your honor, our continuing objection on the subject we noted before.

**The Court:** The Court has considered and overruled the objection.

**[Defense counsel]:** Thank you, Judge.

**Q.** I'm going to ask you if someone came into the office at about 9:30?

**A.** Uhm, it was not 9:30. It was closer to about a quarter to nine. I had only been there 15 minutes.

**Q.** About 8:45?

**A.** Right. I had opened the one door so we could have furniture moved in that day. A person came in through the opened door.

**Q.** What do you mean, person? A male or female.

**A.** It was two males.

**Q.** Two males. And were they White or Black?

**A.** They were Black.

**Q.** I'm going to ask you not to relate any conversations but, if you would, during the conversations did one of the men indicate his name to you?

**A.** Yes. The person kept saying his name was Tony and he wanted to see my

32

husband.

**Q.** Did he ever indicate his last name?

**A.** Yes. After I told him that I could not let him see him, he said his name was Chinn and he needed to see him. Tony Chinn.

**[Defense counsel]:** Excuse me. Can we approach the Bench? Just a second?

**The Court:** All right.

(A sidebar conference is held on the record.)

**[Defense counsel]:** Mrs. Cox is continually indicating and this is what we're objecting to. He's there to see a lawyer. He's in a law office. We feel, based on our objection before, that this should not be allowed and stricken.

**The Court:** Since the purpose is not disclosed, the Court has already considered this matter and finds that objection should be overruled.

(Side Bar conference concludes.)

**Q.** Mrs. Cox, I ask you to look around the Courtroom and tell the Jury if you see this individual in the Courtroom today?

**A.** Yes, I do.

**Q.** Would you point him out for us, please?

**A.** He's the person on the left, the Black man in the black V-neck sweater.

**[Assistant prosecutor]:** Indicating the Defendant for purposes of the record, your Honor.

**Q.** How, Mrs. Cox, without going into any detail, I'm going to ask, for whatever reasons, just whether your attention was directed and did you observe continuously this Defendant on February the 23rd of 1989?

**A.** Yes, I did.

**Q.** Approximately how long?

**A.** Approximately ten to fifteen minutes.

**Q.** Now, as a result of that, did you have occasion to discuss this with your husband later that day?

**A.** Yes, I did the minute he came in the door.

**Q.** Following that discussion, did you call anyone?

**A.** Yes, I did. I called Tony Spells, the Dayton Police Department.

**Q.** Did you have occasion then to be at home later that evening?

**A.** Yes, I did.

**Q**. I'm going to ask what, if anything, occurred that evening?

**A.** Approximately that same evening, I always read the day before's papers. I mean, I never read the same day. I always read the day before because we're always one day behind. I was reading — I was reading Wednesday night's paper. I just looked up at my husband. He was watching T.V. I said, "My God, I don't believe this." He said, "What?" "This Tony Chinn that was in here this morning is in the paper."

**Q.** Now, I'll hand you —

**[Defense counsel]:** I object to that conclusion, your Honor.   Not necessarily that she didn't say that, but that the Jury would reach that conclusion.

**The Court:** Overruled.

**Q.** I'll hand you what has been marked as State's exhibit 21 for identification purposes, and ask you to tell the Jury what that is?

**A.** That is the torn-out article of the page that I was reading on Thursday night, and when I looked at the picture, I just knew it had to be the same person that was in the office that morning.

**Q.** I'm going to ask you, the picture composite that's in that exhibit 21, is that the same — that is also on the Defendant's exhibit L; same two?

**A.** Right, That's just blown-up from this paper.

**Q.** Without going into any details, does that composite and article that's below it, concerning homicide that occurred on January the 30th of 1989, in the 5000 block of Germantown Pike, Jefferson Township?

**A.** Yes, it is.

**Q.** Now, as a result of this article that you saw and read in the paper, and your conversations with your husband, what, if anything, did you do?

**A.** Friday morning I had made a trip to Cincinnati with another lawyer, and his wife, and my husband, for a seminar, and, at the Frisch's in Kentucky, I called Detective Lantz of the Dayton Police Department, because the newspaper says that's who to call.

**Q.** Were you able to talk to Detective Lantz right away?

**A.** No, I wasn't. He ended up giving me some Sergeant that was in charge. I just told him what all I wanted to tell Detective Lantz. He said Detective Lantz would get a hold of me later in the day.

**Q.** Because of your being in Cincinnati, did you have occasion to call Detective Lantz later?

**A.** Right. Apparently, Detective Lantz called my office — my husband's office and my office, at about 1:30, and the secretary told me when I called her.

**[Defense counsel]:** We'll just stipulate she made phone calls. [The assistant prosecutor] need not introduce phone records here.

**[Assistant prosecutor]:** That's fine. We can stipulate that. That you did.

**Q.** You have the long distance records that you did, in fact, make from Cincinnati, calling Detective Lantz; is that right?

**A.** Right.

**Q.** I believe you called him on several occasions; is that correct?

**A.** Right. I called him that morning, which I didn't get him. Then, I talked to him from the hotel approximately around 2:00 — 2:30 — 3:00.

**Q.** Again, without getting into all the conversation you had with him, I'll just ask if the reason you called Detective Lantz — did you tell him the person who was in your office is the person you saw in the paper?

**A.** Right. I told him the reason I was calling in —

**Q.** Did you give Detective Lantz the full name of the person, though?

35

**A.** Yes, I did.

**Q.** In any newspaper article, there is not the full name?

**A.** There is no name other than it said he may go by the name of Tony.

**Q.** That was it?

**A.** Right.

**Q.** And you gave Detective Lantz his full name?

**A.** Right

**[Assistant prosecutor]:** I have no further questions. Thank you very much. You [sic] witness.

**Q. [by defense counsel]:** Good morning, Mrs. Cox.

**A.** Good morning.

**Q.** Your office is downtown?

**A.** Yes, it's in the Hulman Building.

**Q.** Just so I'm straight with this.  Defendant's exhibit L is what you said was a blow up of the composite?

**A.** That is the picture that was in the paper from Wednesday night.

**Q.** That is what you relied on then to make your phone call?

**A.** Yes, I did.

**[Defense counsel]:** I don't have any other questions.
**[Assistant prosecutor]:** No further questions.

(ECF No. 60, at 69-75; Trial Tr. Vol. IV at 375-83; ECF No. 132-5, PAGEID 9078-9086.)

Although not the final state court to review this claim, the Second District Court of

Appeals provided the following insight regarding the testimony of Shirley Cox:

36

Mrs. Cox's testimony was also of probative value to show that Chinn possessed a guilty mind concerning the drawing and the crime with which it was connected. This inference arises naturally and inevitably from proof that shortly after the picture appeared in the newspaper Chinn sought to consult with a lawyer. The trial court did not permit the state to argue the inference to the jury. The Court also excluded testimony by Mrs. Cox that Chinn told her that he wanted to see Attorney Cox "on heavy stuff." (T. 349). The prosecutor conceded in arguments to the court that: "His comments show culpability. His comments show guilt, his comments show that." (T. 357). Exclusion of evidence of Chinn's statement ameliorated, somewhat, the prejudicial character of the evidence, but the fundamental unfairness remained.

It is a necessary and cherished aspect of our adversarial system of justice that one who is or may be accused of a crime has an unrestricted right to take counsel from an attorney concerning the matter. As this right is diminished, whether through direct restriction or indirect impositions of penalty for doing so, the functioning of the adversarial system is impaired. Therefore, and as a general rule, the fact that an accused has consulted with an attorney should not be offered as proof that he is guilty of a crime with which he is accused. To do so employs a matter of no relevance to the charge to impose a penalty for the exercise of a fundamental right.

Our task is to determine whether the trial court abused its discretion in admitting evidence that Chinn attempted to consult with an attorney. As abuse of discretion connotes more than just an error of law. It exists where the court's attitude, evidenced by its decision, was unreasonable, arbitrary, or unconscionable. *Worthington v. Worthington*, (1986), 21 Ohio St.3d. 73.

After a careful review of the record we cannot find an abuse of discretion. The trial court gave a complete hearing, out of the jury's presence, to the various objections of Appellant. The court excluded evidence of Appellant's "heavy stuff" statement to Mrs. Cox and prohibited the state from arguing that Chinn's attempt to consult with an attorney is indicative of guilt. The court gave no limiting instruction pursuant to Evid.R. 105, but the Appellant did not request one. Though the evidence was unfairly prejudicial, that unfairness does not clearly jeopardize the fundamental fairness of the proceeding or the reliability of the verdict. While the trial court should have excluded evidence that Chinn attempted to consult a lawyer, we cannot find that its decision is unreasonable, arbitrary, or unconscionable.

*State v. Chinn*. No. 11835, 1991 WL 289178, *15-16 (Ohio App. 2nd Dist. Dec. 27, 1991).

Petitioner appealed the denial of this claim to the Ohio Supreme Court, which also

rejected the claim on the merits:

In his sixth proposition of law, appellant contends that the trial court erred by allowing Shirley Ann Cox to testify at trial concerning appellant's visit to her husband's law office. Appellant claims that Cox's testimony was irrelevant and was unfairly prejudicial. We agree with appellant's assertions that the trial court should not have permitted Cox to testify that her encounter with appellant occurred in a law office. However, we also agree with the court of appeals' finding in 1991 that although the evidence was "unfairly prejudicial, that unfairness does not clearly jeopardize the fundamental fairness of the proceeding or the reliability of the verdict." *Chinn*, Montgomery App. No. 11835, unreported, at 38. Appellant protests that the court of appeals' holding on this issue "fails to take into account the fundamental weakness of the State's case against Chinn." However, appellant's arguments plainly mischaracterize the strength of the evidence against him which, in our view, cannot seriously be labeled as "weak." Rather, the state's case against appellant was substantial and compelling.

Appellant also suggests that Cox's testimony concerning her identification of appellant as the person depicted in the composite drawing should have been excluded because Cox did not witness the crimes and her testimony may have misled or confused the jury. However, the jury was not misled or confused by Cox's testimony. The jury was well aware that Cox did not witness the killing. Her testimony was relevant to the fact that she had seen a man who identified himself as Tony Chinn and that she subsequently saw a composite sketch of the suspected killer and recognized the resemblance between the composite and Chinn. While this testimony was largely irrelevant to the question of appellant's guilt, the testimony was relevant to inform the jury of the events that led to appellant's apprehension and arrest. Cox's testimony also corroborated Washington's testimony that appellant (whose real name is Davel Von Tress Chinn) went by the name of Tony Chinn. The evidence was not confusing or misleading in any way.

We conclude that while it might have been better for the trial court to have excluded Cox's testimony altogether, or at least any reference to the fact that she had seen appellant in a law office, the trial court's decision to allow Cox's testimony was harmless beyond a reasonable doubt. Cox's testimony was not a major factor in this case. Indeed, her testimony comprises less than eight full pages of the printed transcript. The state's case against appellant hinged on the testimony of Marvin Washington. If the jury accepted Washington's testimony, the jury was certain to convict appellant, but if the jury did not believe Washington, it was certain to acquit appellant of all charges. Had the jury disregarded Washington's account of the crimes, Cox's testimony would have made no difference. However, the jury believed Washington and, therefore, the verdicts of guilt were inevitable. Cox's testimony had little or no impact on the outcome.

*Chinn*, 85 Ohio St.3d 548, 560-561, 709 N.E.2d 1166, 1178 (1999).

38

In denying Petitioner's Third Claim for Relief, the Magistrate Judge determined that the Ohio Supreme Court's decision, which weighed the other evidence of Petitioner's guilt to find the error was harmless, was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, specifically *Chapman v. California*, 386 U.S. 18 (1967). (ECF No. 60, at 79; ECF No. 86, at 14-15.)   Like the Ohio Supreme Court, the Magistrate Judge determined that because the State's case against Petitioner hinged primarily on Marvin Washington's testimony, Mrs. Cox's testimony was largely irrelevant to the question of Petitioner's guilt, and was harmless error.   (ECF No. 60, at 75.)

In his objections to the Original R&R and the Supplemental R&R, Petitioner argues that the Magistrate Judge applied the wrong harmless error standard.   (ECF No. 91, at 9.)   Petitioner notes the Ohio Supreme Court found that the introduction of Mrs. Cox's testimony constituted error, but that the error was harmless beyond a reasonable doubt.   *Chinn*, 85 Ohio St.3d at 561. In the Original R&R, the Magistrate Judge concluded that the Ohio Supreme Court's application of the harmless error standard in *Chapman v. California*, 386 U.S. 18 (1967), was not objectively unreasonable.   (ECF No. 60, at 79, as amended ECF No. 86, at 15.)   Petitioner argues, in both sets of objections, that "[t]he issue is not whether the Ohio Supreme Court's application of *Chapman* was objectively unreasonable.   If a state court has acknowledged that a constitutional violation took place but found that it was harmless, the federal courts must make a *de novo* determination of whether the error had a substantial and injurious effect on the verdict under *Brecht v. Abrahamson*, 507 U.S. 619 (1993)."   (ECF No. 91, at 10.)

The Sixth Circuit recently summarized the varying stages of harmless error review:

Depending on the procedural state of a criminal defendant's challenge to his conviction, different harmless-error tests apply.  *Davis v. Ayala*, 576 U.S. 257

39

(2015). On direct appeal in state courts, the harmless formulation of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), governs and constitutional error is harmless only if the court can "declare a belief that [the error] was harmless beyond a reasonable doubt." *Id*. at 24, 87 S.Ct. 824. Yet, the harmless-error standard demands more of a habeas petitioner when a federal court reviews the conviction in a collateral proceeding. In federal habeas proceedings, the *Brecht* standard governs and the federal court will not grant habeas relief unless the state error "resulted in 'actual prejudice.'" *Ayala*, 135 S.Ct. at 2197 (quoting *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710). This means that in order to grant habeas relief, the court must have at least "grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (quoting *Brecht*, 507 U.S. at 627, 112 S.Ct. 1710). "Grave doubt" about whether the error was harmless means that "the matter is so evenly balanced that the court feels itself in virtual equipoise as to the harmlessness of the error." *Id.* at 435, 115 S.Ct. 992.

*O'Neal v. Balcarcel*, 933 F.3d 618,624 (6th Cir. 2019). Moreover, the Court confirmed that "in the Sixth Circuit on habeas review we always apply *Brecht* and need not also apply AEDPA/*Chapman*." *Id*. at 625. *See also Reiner v. Woods*, 955 F.3d 549, 557 (6th Cir. 2020) (quoting *Balcarcel*); *Sparks v. Dunaway*, 2020 WL 1816059, *9 (E.D. Ky. Apr. 9, 2020) ("The Sixth Circuit recently confirmed that, in this Circuit, a § 2254 court's role is not to apply the AEDPA 'contrary to' / 'clearly unreasonable' lens to the *Chapman* question; instead, the habeas harmlessness inquiry simply proceeds under *Brecht* (and need not separately apply the *Chapman*/AEDPA analysis).") In this case, rather than apply an incorrect legal standard as Petitioner argues, the Magistrate Judge examined both standards, recognizing that "[b]ecause the Ohio Supreme Court's finding of harmless beyond a reasonable doubt would have satisfied the *Chapman* standard, *a fortiori* it satisfies *Brecht*." (ECF No. 60, at 79.) Under *Brecht*, the actual prejudice standard is met only if the habeas court has "grave doubt" as to whether the trial court's error had the requisite negative effect or influence on the verdict.

Like the courts that have reviewed this claim before it, this Court finds troubling the

testimony of Shirley Cox.   To be sure, Mrs. Cox's testimony concerning her interaction with Petitioner and her ability to subsequently connect him to the composite from the newspaper was relevant to explain to the jury the series of events that ultimately led to the identification of Petitioner as "Tony."   What is concerning, however, is that Mrs. Cox was permitted to testify that she met Petitioner after he came to her husband's law office seeking to speak with Attorney Cox.   Although most of the specific details surrounding Mrs. Cox's interaction with Petitioner were omitted from her testimony, the fact that Petitioner sought to speak with an attorney, and was perhaps persistent in his attempt to do so, was made known to the jury.   Mrs. Cox testified that Petitioner "kept saying his name was Tony and he wanted to see my husband," and "[a]fter I told him that I could not let him see him, he said his name was Chinn and he needed to see him." (Trial Tr. Vol. IV, at 377; ECF No. 132-5, PAGEID 9080.)

It is apparent from the transcript of the proceedings that the trial court held extensive discussions with the parties in chambers, prior to Mrs. Cox's testimony, in order to set firm parameters regarding this witness.   A review of those discussions reveals that the trial court severely limited the scope and nature of Mrs. Cox's testimony.   *See* Tr. Trans. Vol. 111, at 347 through Tr. Trans. Vol. IV, at 375; ECF No. 132-5, PAGEID 9049-9078.   In chambers, Mrs. Cox relayed highly prejudicial details of her interaction with Petitioner, and the trial court took necessary steps to ensure the prosecutor stayed clear of those details during her questioning. Nonetheless, the trial court still permitted Mrs. Cox to identify a law firm as the source of her interaction with Petitioner.   As the Magistrate Judge noted, "[h]ad she testified that she was a receptionist for her husband's business and met Chinn in that way, without mentioning that her husband was an attorney, the testimony would have been completely unobjectionable."   (ECF

41

No. 60, at 78.)

Ultimately, whether the trial court should have handled the Cox testimony differently is not the question before this Court on habeas corpus review.   The question for this Court is whether it has grave doubt as to whether the trial court's error had a substantial and injurious effect or influence on the verdict.   The answer to that question is no.   Although the jury may have been permitted to infer that Petitioner was seeking legal advice, the jury did not learn why, specifically, that Petitioner wanted to consult with Attorney Cox, or anything about the nature of Attorney Cox's practice of law.   Moreover, although trial counsel objected to this entire line of questioning, counsel did not request a limiting instruction.

Finally, the Court agrees with the conclusion of the Magistrate Judge that because the Ohio courts found error in the admission of the Cox testimony, a COA should issue as to this claim for relief.   The right to consult counsel is one of our most basic rights, and the Court finds reasonable jurists could find debatable whether the testimony concerning Petitioner seeking counsel had an injurious effect on the verdict.

**Fourth Claim for Relief:**

> Petitioner's right to confront a material witness against him was violated when the trial court restricted his cross-examination of Christopher Ward.   U.S. Const. amends. VI, XIV.

In his Fourth Claim for Relief, Petitioner argues that the trial court denied his Sixth Amendment right to confront witnesses by limiting his cross-examination of state's witness Christopher Ward.   (Petition, ECF No. 3, at 17-18; Traverse, ECF No. 27, at 51-54.)   Ward was an important witness for the State, as he identified Petitioner as being with Marvin Washington on the night of the murder.   The statement at issue concerned whether Ward had told Major

42

McKeever with the Jefferson Township Police Department, that he "did not pay any attention to the other man in the car whose name was Tony." (ECF No. 27, at 51.) Trial counsel's basis for the question was Major McKeever's police report.

On direct appeal, the Ohio Supreme Court denied Petitioner's claim, finding Petitioner could not demonstrate prejudice:

> At trial, Christopher Ward testified that on January 31, 1989, at approximately 12:30 or 1:00 a.m., Washington had pulled up to 5213 Lome Avenue in the black Chevrolet Cavalier and introduced Ward to "Tony," who was seated in the front passenger's seat. Ward testified that he shook Tony's hand and then spoke to Washington for approximately thirty to forty-five minutes until Washington and Tony drove away. Ward identified appellant as the man that Washington had introduced as Tony. During cross-examination, defense counsel sought to cast doubt on Ward's identification of appellant. During questioning, the following exchange took place:
>
> Q. Do you remember telling McKeever—
>
> MR. HECK: I'm going to object now even though he didn't get to finish what he's going to quote.
>
> THE COURT: Let me see counsel at side Bench.
>
>    * * *
>
> THE COURT: Let's make a record. First of all, let's have your complete question.
>
> MR. MONTA: Okay. The question which we would like to ask this witness was if he gave an oral statement to Major McKeever, Major Ronald McKeever, with the Jefferson Township Police on the 5th of February, 1989, and *did he say to Major McKeever he did not pay any attention to the other man in the car whose name was Tony*.
>
> MR. HECK: I object. If he wants to cross-examine him on an alleged inconsistency in the statements, written statements, that's fine. But, my reading of the written statements there is not that inconsistency. He is trying to cross-examine this witness on either a made-up statement or on something that's in the police report, which they have, and I object.
>
> THE COURT: First of all, under Rule 16, the police report is not available.

Secondly, the copy of the statement given to the Court made by this witness on the 5th of February, and McKeever as the officer signing it, has nothing to do with this question. It does not contain any reference to the question before the Court; therefore, the question has to be solely caused by this police report, and so the Court will sustain the objection.

MR. MONTA: May I just add, your Honor, the question which would be asked is one in which the defense is attempting to test the credibility of what the witness has said and answer will either be consistent with or impeach that testimony.

THE COURT: Police reports are inherently inaccurate and that is the very reason why under criminal rule 16 they are not to be made available and not to be used on cross-examination of any witnesses. On that basis, the Court sustains the objection. (Emphasis added.)

The court of appeals in its 1991 decision in this matter found that the trial court had erred by denying defense counsel the opportunity to cross-examine Ward on the alleged prior inconsistent statement, finding that "[w]hether evidence is discoverable under Crim.R. 16 has no bearing on its [admissibility]," since such evidence could be relevant, and all relevant evidence is generally admissible. *Chinn,* Montgomery App. No. 11835, unreported, at 73. The court of appeals found that the question defense counsel propounded "did not concern a police report, but a prior statement of the witness to a police officer," and that "Ward's statements to Officer McKeever concerning 'Tony' were certainly relevant to his identification of Appellant." *Id.* Therefore, the court of appeals determined, "To the extent that [Ward's statements to McKeever] might contradict Ward's trial testimony they were proper grounds for impeachment." *Id.* Additionally, the court of appeals stated, "Appellant was prohibited by Evid.R. 613(B) from introducing evidence of the inconsistent statement in extrinsic form, that is, by way of McKeever's testimony or his written report, unless Ward was first afforded an opportunity to explain and deny the same. The trial court's ruling foreclosed that opportunity. The error was prejudicial if the prior statement could reasonably cause the jury to reject Ward's testimony." *Id.* at 73–74. However, on the issue of prejudice, the court of appeals determined that "the error was not so prejudicial as to require reversal." *Id.* at 74.

Upon a review of the record, we find that the error, if any, in the trial court's decision not to permit defense counsel to cross-examine Ward on the alleged prior inconsistent statement did not unfairly prejudice appellant. After the trial court had sustained the objection to the question propounded by defense counsel, the defense questioned Ward whether he had ever "talked to McKeever about the description of the man on the passenger's side" of Jones' automobile. Ward responded, "I don't remember at all." Later, during the cross-examination of Major McKeever, defense counsel was permitted to question McKeever concerning the statements that Ward

had allegedly made on February 5, 1989:

Q. Now, you also did some investigation in this case; did you not?

A. Yes, sir.

Q. And before you interviewed Marvin Washington, did you not interview a person by the name of Christopher Ward?

A. Yes, sir. I did.

Q. In fact, you interviewed him first; is that correct?

A. That's correct.

Q. On the same day, the 5th of February?

A. I can't recall the day. I probably would have to see my report.

* * *

Q. This starts at page 12, which was provided to us. Is that your statement?

A. Yes, that's mine.

Q. All right.

A. That was on the same day.

Q. And was Mr. Ward able to give you a description of the person that he said he saw, the other person, not Marvin Washington?

A. Very—he indicated to me that he—well, he did see the driver.

Q. Right.

A. And shook hands with him, but he was more interested in the car they were driving, the dashboard.

Q. Didn't he indicate to you that he didn't pay any attention to the other person?

A. Yes, sir, meaning that he spoke to the gentleman but he was more interested in the dashboard of that particular automobile.

45

Q. More interested in the dashboard and didn't pay any attention to the other person?

A. Correct.

During redirect examination, the prosecutor questioned McKeever concerning the police report. The prosecution asked McKeever, "I'm going to ask you, they [the defense] asked you about the statement and what Christopher Ward told you. They asked you this on cross-examination, about the second person, the passenger, this Tony in the car, and I believe Mr. Monta asked about paying attention to him. Was that your conclusion or is it his words?" McKeever responded, "That was my conclusion." The prosecution also asked, "Did Mr. Ward tell you at all times that he could identify the passenger in that car?" McKeever responded, "Several times." The prosecution then asked, "Did he also tell you that he saw the passenger and shook hands, in fact, with the passenger in the victim's car along with Marvin Washington?" McKeever replied, "That's correct."

The record is clear that defense counsel had an opportunity to impeach Ward's trial testimony during cross-examination of McKeever by questioning McKeever concerning Ward's alleged prior inconsistent statement that he "didn't pay any attention" to the man who was with Washington in the victim's car. The record is equally clear that Ward never made any such statement to McKeever. Rather, the statement at issue was McKeever's own statement and was the product of McKeever's own conclusions. In actuality, Ward specifically told McKeever that he had seen "Tony" and that he could positively identify him. Ward did positively identify appellant, and he did so on three separate occasions, *i.e.*, once from a photo array, once at the lineup, and again at trial. Therefore, the alleged inconsistent statement, even if Ward had made it, was not inconsistent with any of Ward's trial testimony. We think it obvious that the trial court's decision not to allow defense counsel to cross-examine Ward concerning the statement had no prejudicial impact whatsoever. The error, if any, was harmless beyond a reasonable doubt.

*State v. Chinn*, 85 Ohio St.3d 548, 570-573, 709 N.E.2d 1166 (1999).

The crux of Petitioner's claim is that he was prevented from cross-examining Ward regarding a prior inconsistent statement that was summarized in a police report. The notation indicated that "Ward said when Marvin came by his home there was another subject in the car, a black male but he did not pay any attention to him." (Traverse, ECF No. 27, at 52.) In the Original R&R, the Magistrate Judge set forth the controlling law for establishing a valid

46

Confrontation Clause claim:

> The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right is incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406 (1965). This right means more than "being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" *Id.* at 315-316 (emphasis in original). The Supreme Court noted that the trial judge maintains the ability to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant and that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)

(ECF No. 60, at 84.) Applying that standard, the Magistrate Judge determined:

> There is no dispute that Ward testified at Petitioner's trial and was, in essence, "available" to testify and that Petitioner had the opportunity to cross-examine him. Petitioner has met his burden here that had counsel been able to cross-examine Ward on this inconsistency, a reasonable juror may have had a different impression of Ward's credibility. However, in turning to the other factors, even though the precise question was objected to and sustained, defense counsel was permitted to ask on cross-examination whether or not Ward recalled having a conversation with Officer McKeever in which he described the other man in the car with Washington. (Trial Tr. Vol. III at 177.) Ward responded that he could not remember. *Id*. Whether he would have remembered if confronted with McKeever's record of what he said is not known. However Officer McKeever testified that it was his own impression, rather than Ward's statement, that Ward had paid more attention to the dashboard of the car than the occupants. (Trial Tr. Vol. III at 339, 343.) The Court also notes that Ward maintained at all times that he could in fact identify the person he saw with Washington that night, that he had shook this man's hand, and spoke with Washington and "Tony" for at least half an hour. Additionally, the Court notes that Ward did in fact identify Petitioner on three separate occasions, from a photo spread, from a line-up, and an in court identification. (Trial Tr. Vol. III at 154, 159, 178-179, 182.) Petitioner has not shown prejudice arising from the inability to cross- examine this witness on this statement. The Fourth Ground for Relief should be denied on the merits and Petitioner should be denied any requested certificate of appealability.

(*Id*. at 85-86.)

47

Petitioner objects to the determination of the Magistrate Judge, arguing he was prejudiced by the inability to cross-examine Ward regarding the prior inconsistent statement. Petitioner argues the evidence of identity against Chinn was not great, and accordingly, the credibility of every State's witness was critical. According to Petitioner, "[i]n particular, Ward's testimony was important for the State because he was the only witness besides Marvin Washington who could positively identify Chinn as the man who sat in the victim's car that night. It was accordingly essential for Chinn to be able to assail Ward's credibility." (ECF No. 91, at 14.)

This Court has reviewed the state court record, and determines that Petitioner's objections to the Magistrate Judge's Report and Recommendations lack merit. Indeed, the better practice would have been to permit trial counsel to inquire further of Ward regarding whether he had made the prior inconsistent statement to Major McKeever. Any such statement on behalf of Ward would have been relevant to his identification of Petitioner as the man with Washington that night. To the extent that statement would have contradicted Ward's trial testimony it was proper grounds for impeachment. Ultimately, however, the record reflects serious doubt as to whether Ward made any such statement, and the Ohio Supreme Court determined that he did not. Trial counsel was permitted on cross-examination to ask Ward if he recalled having a conversation with Major McKeever. Ward did not recall. (Trial Tr. Vol. III, at 177; ECF No. 132-4, PAGEID 8880.) But that was not the end of the inquiry. During cross-examination of Major McKeever, counsel was permitted to inquire again about this issue. Major McKeever testified it was his own impression, and not a statement by Ward, that Ward was more interested in the car than Chinn. (Trial Tr. Vol III, at 338-345; ECF No. 132-5,

PAGEID 9040-9047.)  Whether this was a statement or an impression of a law enforcement officer, the content made its way to the jury.

As the Ohio Supreme Court noted, Ward maintained that he had seen "Tony" and could positively identify him, and he did – on three separate occasions.  Ward testified that he got a look at Petitioner, reached in and shook his hand, spent about 30-45 minutes with him, described what he was wearing, and subsequently identified Petitioner from a photo array, a police lineup and at trial.  (Trial Tr. Vol III, at 154-155, 169-170, 182; ECF No. 132-4, at PAGEID 8857-8859, 8872-8873, 8885.)  The Court finds that regardless of whether the trial court erroneously limited Petitioner's cross-examination of Ward, Petitioner cannot establish prejudice.

Petitioner's Fourth Claim for Relief is without merit and the Court hereby **ADOPTS** the Magistrate Judge's R&R (ECF No. 60, at 79-86; ECF No. 86, at 16-19), and **OVERRULES** Petitioner's objections.  Furthermore, this Court finds that reasonable jurists would not disagree with the Court's denial of relief on this claim and the Court declines to issue a COA.

**Fifth Claim for Relief:**

Petitioner's right to confrontation was violated by the admission of prejudicial hearsay evidence at his trial.  U.S. Const. amends. VI, XIV.

A.    The trial court erred when it allowed Detective Lantz to present hearsay evidence of state's witness Shirley Cox.

B.    The trial court erred when it allowed Detective Lantz to present hearsay evidence of state's witness Marvin Washington.

C.    The trial court erred when it allowed Christopher Ward to present hearsay evidence of state's witness Marvin Washington.

In his Fifth Claim for Relief, Petitioner argues the trial court violated his Confrontation

Clause rights by allowing prejudicial hearsay evidence during Detective Lantz's testimony.

(Petition, ECF No. 3, at 19; Traverse, ECF No. 27, at 55.)   In a prior Opinion and Order, United

States District Judge Edmund A. Sargus, to whom this case was previously assigned, dismissed

sub-claim C as procedurally defaulted.   (Opinion and Order, ECF No. 30, at 40-47.)

In sub-claim A, Petitioner argues that the trial court erred in allowing Detective Lantz to

testify that Shirley Cox picked Petitioner out of a line-up.   In sub-claim B, Petitioner asserts that

the trial court erred in allowing Detective Lantz to testify regarding statements Marvin

Washington made after he initially failed to identify Petitioner out of a line-up.   Specifically,

Detective Lantz testified that Washington was scared, and "[h]e said that this person had already

killed one person and that, that was the reason he was afraid.   He thought that person could see

him through the screen where he was sitting."   (Trial Tr. Vol. IV, 397-399; ECF No. 132-5,

PAGEID 9100-9102.)   The Ohio Supreme Court rejected both claims on the merits and the

Magistrate Judge concluded that this was not an unreasonable application of Supreme Court

precedent as it existed at the time of the state court's decision.   (ECF No. 60, at 94.)

Because this Court's task is to determine if the state court's decision on these issues

constituted an unreasonable application of clearly established federal law, the analysis begins

with the state appellate court's treatment of this claim.   With respect to sub-claims A and B, the

Ohio Supreme Court held:

> In this proposition [Proposition of Law No. VI], appellant also contends that the
> trial court erred by permitting Detective David Lantz to testify at trial concerning
> Cox's identification of appellant at the February 27, 1989 lineup. At trial, the
> following exchange took place during the state's direct examination of Detective

Lantz:

Q: Was Mrs. Cox able to make an -

Mr. Monta [defense counsel]: Objection, your Honor. We need to approach on this.

Mr. Monta: Your Honor, the prosecution had Mrs. Cox on the stand. They also had these documents which would indicate whether a person is seen in a line-up or not. They did not choose to go into that with Mrs. Cox, and as a result of no questioning on this subject with her, this * * * testimony is going to be hearsay.

The Court: Well, defense has also known that she had made the identification, which she could have been asked about. The fact that she was not asked by either party does not in any way prevent this witness to testify as to what he saw. I'll overrule the objection.

Q. Was Mrs. Cox able to [make an] identification at the line-up?

A: Yes she was.

Q: Whom did she indicate?

A. Again, number seven, the Defendant Davel Chinn

Appellant contends that Lantz's testimony constituted impermissible hearsay and resulted in substantial prejudice. We disagree. Lantz's statements concerning Cox's identification of appellant were not hearsay. Evid. R. 801 provides:

> (D) A statement is not hearsay if:
> (1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is *
> * * (c) one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification.

As the court of appeals ably recognized, "because Cox was 'subject to cross-examination' on the lineup, regardless of whether she was actually ever subjected to such examination, Det. Lantz's testimony was not hearsay." (Emphasis sic.) *Chinn*, Montgomery App. No. 11835, unreported, at 39. We agree that Lantz's testimony did not constitute hearsay under Evid. R. 801(D)(1)(c). Moreover, and in any event, we fail to see how that testimony was prejudicial to appellant.

Appellant also argues that the trial court erred by permitting Detective Lantz to testify at trial, over defense objection, concerning Washington's explanation for not

51

immediately identifying appellant at the lineup. Appellant contends that Lantz's testimony was hearsay. However, even if the testimony at issue was hearsay, and we do not believe that it was (see Evid. R. 801 (D)(1)(b) and *Chinn*, Montgomery App. No. 11835, unreported, at 75-76), prejudice is lacking in that Washington had earlier testified as to the statement he made to Lantz.

*State v. Chinn*, 85 Ohio St.3d 548, 561-562, 709 N.E.2d 1166, 1178-1179 (1999).

The Ohio Supreme Court's decision refers to the decision of the Second District Court of

Appeals on these claims, which held:

> For his seventh assignment of error, Chinn contends that:
> THE TRIAL COURT ERRED IN ALLOWING DETECTIVE LANTZ TO OFFER HEARSAY EVIDENCE OF STATE'S WITNESS SHIRLEY COX CONCERNING LINEUP IDENTIFICATION.
>
> Det. Lantz testified over Chinn's objection that Cox picked Chinn out of lineup. (T. 397). Because Cox did not testify concerning the matter, Chinn contends that it was improper to allow Det. Lantz to so testify.
>
> Chinn also contends that the statement was hearsay. We do not agree. Evid. R. 801 (D)(1)(c) states, in pertinent part, "A statement is not hearsay if. . . the declarant testifies and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification." Because Cox was "subject to cross-examination" on the lineup, regardless of whether she was actually ever subjected to such examination, Det. Lantz's testimony was not hearsay.
>
> The seventh assignment of error will be overruled.

*State v. Chinn*, No. 11835, 1991 WL 289178, *16 (Ohio App. 2nd Dist. 1991). With respect to

Detective Lantz's statement explaining Washington's lack of identification, the court of appeals

held:

> THE TRIAL COURT IMPROPERLY ADMITTED HEARSAY EVIDENCE DURING THE GUILT PHASE OF APPELLANT CHINN'S TRIAL, IN VIOLATION OF OHIO RULE OF EVIDENCE 802, THEREBY DEPRIVING APPELLANT CHINN OF THE RELIABILITY AND FAIRNESS REQUIRED IN A CAPITAL TRIAL BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND

SECTIONS 5, 9, 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

Det. Lantz testified that Washington told him that he had deliberately misidentified Chinn at a lineup for fear that he could be seen by Chinn through the one-way glass. (T.398-399). Chinn contends that this was hearsay and should have been excluded.

A statement is not hearsay if it is "consistent with [the declarant's] testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." Evid. R. 801(D)(1)(b). Appellant elicited from Washington on cross-examination that he had identified another person in the lineup. (T. 302-307). Thus, Chinn was implicitly, and later during closing argument explicitly, asserting that Washington fabricated the identification [sic] due to police coercion. Therefore, Det. Lantz's testimony was admissible under Evid. R. 801(D)(1)(b). Furthermore, due to the fact that Washington had previously testified to the same thing (T. 249), we see no unfair prejudice.

*Id.* at *32.

In the Original R&R, the Magistrate Judge set forth the standards governing Petitioner's Confrontation Clause claim. Specifically, the Magistrate Judge noted that *Crawford v. Washington*, 541 U.S. 36 (2004) did not apply, because *Crawford* was not decided until 2004 and does not apply retroactively on collateral review. (ECF No. 60, at 93) (citing *Whorton v. Bockting*, 549 U.S. 406 (2007)). The then governing law was *Ohio v. Roberts*, 448 U.S. 56 (1980), which "required as a matter of Confrontation Clause law that, as to an unavailable declarant, hearsay could be admitted if it (1) bears particularized guarantees of trustworthiness or (2) falls within a firmly-rooted hearsay exception. (ECF No. 86, at 20-21) (citing *Miller v. Stovall*, 608 F.3d 913 (6th Cir. 2010)).

With regard to sub-claim A, the Ohio Supreme Court determined that the statement regarding Shirley Cox's identification did not constitute hearsay, because she was subject to cross-examination on the lineup, "regardless of whether she was actually ever *subjected* to such examination." *Chinn*, 85 Ohio St.3d at 562. (emphasis in original). In reviewing this

determination, the Magistrate Judge agreed with the Ohio Supreme Court's conclusion, and further observed that Mrs. Cox was likely still available for cross-examination on the identification after Detective Lantz testified:

> Since the test under 28 U.S.C. § 2254(d) looks to the law at the time the state courts reached their decision, Chinn can show a Confrontation Clause violation only if he can show the Ohio Supreme Court decision was contrary to or an unreasonable application of Supreme Court law as it existed in 1999. This he has failed to do. So far as the record shows, Chinn's counsel made no effort to re-call Mrs. Cox in order to cross-examine her after Lantz testified. Even though Mrs. Cox had been excused as a witness after cross-examination, there is no showing she had become unavailable by the time Detective Lantz finished testifying. There is no showing Mrs. Cox could not have been found in the place where Mr. Chinn found her, in the Hulman Building on West Second Street in Dayton, less than two blocks from the Montgomery County Courthouse.

(ECF No, 60, at 93-94.) The Magistrate Judge determined that "Lantz's testimony fits squarely within the definition of non-hearsay in Ohio R. Evid. 801 and no United States Supreme Court precedent holds that the admission of such a state[ment] violates the Confrontation Clause." (ECF No. 86, at 21.)

In his objections, Petitioner argues the decision of the Ohio Supreme Court that the statement regarding Mrs. Cox's identification did not constitute hearsay was objectively unreasonable. According to Petitioner, "no competent defense attorney is going to deliberately introduce an inculpatory out-of-court identification on cross after the State itself failed to do so on direct." (ECF No. 63, at 42.) Additionally, Petitioner argued the Ohio Supreme Court's alternative ruling that any error was harmless was not entitled to deference, because the testimony "clearly had a substantial and injurious effect on the verdict." (*Id.*) Notably, however, Petitioner did not address or object to the Magistrate Judge's finding that Mrs. Cox did not become unavailable when she was excused, and could have been recalled by the defense after

54

Lantz testified, if there was any reason to believe she would recant her identification.

With respect to the Cox identification, the Court finds the Ohio Supreme Court's determination that the statement was not hearsay is entitled to deference by this Court. Accordingly, the Court **OVERRULES** Petitioner's objections and **ADOPTS** the Magistrate Judge's conclusion that sub-claim A should be dismissed with prejudice. Although the Magistrate Judge recommended that a COA issue as to this sub-claim, this Court disagrees. Keeping in mind the Sixth Circuit's guidance in *Moody* that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect," 958 F.3d 485, 2020 WL 2190766, *1, the Court finds this sub-claim does not deserve further review on appeal. The Court denies Petitioner's request for a COA as to sub-claim A.

With respect to sub-claim B, Petitioner argues Detective Lantz improperly testified as to a conversation between himself and Marvin Washington after the lineup. In reviewing this claim, the Magistrate Judge determined:

> In Sub-claim B, Petitioner argues that Detective Lantz improperly testified as to a conversation between himself and Marvin Washington after the line-up. (Traverse, Doc. No. 27, PAGEID 332.) He indicated that after the line-up Washington approached him to tell him he could make an identification and that he had failed to do so during the line-up because he had been scared. *Id.* Both the court of appeals and the Ohio Supreme Court correctly held that this was not hearsay because it was excluded from the definition of hearsay by Ohio R. Evid. 801(D)(1)(b). Moreover, Washington himself testified to the exact same facts and circumstances during trial and was subject to cross-examination. *See* Trial Tr. Vol. III at 247-249, 301-307. There was thus no violation of the Confrontation Clause in permitting Detective Lantz to testify to the same conversation.

(ECF No. 60, at 94.) The Court agrees with the resolution of sub-claim B by the Magistrate Judge and finds that there is no merit to this claim for relief. Not only was this statement not hearsay, but there was absolutely no prejudice by its admission because Washington testified to

the same exchange at trial and was subject to cross-examination by defense counsel. (Trial Tr. Vol. III at 247-249, 301-307; ECF No. 132-5, PAGEID 8949-8951, 9003-9009.) The Court will not grant a COA as to sub-claim B, because the Court does not believe reasonable jurists would disagree with the resolution of this sub-claim.

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections regarding his Fifth Claim for Relief. The Court **ADOPTS** the Original R&R, as well as the Supplemental R&R, and hereby dismisses this claim with prejudice. The Court will not grant Petitioner a COA on any part of this claim.

### Sixth Claim for Relief:

Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance in failing to present expert testimony and in failing to cross-examine the State's key witness based on information contained in the witness's juvenile records at Petitioner's capital trial.

A.    Trial counsel failed to present the testimony of an expert on eyewitness identification at Petitioner Chinn's trial.

B.    Trial counsel failed to obtain an expert to present evidence to the jury that Marvin Washington's mental retardation impacted his ability to testify as to the facts in this case. In addition, trial counsel failed to cross-examine Washington with information contained in his juvenile records.

In his Sixth Claim for Relief, Petitioner argues that he was denied the effective assistance of trial counsel because his counsel failed to present expert witnesses to challenge the eye witness identifications, and to present evidence that Marvin Washington was not a competent witness. (Petition, ECF No. 3, at 20); (Traverse, ECF No. 27, at 61.) This claim for relief overlaps with the *Brady* claim contained in Petitioner's First Claim for Relief. Petitioner argues

that "[s]ome of the blame can be attributed to the State's failure to turn over exculpatory evidence and is therefore, State-induced." (Traverse, ECF 27, at 61.) Petitioner directs the Court's attention to the evidentiary hearing held in postconviction, and contends the expert testimony presented there "undermines any confidence that a reliable verdict was reached in this case." (*Id.*)

This Court recounted the state court decisions on the merits of this issue in its analysis of Petitioner's First Claim for Relief. Additionally, in the Original R&R, the Magistrate Judge quoted the state court's lengthy analysis and summation of all witnesses from the evidentiary hearing. (ECF No. 60, at 95-106.) After recounting that evidence, the Magistrate Judge determined that "the thorough decision of the state appellate court was neither contrary to, nor an unreasonable application of, relevant U.S. Supreme Court precedent." (ECF No. 60, at 110.) This Court agrees.

The Sixth Amendment guarantees the right to counsel in all criminal prosecutions. This right includes "'the right to *effective* counsel—which imposes a baseline requirement of competence.'" *Johnson v. Genovese*, 924 F.3d 929, 933-38 (6th Cir. 2019) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)). Federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the Court must ask whether counsel was deficient in representing the defendant, and if so, whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that trial counsel's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that . . . the challenged action 'might be considered sound trial

strategy.'" *Id.* at 688–89.   The "prejudice" component of the claim "focuses on the question of

whether counsel's deficient performance renders the result of the trial unreliable or the

proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).   Prejudice

under *Strickland* requires showing that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466

U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.*

The standard for reviewing claims of ineffective assistance of counsel on habeas review

is highly deferential.   Because the court of appeals considered and denied the claim on the

merits, this Court is required to give that adjudication of this issue deference under the AEDPA.

In addition to the AEDPA deference:

> [B]ecause the underlying claim is an ineffective-assistance-of-counsel claim, we
> are also required to defer to the reasoned decisions of . . . trial counsel.  *See
> Strickland*, 466 U.S. at 690, 104 S.Ct. 2052 ("[C]ounsel is strongly presumed to
> have rendered adequate assistance and made all significant decisions in the exercise
> of reasonable professional judgment.").   In practice, this amounts to a "doubly
> deferential standard of review that gives both the state court *and* the defense
> attorney the benefit of the doubt."  *Burt v. Titlow*, 134 S.Ct. 10, 13, 187 L.E.2d 348
> (2013) (citation omitted) (emphasis added).   "Stated differently, AEDPA requires
> us to 'take a highly deferential look at counsel's performance through the
> deferential lens of 2254(d)."  *Kelly*, 846 F.3d at 832 (quoting *Pinholster*, 563 U.S.
> at 190, 131 S.Ct. 1388).

*Hand v. Houk*, 871 F.3d 390, 413 (6th Cir. 2017).

Applying that deferential standard, the Magistrate Judge concluded, and this Court hereby

**ADOPTS** the following detailed analysis:

After a review of the evidence, the Magistrate Judge concludes that the thorough decision of the state appellate court was neither contrary to, nor an unreasonable application of, relevant U.S. Supreme Court precedent. The expert that would have testified as to the various factors that impact reliability of an identification may have provided information to the jurors, but much of this evidence could be considered common sense or was not applicable in this case (e.g., cross-race identification, weapon focus, short opportunity to observe). (Trial Tr. Vol. VI at 29-33.)   Neither Washington, Ward, nor Shirley Cox testified that they were in fear for their life or under duress/stress. Washington encountered Chinn at a location downtown. (Trial Tr. Vol. III at 228.) After recognizing Chinn, the two began to converse and at some point thereafter, but before the crime, Washington began to drink. *Id*. at 228-229. Washington did not testify that he himself had felt threatened prior to the robbery, kidnapping, and murder of Mr. Jones. At no point did Washington say that he felt threatened or that he was scared for his life. Nor was there a cross [cultural] identification at issue here. Likewise, Ward testified that he met Chinn when Washington and another man drove a car over to his house and he spent between 30-40 minutes talking with the two. (Trial Tr. Vol. III 154-156, 170.) While he does admit that he was more interested in the details of the car than the conversation, he introduced himself to "Tony" and shook his hand. *Id*. at 154-155, 169. Ward had not had any alcohol or drugs that night which would have affected his memory, and this identification was not cross-cultural. *Id*. at 168. Again, Ward did not express any threats or feelings of duress or fear. Given these facts, many if not all of the factors the expert in witness identification would have testified to are simply inapplicable in this case. Petitioner is unable to show prejudice from counsel's failure to call this witness.

In considering the issue of ineffectiveness for failure to obtain an expert in mental retardation and challenge the testimony of Washington, this Court finds the decision by the state court to be thorough and reasonable. During the evidentiary hearing in post-conviction, multiple witnesses were presented as to this matter. The trial court was able to assess each expert's credibility during the hearing. This Court notes that while the experts for the defense presented a strong case for Petitioner regarding Washington, the State presented evidence very much to the contrary from someone that had worked with and interacted with Washington on a daily basis. The Court notes Washington's statement of the events remained consistent and coherent throughout the entire investigation and trial process. Additionally, while he was cooperative with authorities, he was not so "eager to please" as to pick a suspect out of the first photo array but rather stated that Chinn was not in the photos and made the identification during the second photo array, which did contain Petitioner's photo. Additionally, the Court finds plausibility in the testimony that a 15-year-old boy would have been intimidated and scared during a line-up and unsure as to whether or not a defendant would be able to see and identify him through a two way mirror. Immediately after the line-up, Washington asked to speak to Detective Lantz and made an identification. While mentally retarded

people may have an increased risk of false positive identification, it does not seem that these factors were present here, assuming that Washington was mentally retarded. Petitioner has failed to show that but for counsel's failure to present these experts during trial there is a reasonable probability that the outcome of his trial would have been different. The decision of the state court was neither contrary to, nor an unreasonable application of law. The Sixth Claim for Relief should be dismissed with prejudice and Petitioner should be denied any requested certificate of appealability.

(ECF No. 60, at 110-111.)   For the reasons expressed by the Magistrate Judge, and because Petitioner's objections consist of rehashing the same arguments he has previously made, this Court hereby **DENIES** Petitioner's Sixth Claim for Relief.   Furthermore, the Court denies Petitioner a COA on this issue of ineffective assistance of trial counsel.

### Seventh Claim for Relief

Petitioner's right to trial by jury and due process were violated because the trial court failed to define "principal offender," an essential element of aggravating circumstances that made petitioner eligible for the death penalty.   U.S. Const. amends. VI, XIV.

Petitioner's Seventh Claim for Relief was previously dismissed as procedurally defaulted.

(Opinion and Order, ECF No. 30, at 47-52.)

### Eighth Claim for Relief:

Petitioner's due process right to a fair trial and his right to equal protection were violated because the State of Ohio failed to provide timely discovery and the State failed to disclose material evidence.   U.S. Cont. amend. XIV.

A.    The state violated petitioner's right to due process and equal protection when it failed to provide discovery.

B.    The state failed to disclose material evidence to petitioner before trial.

In his Eighth Claim for Relief, Petitioner argues the State failed to disclose evidence

60

about a third person who was with Washington and "Tony" prior to the robbery. This claim has two subparts. First, Petitioner argues he was denied the equal protection of law when the trial court refused to enforce the local rule of the Montgomery County Common Pleas Court providing for open file discovery in criminal cases. Secondly, Petitioner argues the State's failure to disclose the information about the third person prior to trial violated *Brady v. Maryland*, 373 U.S. 83 (1963).

With respect to his Equal Protection claim, Petitioner argues "[t]here was a specific local rule authorizing the discovery requested by Chinn. Unfortunately, the prosecutor refused to abide by it and the trial court arbitrarily refused to enforce it." (Traverse, ECF No. 27, at 81.) On direct appeal, the Ohio Supreme Court addressed the discovery issues, and concluded Petitioner had available to him much of the material he would have received from open file discovery:

> Appellant also asserts that the trial court erred when it failed to grant discovery in accordance with the Local Rules of the Court of Common Pleas of Montgomery County, General Division. Specifically, the trial court in this case ordered that discovery would proceed pursuant to Crim. R.16 as opposed to Loc. R. 3.01 and 3.03. While much could be said concerning Crim. R. 16 and the theory of "open file" discovery of the type authorized by local rules (see, e.g., *State v. Lambert* [1994], 69 Ohio St.3d 420, 428-429, 639 N.E.2d 83, 89-90), suffice it to say that our review of the record reveals that appellant suffered no prejudice in connection with the trial court's decision to adhere to Crim. R. 16 exclusively. The record is clear that appellant was in possession of much of the material that would have been available to him had the local rules been deemed applicable by the trial court. With respect to the materials that appellant allegedly did not have and to which he claimed entitlement under the local rules, appellant has utterly failed to demonstrate that he was prejudiced in any discernible way.

*State v. Chinn*, 85 Ohio St.3d 548, 569, 709 N.E.2d 1166, 1184 (1999).

In the Original R&R, the Magistrate Judge noted that even assuming the State violated Ohio Criminal Rule 16, that claim is not cognizable in habeas corpus because "[t]here is no

general constitutional right to discovery in a criminal case." (ECF No. 60, at 114) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). With respect to Petitioner's Equal Protection argument, the Magistrate judge concluded that although it was cognizable, it lacked merit. Specifically, the Magistrate Judge reasoned that because there is no fundamental right to discovery in a criminal case, "the trial judge's action in denying Chinn application of the 'Case Management Plan' must be judged on rational basis scrutiny." (ECF No. 86, at 32) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). "The states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Id.* (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). Applying that standard to Petitioner's case, the Magistrate Judge opined:

> Here the trial judge, a part of the court which adopted the Case Management Plan, articulated its purpose – to promote settlement of criminal cases. Noting that this case was headed for trial in any event, he found that applying the Case Management Plan would not further the state purpose for which it was adopted. That is surely a rational basis for declining to apply the local rule. Chinn has therefore not demonstrated an Equal Protection violation as to this part of his Eighth Ground for Relief.

(ECF No. 86, at 31-32.)

With respect to the *Brady* portion of Petitioner's claim, the Second District Court of Appeals, in what was the last reasoned state court decision on this issue, held as follows:

> It is well settled that the State cannot withhold evidence favorable to the defendant if the evidence is material to either guilt or punishment. *Brady v. Maryland* (1963), 373 U.S. 83. Furthermore, the State has a duty to volunteer exculpatory information to the defendant if it could create a reasonable doubt. *U.S. v. Agurs* (1976), 427 U.S. 97. Chinn argues that the State violated these duties in four instances.

Welborn testified that prior to the robbery he saw a third man with "Tony" and Washington, but that the man drove away prior to the robbery. The man was not identified. (T. 124). Welborn testified that he gave this information to the prosecutor (T. 125), but the State did not share this information with Chinn. We are dismayed that the evidence was not produced. However, we see no reasonable probability that Chinn would have been acquitted if he had known this information. Therefore, there was no *Brady* violation. *U.S. v. Bagley* (1985), 473 U.S. 667.

*State v. Chinn*, No. 11835, 1991 WL 289178, * 26-27 (Ohio App. 2nd Dist, 1991).

As discussed in the section of this Opinion and Order addressing Petitioner's First Claim for Relief, *Brady v. Maryland* held that the suppression of evidence favorable to the accused is a due process violation where the evidence is material to guilt or punishment. 373 U.S. 83, 87 (1963). Applying that standard to Petitioner's claim the Magistrate Judge concluded:

> The Sixth Circuit Court of Appeals has observed, that "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose," continuing on to say the delay violates *Brady* only "when the delay itself causes prejudice." *LaMar v. Ishee*, 2010 U.S. Dist. LEXIS 139621, *30 (S.D. Ohio 2010); *citing O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007), *quoting United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994) and *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992), *judgment vacated and remanded on other grounds by Mohwish v. United States*, 507 U.S. 956 (1993). This case clearly deals with an incident of alleged delayed disclosure as opposed to a true *Brady* violation of failure to disclose completely. Therefore, in order to advance this claim, Petitioner must show that the delay itself caused him prejudice. *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007).

> Petitioner argues that this statement was favorable in nature because not only does it place another person at the scene of the crime, but it also corroborates Welborn's earlier statement to police that the other man involved was taller than Marvin Washington. (Traverse, Doc. No. 27, PAGEID 355); (Trial Tr. Vol. III at 127). The suppression of this statement until the time of trial effectively deprived him and his counsel of the opportunity to pursue an investigation and denied them possible trial strategies and defenses. (Traverse, Doc. No. 27, PAGEID 355.) Had counsel known of this alleged third person prior to trial, they could have investigated and found the mystery person who could have provided a description of "Tony." *Id*. Additionally, this person could have testified as to whether or not Chinn was present, the strength of his alibi, and cast doubt on Washington's credibility. *Id*.

Petitioner has not established any prejudice from the delay. It is purely speculative that defense counsel would have been able to track down this unidentified third person and what he would have said. Furthermore, the State's key witness testified that when he met Chinn downtown Chinn was alone. (Trial Tr. Vol. III at 265.) At no point does Washington mention another person meeting up with them downtown. *Id.* Additionally, despite the information allegedly having been disclosed at trial, defense counsel was afforded the opportunity to fully cross-examine Welborn on this issue. Therefore, the issue of a possible third man meeting up with Washington and Chinn was before the jury.

(ECF No. 60, at 118-119.)

Gary Welborn was one of the victims in this case.  During his direct examination at trial, Welborn made reference to the presence of a third man with Washington and Tony before the robbery.  Specifically, in response to the State asking what happened next, Welborn replied "Then, there were three guys standing on the corner and they yelled something out. We ignored them.  When we looked over, one of the three guys that was standing on the corner got in a car and left.  There was just two of them left then."  (Trial Tr. Vol. III, at 110, ECF No. 132-4, PAGEID 8813.)  During cross-examination, the following exchange occurred:

Q: So, shortly before that, you were in this area of Court and Ludlow; is that correct?
A: Yes.
Q: And you had indicated that you saw three men?
A: Yes.
Q: On the corner of what?
A: Court and Ludlow.
Q: Would that be up near that building?
A: Yeah.
Q: Was the lighting good in that area?
A: There was a lot of street lights around there. The parking lot has light through there.
Q: How long were those people there?
A: That I don't really know.
Q: Did you look at them for any length of time?
A: No.
Q: Were all three of them Black people?
A: As far as I could tell.

64

Q: You say one person left in a car?
A: Yes.
Q: Do you know that kind of car that was?
A: It was a newer Buick.
Q: Color?
A: Silver.
Q: Have you ever told this to anybody before, this part of the story about a third man?
A: Yes
Q: Who did you tell it to?
A: Matt Heck
Q: When did you do that?
A: When I first came down to the prosecutor's office.
Q: You didn't tell the police about that, though; did you?
A: Yes

(Trial Tr. Vol. III at 123-125, ECF No. 132-4, PAGEID 8826-8828.)

In his objections, Petitioner argues that if the defense had been made aware of the third person earlier, they might have been able to track him down and he might have impeached Washington. The Court finds this to be speculative at best. As the Magistrate Judge noted, "[w]ith the descriptions, the third person had not been found nor had his statement been taken by the time of the post-conviction process, which took many years, in part because of a remand for an evidentiary hearing." (ECF No. 86, at 33.) Moreover, while the Second District Court of Appeals noted that it was "dismayed that the evidence was not produced," the court found "no reasonable possibility that Chinn would have been acquitted if he had known this information." *Chinn*, 1991 WL 289178, *27. That court found no prejudice from the delay in the disclosure of the information about the third person, and this Court cannot conclude that the Second District's decision is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Additionally, the Court cannot find that the state court's determination that there was no *Brady* violation is contrary to or an unreasonable application of

65

clearly established Supreme Court precedent.   Certainly the better course of action would have

been to disclose the presence of a potential third person.   Even so, Petitioner cannot establish

that he was prejudiced by the delayed disclosure, and it is speculative to assume the third person

would have been identified and would have helped the defense.

The Eighth Claim for Relief is hereby dismissed with prejudice, and the Court finds

Petitioner is not entitled to a COA.

### Ninth Claim for Relief:

> Petitioner's right to the effective assistance of counsel was violated
> by counsel's prejudicially deficient performance at both phases of
> petitioner's capital trial.   U.S. Const. Amends. VI, XIV.

 (Petition, ECF No. 3, at 35-36.)

In his Ninth Claim for Relief, Petitioner sets forth several allegations of ineffective

assistance of trial counsel, many of which rehash other claims in the Petition.   He complains that

the errors of counsel, taken individually and together, denied him a fair trial.   The Court notes

that sub-claim 9(D) and a portion of 9(H) were previously dismissed as being without merit.[2]

(Opinion and Order, ECF No. 30, at 54-55.)

This Court discussed the standards governing claims of ineffective assistance of trial

counsel in connection with Petitioner's Sixth Claim for Relief.   In short, federal claims of

ineffective assistance of counsel are subject to the highly deferential two-prong inquiry set forth

in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, the Court must ask

whether counsel was deficient in representing the defendant, and if so, whether counsel's alleged

---

[2] The prior Opinion and Order stated that sub-claim 9(I) was dismissed as without merit, but that appears to be a typographical error.   (ECF No. 30, at 54-55.)   It was a portion of sub-claim 9(H) that was discussed and dismissed.

deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. "When a habeas petition arising under § 2254(d) is based upon a claim of ineffective assistance of counsel, relief is all the more difficult to come by." *Johnson v. Genovese*, 924 F.3d 929, 933-38 (6th Cir. 2019). That is because "[t]he standard for § 2254(d) relief and the test for ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), are each 'highly deferential.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). "[A]nd when the two apply in tandem, review is 'doubly' so." *Id.* (quoting *Richter*, 562 U.S. at 105). Stated differently, "this amounts to a 'doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt.'" *Hand v. Houk*, 871 F.3d 390, 413 (6th Cir. 2017) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)). With this standard in mind, the Court will briefly address each of Petitioner's allegations of ineffective assistance of counsel, all of which lack merit.

> **Sub-claim A:   Failure to object to the trial court's penalty phase instruction on both the "principal offender" and "prior calculation and design" elements of the felony murder death specification.**

In sub-claim 9(A), Petitioner argues that his trial counsel failed to object to the penalty phase jury instructions which permitted the jury to consider both the "principal offender" and the "prior calculation and design" components of the O.R.C. § 2929.04(A)(7) aggravating circumstance. Petitioner points to the Ohio Supreme Court's decision in *State v. Penix*, 32 Ohio St.3d 369, 513 N.E.2d 744 (1987), which held that the elements of principal offender and prior calculation and design are mutually exclusive alternatives that are not to be charged or proven together. Petitioner argues that the trial court weighed both components as aggravating circumstances, which was cause for reversal and remand for resentencing, and if the trial judge

considered both, then the jury must have also considered both components. (ECF No. 63 at 63-64.)

On his first direct appeal, the Second District Court of Appeals considered this claim and remanded the case back to the trial court for resentencing:

> Since the jury found that appellee was the principal offender, the second aggravating circumstance referred to in the instructions was present. The first, however, was an incomplete statement of a portion of R.C. 2929.04(A)(7) not applicable to appellee. Prior calculation and design is an aggravating circumstance *only* in the case of an offender who did not personally kill the victim. Thus, the criteria set forth in R.C. 2929.04(A)(7) are constructed *in the alternative*. If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (i.e., the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design. The language of the statute provides that *these are alternatives which are not to be charged and proven in the same cause*. Thus, if the defendant is found to be the principal offender, then the aggravating circumstance is established, and the question of whether the offense was committed with prior calculation and design is irrelevant with respect to the death sentence. *State v. Penix* (1987), 32 Ohio St.3d 369, 371. (Emphasis added). The aggravating circumstances that may be considered in imposing the death penalty are those specifically enumerated in R.C. 2929.04(A). *State v. Johnson* (1986), 24 Ohio St.3d 87. Use of both the "principal offender" and "prior calculation and design" culpability factors in an (A)(7) aggravating circumstance is contrary to the mandate of the statute that they apply only in the alternative, and taints the weighing process against mitigating factors that may apply. Thus, it impermissibly tips the scales in favor of death. *State v. Penix, supra*. This conclusion applies to an independent review by the trial court as well as to a jury deliberation, the case in *Penix*, because the trial court must also find that the aggravating circumstances were sufficient to outweigh the mitigating factors. R.C. 2929.03(D)(3).

> We conclude that the trial court erred by (1) failing to merge the three aggravating factors into one, viz., that Chinn was the principal offender in the aggravated murder committed while he was fleeing immediately after committing an aggravated robbery, per R.C. 2929.04(A)(7), and by (2) considering the additional, alternative culpability element of the aggravating circumstance that Chinn, clearly the principal offender, committed the murder with prior calculation and design, which it was not permitted to do. Each, and both together, tainted the weighing process required by R.C. 2929(D)(3) and impermissibly tipped the scales in favor of death.

68

*State v. Chinn*, No. 11835, 1991 WL 289178, *22-23 (Ohio App. 2nd Dist. Dec. 27, 1991).

After a second, unrelated remand for resentencing, Petitioner's case made its way to the Ohio

Supreme Court, which rejected this claim on the merits:

> Appellant also claims that the trial court erred by instructing the jury in the penalty phase on both the principal offender and the prior calculation and design aspects of R.C. 2929.04(A)(7). Appellant asserts that the jury should have been instructed that it could not consider whether appellant committed the murder with prior calculation and design if appellant was found to be the principal offender in the aggravated murder. However, we have held that "a trial court may instruct the jury on prior calculation and design and principal offender status disjunctively in the same specification." *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248. That is precisely what occurred in the case at bar.
>
> The court of appeals vacated the appellant's death sentence in 1991 because the trial court, in its original sentencing opinion, had determined that appellant was the principal offender *and* that he had committed the offense with prior calculation and design. *Chinn*, Montgomery App. No. 11835, unreported, at 52-57. Appellant claims that "because the trial court committed precisely this error, it is highly likely that the jury did also." However, appellant's argument is purely speculative and is not supported by the record. Moreover, contrary to appellant's arguments, it is clear to us that the jury unanimously determined that appellant was the principal offender in the aggravated murder of Jones. At trial, the state's evidence portrayed appellant as the principal offender. Conversely, appellant offered a defense of alibi. Thus, the main issue for the jury was one of identity, i.e. , either appellant was the man who was with Marvin Washington on the night in question. Therefore, the evidence suggested that appellant was either the principal offender in the aggravated murder, or, if not the principal offender, that he committed no offense at all. The jury obviously accepted the state's theory of the case and, in doing so, found appellant to be the principal offender in the aggravated murder. Under these circumstances and because the jury was instructed on the principal offender and the prior calculation and design aspects of R.C. 2929.04(A)(7) in the disjunctive, there is no danger that the jury actually considered the prior calculation and design alternative of the R.C. 2929.04(A)(7) death penalty specifications during its sentencing deliberations.

*State v. Chinn*, 85 Ohio St.3d 548, 558-559, 709 N.E.2d 1166, 1176-1177 (1999).

The Magistrate Judge reviewed Petitioner's claim and determined it lacked merit.   The

Magistrate Judge noted that in *Penix*, the jury was not given the option of finding either that the

69

defendant was the principal offender or if not the principal offender, committed the aggravated

murder with prior calculation and design. In subsequent cases, the Ohio Supreme Court found

no error where the elements were charged "disjunctively" in a single specification. *Ohio v.*

*Cook*, 65 Ohio St.3d 516, 527, 605 N.E.2d 70 (1992). The Magistrate Judge concluded:

> The rationale is, if the instruction is given disjunctively then the jurors will not
> consider both. Nonetheless, a court errs if it does not instruct the jury that they
> must be unanimous in agreeing on which of the alternative the defendant is guilty.
> *See Ohio v. Burke,* 73 Ohio. St. 3d 399, 405, 653 N.E.2d 242 (1995). That error is
> harmless if the jury elsewhere indicates its unanimous verdict on either the prior
> calculation and design aspect or on the principal offender aspect. *Id*.; *see also Ohio
> v. Moore,* 81 Ohio St.3d 22, 40, 689 N.E.2d 1 (1998).
>
> In this case the instruction was given in disjunctive form. (Trial Tr. Vol. IV, at
> 730-732.) Additionally, this Court notes that while the initial finding by the trial
> court was incorrect in that it considered both factors, the case was remanded and
> corrected. Because this error was in fact corrected and considered by the state
> courts on direct appeal, Petitioner is not able to demonstrate prejudice from
> counsel's failure to object.

(ECF No. 60, at 126.)

The Court has reviewed the penalty phase instructions, and finds that the portion of the

instruction at issue was given in disjunctive form. Specifically, the trial court instructed the jury

that it must find "either the offender was the principal offender in the commission of the

aggravated murder or, if not the principal offender, committed the aggravated murder with prior

calculation and design." (Trial Tr. Vol. IV, at 731; ECF No. 132-7, PAGEID 9434.) The jury

was also instructed that their decision had to be unanimous. (Trial Tr. Vol. IV, at 732; ECF No.

132-7, PAGEID 9435.) Because the jury was instructed in disjunctive form, and the Ohio

Supreme Court determined "it is clear to us that the jury unanimously determined that appellant

was the principal offender in the aggravated murder of Jones," *Chinn*, 85 Ohio St.3d at 558,

Petitioner cannot establish a claim of ineffective assistance of counsel for failing to request a

more favorable instruction.   Sub-claim 9(A) is without merit.

**Sub-claim B:  Failure to object to the trial court's failure to merge the kidnapping and aggravated robbery aggravating circumstances.**

In sub-claim 9(B), Petitioner argues that trial counsel failed to object to duplicative aggravating circumstances.   According to Petitioner, the O.R.C. § 2929.04(A)(7) kidnapping and O.R.C. 2929.04(A)(3) aggravating circumstances should have been merged into the O.R.C. §2929.04(A)(7) aggravated robbery aggravating circumstance.   Petitioner argues that because the trial court failed to merge those duplicative aggravators in the weighing process, this error must have also tainted the jury's weighing process, as the jury was exposed to the same error.

The Second District Court of Appeals found error in the trial court's failure to merge aggravating circumstances, but determined that Petitioner was not entitled to relief because he could not establish prejudice:

> It may be that the trial court performed an unannounced merger of two of the specifications. Its charge, quoted at pp. 23-25, *supra*, charges only the first specification, murder to escape apprehension, etc., and third specification, murder while committing kidnapping. Therefore, our analysis is limited to the need of merging only those.

> The kidnapping and the movement of the victim from downtown Dayton to a location on Germantown Pike had but two possible purposes: to remove Jones from the scene of the robbery and to remove Jones to where he could be killed, or both. In either or both cases the movement in the kidnapping was only incidental to, and not separate from those purposes, which are charged in the first specification. Therefore, the specifications charged should have been merged under the rules of *Logan* and *Jenkins* and the court erred in failing to do so.

> Our review of the record reveals that Chinn failed to object to the instruction. Therefore, he waives the error on appeal unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood, supra*. We cannot find that but for the error the outcome of the trial court would clearly have been otherwise.

*State v. Chinn*, No. 11835, 1991 WL 289178, *13 (Ohio App. 2nd Dist. Dec. 27, 1991).

71

The Ohio Supreme Court merged the aggravating circumstances in its independent review and reweighing:

> For purposes of our independent review, however, we will consider only the single (merged) aggravating circumstance that was considered by the trial court on remand from the court of appeals and that was considered by the court of appeals in its own independent review of appellant's death sentence. Thus, we consider the R.C. 2929.04(A)(7) specification of the aggravating circumstance premised on aggravated robbery – i.e., that appellant shot and killed Brian Jones during the course of an aggravated robbery – which is clearly shown on the record before us.

*State v. Chinn*, 85 Ohio St.3d 548, 577, 709 N.E.2d 1166, 1189 (1999).

The Magistrate Judge determined that Petitioner was not entitled to relief on this sub-claim, because "[e]rrors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in the state appellate court." (ECF No. 60, at 127.) Looking to the state court decisions, the Magistrate Judge concluded that both courts merged the specifications in their weighing, and that the "[r]eweighing by the Ohio Supreme Court satisfies the requirements of *Clemons v. Mississippi*, 494 U.S. 738 (1990)." (*Id.*)

In his objections to the R&R, Petitioner acknowledges that in *Post v. Bradshaw*, 621 F.3d 406, 420 (6th Cir. 2010), the Sixth Circuit concluded that appellate reweighing could be used to cure violations of the right to effective assistance of counsel. Nonetheless, Petitioner argues that "*Post* is an incorrect statement of law and Chinn reserves the right to challenge it on appeal." (ECF No. 63, at 65.) *Post* is still good law and this Court must follow it. Moreover, the United States Supreme Court recently reaffirmed *Clemons* reweighing as a permissible remedy for both an improperly considered aggravating circumstance, as well as an ignored mitigating circumstance. *McKinney v. Arizona*, 140 S.Ct. 702, 707 (2020) ("This Court stated that 'the Federal Constitution does not prevent a state appellate court from upholding a death sentence

72

that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review.'") (quoting *Clemons v. Mississippi*, 494 U.S. 738,741 (1990)). Here, it is apparent that on its independent review, the Ohio Supreme Court appropriately merged the aggravating circumstance and weighed it against the mitigation. Because this error was cured during the reweighing, Petitioner cannot show prejudice arising from trial counsel's failure to object. *See also Baston v. Bagley*, 420 F.3d 632, 638 (6th Cir. 2005) ("This reweighing by the Ohio Supreme Court satisfied the requirements of *Clemons* and cured the alleged sentencing errors. The court carefully reviewed all the aggravating and mitigating factors, and it is undisputed that the court considered the proper factors."). Sub-claim 9(B) is without merit.

>    **Sub-claim C: Failure to object to jury instructions which could have led the jury to treat a firearm specification as an aggravating circumstance.**

In sub-claim 9(C), Petitioner contends that his trial counsel failed to object to an improper penalty phase jury instruction, which he argues allowed the jury to weigh all of the specifications that it had previously found as aggravating circumstances, including a firearm specification. On direct appeal, the Ohio Supreme Court rejected this claim on the merits:

> Additionally, during its deliberations in the penalty phase, the jury sent a note to the trial judge requesting a clarification of the aggravating circumstances and mitigating factors. The note stated, "We would like a summary of the elements that make up the mitigating and aggravating circumstances/factors. For example, character of [defendant], testimony of [defendant], etc." (Emphasis sic.) The trial court responded, "The aggravating circumstances are those that you have found in previous specifications and the mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant." We find that the trial court's response to the jury's question clarified that there were only three aggravating circumstances the jury was to consider and weigh in the penalty phase, i.e., the three specifications of aggravating circumstances the jury had previously found appellant guilty of

committing.

Nevertheless, appellant claims that the trial court's response to the jury's question merely "added to the confusion." Specifically, appellant argues that "by telling the jury that the aggravating circumstances were the same as the specifications, the court instructed the jury to weigh a nonstatutory aggravating circumstance, the firearm specification, which was attached to each substantive count in the indictment." However, the record does not support appellant's arguments in this regard. The record clearly demonstrates that the trial court's statement that "the aggravating circumstances are those that you have found in previous specifications" referred only to the death penalty specifications for which the jury had previously found appellant guilty of committing. The firearm specifications were submitted to the jury only in the guilt phase and were not even identified as "specifications" on the verdict forms that were returned by the jury at the conclusion of the guilt phase. The only specifications that were identified as such on the verdict forms in the guilt phase of appellant's trial were the three death penalty specifications that had been submitted to the jury in connection with Count One of the indictment, i.e., the R.C. 2929.04 (A)(3) specification and the two R.C. 2929.04 (A)(7) specifications. For these reasons, it is clear that the trial court's response to the jury's question in the penalty phase did not invite the jury to consider the firearm specifications as nonstatutory aggravating circumstances.

*State v. Chinn*, 85 Ohio St.3d 548, 556-557, 709 N.E.2d 1166, 1175 (1999).

In the Original R&R, the Magistrate Judge concurred with the state court, finding the firearm charges were not identified to the jury as specifications. (ECF No. 60, at 129.) The Magistrate Judge determined "the only 'specifications' which the jury had found were the specifications that qualified Chinn for the death sentence. In other words, although the guilt phase verdicts had firearms findings, they were not labeled 'specifications.' Because there was no trial court error, there is no prejudice from counsel's failure to object." (ECF No. 86, at 36.)

In his objections, Petitioner repeats his prior arguments that the language of the supplemental instruction invited the jury to consider the noncapital firearm specification from the guilt phase as an aggravating circumstance. The Court finds this argument to be illogical and wholly without merit. The Ohio Supreme Court determined that "the record does not support"

74

Petitioner's argument, and "[t]he record clearly demonstrates that the trial court's statement that

'the aggravating circumstances are those that you have found in previous specifications' referred

only to the death penalty specifications for which the jury had previously found appellant guilty

of committing." *Chinn*, 85 Ohio St.3d at 557. This determination is entitled to AEDPA

deference, and this Court hereby denies sub-claim 9(C) as without merit.

> ### Sub-claim E: Failure to object to the penalty phase instruction on the nature and circumstances of the offense

In sub-claim 9(E), Petitioner argues that his trial counsel failed to object at the penalty

phase to the trial court's instruction on the "nature and circumstances of the aggravating

circumstance." (ECF No. 27, at 85.) According to Petitioner, that instruction rendered the

jury's sentencing process unconstitutionally vague by incorporating a statutory mitigating factor,

the circumstances of the offense, into the aggravating circumstances.

The Original R&R determined this claim was barred by *Cooey v. Coyle*, 289 F.3d 882

(6th Cir. 2002). Petitioner's only objection is that "*Cooey* is an incorrect statement of law and

Chinn reserves the right to challenge it on appeal." (ECF No. 63, at 67.)

In *Cooey v. Coyle*, 289 F.3d 882, 927-28 (6th Cir. 2002), the Sixth Circuit considered and

rejected this precise argument. In concluding that Ohio Revised Code Sections 2929.03(D)(1)

and 2929.04 were not unconstitutionally vague, the Sixth Circuit held:

> We find this argument meritless[.] The only conceivable way for a court properly
> to weigh all the aggravating and mitigating circumstances is to take a hard look in
> both instances at the "nature and circumstances of the offense." We cannot
> understand how the court's analysis could possibly become "unconstitutionally
> vague" by looking at the nature and circumstances of the offense in determining
> both aggravating and mitigating circumstances. We cannot even imagine a
> constitutional violation here.

*Id*. at 927–28 (6th Cir. 2002). *Cooey* is binding on this Court and sub-claim 9(E) is without

merit.

### Sub-claim F: Failure to object to victim impact testimony

In Sub-claim 9(F), Petitioner argues the victim impact statement made by the victim's mother was improper, and his counsel were ineffective for failing to object. This Court has discussed and rejected the underlying claim regarding the victim impact statement in the section of this Opinion and Order addressing Petitioner's Eighteenth Claim for Relief. As will be discussed in that section, pursuant to *Post v. Bradshaw*, 621 F.3d 406, 420 (6th Cir. 2010), any error in the admission of the statement was cured by appellate reweighing by the Ohio Supreme Court. Sub-claim 9(F) is without merit.

### Sub-claim G: Failure to request limiting instruction regarding Shirley Cox's testimony

In sub-claim 9(G), Petitioner argues his trial counsel were ineffective for failing to request a limiting instruction regarding Shirley Cox's testimony that she met Petitioner at her husband's law firm. The Magistrate Judge determined that trial counsel did not act deficiently, finding that "defense counsel had fought hard to keep this fact away from the jury." (ECF No. 86, at 37.) The Magistrate Judge noted that "getting a limiting instruction would likely re-emphasize the fact of their meeting place." (*Id*.) This Court agrees. As discussed more fully in connection with Petitioner's Third Claim for Relief, trial counsel objected strenuously to the testimony of Shirley Cox, particularly in regard to where she met Petitioner. It is likely trial counsel chose not to request a limiting instruction in order to avoid drawing additional attention to this matter. Petitioner cannot overcome the hurdle of proving that trial counsel's decision to forego requesting a limiting instruction was anything more than sound trial strategy. Sub-claim 9(G) is without merit.

76

### Sub-claim H:   Failure to object to prejudicial hearsay testimony

In sub-claim 9(H), Petitioner argues his trial counsel were ineffective because they failed to object to prejudicial hearsay statements of Marvin Washington and Christopher Ward.   In a prior Opinion and Order, Judge Sargus dismissed, as without merit, the portion of this claim that pertains to the statements of Christopher Ward.   (ECF No. 30, at 54-55.)   For the reasons more fully discussed in the section of this Opinion and Order rejecting Petitioner's Fifth Claim for Relief, this Court finds Petitioner's claim regarding the statements of Marvin Washington, as introduced through the testimony of Detective Lantz, to also lack merit.   Petitioner did not suffer prejudice by the introduction of Washington's statement about the line-up, and therefore, trial counsel were not ineffective for failing to object.   Sub-claim 9(H) is without merit.

### Sub-claim I:   Failure to object to prosecutorial misconduct

In sub-claim 9(I), Petitioner argues that his counsel provided ineffective assistance because they failed to object to prosecutorial misconduct throughout his trial.   The Magistrate Judge determined this sub-claim was without merit, because Petitioner's underlying claims of prosecutorial misconduct set forth in his Second Claim for Relief are without merit.   This Court agrees.   The state court decisions rejecting Petitioner's claims of prosecutorial misconduct were neither contrary to nor an unreasonable application of Supreme Court precedent.   Given that the state courts found no prejudicial error in the form of prosecutorial misconduct, counsel cannot be deemed ineffective for failing to object to the alleged misconduct.   Sub-claim 9(I) is also without merit.

### Sub-claim J:   Cumulative Prejudice

Petitioner argues in his final sub-claim that the cumulative prejudice from trial counsel's

errors is sufficient to warrant habeas relief.   The Magistrate Judge rejected this argument, finding that because Petitioner has not demonstrated prejudice as to any of his sub-claims, "there is no prejudice to accumulate."   (ECF No. 60, at 39.)   This Court agrees.

For the foregoing reasons, the Court finds all of Petitioner's sub-claims of ineffective assistance of trial counsel to be without merit.   Accordingly, the Court **DISMISSES** Petitioner's Ninth Claim for Relief.   The Court agrees with the Magistrate Judge that reasonable jurists would not find debatable or wrong the Court's resolution of this claim and therefore, Petitioner is denied a COA.

### Tenth Claim for Relief:

> Petitioner's convictions violate the Due Process Clause as the State's evidence was insufficient to prove the element of identity. U.S. Const. amend. XIV.

In his tenth claim for relief, Petitioner argues that his conviction was based on insufficient evidence, as the State failed to offer sufficient proof that he committed the crimes. (Petition, ECF No. 3, at 37; Traverse, ECF No. 27, at 87-90.)   Noting that no physical evidence linked him to the crimes, Petitioner argues that the eyewitness testimony identifying him as the perpetrator was insufficient to prove that he was the "Tony" that was Marvin Washington's accomplice.

The Magistrate Judge recommended that this Court deny Petitioner's claim as without merit, and because the state appellate court's decision rejecting the claim did not contravene or unreasonably apply federal law.   (ECF No. 60, at 132-137.)   More precisely, the Magistrate Judge concluded that the Ohio Supreme Court applied the appropriate federal legal standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), and that its application of *Jackson* was not

objectively unreasonable.   In so doing, the Magistrate Judge recounted verbatim the Ohio

Supreme Court's decision considering and rejecting Petitioner's claim.   Because Petitioner – in

nearly every claim in his Petition – circles back to what he characterizes as the weak evidence of

his guilt, this Court finds it important to recite as well:

> In his eighth proposition of law, appellant contends that the evidence is insufficient
> to establish his identity as the perpetrator of the aggravated murder.   He also claims
> that the evidence is insufficient to show that he specifically intended to cause the
> death of his victim.   Appellant's contentions are not well taken.
>
> In this proposition, appellant essentially asks us to evaluate the credibility of
> witnesses and to resolve all evidentiary conflicts in his favor. However, in
> reviewing the sufficiency of evidence, "the relevant question is whether, after
> viewing the evidence in the light most favorable to the prosecution, *any* rational
> trier of fact could have found the essential elements of the crime beyond a
> reasonable doubt." (Emphasis *sic*.)   *Jackson v. Virginia*, (1979), 443 U.S. 307,
> 319, 99 S.Ct 2781, 2789, 61 L.Ed.2d 560, 573.
>
> Appellant argues that Marvin Washington's testimony is inherently unreliable and
> wholly unbelievable. We emphatically disagree. Washington's trial testimony was
> cogent and intelligible, and we are completely satisfied that his testimony
> identifying appellant as the killer, if accepted, sufficiently and overwhelmingly
> establishes appellant's guilt beyond a reasonable doubt.   Appellant points out that
> Washington was a participant in the crimes.   This is undoubtedly true.
> Washington was an eyewitness to the killing and he participated in and witnessed
> all aspects of the crimes.   As a participant, he was in a much better position to
> identify the killer than anyone else who testified at trial.   Washington had nothing
> to gain from testifying against appellant.   Prior to testifying, Washington was
> charged with and was sentenced in juvenile court for his participation in these
> crimes.   Washington's testimony at appellant's trial was not part of any plea
> agreement.   Additionally, as a juvenile offender, Washington was not eligible for
> the death penalty as an accomplice to the crimes.   Therefore, in addition to having
> been in the best position to identify the killer, Washington simply had no reason to
> lie.
>
> At trial, Washington testified that he and appellant robbed two men in Dayton and
> that they kidnapped Jones in Jones's car.   Welborn corroborated Washington's
> description of the robbery, the abduction, the kidnapping, and the car theft.
> Welborn testified that Washington was one of the perpetrators of the robbery.
> Welborn never saw the face of the second robber, but Washington's testimony
> clearly identified appellant as the other participant in the crimes.   Washington

testified that he and appellant drove Jones to an area of Jefferson Township. According to Washington, appellant then got out of the car and shot Jones. Stacy Dyer witnessed the shooting. Although Dyer did not get a look at the shooter and therefore could not identify him, Dyer's testimony corroborated, in large part, Washington's description of the events that occurred in Jefferson Township on the night of January 30, 1989. Washington also testified that he and appellant then drove in the victim's car to Lome Avenue in Dayton and that they spoke to Christopher Ward. Ward testified that he saw Washington and appellant in Jones's car in the early morning hours of January 31, 1989. Therefore, Ward's testimony not only corroborated Washington's testimony but also served to severely undermine appellant's alibi defense.

Appellant points out that Washington failed to immediately identify him at a lineup conducted on February 27, 1989. However, the reason that Washington had failed to do so was adequately explained at trial. Additionally, there is no dispute that immediately after the lineup Washington summoned Detective Lantz into an interview room and positively identified appellant as the perpetrator of the aggravated murder.

Appellant also points out that several witnesses at trial indicated that the man who was with Washington on the night of the murder was taller than appellant. However, this discrepancy in the evidence does not severely undermine either Washington's testimony identifying appellant as the killer or Ward's testimony that he saw appellant and Washington in the victim's car shortly after the murder.
The fact remains that Washington was the state's eyewitness to the crimes and that he positively identified appellant as the killer. The jury accepted Washington's testimony. Upon a review of the entire record, it is clear to us that Washington's testimony was neither inherently unreliable nor inherently unbelievable. Indeed, upon a careful review of the record before us, we find Washington's testimony to be entirely believable. However, we note, in passing, that our view of the credibility of witnesses is not what is important on the question of sufficiency of the evidence. What is important is our finding that the evidence in this case was sufficient to establish appellant's identity as the perpetrator of the aggravated murder.

Appellant also claims that the evidence is insufficient to show that he specifically intended to cause Jones's death, since the fatal shot had been fired into the upper portion of Jones's left arm. However, the evidence at trial established that the muzzle of the revolver was pressed against the victim's sweatshirt at the time the weapon was discharged. The projectile entered through the victim's left arm, entered his chest, perforated the main pulmonary artery, and came to rest near the base of his heart. We therefore have great difficulty accepting appellant's characterization of the evidence as indicating nothing more than that the victim was "shot in the arm." The shot was fired in a manner that was likely to and did cause

80

the victim's death.   Additionally, "[i]t is well-established that 'where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill.'"   *State v. Esparza* (1988), 39 Ohio St.3d 8, 14, 529 N.E.2d 962, 968.   The evidence was clearly sufficient to show that appellant specifically intended to cause the death of his victim.

Upon a careful review of the entire record, we find that the evidence was more than sufficient to establish appellant's identity as the perpetrator of the aggravated murder and to show that he specifically intended to cause the death of his victim. Accordingly, we reject appellant's eighth proposition of law.

*State v. Chinn*, 85 Ohio St.3d 548, 565-567, 709 N.E.2d 1166, 1181-1183 (1999).

In rejecting Petitioner's insufficiency of the evidence claim, the Magistrate Judge noted that "[a]fter a thorough review and upon consideration of all the evidence in the light most favorable to the prosecution, this Court holds that a reasonable juror could have found by proof beyond a reasonable doubt that the State has proven the essential element of identity.   The state court decision listed in great specificity the evidence presented."   (ECF No. 60, at 136.)   In his objections to the R&R, Petitioner argues that "the Magistrate Judge failed to examine the credibility and reliability of Washington before relying on his testimony," and "without Washington, there was no case against Chinn."   (ECF No. 63, at 75.)   Petitioner proceeds to list all the reasons that in his view, Washington was not a credible witness, while minimizing the evidence that corroborated certain details of Washington's testimony.   In his objections to the Supplemental R&R, Petitioner reiterates that "Washington's testimony was inherently unreliable, no reasonable juror could believe that his testimony amounted to proof beyond a reasonable doubt, and the remaining evidence was insufficient to support a conviction; furthermore, the Ohio Supreme Court's rejection of this claim is not entitled to deference under the AEDPA." (ECF No. 91, at 27-28.)

An allegation of insufficient evidence states a claim for relief under the Due Process

Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*,

443 U.S. 307 (1979). When reviewing a sufficiency of the evidence claim in habeas corpus, this

Court must apply "two layers of deference" – one to the jury verdict, and a second to the state

appellate courts' consideration of that verdict, as required by the AEDPA:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the
> constitutional sufficiency of the evidence used to convict him, we are thus bound
> by two layers of deference to groups who might view facts differently than we
> would. First, as in all sufficiency-of-the-evidence challenges, we must determine
> whether, viewing the trial testimony and exhibits in the light most favorable to the
> prosecution, *any rational trier of fact* could have found the essential elements of
> the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319,
> 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, we do not reweigh the
> evidence, re-evaluate the credibility of witnesses, or substitute our judgment for
> that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).
> Thus, even though we might have not voted to convict a defendant had we
> participated in jury deliberations, we must uphold the jury verdict if any rational
> trier of fact could have found the defendant guilty after resolving all disputes in
> favor of the prosecution. Second, even were we to conclude that a rational trier of
> fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas
> review, we must still defer to the *state appellate court's* sufficiency determination
> as long as it is not unreasonable. *See* 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009); *see also Tanner v. Yukins*, 867 F.3d 661,

672 (6th Cir. 2017) (finding "the applicable law tightly constrains our review of the state

appellate court and the jury"); *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

Here, the Magistrate Judge has carefully reviewed the evidence and determined that

Petitioner cannot establish that he is entitled to relief, and that additionally, Petitioner is not

entitled to a COA. This Court agrees with the Magistrate Judge's decision. The Court has

reviewed the entire state court record and cannot find that Petitioner presents a meritorious

sufficiency of the evidence claim. Woven throughout the Petition is Petitioner's contention that

82

there was a fundamental weakness in the state's case against him. This Court simply does not agree, and more importantly, neither did the state courts asked to review his convictions and sentence. With respect to Petitioner's argument that Marvin Washington was "wholly unbelievable," the Ohio Supreme Court stated that it "emphatically disagree[d]." *Chinn*, 85 Ohio St.3d at 566. That court found Washington's trial testimony to be "cogent and intelligible," and noted that it was "completely satisfied that his testimony identifying appellant as the killer, if accepted, sufficiently and overwhelmingly establishes appellant's guilt beyond a reasonable doubt." *Id*. When viewed in a light favorable to the prosecution, there was ample evidence of Petitioner's guilt, including testimony by his accomplice, who identified Petitioner and detailed Petitioner's role in this offense. Moreover, many of those details were corroborated by additional witnesses. Accordingly, the Tenth Claim for Relief is dismissed with prejudice and a COA shall not issue.

### Eleventh Claim for Relief:

> Petitioner's right against cruel and unusual punishment and his right to due process were violated by multiple errors in the jury instructions at the penalty phase. U.S. Const. amends. VIII, XIV.

> A.    The trial court failed to adequately instruct the jury as to what the aggravating circumstances were that the jury had to weigh to determine whether to sentence petitioner to death.

> B.    The trial court failed to merge duplicative specifications for the jury's weighing process.

> C.    The jury improperly weighed both the "principal offender" and "prior calculation and design" elements of the felony murder capital specifications.

Petitioner's Eleventh Claim for Relief was previously dismissed as procedurally

defaulted.   (Opinion and Order, ECF No. 30, at 55-68.)

### Twelfth Claim for Relief:

> The penalty phase instructions kept petitioner's jury from considering all relevant mitigating factors.

In his Twelfth Claim for Relief, Petitioner argues his death sentence violates the Eighth Amendment because the improper jury instructions created a "reasonable likelihood" that the jury was not able to consider or give "full mitigating effect" to all of his mitigation evidence. (Petition, ECF No. 3, at 43; Traverse, ECF No. 27, at 104.)   Specifically, Petitioner objects to the following instructions:

> You will consider all the evidence, the arguments, the statement of the Defendant, and all of the information and reports that are relevant to the nature and circumstances of the mitigating facts, and the mitigating facts include but are not limited to the nature and circumstances of the offense, and the history, character, and background of the Defendant; and you may consider, I guess, should consider any facts that are relevant to the issue of whether the Defendant should be sentenced to death.

(Trial Tr. Vol. IV at 731; ECF No. 132-7, PAGEID 9434.)   As set forth in the Ohio Supreme Court's opinion on this issue, during deliberations, the jury sent the trial court a note, in which it requested to have mitigation redefined by the court:

> Judge:
>
> We would like a summary of the elements that make up the mitigating and aggravating [sic] circumstances/factors . . . .
>
> The trial court answered:
>
> The mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant.

84

*State v. Chinn*, 85 Ohio St.3d 548, 556 (1999).

In the R&R, the Magistrate Judge began his analysis by reciting the Ohio Supreme

Court's rather lengthy discussion rejecting this claim on direct appeal. *See Chinn*, 85 Ohio

St.3d at 554-557. Next, the Magistrate Judge reiterated the long standing principle that "[i]n

order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner

must show more than that the instructions are undesirable, erroneous, or universally condemned;

taken as a whole they must be so infirm that they rendered the entire trial fundamentally unfair."

(ECF No. 60, at 141.) Furthermore, as the Magistrate Judge noted, "[t]he only question for a

habeas court to consider is 'whether the ailing instruction by itself so infected the entire trial that

the resulting conviction violates due process.'" (*Id.*) (*quoting Estelle v. McGuire*, 502 U.S. 62

(1991)).

The Magistrate Judge opined:

> For clarification purposes the jurors sent a note to the trial judge requesting:
> "[w]e would like a summary of the elements that make up the mitigating and
> aggravating [sic] circumstances/factors . . . ." The trial court responded to the
> question by reiterating that, "[t]he mitigating factors are those which are relevant
> to the issue of whether the defendant should be sentenced to death, and they include,
> *but are not limited to*, the nature and circumstances of the offense and the history,
> character and background of the defendant."
>
> Petitioner contends that in this response "the trial court completely
> eliminated nonstatutory or 'catchall' mitigation from the jury's consideration. The
> trial court's response omitted any reference to O.R.C. 2929.04(B)(7) mitigation:
> 'any other factors that are relevant to the issue of whether the offender should be
> sentenced to death.' Accordingly, the jury's ability to consider or give 'full
> mitigating effect' was eviscerated by the court's truncated instruction on
> nonstatutory mitigating factors." (Traverse, Doc. No. 27, PAGEID 381.) The
> Ohio Supreme Court held "the arguments raised . . . are not supported by a fair and
> impartial review of the record. Nothing in the trial court's penalty phase
> instructions or in its response to the jury's questions supports [Chinn's] assertion
> that the jury was precluded from considering mitigation." This Court agrees. The
> judge's original definition of mitigating factors to the jury contained a "catch-all"

85

phrase. (Trial Tr. Vol. IV at 731.) In response to the jury question, the trial judge responded that the mitigation factors "include, but are not limited to." While perhaps neither were stated in the most articulate manner possible, both the original instruction and the response conveyed to the jurors that the mitigating factors to be considered were left to the individual juror's discretion. Thus, the instruction does not limit what the jurors may consider as a mitigating factor, but rather reiterates the circumstances, factors, or elements which the jurors may give consideration which excuses or lessens the defendant's culpability in the crime. Such "catch-all" phrase has been held to be constitutional. *Boyde v. California*, 494 U.S. 370 (1990).

The Twelfth Claim for Relief should be dismissed with prejudice and Petitioner should be denied a certificate of appealability on this claim.

(ECF No. 60, at 141-142.) (emphasis added).

Petitioner objects to the decision of the Magistrate Judge, and specifically to the Magistrate Judge's finding "that the use of the phrase 'should consider' in the jury instructions did not result in constitutional error.'" (ECF No. 91, at 28.) Petitioner argues that "[t]elling jurors that they 'should' do something is not the same as telling them they 'must' do something," and "[t]he distinction between must and should in the criminal law is long-standing in American jurisprudence." (*Id*.). The Court does not find Petitioner's objections persuasive.

Recently, the Sixth Circuit reiterated that "'[a] challenge to a jury instruction is not to be viewed in 'artificial isolation,' but rather must be considered within the context of the overall instructions and trial record as a whole.'" *Wheeler v. Simpson*, 852 F.3d 509, 519 (6th Cir. 2017) (quoting *Hanna v. Ishee*, 694 F.3d 596, 620–21 (6th Cir. 2012)). Establishing that the jury instructions in a capital case, when taken as a whole, are "so infirm that they rendered the entire trial fundamentally unfair" is a high standard indeed. *Id*. The Sixth Circuit has held that "[t]he burden is even greater than that required to demonstrate plain error on appeal.'" *Id.* (quoting *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001)). Here, nothing in the trial court's instruction or additional response to the jury's question supports Petitioner's claim that the jury

86

was precluded from considering mitigating evidence.   Petitioner's focus on the trial court's use of the word "should" rather than "must" is nonsensical.   As the Magistrate Judge noted, "Chinn has failed to show, or even intelligibly argue, how a reasonable juror could have misconstrued what the trial judge said as to refuse to consider fully any relevant mitigating evidence Chinn offered."   (ECF No. 86, at 45.)

This Court finds Petitioner's objections unpersuasive and hereby adopts the Magistrate Judge's Original R&R, as well as the Supplemental R&R.   (ECF Nos. 60, 86.)   The Court dismisses Petitioner's Twelfth Claim for Relief and further finds that reasonable jurists would not disagree with the Court's resolution of this claim.   Petitioner is denied a COA.


### Thirteenth Claim for Relief

> Petitioner's right to due process and his right against cruel and unusual punishment were violated because he was denied his right to present all relevant mitigating evidence to the sentencer, on remand to the trial court and he was also sentenced to death without a valid recommendation from his trial jury on remand to the trial court. U.S. Const. amends. VIII, XIV.

> A.    The original death penalty recommendation of petitioner's trial jury was void after *Chinn I*.

> B.    Petitioner's right to present all relevant mitigating evidence was violated after *Chinn I*.


In his Thirteenth Claim for Relief, Petitioner challenges the reimposition of his death sentence by the trial court.   Specifically, Petitioner argues that once the court of appeals reversed his death sentence and remanded for a new sentencing hearing by the trial court, that his original jury recommendation for a sentence of death became void.   (Petition, ECF No. 3, at 45);

(Traverse, ECF No. 27, at 107.)   Additionally, he argues that the trial court erred when it refused to allow him to present additional mitigating evidence upon remand that he did not present during the mitigation phase of his trial.   (*Id.*)

During the mitigation phase of his trial, Petitioner offered evidence regarding the effect of his father's murder, as well as claims of innocence or residual doubt.   As will also be discussed in connection with Petitioner's Fifteenth Claim for Relief, the Court of Appeals determined that the trial court ignored these factors in its own independent weighing, after the jury had recommended a sentence of death.   *State v. Chinn*, No. 11835, 1991 WL 289178, *19-21, 24 (Ohio App. 2nd. Dist. Dec. 27, 1991) ("*Chinn I*").   The court of appeals remanded the case to the trial court for resentencing.   In its disposition of the appeal, the court of appeals provided the following guidance to the trial court:

> Although it does present a rather novel question, we find that when a sentencing error was committed solely by the trial judge in his review of the jury's recommendation, it is analogous to a situation in which the defendant's case was heard by a three-judge panel which committed a sentencing error. The Supreme Court has held that
>
> When a reviewing court vacates the death sentence of a defendant imposed by a three-judge panel due to error occurring at the penalty phase . . . such reviewing court may remand the action to that trial court for a resentencing hearing at which the state may seek whatever punishment is lawful, including, but not limited to, the death sentence.
>
> *State v. Davis* (1988), 38 Ohio St.3d 362, syllabus.   Accordingly, we will vacate Chinn's death sentence and remand the issue of sentencing to the trial court so that it may weigh the proper mitigating factors against the single aggravating circumstance.   Pursuant to this reevaluation, the trial court may impose whatever lawful punishment it deems appropriate, including but not limited to a sentence of death.

*Id.* at 24.

On remand, Petitioner argued that he should be allowed to present new mitigating

88

evidence not presented during his trial. The trial court did not grant Petitioner the opportunity to present additional evidence and limited its consideration to the evidence already considered by the jury. The trial court conducted a re-weighing of the aggravating circumstances and mitigating factors, and again imposed a death sentence, without Petitioner being present. Petitioner appealed the reimposition of the death sentence, arguing he should have been permitted to present additional mitigation evidence at a full resentencing hearing. The court of appeals rejected Petitioner's argument, finding the trial court followed proper procedure:

> When we remanded Chinn's case, we did not expect the trial court to conduct a resentencing hearing, and we find no compelling reason why Chinn should have been afforded a second opportunity to present mitigating evidence prior to sentencing. Chinn was given a full opportunity to present such evidence at the initial sentencing hearing. The error for which we remanded the matter occurred after the mitigating evidence had been presented and after the jury had made its recommendation based upon that evidence. *On remand, the trial court was required to proceed from the point at which the error occurred. State ex rel. Stevenson v. Murray* (1982), 69 Ohio St.2d 112, 113. In Chinn's case, the error occurred after the sentencing hearing.
>
> Moreover, Chinn's contention that he should have been allowed to present additional mitigating evidence on remand is inconsistent with Ohio's capital sentencing framework. In capital sentencing, the jury first must weigh the aggravating and mitigating factors and decide whether to recommend the death penalty. R.C. 2929.03(D)(2). Then, if the jury recommends death, the trial court must consider the same evidence and decide whether it, too, finds the aggravating circumstances to outweigh the mitigating factors. R.C. 2929.03(D)(3). Because the sentencing error for which we remanded this case related only to the trial court's independent evaluation of the aggravating and mitigating factors, allowing Chinn to present additional mitigating evidence would have allowed the trial court to make its recommendation based upon information which was not before the jury. Such a result is inconsistent with the statutory framework for imposing the death penalty.
>
> In sum, Chinn was not entitled to an opportunity to improve or expand his evidence in mitigation simply because we required the trial court to reweigh the aggravating circumstance and mitigating factors. To the extent that Chinn's trial counsel may have acted ineffectively in presenting mitigating evidence in the first instance, Chinn could have raised such an argument on direct appeal from his conviction or he may do so through a petition for post-conviction relief. Such an argument is not

properly raised, however, on this appeal from resentencing.

*State v. Chinn*, No. 15009, 1996 WL 338678, *2-3 (Ohio App. 2nd Dist. June 21, 1996) (*Chinn*

*II*) (emphasis added).   Ultimately, the court of appeals reversed Petitioner's death sentence on

the basis that the trial court failed to afford Petitioner the opportunity to be present at the

resentencing hearing.   *Id*. at 8.   Upon remand, the trial court sentenced Petitioner to death for

the third time and in his presence.   That sentence was affirmed, and Petitioner appealed to the

Ohio Supreme Court.   *State v. Chinn*, No. 1997 WL 464736, *3 (Ohio App. 2nd Dist. Aug. 15,

1997) (*Chinn III*).

The Ohio Supreme Court summarized Petitioner's claim regarding the resentencing

procedure as follows:

> In his seventh proposition of law, appellant contends that he was ineligible for the
> death penalty on remand from the court of appeals' 1991 decision vacating his
> original death sentence. Appellant claims that "when the court of appeals vacated
> Chinn's death sentence it also vacated the trial jury's sentencing recommendation."
> We disagree. In neither case where the court of appeals vacated appellant's death
> sentence did the appellate court purport to vacate the jury's verdict recommending
> imposition of the death penalty. Nor was the court of appeals required to vacate the
> jury's recommendation in this case. The appellate court specifically determined,
> and we agree, that the recommendation of the jury was untainted by error.
> Moreover, contrary to appellant's contentions, *Penix* does not preclude the trial
> court from imposing the death sentence on remand. The reason, of course, is that
> the errors identified and relied upon by the court of appeals in vacating appellant's
> original death sentence in 1991 related to the trial judge's independent evaluation
> of sentence. These errors were committed *after* the jury had returned its verdict in
> the penalty phase. Under these circumstances, the court of appeals correctly
> determined that *Penix* does not prohibit the trial judge, on remand, from accepting
> the jury's 1989 sentencing recommendation. Rather, as the court of appeals
> recognized, the trial court was required to proceed on remand from the point at
> which the errors had occurred, *i.e.*, after the jury had returned its recommendation
> of death.
>
> In this proposition, appellant also argues that he had "an absolute right to present
> any new mitigating evidence at his resentencing hearing in 1994." In support of this
> proposition, appellant relies on several United States Supreme Court opinions

90

requiring that the sentencer not be precluded from considering relevant mitigating evidence in a capital case. See, e.g., *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L. Ed. 2d 973; *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1; and *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S. Ct. 1821, 95 2d 347. However, each of those cases involved a situation where the capital sentencer was prohibited, in some form or another, from considering relevant mitigating evidence at trial. In the case at bar, no relevant mitigating evidence was ever excluded from consideration during the penalty phase of appellant's 1989 trial. Therefore, the case at bar is clearly distinguishable from the United States Supreme Court's pronouncements in *Lockett*, *Skipper*, and *Hitchcock*. Accordingly, as was the case in *State v. Davis* (1992), 63 Ohio St.3d 44, 46, 584 N.E.2d 1192, 1194-1195, we find *Lockett*, *Skipper*, and *Hitchcock* to be inapplicable here. It is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation phase of his 1989 trial. In this case, as in *Davis*, the errors requiring resentencing occurred after the close of the mitigation phase of the trial. Under these circumstances, the trial court is to proceed on remand from the point at which the error occurred. Appellant's arguments to the contrary are not well taken. In addressing this issue, the appellate court stated, "In sum, Chinn was not entitled to an opportunity to improve or expand his evidence in mitigation simply because we [the court of appeals] required the trial court to reweigh the aggravating circumstance and mitigating factors." *Chinn*, Montgomery App. No. 15009, unreported, at 6. We agree with the court of appeals' assessment of this issue.

Additionally, appellant takes issue with the fact that in its 1996 sentencing entry the trial court simply stated, "it is the conclusion of this Court that the verdict of the jury recommending death be accepted." Appellant contends that the trial court failed to independently weigh the aggravating circumstance and the mitigating factors in reimposing the death sentence in 1996 and failed to comply with the requirements for the issuance of a sentencing opinion under R.C. 2929.03(F). However, the trial court's 1994 sentencing option fully complied with the requirements of R.C. 2929.03(F). The mere fact that the trial court did not specifically incorporate its 1994 sentencing opinion into its 1996 sentencing entry does not rise to the level of reversible error. Furthermore, appellant failed to raise this issue during his final appeal to the court of appeals and, therefore, appellant's arguments have been waived.

Accordingly, for all of the foregoing reasons, we reject appellant's seventh proposition of law.

*State v. Chinn*, 85 Ohio St.3d 548, 563-564 (1999).

Finally, the Ohio Supreme Court summarized the mitigation evidence:

> In mitigation, appellant presented evidence concerning his history, character, and family background. Appellant's father was murdered in 1972. Appellant's grandmother testified that appellant, as a child, was "very emotionally upset" over his father's death. She also testified that appellant is deeply devoted to his nieces and nephews and to his entire family. Appellant's brother and sister testified that appellant helped them spiritually and that he is close to his family and helpful to family members. Appellant's mother, Anna Less, testified that appellant was born in 1957. Lee testified that appellant, during childhood, had no disciplinary problems and was a "very sensitive" and "active child." According to Lee, appellant became even more sensitive following his father's death. During childhood, appellant read from the Bible, believed in God, and was devoted to his family members. Lee testified that appellant had enrolled in Cambridge Technical Institute to better his life through education. Appellant gave an unsworn statement in which he proclaimed that he was innocent. Appellant stated that he had been involved in sports and certain civic organizations and activities during his childhood. He expressed his belief in God, his devotion to family, and his bitterness over his father's death. Appellant claimed to be "a compassionate and concerned human being." He also indicated that he had enrolled in Cambridge Technical Institute to better himself and that he was proud of his accomplishments in school.

*Id*. at 577-78.

In the Original R&R, the Magistrate Judge conducted a thorough analysis and concluded that the Ohio Supreme Court's decision with respect to this claim was neither contrary to nor an unreasonable application of relevant United States Supreme Court precedent. (ECF No. 60, at 148-153.) Specifically, the Magistrate Judge determined that no United States Supreme Court precedent requires a retrial under the circumstances present in Petitioner's case:

> Chinn first argues that his sentence is unconstitutional because when the court of appeals remanded the case back to the trial court for sentencing, it voided the original jury recommendation. *Id*. The Sixth Circuit has noted that "the state courts of Ohio have construed the state statute at issue to apply only when a jury, not a three-judge panel, recommends a sentence of death." *See Davis v. Coyle*, 475 F.3d 761, 775 (6th Cir. 2007); *Davis II*, 38 Ohio St.3d 361, 372, 528 N.E.2d 925, 936 (1988). Here Chinn was in fact tried by a jury, but the alleged errors did not occur until *after* the jury had made a recommendation. As such, and as stated by the Ohio state courts, that portion of his trial was not defective. The case was remanded to the trial judge to cure the errors *he made* in determining whether or not to accept

92

the jury recommendation. The effect of the reversal of the sentence by the state court of appeals is, in any event, a question of state law. No United States Supreme Court precedent commands a re-trial under those circumstances.

Additionally, Petitioner argues that the decision of the Ohio Supreme Court unreasonably applied federal law and constrained the legal principles of *Lockett* and *Skipper* to only mitigation evidence that had been presented in the original 1989 trial. (Traverse, Doc. No. 27, PAGEID 382.) Once his case was remanded to the trial court, Chinn filed [a] motion to present additional mitigation evidence. (Traverse, Doc. No. 27, PAGEID 383.)  Multiple affidavits attest to an in-chambers conference and state that there was no additional hearing on the matter and that Chinn proffered all his additional mitigation evidence.  (Return of Writ, Doc. No. 24, Apx. Vol. VI at 67-74.)  The proffer included a report from the Montgomery County Sheriff's Office that said Chinn had not caused any discipline problems with either jailers or other inmates during the time he had been incarcerated in the county jail **awaiting and during** his 1989 trial. *Id.* He also proffered "evidence undermining the reliability of his conviction and the credibility of his co-defendant," with testimony that he was at home when the crime occurred and with testimony from Dr. Solomon Fulero regarding the unreliability of eyewitness testimony. *Id.* Additionally, he offered evidence impeaching the State's key witness, Washington, because of a mental impairment, testimony from Dr. Caroline Everington regarding the impact of mental retardation and its effect on the ability to make identifications, and testimony regarding an incident that occurred before Washington's testimony when Washington was brought into the courtroom so someone could point Chinn out to him. *Id.* He also proffered Washington's juvenile records including psychological reports, neuropsychological reports, chemical abuse assessment, a social history and updates, a supplemental police report, and a statement made to police describing Tony. *Id.* Chinn argues that because he was precluded from presenting this additional mitigation evidence, this was a *Skipper* violation resulting in a denial of his Eighth Amendment and Fourteenth Amendment rights. (Traverse, Doc. No. 27, PAGEID 386.)

(ECF No. 60, at 148-149.)

The Magistrate Judge also discussed the applicability of *Davis v. Coyle*, 475 F.3d 761

(6th Cir. 2007).  Like Petitioner, *Davis* involved a prisoner who had been sentenced to death,

and then re-sentenced to death after the Ohio Supreme Court vacated his original sentence.  475

F.3d at 763-64.  At re-sentencing, the trial court refused to allow Davis to introduce new

mitigation evidence concerning his adaptability and good behavior from the date of his first

sentencing. *Id*. at 770-71. This new evidence would have rebutted the State's argument at re-sentencing that Davis was too dangerous an offender to serve a life sentence. *Id*. at 772. The Sixth Circuit noted that "the record in this case establishes without a doubt that [the new mitigation evidence] was highly relevant to the single aggravating factor relied upon by the state – that future dangerousness should keep Davis on death row." *Id*. at 773. The Sixth Circuit ordered a second re-sentencing by the trial court, and did not permit the state appellate courts to cure the error by re-weighing, because "the improperly excluded evidence was never put into the record . . . and therefore, no factual basis for re-weighing exist[ed]." *Id*. at 774.

Distinguishing Petitioner's case, the Magistrate Judge concluded:

> The evidence proffered by Chin[n] on remand in this case is not *Skipper/Davis* evidence. That is, it does not purport to show anything about Petitioner's behavior **after** the jury made its death sentence recommendation. Rather, it is new mitigating evidence which would have been available for presentation to the jury at the time of trial but was not presented. Nor did the prosecutor on resentencing make any argument about future dangerousness that would have made post-verdict behavior of Petitioner relevant in mitigation of that argument.

(ECF No. 60, at 152.)

In his objections, Petitioner argues that the Ohio Supreme Court's refusal to extend *Skipper v. North Carolina*, 476 U.S. 1 (1986), to this case was objectively unreasonable. In *Skipper*, the Supreme Court held that the trial court infringed on the defendant's "right to place before the sentencer relevant evidence in mitigation of punishment" when the court excluded certain evidence that it deemed cumulative. 476 U.S. 1, 4 (1986). There, the defendant sought to admit at his sentencing hearing the testimony of two jailers, and a regular visitor at the jail. *Id.* at 3. The witnesses would have testified regarding the defendant's good behavior in jail while awaiting trial. This evidence would have mitigated the State's assertion

94

that if given a life sentence, the defendant posed a threat to the safety of other inmates. *Id.* at 4. The State argued that the testimony was properly excluded because it was cumulative. The Supreme Court concluded the additional evidence was not cumulative and that its exclusion constituted reversible error. *Id.* at 8. The Supreme Court explained:

> The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses – and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges – would quite naturally be given much greater weight by the jury.

*Id.* In light of the State's argument that the defendant posed a continuing threat to other prisoners, the Court concluded "it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence." *Id.* The Court held that exclusion of the evidence constituted reversible error. *Id.*

This Court agrees with the Magistrate that the new evidence Petitioner sought to introduce on remand to the trial court for resentencing was not the kind of evidence at issue in *Skipper* and *Davis*. Here, the State did not raise any arguments about Petitioner's future dangerousness that would have made his post-trial behavior relevant in mitigation at the second re-sentencing. Rather, Petitioner sought a second bite of the apple – a chance to relitigate some of the information that was originally presented, as well as offer new information that had not been presented previously but was available at the time of trial. Because *Skipper* and *Davis* are distinguishable, this Court cannot conclude that Petitioner is entitled to relief on his Thirteenth Claim for Relief, and accordingly, the Court **OVERRULES** Petitioner's objections, and **ADOPTS** the recommendation of the Magistrate Judge to dismiss this claim.

The Court notes, however, that the trajectory of Petitioner's state court direct appeal process was lengthy and complex and resulted in two reversals of Petitioner's death sentence and the issuance of four separate legal opinions.   Due to the complicated procedural history, as well as the relative similarity to *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007), the Court will grant Petitioner a COA on this claim.

### Fourteenth Ground for Relief

> Petitioner's right to due process and his right against cruel and unusual punishment were violated when his jury was misinstructed to be unanimous in order to find that aggravating circumstances did not outweigh mitigating factors.   U.S. Const. amends. VIII, XIV.

Petitioner's Fourteenth Ground for Relief was previously dismissed as procedurally defaulted.   (Opinion and Order, ECF No. 30, at 68-70.)

### Fifteenth Claim for Relief:

> Petitioner's right to the effective assistance of counsel was violated by counsel's prejudicially deficient performance in failing to investigate, prepare, and present compelling mitigation evidence during the penalty phase of Petitioner's trial.   U.S. Const. Amends. VI, VIII, XIV.

In his Fifteenth Claim for Relief, Petitioner argues that he was denied the effective assistance of counsel at the mitigation phase of his trial, because his counsel failed to investigate, identify, and present all available mitigating evidence.   This claim has two parts.   First, Petitioner argues his counsel were ineffective because they did not offer evidence of his good prison conduct while awaiting trial at the Montgomery County jail.   Secondly, Petitioner argues

96

counsel failed to present additional evidence of residual doubt, to include alibi evidence that Petitioner was home when the crime occurred, an expert witnesses to challenge the reliability of eyewitness testimony, an expert to challenge the testimony of Marvin Washington on the basis of intellectual disability, Marvin Washington's juvenile records, and a supplemental police report from Christopher Ward that may have also called into question Ward's mental capacity. (Petition, ECF No. 3-2, at 53-55); (Traverse, ECF No. 27, at 128-131.)

Petitioner has litigated the underlying issues comprising the substance of this claim extensively through the State courts. The state courts originally addressed the issue of residual doubt in the context of a claim alleging the trial court erred in its own weighing of the mitigating factors and in making the findings required by R.C. 2929.03(D)(3). Specifically, the Second District Court of Appeals affirmed the jury's verdict and found no error with the jury's recommendation of death, but found the trial court erred in its own consideration of the mitigating factors and aggravating circumstances. The court of appeals remanded for a new sentencing hearing:

> A capital defendant's right to mitigate his sentence is not merely statutory, but a constitutional guarantee. *Lockett v. Ohio* (1978), 438 U.S. 586, 608; *Furman v. Georgia* (1972), 408 U.S. 238, rehearing denied (1972), 409 U.S. 902. A factor that could never possibly tip the scales in favor of life imprisonment would be "mitigating" in name only. The Eighth Amendment requires that any mitigating evidence, given the right factual circumstances, have the potential of precluding the death penalty. *Id.* The precise weight to assign to a factor lies, in the first instance, in the sound discretion of the sentencing court. However, in this case the trial court abused its discretion by completely ignoring the factor of residual doubt.

> *Scott* cannot be read as eviscerating the mitigation value of residual doubt. Rather, *Scott* serves as a reminder to the court that the defendant's continued protestations of innocence must be viewed in light of fact that the issue of guilt has already been resolved. Residual doubt is, as the name implies, the gap between "beyond a reasonable doubt" and absolute certainty. The size of this gap is, necessarily, dependent upon the facts in the case. In *Scott, supra*, the Supreme Court found that

the only fact which contributed to residual doubt was the defendant's continued protestations of innocence, and therefore the factor had little mitigating effect. However, in the case at bar there are a number of facts in addition to Chinn's claims of innocence which cause the gap between reasonable doubt and absolute certainty to be far broader than in *Scott*.

It is uncontroverted that Chinn is five feet five inches tall. (T.702). However, everyone who saw "Tony" claimed that he was much taller. Couch, the bookstore employee, testified that 'Tony" was "certainly taller" than Washington, who also stands five feet five inches, and estimated "Tony's" height at five feet seven to nine inches. (T. 74-75). Dyer, who witnessed the murder of Jones, testified that the victim and the murderer were the same height. (T.90). Jones was five feet ten inches tall. (T. 23). Welborn, the man whom "Tony" robbed, told police that "Tony" was five feet nine inches tall. (T. 126). Finally when Washington originally described "Tony" to the police, he too said that he was taller than himself, standing at least five feet seven inches. (T. 265).

Further residual doubt may have been created by the fact that witnesses were unable to pick Chinn out of a lineup. Welborn was able to positively identify Washington, but identified someone other than Chinn as being "Tony". (T. 132). Dyer and Couch were also unable to identify Chinn. Washington did not identify Chinn in a line-up, but then changed his story. He testified that he had deliberately misidentified Chinn from fear of being seen through the one way mirror.

Washington's testimony was crucial to Chinn's conviction, but given Washington's admitted culpability in the murder of Jones his testimony is inherently suspect. This suspicion is intensified by the fact that Washington testified that he had been introduced to "Tony" and his girlfriend Stephanie Woods by Henry Walker one year before the night of the murder. (T. 257). Detective Lantz testified that he had spoken to both Walker and Woods, and both claimed not to know anyone named "Tony", and neither could identify Chinn by his picture. (T. 412-413). Washington's friend, Ward, was also able to identify Chinn. However, Ward initially told police that [sic] did not get a clear look at "Tony", (T. 158), and before making the identification inquired into the availability of a reward. (T. 181).

It must also be remembered that Chinn produced evidence from several sources that he was elsewhere taking an examination for school at the time when Washington said he met "Tony" and was at home with his mother and brother thereafter. Furthermore, neither the murder weapon nor any other incriminating evidence was discovered which would implicate Chinn. The totality of these circumstances may create a substantial amount of residual doubt as to whether Chinn actually was "Tony".

Since Jones was shot once in the arm, there may also be residual doubt as to whether

98

"Tony" intended to kill Jones.

The trial court erred in not considering these mitigating factors.

*State v. Chinn*, No. 11835, 1991 WL 289178, *19-21 (Ohio App. 2nd Dist. Dec. 27, 1991)

("*Chinn I*"). The case was remanded to the trial court for a resentencing hearing, directing the

trial court to take into consideration residual doubt. The trial court once again sentenced

Petitioner to death, and Petitioner appealed to the court of appeals for a second time.

In *Chinn II*, the Second District again vacated Petitioner's death sentence, this time

finding the trial court had denied Petitioner the right to be present at resentencing. *State v.*

*Chinn*, No. 15009, 1996 WL 338678 (Ohio App. 2nd Dist. June 21, 1996) ("*Chinn II*"). Prior to

remanding the case to the trial court for a second resentencing in Petitioner's presence, the court

of appeals determined that the trial court had appropriately considered the mitigating evidence,

including residual doubt:

> Regarding mitigating factors, the trial court did state its own opinion that residual
> doubt should not be treated as a mitigating factor. The trial court acknowledged our
> instruction that residual doubt must be considered, however, and it stated that it had
> no residual doubt about Chinn's guilt. We did not require the trial court to give any
> particular weight to the mitigating factors; we required, as the statute does, only
> that it identify those factors and consider whether they should be given any weight.
> Based upon our review of the trial court's sentencing opinion, it complied with our
> instructions on remand. If the trial court harbored no residual doubt of Chinn's guilt,
> it did not err by assigning that mitigating factor "negligible or no weight."

*Chinn II*, 1996 WL 338678, *4. The Second District then conducted its own analysis of residual

doubt, opining:

> In *Chinn I,* we discussed the mitigating factor of residual doubt, meaning the gap
> between proof beyond a reasonable doubt which formed the basis of the finding of
> guilt and proof to a degree of absolute certainty. Indeed, we remanded Chinn's case
> for resentencing because the trial court had not considered each mitigating factor
> about which Chinn had introduced evidence, including residual doubt. In doing so,
> we pointed to the evidence in the record which lent support to Chinn's argument

that there was some residual doubt as to his guilt. See *Chinn I, supra.* We noted that the gap between proof beyond a reasonable doubt and proof to a degree of absolute certainty was greater in Chinn's case than in some other cases discussing residual doubt. *Id.* We stated no opinion, however, as to how that evidence should be weighed, along with the other mitigating factors, against the aggravating circumstance.

In light of our extensive discussion in *Chinn I* of the evidence "which may [have created] a substantial amount of residual doubt as to whether Chinn was actually 'Tony,'" we will state with some specificity the evidence which leads us to conclude that residual doubt, as a mitigating factor, is entitled to little weight in this case.

Chris Ward was a friend of Marvin Washington, Chinn's alleged cohort in Jones' murder. Ward testified that he saw Washington and Chinn in the early morning hours of January 31, 1989, which was within a short time of Jones' murder. On that occasion, Ward stated that Washington drove into a friend's yard in a black car, honking the horn. Ward and the friend went outside, looked at the car, and talked with Washington. Ward testified that Chinn was in the passenger seat of the car, and that Washington identified Chinn as "Tony." When Ward asked whose car it was, Washington said it was "Tony's" car, and Ward shook "Tony's" hand.

After their brief conversation with Ward, Washington and "Tony" drove away in the car, and Ward went back into his friend's house. A few minutes later, Washington returned without the car. Washington told Ward that he had let "Tony" have the car, and Ward testified that Washington had acted very nervous. When questioned about his behavior, Washington told Ward that "Tony" had shot someone in Jefferson Township.

Jones' car was discovered by a police officer shortly after dawn on January 31. Ward identified photographs of Jones' car as the car in which he had seen Washington and Chinn the prior night. Ward identified Chinn's picture and picked him out of a lineup as the man he had seen with Washington the night of the murder, and Ward provided a description of "Tony's" clothing which matched the description given by Gary Welborn, Jones' friend and fellow robbery victim. Ward also identified Chinn in court as the man he had seen in the black car on January 31, 1989.

Ward's testimony corroborated significant portions of the testimony of both Welborn and Washington, and Ward appears to us from our review to have been a credible witness with no reason to fabricate his story.

Despite Washington's role in the murder, his testimony also appears to have been believable. In particular, we think it noteworthy that Washington could identify

100

> Chinn to the police only as "Tony." Any contention that Washington falsely directed blame toward another suspect in an effort to deflect attention from his own role in the crime is undercut by this imprecise identification. Further, the record does not suggest any reason for which Washington would have singled Chinn out other than his involvement in the crime.
>
> We also note that Chinn's alibi, insofar as it was corroborated by disinterested witnesses, did not account for his whereabouts at the time of the murder. Only Chinn's mother testified that he had been at home with his brother when the murder occurred.
>
> For these reasons, among others, we harbor little residual doubt of Chinn's guilt, and we have considered that mitigating factor accordingly in our independent weighing of the aggravating circumstance and mitigating factors. Having found that the aggravating circumstance outweighs the mitigating factors, we conclude that the sentence of death is appropriate.

Id. at *5-6.

Petitioner appealed his death sentence for the third time. In August 1997, the court of

appeals affirmed the judgment of the trial court and upheld Petitioner's death sentence.

*State v. Chinn*, No. 16206, 1997 WL 464736 (Ohio App. 2nd Dist. Aug. 15, 1997) (*Chinn III*).

The Second District held:

> The only other mitigating factor, residual doubt, also is entitled to limited weight. In his brief to this court, however, Chinn suggests that we found "a substantial amount of residual doubt" in *Chinn I*, yet harbored "little residual doubt" when reviewing the same facts four years later in *Chinn II*. We cannot agree with Chinn's characterization of our prior rulings. In *Chinn I*, we held that the trial court erred by failing to consider as a mitigating factor residual doubt concerning Chinn's guilt. In connection with that ruling, we proceeded to identify specific evidence presented at trial that we noted "may create a substantial amount of residual doubt" about Chinn's guilt. *Chinn I, supra*.
>
> In *Chinn II*, however, this court actually evaluated the residual doubt evidence and, after that review, explained why the residual doubt factor was entitled to little weight in mitigation. In fact, given our pronouncement in *Chinn I* that a substantial amount of residual doubt might exist, in *Chinn II* we stated with particularity the evidence leading us to conclude that the residual doubt factor was entitled to little mitigating weight. For the reasons explained in *Chinn II*, we continue to harbor little residual doubt about Chinn's guilt, and we accord that factor little weight in

mitigation.

Consequently, having considered and independently weighed the aggravating circumstance and mitigating factors, and having considered both the offense and the offender, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. We reach this conclusion based in part upon our belief that Chinn's scant mitigating evidence withers when weighed against his callous murder of Jones while committed an aggravated robbery.

*Chinn III*, 1997 WL 464736, *3.

Petitioner appealed the decision in *Chinn III* to the Ohio Supreme Court, who

independently reviewed Petitioner's death sentence for appropriateness, concluding:

Upon a review of the evidence in mitigation, we find that the evidence concerning appellant's history, character, and background is entitled to some, but very little, weight in mitigation. Specifically, we find that appellant's support and devotion for his family, his helpfulness to others, and his efforts toward education are entitled to some, but very minimal, weight in mitigation. Appellant's religious beliefs and his bitterness over his father's death are also entitled to little or no weight in mitigation. Appellant's father died more than a decade before appellant committed this senseless and tragic murder of Brian Jones, an innocent victim who offered absolutely no resistance in the aggravated robbery. Further, appellant's belief in God obviously did not dissuade him from robbing and killing. Additionally, appellant's assertions of innocence—a matter pertaining to the issue of "residual doubt"—are entitled to no weight in mitigation. Residual doubt is irrelevant to the issue of whether appellant should be sentenced to death, *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus, and we have absolutely no doubt of appellant's guilt.

*State v. Chinn*, 85 Ohio St.3d 548, 578 (1999).

The state courts also addressed the issue of residual doubt during Petitioner's state post-

conviction proceedings, wherein he presented the instant claim of ineffective assistance of trial

counsel:

The third and fourth claims raised by Chinn in his petition for post-conviction relief involve his contention that his conviction and sentence are void or voidable because: (1) his trial attorney rendered ineffective assistance of counsel by failing to investigate and present mitigating evidence; and (2) the one aggravating circumstance present in his case does not outweigh the mitigating factors.

102

Specifically, Chinn argued that trial counsel failed to present evidence of his good conduct in prison while awaiting trial, and failed to present "additional evidence of residual doubt." He also argued that the death sentence was inappropriate because the aggravating circumstance did not outweigh all of the mitigating factors; i.e., both those factors presented to the judge and jury and those not presented.

The trial court denied both of these claims under the doctrine of *res judicata*. The court stated that the claim of ineffective assistance of counsel could have been raised on direct appeal. The court further stated that the mitigating factors had been considered by this court in a prior direct appeal.

We find that although we had previously weighed the aggravating circumstance and mitigating factors in the prior direct appeals, the post-conviction petition claims involve mitigating factors that were not raised in those appeals. Furthermore, all of the mitigating evidence that Chinn referred to in support of this claim is *dehors* the record, and was therefore not capable of being presented on direct appeal. We conclude that the trial court did err by ruling that the claim of ineffective assistance of counsel was barred by the doctrine of *res judicata*. However, we must affirm the trial court's decision on other grounds.

In the prior direct appeals, we addressed, and independently weighed, the aggravating circumstance and mitigating factors present in this case. Indeed, we concluded that the aggravating circumstance outweighs the mitigating factors presented at sentencing. Therefore, we must now determine whether our assessment of the mitigating factors and aggravating circumstance would change based upon the additional evidence.

In Ohio, good behavior while in jail awaiting trial has been recognized as a mitigating factor. See e.g., *State v. Moreland* (1990), 50 Ohio St.3d 58, 70, 552 N.E.2d 894. Therefore, we will presume for the sake of argument that the failure to present this evidence did constitute ineffective assistance of counsel. In order to prevail on this issue, Chinn must show a "reasonable probability that the outcome would have been different but for the ineffective assistance of counsel." *State v. Lascola* (1988), 61 Ohio App. 3d 228, 236, 572 N.E.2nd 717. Evidence of good conduct in jail is entitled to very little weight in mitigation. *Moreland*, at 70. We cannot conclude that the requested evidence would have changed the outcome of the sentencing hearing. Therefore, we find that Chinn's claim of ineffective assistance prejudicial to his rights is not well-taken.

Likewise, we find that Chinn's claim that trial counsel should have presented additional evidence of residual doubt "is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death." *State v. McGuire* (1997), 80 Ohio St. 3d 390, 686 N.E.2nd 1112, paragraph 1 of the syllabus. Therefore, since any evidence regarding residual

103

doubt would not be relevant to the sentence imposed, we cannot say that counsel was ineffective for failing to present such evidence.

Accordingly, we find that the trial court's denial of Chinn's claim of ineffective assistance of counsel for failure to present mitigating evidence, as well as his claim that the aggravating circumstance did not outweigh the available mitigating factors was correct, albeit for reasons differing from than those relied upon by the court. Since we conclude that Chinn's claim is not meritorious, we further find that the trial court did not err by failing to conduct an evidentiary hearing on this issue.

*State v. Chinn*, No. C.A. 16764, 2000 WL 1458784, *4-5 (Ohio App. 2nd Dist. Aug. 21, 1998).

This Court must analyze Petitioner's allegations of ineffective assistance of trial counsel under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, *Strickland* requires a showing that counsel made errors so serious that counsel was not functioning as counsel at all. Secondly, the Petitioner must show that the deficient performance prejudiced the defense. *Id.* at 680. In evaluating whether the representation fell into the category of ineffective assistance, the Court must look to "prevailing professional norms." *Id.* When analyzing an ineffectiveness claim for the failure to investigate, the court must consider the claim by assessing the reasonableness of the decision and by giving heavy deference to counsel's judgment. *Id.* at 691. Moreover, the United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). That is, "'[s]urmounting *Strickland*'s high bar is never...easy,' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a

104

federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

Here, the Magistrate Judge noted that at the time of Petitioner's trial, Ohio courts recognized residual doubt as a mitigating factor. Thereafter, in *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), the Ohio Supreme Court determined that "[r]esidual or lingering doubt as to the defendant's guilt or innocence is not a factor relevant to the imposition of the death sentence because it has nothing to do with the nature and circumstances of the offense or the history, character, and background of the offender." *Id*. at 403. According to the Magistrate Judge, "the timing of *McGuire* reinforces the correctness of the court of appeals' decision: while *McGuire* was decided after this case was tried, it was decided well before this case was decided on direct appeal by the Ohio Supreme Court in 1999. Thus had defense counsel presented the proffered residual doubt evidence in mitigation at trial, it would have been disregarded as irrelevant when the case reached the Ohio Supreme Court." (ECF No. 86, at 50.) This conclusion holds true so long as the case reached the Ohio Supreme Court on death penalty review. Petitioner, of course, sees the matter differently, and would argue that the question is whether the outcome of the sentencing proceedings would have been different had his counsel presented this evidence in the first instance. That scenario is highly unlikely, as the defense theory of the case was one of identity and the jury found Petitioner guilty beyond a reasonable doubt of all charges. As such, there is no reasonable way to conclude that the outcome of Petitioner's sentencing proceeding would have been different had counsel argued residual doubt,

which is no longer a valid sentencing consideration in the State of Ohio.

With respect to the issue of Petitioner's good performance in jail while awaiting trial, the state courts determined that this was a relevant factor, and for the sake of argument, were willing to consider that counsel's performance was deficient in this regard. However, the state courts concluded that even assuming deficient performance, evidence of good prison conduct awaiting trial is entitled to very little weight in mitigation. The Court cannot conclude that this evidence had a reasonable probability of affecting the outcome of Petitioner's sentencing proceedings, and the state court decision in that regard is entitled to deference on habeas review.

For the foregoing reasons, Petitioner is not entitled to relief on his Fifteenth Claim for Relief. The Court does not believe reasonable jurists would find its decision debatable or wrong and declines to issue a certificate of appealability as to this claim.

### Sixteenth Claim for Relief:

> Petitioner's due process right to a fair trial was violated because he was denied his right to be present when the trial court gave supplemental jury instructions. U.S. Const. amend. XIV.

In his Sixteenth Claim for Relief, Petitioner argues his rights were violated when the trial court held discussions with the jurors regarding clarification of instructions, outside of his presence. (Petition, ECF No. 3, at 55); (Traverse, ECF No. 27, at 132.) The Ohio Supreme Court denied this claim on the merits, finding the record did not support Petitioner's claim:

> Appellant contends that he is entitled to a new trial because there is nothing in the record to indicate that appellant and defense counsel were present on two occasions involving communications between the trial court and the jury. However, we are unwilling to presume that appellant and his attorneys were not present during the times in question. Rather, "the record must *affirmatively indicate the absence* of

a defendant or his counsel during a particular stage of the trial." (Emphasis added.) *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844, 851. The record does not affirmatively so indicate and, therefore, we reject appellant's tenth proposition of law.

*State v. Chinn*, 85 Ohio. St. 3d 548, 568, 709 N.E. 2d 1166, 1183 (1999).

In the Original R&R, the Magistrate Judge recommended this claim be denied on the merits, agreeing there is no record evidence establishing that Petitioner or his counsel were absent during the relevant times. (ECF No. 60, at 163-167.) The Magistrate Judge agreed there was no affirmative factual finding by the state court's that Petitioner was indeed present, but concluded that "no such finding is necessary where they were presumed to be present in the absence of evidence to the contrary and no rule of constitutional law prohibits that presumption." (ECF No. 86, at 52.)

Petitioner objects to this recommendation, countering that "[t]here is absolutely no indication in the record that either Chinn or his attorneys *were present* when this exchange between the judge and the jury took place." (ECF No. 63, at 99.) (emphasis added). Petitioner refers to the guilt phase of the proceedings where "communications between the trial court and the jury were conducted in open court and on the record. (ROW Tr. at 622-41.)" (*Id.*) By contrast, Petitioner argues, the penalty phase jury communications are not reflected in the transcript, and therefore, this Court should infer that he and his counsel were absent at the relevant times.

This Court, like the Ohio Supreme Court, will not presume error from a silent record. Furthermore, as the Magistrate Judge pointed out, if Petitioner and/or his counsel were absent, Petitioner could have raised this claim in post-conviction and presented evidence *dehors* the record in the form of an affidavit of trial counsel. This he did not do. The Court adopts the

recommendation of the Magistrate Judge, overrules Petitioner's objections, and finds Petitioner's Sixteenth Claim for Relief to be wholly without merit.   Furthermore, no COA should issue as to this claim.

### Seventeenth Claim for Relief:

> Petitioner's right to be tried and sentenced by a fair and impartial tribunal was violated because the State trial judge presiding over Petitioner's trial and sentencing was biased.   U.S. Const. amends. V, VI, VIII, IC, XIV

Petitioner's Seventeenth Claim for Relief was previously dismissed as procedurally defaulted.   (Opinion and Order, ECF No. 30, at 70-74.)

### Eighteenth Claim for Relief:

> Petitioner's right against cruel and unusual punishment and the right to due process were violated when a victim impact statement with opinions about punishment and petitioner's potential for rehabilitation was made at the capital sentencing hearing.   U.S. Const. amends. VIII, XIV.

In his Eighteenth Claim for Relief, Petitioner argues his constitutional rights were violated when the trial court considered a victim impact statement made by Brian Jones's mother.   The record reflects that Mrs. Jones delivered a statement to the court after the jury had recommended death but before the trial court imposed sentence.   Petitioner claims Mrs. Jones expressed her opinion that death was appropriate and Petitioner was not amenable to rehabilitation.   (Traverse, ECF No. 27, at 140.)

108

In *Booth v. Maryland*, the United States Supreme Court held that the admission of victim impact evidence "at the sentencing phase of a capital murder trial violates the Eighth Amendment." 482 U.S. 496, 509 (1987). The Court distinguished two categories of victim impact information – evidence that relates to the victim and the impact of the victim's death on the victim's family, and the family members' opinions as to the appropriate punishment. *Id*. at 503, 508. In *Payne v. Tennessee*, the Supreme Court overruled a portion of *Booth*, holding "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." 501 U.S. 808, 827 (1991). The Sixth Circuit has characterized *Payne* as overturning "only that part of *Booth* that disallowed 'evidence . . . relating to the victim and the impact of the victim's death on the victim's family.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1141 (6th Cir. 2016). *Payne* did not disturb "the portion of *Booth* that forbids 'a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence' from being admitted into evidence." *Middlebrooks*, 843 F.3d at 1141 (citing *Fautenberry v. Mitchell*, 515 F.3d 614, 638 (6th Cir. 2008) (quoting *Payne*, 501 U.S. at 830 n.2)).

The full statement of Mrs. Jones appears in the transcript as follows:

First of all, I want to say this is very hard and very difficult for us. We are here for our son, Brian Jones, who cannot be here to speak for himself, so we're here to speak on his behalf and for the rest of our family. First of all, we would like for you and everyone to know what a great loss that we have suffered, the pain has been and will be beyond what words could describe. Only another person that has lost a child to such a tragedy could begin to feel the empty, lonely feelings. Needless to say, we have suffered the greatest loss of our entire life. We know that nothing or no one is going to replace that empty and void feeling and that part of our lives are gone. Now, we must begin to try to pick up the pieces and put our lives back together as good as we can. I really don't feel that this will ever be possible because, first of all, we feel very threatened by this Defendant and his family. We have not done or said anything, your Honor, about them; but yet, we are afraid for our safety

109

and we feel very threatened by them. I'm afraid to leave my home alone. I'm afraid for my daughter to leave her home alone; and regardless of what I'm doing, if I know that she's leaving, I will quit whatever I'm doing and go and be with her because I fear what could happen to her. I fear of the morning when my husband leaves for work. I stand at the window. He leaves just before daylight. I stand at the window and watch him until he gets in his car and pulls out our driveway. Never in my life have I ever done this before, I've been doing this ever since our son has been killed. Your Honor, this terrible, threatening fear that we are living with is not a good feeling. We really do feel – We really do feel very threatened by this Defendant and what he might do our family. With his previous record, if he had been put away where he should have been, my son may be living today. Your Honor, this makes me feel very ill inside to think that if this Defendant had not been out there on the streets, on January 30th, that my son would be with us. We would not be going through all of this pain that we're feeling. We would not be afraid and feel threatened as we do today. Your Honor, we feel that this Defendant has been given every opportunity that there is. He's been on shock probation, and by his own actions, has chosen not to accept any of them; and now we feel that the time has come for him to be punished according to the law of Ohio. My family and I thank you and the Courts for being kind to us, and for everything you have done. Thank you a lot.

(Return of Writ, Trial Tr. Vol. V, at 740-42; ECF No. 132-7, PAGEID 9446-9448.)

Petitioner presented this claim as his twenty-first proposition of law before the Ohio

Supreme Court, who rejected the claim on the merits:

Appellant's twenty-first proposition of law concerns alleged victim-impact evidence that was heard by the trial judge after the jury was discharged but immediately before the trial court pronounced sentence on all of the crimes appellant was found guilty of committing. Appellant claims that the evidence included an expression of opinion by Brian Jones's mother that appellant should be sentenced to death. However, Mrs. Jones never specifically stated her opinion as to the appropriate punishment. Rather, she stated that "now we feel that the time has come for [appellant] to be punished according to the law of Ohio." Appellant also complains that Mrs. Jones stated or implied that appellant was incapable of rehabilitation. However, the record does not fully support appellant's claims in this regard. Moreover, and in any event, there is absolutely nothing in the record to suggest that the trial court was influenced by irrelevant factors in sentencing appellant for the capital crime. Therefore, we find no reversible error here.

*State v. Chinn*, 85 Ohio St.3d 548, 575-76 (1999).

110

In the Original R&R, the Magistrate Judge agreed with the Ohio Supreme Court, and found no merit to Petitioner's claim. Specifically, the Magistrate Judge determined:

> Petitioner argues that the victim impact statement made by the victim's mother exceeded the proper scope allowed under the Eighth Amendment. (Traverse, Doc. No. 27, PAGEID 415.) Specifically, because she expressed her views on rehabilitation and because life without parole was not an option at the time of Petitioner's trial, Mrs. Jones' concerns and views on Chinn's rehabilitation was essentially a push for the imposition of a sentence of death. (Traverse, Doc. No. 27, PAGEID 421.) Chinn argues that it was error for the sentencer to consider opinions about the defendant's character, potential for rehabilitation, and opinion on proper punishment and that the state court decision was unreasonable when it found she did not express any improper opinions and the record did not support the Eighth Amendment claim. (Traverse, Doc. No. 27, PAGEID 420.) Under clearly established law, he says, her opinions were improper, Chinn's Constitutional rights were violated, and the state courts' reasoning in view of the record was an unreasonable and improper application of established U.S. Supreme Court law. (Traverse, Doc. No. 27, PAGEID 421.)

> The statement in question was made by Mrs. Jones to the judge after the jury had made its recommendation of a sentence of death but prior to the court's sentencing. Her statement, which is comprised of approximately two pages of transcript, related the effect of Brian's death on his family. (Trial Tr. Vol. V at 740-741.) It expressed feelings of loss and her constant fear for the well-being of other family members. *Id*. Specifically, Mrs. Jones spoke of a "[t]errible threatening fear that we live with . . . We really do feel threatened by this Defendant and what he might do our family[sic]." *Id*. She continued by stating "[w]ith his previous record, if he had been put away where he should have been, my son may be living today. Your Honor, this makes me very ill inside to think that if this Defendant had not been out there on the streets on January 30th, that my son would be with us . . . Your Honor, we feel that this Defendant has been given every opportunity that there is. He's been on shock probation, and by his own actions, has chosen not to accept any of them; and now we feel that the time has come for him to be punished according to the law of Ohio." (Trial Tr. Vol. V at 741-742.)

> The comments above do reflect Mrs. Jones opinion as to Petitioner's past rehabilitation attempts. The statements, do not however, go so far as to imply that the only option for punishment would be death, but rather she asks that he be punished in accordance with the laws of Ohio. *Id*. However, even if we find a violation, the statements must be so prejudicial as to render the trial fundamentally unfair. That is not the case here. The statement was made outside the presence of the jurors after they had given their recommendation to the trial court. In *Fautenberry v. Mitchell*, the Sixth Circuit questioned if *Booth* was applicable in cases where the

111

victim impact statement was before a judge, rather than a jury. 515 F.3d 614, 639 (6th Cir. 2008). *Fautenberry* reasoned that the *Booth* court was concerned that the victim impact evidence might "distract the sentencing jury from its constitutionally required task [of] determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime . . ." and "divert the jury's attention away from the defendant's background and record[] and the circumstances of the crime . . ." or "create an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Id.* at 639; *citing Booth*, 482 U.S. at 505, 507. They held that this risk is severely diminished when the information is before a judge and not a jury, therefore giving *Booth* "minimal relevance." *Fautenberry*, 515 F.3d at 639. Absent evidence to the contrary, it is assumed that the judge did not rely on the improper portion of the victim impact statement. As the Sixth Circuit stated in *Fautenberry*, "the Ohio Supreme Court's finding that there was no indication that the three-judge panel relied on the victim-impact evidence was a 'factual finding that is presumed to be correct under the AEDPA.'" *Id.*; *see also Cooey v. Coyle*, 289 F.3d 882, 910-11 (6th Cir. 2002) (affirming the district court's deference to the Ohio Supreme Court's factual finding that there was "no affirmative indication that the victim impact statements were considered in sentencing [the petitioner] to death.") Likewise, in this case, there is no indication made by the Ohio Supreme Court that the trial judge considered and relied on that portion of the victim impact statement in rend[er]ing sentence.

Petitioner's Eighteen Claim for Relief is without merit and should be dismissed with prejudice. No certificate of appealability should be granted on this claim.

(ECF No. 60, at 169-171.)

In his objections to the R&R, Petitioner objects to the Magistrate Judge's determination that the statements by Mrs. Jones did not violate the Eighth Amendment's prohibition on the introduction of victim impact statements consisting of the "victim's family members characterizations and opinions about the crime, the defendant, and the sentence." (ECF No. 63, at 107, citing *Payne*, 501 U.S. at 830, n.2.) Petitioner asserts that "Mrs. Jones' statements indicated that Chinn posed an ongoing threat of violence, that he was not capable of rehabilitation, and that death was the appropriate punishment." (*Id.* at 108.) With respect to the Magistrate Judge's conclusion that Mrs. Jones did not "go so far as to imply that the only

112

option for punishment would be death, but rather she asks that he be punished in accordance with the laws of Ohio," Petitioner argues:

> This interpretation of Mrs. Jones' statement does not withstand scrutiny. Mrs. Jones clearly wasn't suggesting that the trial court should set aside the jury's death recommendation. Furthermore, life without parole was not available as a sentence at the time of Chinn's trial and sentencing. The statements in question came right after Mrs. Jones had finished explaining that Chinn caused her to fear for her own personal safety, as well as the safety of her loved ones, so it is highly unlikely that Mrs. Jones intended to suggest that a sentence providing for the possibility of parole at some point in the future would be an acceptable alternative to the death penalty. Given the totality of circumstances, Mrs. Jones' request for Chinn 'to be punished according to the law of Ohio' cannot be construed as anything other than a request for the death penalty to be imposed.

(*Id*. at 108 n.29.) Furthermore, Petitioner argues that the decision of the Ohio Supreme Court is not entitled to deference under 28 U.S.C. § 2254(d). According to Petitioner, "[n]o fair-minded jurist reviewing the sentencing transcript in this case could seriously believe that Mrs. Jones intended to convey anything other than a message that Chinn was beyond rehabilitative hope." (*Id*. at 111.) As a result, Petitioner argues, his death sentence "is constitutionally invalid unless the statements did not have a substantial and injurious effect on the penalty phase verdict." (*Id*. at 109.) Finally, Petitioner argues that the decision of the Ohio Supreme Court is not entitled to deference because that court "plac[ed] the burden on Chinn to demonstrate prejudice instead of requiring the State to establish the error was harmless beyond a reasonable doubt . . . ." (*Id*. at 112.)

The Magistrate Judge cited *Post v. Bradshaw*, 621 F.3d 406, 420 (6th Cir. 2010), for the proposition that the erroneous admission of victim impact evidence could be cured through appellate reweighing by the Ohio Supreme Court. Petitioner disagrees with *Post*, arguing "*Post* is an incorrect statement of law which should be overruled, and Chinn reserves the right to

113

challenge it on appeal."   (ECF No. 63, at 109.)   In *Post*, the petitioner's trial counsel placed victim-impact evidence and other prejudicial information before the court, by way of a presentence investigation report ("PSR") and a statement from the victim's son.   *Post*, 621 F.3d at 419.   The Sixth Circuit held that "[n]o prejudice could flow from the allegedly improper victim impact evidence," because "[a]ny error was cured when the Ohio Supreme Court, without considering the victim-impact evidence, independently reweighed the aggravating and mitigating factors and affirmed the sentence of death."   *Id*. at 420.   The Court concluded that "[i]t is therefore not reasonably probable that the result of the proceedings would have been different had counsel prevented the evidence from being considered by the three-judge panel."   *Id*.

This Court finds Petitioner's objections to the decision of the Magistrate Judge unpersuasive, and finds that Petitioner's Eighteenth Claim for Relief lacks merit for the following reasons.   First, it is not apparent that an error occurred.   The Magistrate Judge assessed Mrs. Jones comments as "relat[ing] the effect of Brian's death on his family" and "express[ing] feelings of loss and her constant fear for the well-being of other family members." (ECF No. 60, at 169.)   The Magistrate Judge noted that although her comments did express an opinion about Petitioner's past rehabilitation attempts, the comments did not "go so far as to imply that the only option for punishment would be death, but rather she ask[ed] that he be punished in accordance with the laws of Ohio."   (*Id.* at 170.)   Secondly, the Magistrate Judge determined that even if the statement was improper, Petitioner is not entitled to relief unless the statements were so prejudicial as to render the entire trial unfair.   That is simply not the case when the statements at issue were made *after* the jury returned its sentencing recommendation. In *Fautenberry v. Mitchell*, 515 F.3d 614 (6th Cir. 2008), the Sixth Circuit questioned whether

114

*Booth* would even apply to a situation where the victim information was before a judge or three judge panel. The Sixth Circuit opined that the risks noted by *Booth* – that the victim impact evidence might distract the jury or "create an impermissible risk that the capital sentencing decision will be made in an arbitrary manner" – is "severely diminished" when the information is before the court rather than the jury. *Id*. at 639. Next, the pronouncement by the Ohio Supreme Court that "there is absolutely nothing in the record to suggest that the trial court was influenced by irrelevant factors in sentencing appellant for the capital crime," is a finding of fact entitled to deference by this Court on habeas corpus review. Finally, as noted by *Post* which is still good law in this Circuit, "[n]o prejudice could flow from the allegedly improper victim impact evidence," because "[a]ny error was cured when the Ohio Supreme Court, without considering the victim-impact evidence, independently reweighed the aggravating and mitigating factors and affirmed the sentence of death." *Post*, 621 F.3d at 420.

The Court hereby **DISMISSES** Petitioner's Eighteenth Claim for Relief. Furthermore, this Court does not find that reasonable jurists would disagree with its resolution of this claim and therefore, a COA should not issue.


### Nineteenth Claim for Relief:

Petitioner's right against cruel and unusual punishment and his right to due process were violated because O.R.C. § 2929.03(D)(1) renders O.R.C. § 2929.04(A) and (B) unconstitutionally vague. U.S. Const. amends. VIII, XIV.

Petitioner's Nineteenth Ground for Relief was previously dismissed as procedurally defaulted. (Opinion and Order, ECF No. 30, at 74-81.)

115

**Twentieth Claim for Relief:**

Petitioner's right to due process was violated by the ineffective assistance of counsel in his first appeal as of right to the Ohio Court of Appeals of Montgomery County. U.S. Const. amend. XIV

A.  Counsel failed to assign as error the vagueness defect in Ohio's sentencing scheme. O.R.C. § 2929.03(D)(1) incorporates the nature and circumstances of the offense, a statutory mitigating factor under O.R.C. § 2929.04(B), into the aggravating circumstance. Accordingly, petitioner's death sentence is arbitrary. *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Stringer v. Black*, 503 U.S. 222 (1993).

B.  Counsel failed to assign as error the trial court's failure to define "principal offender," which was an essential element of the O.R.C. § 2929.04(A)(7) aggravating circumstance in this case. *See Cabana v. Bullock*, 474 U.S. 376 (1986).

C.  Counsel failed to assign as error, the trial court's erroneous instruction on both the "principal offender" and "prior calculation and design" components of the O.R.C. § 2929.04 (A)(7) aggravating circumstance. Only one of those statutory alternatives applied to this case and it was improper to instruct the jury on both. *State v. Penix*, 513 N.E.2d 744 (Ohio 1987). Counsel's failure to assign this issue as error was certainly prejudicial to petitioner because the court of appeals vacated his death sentence, inter alia, because the trial court considered both components in its in its original sentencing calculus. *State v. Chinn*, No. 1991 WL 289178, 15-17 (Ohio App. 2nd Dist. 1991).

D.  Last, appellate counsel were ineffective because they failed to assign as error trial counsel's failure to object to the errors in paragraphs A-C, *supra*. *Strickland*, 466 U.S. 668.

In his Twentieth Claim for relief, Petitioner sets forth four sub-claims of ineffective assistance of appellate counsel. (Petition, Doc. No. 3 at 65); (Traverse, Doc. No. 27, at 159-162.) The Ohio Supreme Court dismissed this claim summarily:

Appellant also argues that he was deprived of the effective assistance of counsel in

116

the court of appeals. We find no merit to appellant's contention. The fact that appellate counsel was able to persuade the court of appeals to reverse the death sentence on two separate occasions over the course of the years is a testament to the effectiveness of appellant's counsel. None of the instances of alleged ineffective assistance of appellate counsel compels reversal here.

*State v. Chinn*, 85 Ohio St.3d 548, 576, 709 N.E.2d 1166, 1188 (1999).

The Magistrate Judge determined that the Court touched upon the substance of each of the four sub-claims in the Court's prior Opinion and Order resolving procedural default:

In his first sub-claim, Petitioner argues that appellate counsel were ineffective in their failure to argue Ohio's capital sentencing scheme is unconstitutionally vague. (Traverse, Doc. No. 27, PAGEID 436.), specifically that Ohio Revised Code § 2929.03 (B) permits the use of the nature and circumstances of the offense as a mitigating factor, but that Ohio Revised Code § 2929.03(D)(1) permits the sentencer to consider the nature and circumstances in aggravation. *Id.*

In making its procedural default determination of the underlying sub-claim, which is effectively Petitioner's Nineteenth Ground for Relief, the District Court considered the claim on the merits to the extent necessary to determine if ineffective assistance of counsel could excuse Chinn's failure to properly raise this claim on direct appeal. (Opinion, Doc. No. 30, PAGEID 562-569.) After a thorough analysis as to whether or not appellate counsel was ineffective in this regard, the District Court held "[e]ven assuming that counsel's decision was unreasonable, or that counsel omitted the issue out of pure oversight, the Court cannot conclude under the prejudice prong of *Strickland* that there is a reasonable probability that the outcome of petitioner's appeal would have been different had appellate counsel raised this issue." (Opinion, Doc. No. 30, PAGEID 568.)

In his next sub-claim, Chinn argues appellate counsel erred when they failed to object to the trial court's failure to define the "principal offender" element. (Traverse, Doc. No. 27, PAGEID 436.) He argues this was error as "principal offender" was an element of the charge that the jury needed to find to convict him of capital murder. *Id.*

Again, in making its procedural default decision of this underlying sub-claim, which is Petitioner's Seventh Ground for Relief, the District Court considered the claim on the merits to the extent necessary to determine if ineffective assistance of counsel could excuse Chinn's failure to properly raise this claim on direct appeal. (Opinion, Doc. No. 30, PAGEID 535-540.) The Court previously held, "that neither trial counsel nor appellate counsel were ineffective, sufficient to excuse the default of petitioner's seventh claim for relief." *Id.* at 539.

Next, Petitioner alleges appellate ineffectiveness in failing to raise on appeal error in the penalty phase instruction directing the jury to find the "principal offender" and "prior calculation and design" elements of the felony murder specification. (Traverse, Doc. No. 27, PAGEID 435-436.) He argues that under Ohio law only one of the two elements may be considered and weighed. *Id*

The District Court also addressed this underlying claim in its previous opinion. Again, in making its determination on whether or not the ground for relief, here, the Eleventh Ground for Relief, sub-section c, was procedurally defaulted, the Court addressed the effectiveness of counsel to determine if there was cause and prejudice to excuse such default. (Opinion. Doc. No. 30, PAGEID 547, 554-556.) Thus, the Court addressed the underlying claim on both procedural default and on the merits and found that, "[t]his court is not persuaded either that counsel performed deficiently in failing to object or that petitioner was prejudiced by counsel's failure to object." *Id*. at 554. "For these reasons, the Court cannot find either that defense counsel performed deficiently in failing to object to an instruction that was not facially improper . . . ." *Id*. at 555. Because trial counsel was not ineffective, we cannot hold appellate counsel ineffective for their failure to raise trial counsel's alleged deficiency.

In his last sub-claim, Chinn argues ineffectiveness of appellate counsel in their failure to make the claim that trial counsel were ineffective in their failure to raise the above claims, for not objecting to the instruction containing both "principal offender" and "prior calculation and design," for failing to object when "principal offender" was not defined and, for not challenging the vagueness defect in Ohio's statute. (Traverse, Doc. No. 27, PAGEID 437.)

Again, in making its procedural default decision of this underlying sub-claim, which is Petitioner's Ninth Ground for Relief, sub-claims a, d and e, the Court concluded that while not procedurally defaulted, sub-claim d is without merit. (Opinion, Doc. No. 30, PAGEID 540-543.)

In sum, the Twentieth Claim for Relief should be dismissed with prejudice and Petitioner should be denied a certificate of appealability on it.

(ECF No. 60, at 173-175.)

Although Petitioner objects to the determination of the Magistrate Judge, he merely

repeats his arguments as to why he believes the sub-claims are meritorious.   Petitioner does not

address the Magistrate Judge's conclusion that Judge Sargus effectively ruled on the merits of his

118

ineffective assistance of appellate counsel claims, when the Court determined those claims lacked merit and therefore could not serve as cause to excuse the default of the correlating substantive claims of error.   The Magistrate Judge is correct.

Sub-claim A correlates to Petitioner's Nineteenth Claim for Relief; sub-claim B correlates to Petitioner's Seventh Claim for Relief; sub-claim C correlates to sub-claim C of Petitioner's Eleventh Claim for Relief, and sub-claim D correlates to sub-claims A, D and E of Petitioner's Ninth Claim for Relief.   In previously finding claims Nineteen, Seven, Eleven (C), and Nine (D) procedurally defaulted, Judge Sargus determined that the ineffective assistance of appellate counsel for failing to raise those claims also lacked merit.   (Opinion and Order, ECF No. 30, at 47-52, 54-68, 74-81.)   Accordingly, the Court dismisses Petitioner's Twentieth Claim for Relief with prejudice.   The Court declines to issue a COA.

## III.    Leave to Amend

For the past eight years, Petitioner has made multiple attempts to amend his habeas petition to add claims challenging the constitutionality of Ohio's lethal injection method of execution, as well as a claim that Ohio's capital sentencing scheme, and particularly how it operated in his case upon resentencing, was unconstitutional pursuant to *Hurst v. Florida*, 136 S.Ct. 616 (2016).   Ultimately, his attempts have been denied by well-reasoned decisions by the Magistrate Judge.   (ECF Nos. 186, 190, 196, 201, and 205.)   Petitioner followed each with objections.   (ECF Nos. 187, 193, 197, 202.)

In a November 8, 2017, Decision and Order, (ECF No. 186), the Magistrate Judge denied Petitioner leave to amend his petition to add lethal injection method of execution claims, on the

basis of *In re Campbell*, 874 F.3d 454 (6th Cir. 2017), which held that such claims are not

cognizable in habeas corpus and must proceed under § 1983.   (ECF No. 186.)   That decision

also restated an earlier denial of Petitioner's motion to add a *Hurst* claim, on the basis that *Hurst*

is not applicable to cases on collateral review.   The Magistrate Judge filed a December 13, 2017,

Supplemental Memorandum (ECF No. 190) and a January 19, 2018, Second Supplemental

Memorandum on Proposed Amendments (ECF No. 196), both of which provided additional

discussion regarding why *Hurst v. Florida* does not apply on collateral review.   On August 7,

2019, and after this case was transferred to the Undersigned, the Magistrate Judge issued a Third

Supplemental Memorandum on Proposed Amendments (ECF No. 201), reiterating his prior

decision that Petitioner should not be permitted to add claims under *Hurst* or to add lethal

injection invalidity claims.   Finally, on March 10, 2020, the Magistrate Judge issued a Fourth

Supplemental Memorandum on Proposed Amendments (ECF No. 205), citing the United States

Supreme Court decision in *McKinney v. Arizona*, 140 S.Ct. 702 (2020), which held *Hurst* does

not apply on collateral review.

          "A motion to amend a habeas corpus petition is, per 28 U.S.C. § 2242, subject to the

same standards which apply generally to motions to amend under Fed. R. Civ. P. 15(a)."

*Lindsey v. Jenkins*, No. 1:03-cv-702, 2018 WL 4654691, *4 (S.D. Ohio, Sept. 27, 2018).   A

motion to amend is a non-dispositive motion which magistrate judges are authorized to decide in

the first instance.   28 U.S.C. § 636(b)(1)(A).   *Monroe v. Houk*, No. 2:07-cv-258, 2016 WL

1252945, at *1 (S.D. Ohio, Mar. 23, 2016).   A non-dispositive ruling can be set aside only if it

is "clearly erroneous or contrary to law."   Fed. R. Civ. Pro. 72(a); 28 U.S.C. § 636(b)(1)(A).   A

court reviews a magistrate judge's legal conclusions *de novo*.   *McKnight v. Bobby*, No. 2:09-cv-

059, 2017 WL 1154119, at *1 (S.D. Ohio Mar. 28, 2017). Because Petitioner's objections all involve questions of law, this Court applies a *de novo* standard of review.

For the reasons discussed in the Magistrate Judge's November 8, 2017 Decision and Order, ECF No. 186, as well as the supplemental memoranda, ECF Nos. 190, 196, 201 and 205, the Court denies Petitioner's request for leave to amend his petition. In this case, amendment would be futile because Petitioner's proposed *Hurst* claim and his proposed method-of-execution claims would not survive a motion to dismiss. Specifically, Petitioner is denied leave to add a *Hurst* claim, because *Hurst* "do[es] not apply retroactively on collateral review." *McKinney v. Arizona*, 140 S. Ct. 702, 708 (2020).[3]

Furthermore, Petitioner is denied leave to amend his petition to add lethal injection invalidity claims, because such claims are not cognizable in habeas corpus on the basis of *In re Campbell*, 874 F.3d 454 (6th Cir. 2017). *See Bays v. Warden*, No. 18-3101, 2020 WL 1514841, *1, 5-6 (6th Cir. Mar. 30, 2020) (discussing the Sixth Circuit's evolving position regarding the proper "procedural vehicle" for lethal injection claims and finding that "this court's precedent in *In re Campbell*, 874 F.3d 454 (6th Cir. 2017), forecloses Bay's argument that his lethal injection claims are cognizable in habeas rather than as a claim under 42 U.S.C. § 1983"). The Court overrules Petitioner's objection that *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) abrogates *In Re Campbell*. As the Magistrate Judge reasoned, "*Bucklew* did not mention *Campbell* or any other

---

[3] The Court notes that the state courts have considered and denied Chinn's motion for a new sentencing phase of his trial on the basis of *Hurst*. *State v. Chinn*, No. 28345, 2020 WL 116037, *5 (Ohio App. 2nd Dist. Jan. 10, 2020) ("We conclude that Chinn has not demonstrated a right to have the holding in *Hurst* applied retroactively to his case. We further conclude that even if *Hurst* did apply, Chinn has not demonstrated the type of Sixth Amendment violation found in that case.").

case in which a sister circuit may have held that method of execution claims were not cognizable

in habeas . . . ."   (ECF No. 201, at 7) (quoting *Raglin v. Mitchell*, No. 1:00-cv-767, 2019 WL

3797967, *1 (S.D. Ohio Jun. 10, 2019)).   This position is supported by the Sixth Circuit's very

recent decision in *Bays*, applying *Campbell*, after *Bucklew*, to foreclose a lethal injection

invalidity claim in habeas corpus.   *Bays*, 2020 WL 1514841, *5-6.   The decision to deny

Petitioner leave to amend does not leave Chinn without remedy, as he is a plaintiff in *In re: Ohio*

*Execution Protocol Litigation*, Case No. 2:11-cv-1016, the consolidated litigation under

42.U.S.C. § 1983, challenging the constitutionality of Ohio's method of lethal injection.   That is

where Chinn can and must pursue his method-of-execution claims.

In summary, permitting Petitioner to amend would be futile because his proposed *Hurst*

claim and his proposed method-of-execution claims would not survive a motion to dismiss.   The

Court hereby **ADOPTS** the Magistrate Judge's November 8, 2017, Decision and Order (ECF No.

186), the Second Supplemental Memorandum on Proposed Amendments (ECF No. 196), the

Third Supplemental Memorandum on Proposed Amendments (ECF No. 201), and the March 10,

2020, Fourth Supplemental Memorandum on Proposed Amendments (ECF No. 205).   The Court

**OVERRULES** Petitioner's objections. (ECF Nos. 187, 193, 197, 202.)   Petitioner is denied

leave to amend his petition.

## IV.    Conclusion

For the foregoing reasons, the Court **ADOPTS** and **AFFIRMS** the Magistrate Judge's

Original R&R (ECF No. 60) and Supplemental R&R (ECF No. 86), and hereby **OVERRULES**

the Objections (ECF No. 63) and Supplemental Objections (ECF No. 91.)

Furthermore, the Court **ADOPTS** and **AFFIRMS** the Magistrate Judge's November 8, 2017, Decision and Order (ECF No. 186), and Supplemental Memoranda on proposed amendments (ECF Nos. 190, 196, 201 and 205) and **OVERRULES** Petitioner's objections. (ECF Nos. 187, 193, 197, 202.)   Petitioner is denied leave to amend his petition.

The Court **CERTIFIES** the following issues for appeal:   Claims One, Three and Thirteen.   The Court **DENIES** a certificate of appealability as to all other claims.

The Court hereby **DISMISSES** this habeas corpus action **WITH PREJUDICE**.


**IT IS SO ORDERED.**

**/s/ Sarah D. Morrison**
**SARAH D. MORRISON**
**United States District Judge**

**Date:**  5/29/2020